UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JEREMY SORENSON, an individual,
RANDAL REEP, an individual,
RANDAL SMITH, an individual,
ADAM MCLEAN, an individual, and
JAMES DOYLE, an individual, on
behalf of themselves and all others
similarly situated,

          Plaintiffs,                       CASE NO. 1:17-cv-541-ELR

v.

DELTA AIR LINES, INC.,
a Delaware Corporation.

          Defendant.

_____

PLAINTIFF REEP'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.   INTRODUCTION

This Opposition to Defendant Delta Airlines' ("Delta") Motion for Summary

Judgment ("MSJ") is submitted on behalf of Plaintiff RANDAL REEP ("Reep"), in

an abundance of caution and in consideration of existing circumstances. [Doc. 178].

At issue in the MSJ are the common policies and practices of Delta toward pilots

with military responsibilities, and whether these policies and practices violate the

Uniformed Services Employment and Reemployment Rights Act ("USERRA").

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs filed their lawsuit in the United States District Court for the Northern District of Georgia on February 13, 2017. [Doc. 1]. On March 10, 2017, Plaintiffs filed their First Amended Complaint. [Doc. 12]. Delta filed its Motion to Dismiss on April 6, 2017 [Doc. 13], which was Denied on February 16, 2018. [Doc. 24].

As this Court recognized, Congress enacted USERRA:

(1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against persons because of their service in the uniformed services.

38 U.S.C. § 4301; Sorenson v. Delta Air Lines, 2018 U.S. Dist. LEXIS 244076, *12-13 (N.D. Ga. 2018) [Doc. 24, p. 10]. USERRA prohibits discrimination in employment if membership in the armed services "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership." Id.; 38 U.S.C. § 4311(c)(1).

Delta violated USERRA by: (1) undercalculating pension contributions for pilots who took military leave of absence ("MLOA"); (2) undercalculating profit-sharing payments during MLOA; (3) restricting vacation accrual to the first 30 days

of each MLOA; and (4) discriminating against pilots due to their military service.

Delta's company culture of discrimination and harassment against its military personnel is evidenced by a robust factual record establishing USERRA violations:



(Deposition of Barry Behnfeldt ("Behnfeldt Depo."), Ex. 19 (Email exchange circulated between Delta supervisors overseeing MLOA seeking to modify pilot behavior.) [Doc. 198-19.1, 19.2]) In 2015, Captain Chris Frederick (Delta's then Regional Director and Chief Pilot in Atlanta) summarized Delta's culture of severe and pervasive harassment toward its pilots with military responsibilities in an email exchange with Barry Behnfeldt (Delta's Flying Operations Special Assignment Supervisor in charge of overseeing MLOA), wherein he states:

This is a case of the airlines subsidizing the military/government. Cooperation is one thing, but this has a direct impact on operations. It will make us start looking at whether to hire these guys or not to. Then, we show intent to be more discriminatory, they start leaving the reserve/guard in droves. Cause and effect. (Deposition of Christopher Frederick ("Frederick Depo.") Ex. 2.1 [Doc. 199-2].)

Delta's policies and practices are designed to discourage and reduce MLOA, to persuade pilots to resign from military service, and to underfund benefits for pilots who take MLOA. (Behnfeldt Depo., Exs. 15, 17.1 [Docs. 198-15, 198-17].) This enables Delta to employ fewer pilots, to minimize its USERRA responsibilities and to increase profits to the detriment of Plaintiffs and the Class. (Deposition of James Mangie ("Mangie Depo"), Exs. 1.1, 8-9,11 [Docs. 195-1, 195-8, 195-9, 195-11].)

## III. STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To defeat summary judgment, the opposing party only has to provide "specific facts showing that there is a genuine issue for trial." Id. When determining whether a genuine issue of material fact exists, evidence must be considered in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.   OVERVIEW OF USERRA

"In 1994, Congress passed the Uniformed Services Employee and Reemployment Rights Act (USERRA) with the goal of prohibiting civilian employers from discriminating against employees because of their military service. 38 U.S.C. §4301(a)." White v. United Airlines, Inc., 987 F.3d 616, *2 (7th Cir. Feb. 3, 2021). USERRA affords broad protections against discrimination, providing that service members "shall not be denied … any benefit of employment by an employer on the basis of that membership...." 38 U.S.C. §4311(a). It is settled and longstanding law that military rights statutes such as USERRA are "always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation." Boone v. Lightner, 319 U.S. 561, 575 (1943).

"A person who is reemployed under [USERRA] is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed." 38 U.S.C. § 4316(a). If benefits are seniority-based benefits, the benefits accrue as though the employee was continuously employed, regardless of the length of military leave. 20 C.F.R. § 1002.210.

If benefits are non-seniority-based benefits, employees on military leave are

entitled to the same benefits provided to other employees on a leave of absence pursuant to 38 U.S.C. § 4316(b)(1)(B). Section 4316(b)(1) "adopts a simple formula: employees who take military leave from their jobs must receive the same 'rights and benefits' provided to employees absent for other reasons." Travers v. Fed. Express Corp., 8 F.4th 198, 202 (3rd Cir. 2021). If there are multiple types of leaves of absences available, "the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services." White, 987 F.3d at 621 (quoting 20 C.F.R. § 1002.150(b)).

## V.   LEGAL ARGUMENT

### A.   Genuine Issues of Fact Exist for Trial on Plaintiffs' Cause of Action for Pension Contributions in Violation of USERRA.

Pension plan benefits must accrue as though the employee was continuously employed. 20 C.F.R. § 1002.210. "[T]he employer must allocate the amount of its make-up contribution for the employee … in the same manner and to the same extent that it allocates the amount for other employees during the period of service." 20 C.F.R. §1002.261; 38 U.S.C. §4318(b)(1). The employee's pension contributions must be based on the compensation the employee would have reasonably received but for the period of military service. 38 U.S.C. § 4318(b)(3).

Delta's "has not established that pilot pay is 'uncertain.'" (Deposition of Candice Rosevear ("Rosevear Depo."), Ex. 2, p. 6, ¶13 [Doc. 173-2].) Delta is

incorrect with regard to "how to interpret and compare standard deviations, making all of his conclusions meaningless," and "the Speakman Report presents invalid comparisons which lead to invalid conclusions." (Id. at p. 8, ¶18, p. 9, ¶30.)

### 1. Delta Underfunded Pension Contributions to Pilots on Military Leave During the 2005-2011 Time Period.

Under USERRA a look back for past earnings can only be used if deemed earnings are "not reasonably certain." 38 U.S.C. §4318(b)(3)(B). "Where the rate of pay the employee would have received is not reasonably certain, such as where compensation is based on commissions earned," only then may a look back be used (but even then it is not required). 20 C.F.R. §1002.267(b)(1). Between January 1, 2005 and December 31, 2011, Delta used the average *pay* a pilot received in the previous 12-months to calculate pension contributions while on MLOA. (Declaration of Charles Billy ("Billy Decl."), Ex. 1.) Years ago, the pilot union ("ALPA") informed Delta that pilot earnings are "reasonably certain" and the look-back method to calculate deemed earnings violated USERRA.  (Billy Decl., ¶6; Ex. 2.) ALPA suggested using an average for monthly pay hours, along with actual hourly pay rates with longevity and contractual pay raises, and the hourly pay rate increases caused by "position changes." Id.

Delta changed its policy in 2012 after its "Labor Relations" department agreed with ALPA that Delta's then "current position" (i.e. the 12-month look back) was

not USERRA compliant; and an average monthly pay hour value along with actual hourly pay rate increases, is "a fair estimation of the average pilot's earnings" which "should enhance our USERRA compliance." (Billy Decl., ¶¶ 7-8; Ex. 3, pp. 357974, 357994.) Delta agreed that pilot earnings *are* reasonably certain, but Delta did not retroactively correct prior pension underpayments. (Billy Decl., ¶7-10.)

### 2. Delta Underfunded Pension Contributions to Pilots on Military Leave During the Time Period from 2012-Present.

Since 2012, Delta has utilized an artificially low average for pay hours in its calculations called Average Line Value ("ALV"). Id. at ¶7. Delta also uses hourly Pay Rates that account for contractual pay increases, but does not use pay rate increases caused by seat movement.[1] Id. at ¶¶7, 9, 11.

ALV is "the number of hours established by [Delta] that is the projected average of all regular line values, for a position, for a bid period and is" between 71 and 85 pay hours per month. (Doc. 178-3, p. 14, §2(A)(29).)[2] "ALV changes month-to-month," and "is derived from the [future] bid award." (30(b)(6) Deposition of Delta Airlines, Inc. ("30b6 Depo."), p. 31:13-21 [Doc. 200].) ALV is a forward-looking estimate and not a true reflection of the pay hours that pilots will receive.

All pilots, available for a full bid period, and not absent due to some form of

---

[1] There is no dispute that Pay Rates are reasonably certain.
[2] Delta only provides sections of the most recent PWA.  (Billy Decl., ¶12.)

leave, are *scheduled* to receive monthly pay hours between 71 and 85 pay hours per month. (Billy Decl., ¶20; 30b6 Depo., p. 27:16-20; [Doc. 200]; Doyle Depo., Ex. 6, p. 26, §4(C) [Doc. 170-6].)  Pilots receive pay for time other than flying, such as vacation, sick time, jury duty, deadhead time, overtime or premium time and time on call. (30b6 Depo., p. 20:18-24 and p. 26:5-16 [Doc. 200].) "[S]easonal variations in compensation" are to be included in earnings calculations and in determining if compensation is reasonably certain. 20 C.F.R. §1002. ALV exhibits strong seasonality that is depicted in Exhibit 1 of the Rosevear Expert Report. (Rosevear Depo., Ex. 1, p. 12, ¶23 [Doc 173-1]; 30b6 Depo., Ex. 2 [Doc. 200-2].) ALV is an artificially low *average,* so using it (for both short-term and long-term MLOA) undercalculates deemed earnings. Delta must use the Average Pay Hours ("APH") that Delta actually compensates pilots continuously employed, and not impacted by military leave. Since 2012, Delta has tracked APH for its pilots. (Billy Decl., ¶14.)

Rather than forecasting "future"  hours, APH takes into account compensation that was actually paid to pilots, including overtime/premium pay, sick pay, vacation, additional trips picked up by pilots on days off, weather events, or other operational events that increase pay, which are completely omitted by ALV. (Id.; 30b6 Depo, p. 26:1-12 [Doc. 200]; Ex. 3 [Doc. 200-3].) When placed on the same chart as ALV, APH follows identical seasonality trends as ALV, but "APH is consistently greater

than ALV" with an average differential across the entire Class Period of 14.01 hours per month. (Rosevear Depo., Ex. 1, p. 12 ¶¶ 23-24, p. 21, Ex. 1 [Doc. 173-1].) Average APH is 90.47 hours and average ALV is 76.46 hours per month. Id. at ¶23.

Delta admits that an *average* for pay hours is "a fair estimation of the average pilot's earnings," but it chose an average that is artificially low, economically favorable to Delta, which undercalculates deemed earnings, and therefore pension contributions, when compared to pilots with no military obligations. (Billy Decl., ¶8.) Had Delta properly used APH data to calculate deemed earnings, military pilots would have received higher pension and profit-sharing distributions, amounting to over $120 Million in damages. (Rosevear Depo. Ex. 1, pp. 19-20, ¶41[Doc. 173-1].)

Delta argues that due to the variations in pay of the five named Plaintiffs, deemed earnings are not reasonably certain, but Delta ignores this fatal point: all five had MLOA and/or military duty throughout their employment, which caused their monthly pay hours to vary significantly, and caused their annual earnings to be significantly reduced, when compared to pilots with no military obligations. (Billy Decl., ¶¶22-25, 27-28.) Plaintiff Reep adjusted his Delta schedule as contract provisions allowed to avoid taking formal MLOA, but he performed military duty every month from March 2001 through December 2016, because he was specifically harassed by Delta for taking too much MLOA, and he informed Delta of his actions.

(Deposition of Jim Graham ("Graham Depo."), Ex. 12.1 [Doc. 201-12]; Declaration of Randal Reep ("Reep Depo."), Ex. 3 [Doc. 172-3]; Billy Decl., ¶¶22, 23.)[3]

The appropriate and necessary comparator is the APH of the larger pool of the Delta pilot population who were not on leave during the period. (Billy Decl., ¶14.)

Pilot pay is reasonably certain and the standard deviation of the respective five named Plaintiffs' pay hours is irrelevant based on their performance of military duty.

## B.   Genuine Issues of Fact Exist for Trial on Plaintiffs' Cause of Action for Profit-Sharing in Violation of USERRA.

Delta calculates profit-sharing for pilots on MLOA in the same flawed way it undercalculates pension contributions: by using an artificially low pay hour average upon which to base the deemed earnings a pilot would have earned but for MLOA, resulting in profit-sharing payments significantly lower than if no MLOA occurred. (30b6 Depo., Ex. 3[Doc. 200-3].) Profit-sharing compensation is pensionable, so the undercalculation also leads to additional pension underfunding. [Doc. 178-3, p. 58].

Plaintiffs are not claiming Delta's profit-sharing plan is an ERISA plan under Section 4318. Scanlon v. American Airlines Group, Inc., 384 F. Supp. 3d. 520 (E.D. Pa. 2019). Delta allows pilots absent due to MLOA to participate in profit-sharing, such that while on MLOA "his or her Annual Compensation shall be equal to the

---

[3] "The vast majority of [Reep's] military obligations were performed on days where [he] did not need to use Military Leave." (Graham Depo., Ex. 12.1 [Doc. 201-12].)

earnings the Participant would have received had the individual been actively employed by Delta." [Doc. 178-3, pp. 170-171, §2.3(b).]

When a company choses "to extend such benefit as a right of employment, it [is] bound by the other provisions of USERRA (such as Sections 4311, 4312, and 4313) not to reduce the amount of this employment benefit on the basis of the pilot's absence from work on account of military service." Huhmann v. Federal Express Corp., 874 F.3d. 1102, 1112 (9th Cir. 2017). Delta chose to provide profit-sharing to its MLOA pilots, and is obligated to properly calculate deemed earnings using APH reflecting what a pilot would earn but for MLOA. (30b6 Depo., Ex. 3 [Doc. 200-3].)

**C.    Genuine Issues of Fact Exist for Trial on Plaintiffs' Cause of Action for Vacation Time Accrual in Violation of USERRA.**

If there are multiple types of leaves of absences available, "the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services." White v. United Airlines, Inc., 987 F.3d at 621. (quoting 20 C.F.R. § 1002.150(b)). Duration and "other factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered" for comparability. Id.

Delta pilots do not accrue vacation if on MLOA in excess of 30 consecutive days. (Billy Decl. ¶31, Ex. 13, p. 1058, § 7.b.3.) At least two leaves offered to Delta pilots provide enhanced vacation accrual and are comparable to MLOA: Special

12

Conflict Military Leave ("SCML") and Known Leave of Absence ("KLOA").

### 1.    SCML is Comparable to MLOA.

Since 2001, Delta has provided SCML benefits that allow the accrual of vacation for up to 60 consecutive days of MLOA. (30b6 Depo., pp. 84:8–86:19 [Doc. 200]; Billy Decl., Exs. 14, 15.)  SCML must be comparable to MLOA, because both are military leave, have comparable durations, comparable purpose and there would be a comparable ability of service members to schedule either leave. Id. Any argument that SCML is not comparable to MLOA would be illogical.

Delta's own expert, Robert Speakman, agrees that general MLOA and SCML are comparable as he lumps them together in his military leave data analysis, he included SCML in and with the military leave calculations, and he acknowledged that SCML is included in the military leave date database.  (Deposition of Robert Speakman ("Speakman Depo."), pp. 46:18–47:16 [Doc. 204].) Vacation Time Accrual for up to 60 days for some military pilots, but not others, violates USERRA.

### 2.    KLOA is Comparable to Military Leave.

During KLOA pilots remains on "active status" and continue to accrue vacation during the entire KLOA. (Billy Decl., Ex.13, p. 1058, §7(B)(3).) KLOA's are typically up to 90 days in length, but consecutive KLOA's can be infinite in length, it is comparable to MLOA, and cannot be unilaterally revoked. (30b6

Depo., pp. 91:13-92:20 [Doc. 200]; Billy Decl., Ex. 16, pp. 488986, 488988.)

**D.    Genuine Issues of Fact Exist for Trial on Plaintiffs' Cause of Action for Discrimination in Violation of USERRA.**

**1.    *Count 1: General Harassment***

The primary purposes of USERRA are "to *encourage* noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service" and "to prohibit discrimination against persons because of their service." 38 U.S.C. §4301(a).

> An employer engages in a prohibited act under Section 4311 "if the person's membership. . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership." 38 U.S.C. § 4311(c)(1). Thus, an individual's military status need not be the sole factor for the decision; it needs only to be a motivating factor. Finally, harassment claims brought pursuant to USERRA, like those under Title VII, should be analyzed using the principle announce by the Supreme Court in Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986): harassment is actionable when it is "sufficiently severe or pervasive to alter conditions of [the victim's] employment and create an abusive working environment." See Dees v. Hyundai Motor Mfg. Ala., LLC, 605 F. Supp. 2d 1220, 1228 (M.D. Ala. 2009).

Sorenson, supra, 2018 U.S. Dist. LEXIS 244076, *19-21. [Doc. 24, pp. 17-18]. "Indeed, [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." Brandsasse v. City of Suffolk, Va., 72 F.Supp.2d 608, 617 (E.D.Va. 1999). "Circumstantial evidence plays a critical part in these cases, 'for discrimination is seldom open or

notorious.'" Coffman v. Chugach Support Services, Inc., 411 F.3d 1231 (11th Cir.

2005), quoting Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1014 (Fed Cir. 2001).

> A court can infer a discriminatory motivation from a variety of considerations, such as: (1) the temporal proximity between the employee's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members protected by the statute combined with its knowledge of the employee's military activity; and (4) disparate treatment of similarly situated employees.

Annarumma v. City of High Springs Fla., 846 Fed. Appx. 776, 782 (11th Cir. Feb.

11, 2021); Coffman, 411 F.3d at 1238. "[I]n USERRA actions there must be an

initial showing by the employee that military status was at least a motivating or

substantial factor in the agency action, upon which the agency must prove, by a

preponderance of evidence, that the action would have been taken despite the

protected status." Coffman, 411 F.3d at 239, quoting Sheehan, 240 F.3d at 1014.

The substantial evidence of severe and pervasive harassment through

discriminatory policies and practices toward Delta's military pilots is astonishing

and overwhelming. Through company-wide policies, Delta sought to dissuade and

prevent its pilots from performing military duty when it was inconvenient for Delta's

schedule, or when it might require Delta to hire additional pilots to account for

periods of military service. By implementing discriminatory policies that deterred

military service, and by making targeted examples of a few pilots such as the

Plaintiffs, who were relatively senior both in the military and at Delta; Delta's harassment has been successful in modifying military pilot behavior to benefit Delta. It has changed the terms and conditions of employment for all military pilots, and a loss of employment for Reep, McLean, Doyle and Smith.

Employers are not permitted to deny military leave or pick the days of military service, and employees are "not required to accommodate his or her employer's interests or concerns regarding the timing, frequency or duration of the uniformed service." 20 C.F.R. § 1002.104.[4] Delta has made a significant effort to dissuade pilots from taking military leave near holidays by making it more difficult for pilots to submit military leave if it touches a holiday or the summer travel season. (Mangie Depo., Exs. 1,8-9, 11 [Docs. 195-1, 195-8, 195-9, 195-11].) Delta even has a MLOA Holiday Request Flow and checklists for managers to follow to coerce pilots to move the military service dates. (Mangie Depo., Exs. 1, 9 [Docs 195-1, 195-9].)

In a single email on December 11, 2014, Barry Behnfeldt, Flight Operations Special Assignment Supervisor in charge of military affairs at Delta, clearly spells out how and why Delta harasses its military affiliated pilots. Delta wants military

---

[4] Delta was admonished in December 2016 when it was told by the Employer Support at the Guard and Reserve ("ESGR") that "[i]t appears you guys are telling people when they can take military leave…that's a no in regards to USERRA, you can't tell them when…" (Mangie Depo., p. 25:16-17, p. 206:4-6 [Doc. 195]; Ex. 38 [Doc. 195-38].)

pilots to understand that when MLOA "touches a certain date, we now ask them to fill out a military leave log and they are probably going to get a call from someone and someone is maybe going to call their unit or wing leadership to check on some things.  Is this 'harassment'? To some it probably is." (Behnfeldt Depo., Ex. 5.2 [Doc. 198-5].) Shortly prior to becoming in charge of military affairs in late 2014, Behnfeldt expressed his belief that this type of questioning of a service member's military leave is harassment, or at least "boarders on harassment." (Behnfeldt Depo., Ex. 4.1 [Doc. 198-4]; Behnfeldt Depo., pp. 20:25–21:21; 24:12–26:23 [Doc. 198].)

Delta's efforts to change behavior worked, and Jim Mangie informed Behnfledt that "[t]he calls have a good long term desired effect." (Mangie Depo. Ex. 3 [Doc. 195-3]; Graham Depo. Ex. 8 [Doc. 201-8].) Over "[t]he last 3 or 4 years we called every pilot" when there was a holiday military leave notification, and "[t]he problem became much smaller every year." (Mangie Depo. Ex. 3.1 [Doc. 195-3].) Delta documented a 59% reduction in MLOA taken on or near a holiday between 2015 and 2016. (Behnfeldt Depo. Ex 29 [Doc. 198-29].)

Plaintiffs' expert, Dwight Steward, Ph.D., was also able to establish that said policies caused military pilots to avoid taking military leave during holiday periods. (Billy Decl., Ex. 21 at Ex. B ("Steward Expert Report."), ¶¶ 6, 12-19.) A "comparison of the holiday military leave and non-military leave rates shows that

military pilots were nearly one-third less likely to take military leave on a given holiday than non-military pilots were to take vacation on the same holiday." Id. at ¶¶ 6, 19.  Incredibly, pilots were far more likely and allowed to take vacation over holidays than they were to perform military duty near the same holiday. Id.

The culture of harassment against MLOA is pervasive throughout Delta.[5]  It is accepted to use phrases like "I 'convinced' him" to remove the military leave, "I made him an offer he couldn't refuse…" and "[i]sn't he the guy that suddenly got his shoulder dislocated after visiting [Chief Pilot] Goedeke?" (Behnfeldt Depo., Ex. 25.1 [Doc. 198-25].) The harassment is designed to "reset [the pilot's] expectations" (Id. at Ex. 11.1 [Doc. 198-11]), "move the needle" (Id. at Ex. 23.1 [Doc. 198-23]), to "change the culture" (Id. at Ex. 10.1 [Doc. 198-10]), or result in the pilot preforming military duty on days off (Id. at Ex. 5.1 [Doc. 198-5].)

"Delta has a very bad reputation for its current military policy, both with its own pilots and the pilots of other airlines. And that reputation continues to get worse." (Graham Depo., Ex. 11, p. 3 [Doc. 201-11].) "Delta is anti-military, that our guys are being singled out and punished for using any MLOA." (Behnfeldt Depo., Ex. 36.1 [Doc. 198-36].) Delta is waging a "jihad" against military pilots and there

---

[5] Delta also harasses pilots who it views as "liberally" taking military leave, and regularly criticizes pilots "about [] use of mil leave and his [] priorities to [Delta as the] primary employer." (Behnfeldt Depo., Ex. 30 [Doc. 198-30].)

is a "toxic level of distrust" between Delta and military pilots. (Frederick Depo., Ex 8 [Doc. 199-8]; Deposition of Phil Davis ("Davis Depo."), Exs. 2-3 [Docs. 197-2, 197-3].) MLOA users have even been called "baby killers." (Deposition of William Underwood ("Underwood Depo."), Ex. 7 [Doc., 202-7].)

Managers write that Delta "need[s] to stop hiring as many military guys" (Behnfeldt Depo., Ex. 26 [Doc. 198-26]) and "[t]his is the kind of thing that makes one think twice about hir[ing]" military pilots. (Frederick Depo. Ex. 2.2 [Doc. 199-2].) If a pilot's behavior didn't change, Delta would "put the screws to" pilots (Behnfeldt Depo. Ex. 6.1 [Doc. 198-6]) and "bump things up a notch or two." (Davis Depo. Ex. 8.1 [Doc. 197-8].) Delta brought Plaintiff Doyle "in for an ass kicking." (Behnfeldt Depo., Ex. 21.1 [Doc. 198-21]; Davis Depo. Ex. 17.1 [Doc. 197-17].)

USERRA only requires one of seven forms of documentation, and any one of them is sufficient. 20 C.F.R. § 1002.123. But it was common for Delta to demand multiple items, at times credit card statements and military flight records, among other things, even for short term MLOA when no documentation is actually required. (Davis Depo., p. 176:7-9 [Doc. 197], Exs. 20, 25.1 [Docs. 197-20, 197-25]; Mangie Depo. Ex. 22.1 [Doc. 195-22]; Underwood Depo., pp. 251:7-9, 253:1-10[Doc. 202.])

In April 2015, Delta was looking "to take a few guys to the mat" to improve overall productivity, and looking for "'that case' where we want to go full tilt

against an MLOA abuser." (Frederick Depo., Exs. 11.1, 15.1, 21 [Docs 199-11, 199-15, 199-21].) Delta's Reep and Doyle investigations commenced in April 2015. (Id. at Ex. 17 [Doc. 199-17]; Davis Depo., Ex. 16.1 [Doc. 197-16].)

### 2.    *Count 2: Concurrent Duty*

This Court found that Plaintiffs have alleged a plausible claim based on Delta's alleged discriminatory "Concurrent Duty" policy whereby "pilots may not perform any military service on the same day that they have obligations to [Delta], but they may engage in any other activity." Sorenson, supra, 2018 U.S. Dist. LEXIS 244076, *24 [Doc. 24, p. 21]. It is discriminatory because it *only* prohibits employees from performing military service, but nothing else.[6] "Many Delta pilots have other careers," but this policy does not prohibit pilots from engaging in *any* other activity. (Billy Decl., Ex. 5, p. 607866, §11.5.7; Ex. 7, p. 285264, §28.5.6; Ex. 19, p. 94064.)

"[M]ilitary pilots are being singled out for double-dipping where pilots with side-business (sic) are not." (Behnfeldt Depo. Ex. 36 [Doc. 198-36].) "[A] pilot can have a business at home and get paid for that while sitting long call (or even short call), but a Military pilot cannot perform Military service while on long call without

---

[6] From 2006 until August 30, 2016, Delta's concurrent duty policy was minimal and listed in Delta's Flight Operations Manual ("FOM") as follows: "It is Delta's policy that a pilot participating in active military duty is ineligible to perform Delta duties in any capacity." (Billy Decl., ¶ 18.) It was greatly expanded in the FOM after August 2016.  (Id.)

fearing for retribution if he is ever asked for orders." (Id.) Similarly, if a pilot calls in sick from Delta such that the pilot can't fly, but can perform other activities, that pilot is not prevented from performing any other non-military activity while they are recovering on paid sick leave. But Delta's policy prevents that person from performing military duty, unless the pilot goes off of paid sick leave and on unpaid MLOA. (Graham Depo., p.133:13-134:8, 135:18-136:2 [Doc. 201].) The pilot can work as a dentist on the same day he or she works for or is sick from Delta, but that same pilot cannot perform work as a military dentist. (Id. at. p. 99:19-100:7; Davis Depo., pp. 193:10-194:11 [Doc. 197]; Mangie Depo., p. 202:7-19 [Doc. 195].) A pilot can fly their own airplane, but they can't fly a military airplane. (Deposition of Brian Tully ("Tully Depo."), p. 63:19-21, p. 64:4-13 [Doc. 205].) The pilot can drink alcohol on the same day, but can't perform military duty. (Graham Depo., p. 104:2-6 [Doc. 201]; Billy Decl., ¶19.)

USERRA only requires employees to provide verbal or written notice of their military duty if the employee is _absent_, as in "the employee intends to _leave_ the employment position to perform service in the uniformed services." 38 U.S.C. §4316(b); 20 C.F.R. § 1002.85(a)(emphasis added); 38 U.S.C. §4312. If one can perform military duties on personal days, on personal time, or one can perform tasks such as telecommuting or administrative work from the comfort of one's own home

or hotel room, one need not inform the employer nor request time off. The timing only needs to be "reasonable under the circumstances," if an absence from the employer is required. 20 C.F.R. § 1002.85(d).

Delta's policies require pilots to notify Delta of all military duty, including on days off from Delta, even if MLOA isn't required to accomplish the military duty. (Frederick Depo., Ex. 20. [Doc. 199-20].) Non-military pilots are not required to report any activity to Delta that occurs during their free time. (Billy Decl., ¶34.)

A military service member can simultaneously "moonlight" at a civilian employer, and is not required to inform the civilian employer about military duty unless it causes the employee to be unavailable. Drake v. Tucson, Inc., 1010 WL 148212, at *1-3, 10-11 (D. Ariz. Jan 12, 2010). "From [the] military's perspective, if someone is on 120-day orders; when they have time not assigned to military duty, they may fly for their commercial carrier." (Deposition of Theresa Livingston ("Livingston Depo."), Ex. 2.6, Doc. 196-2].) The military does not limit pilots' ability to moonlight because it can't meet operational requirements without guard and reserve pilots. (Id. at p. 2.2.)

Some of Delta's Chief Pilots and managers have questioned the legality of the concurrent duty policy and sought relief to allow pilots to perform military duty on their own time, including while on reserve and on layovers. (Behnfeldt Depo., Ex.

34 [Doc. 198-34].) "This is a slippery slope we've gone down w/ our concurrent duty policy. I think the reasonable choice is to say [the pilot] should be able to perform military duty AFTER he has completed Delta duty." (Id. at Ex. 32.2 [Doc. 198-32].) "Webster's defines concurrent as 'happening at the same time'"… and "[i]t's not concurrent when [military duty is] done AFTER (or even before) a [Delta] duty period. Conflict is conflict, but after-or perhaps even before-is not a conflict." (Id. at p. 1.) Delta Chief Pilots even admit that they themselves performed concurrent duty, and performed military duty after they called in sick for Delta. (Underwood Depo., p. 47:17-19; p. 48:6-14, 23-25; p. 49:18-24; p. 45:14 -46:18 [Doc. 202].)

The considerations looked at recently by the 11th Circuit in Annarumma to determine discriminatory motivation exist here. See Annarumma, 846 Fed. Appx. at 782. Delta's policy alters the terms and conditions of employment for every military pilot because there is a fear of punishment, retaliation and termination, with the associated loss of pay and benefits. (Reep Depo., Ex. 12, pp. 7-8 [Doc. 172-12].)

On March 17, 2015, Reep attempted to take MLOA over four days, April 3-6, 2015, but Delta asked for verification because it fell over Easter. (Frederick Depo., Ex. 16.1 [Doc. 199-16].) Reep provided military orders that included April 1, 2015 through July 15, 2015. (Reep Depo., Ex. 4, p. 2 [Doc. 172-4].) Reep did not report all military duty days to Delta because he was available and allowed to work for

Delta by his military unit, his military commanders were aware of his Delta employment, and his military commanders even informed Delta that Reep would have been able to "respond and fly for Delta" should Delta have called him while doing military work. (Frederick Depo., Ex. 19, pp. 2-3 [Doc. 199-19] and Ex. 2 [Doc. 199-2].)[7] But his commanders were very concerned that Delta had its concurrent duty policy. Id. Delta has punished, but not terminated, other pilots for similar activity. (Billy Decl., ¶40.)

The year-long investigation of Reep culminated in an April 26, 2016 Notice of Intent to Terminate employment ("NOIT") which focused exclusively on military duty and concurrent duty. (Reep Depo., Ex. 4. [Doc. 172-4].) The only mention of "sick leave abuse" was related to five occasions where Reep was sick from Delta, and then performed some military duty on the same day. (Id.) Realizing that USERRA protected Reep, the NOIT was rescinded so that additional justification could be fabricated. (Billy Decl. ¶¶34-40.)  Yet, Delta's August 24, 2016 disciplinary report still listed Reep "pending termination" for "Suspected MLOA abuse," and nothing else.  (30b6 Depo., Ex. 14, , p. 2 [Doc. 200-14].)[8]

---

[7] Reep was not aware of Delta's concurrent duty policy during his employment. (Billy Decl. ¶15, 18; Reep Depo., [Doc. 172:12-16].)

[8] Other than "lying, cheating, or stealing . . . [there is no such thing as] [MLOA] abuse. If something is allowable under USERRA, even if problematic, it is not

Delta knew that Reep was an attorney as early as March 2015, but in October 2016, falsely claimed this "new information came to light." (Frederick Depo., Ex. 16 [Doc. 199-16]; Reep Depo., Ex. 8, p. 3 [Doc. 172-8].) Reep "didn't call[] in sick in order to be in court" because he didn't need to, as other attorneys at his firm would attend hearings. [Doc. 178-4, p. 88]; Billy Decl., Ex. 17, pp. 353568-353569.) Other completely unsubstantiated accusations include Reep being on sick leave at Delta to: 1) go on vacation, and 2) to fly for the military. (Frederick Depo., Ex. 26.3 [Doc. 199-26]; Billy Decl. ¶¶35-39.) Reep was never found to be out of position for a Delta flight or late for a Delta trip. (Billy Decl., ¶37.) Delta secured documentation directly from medical providers to substantiate all but one of Reep's sick leave periods, and it's not unreasonable for a person to recover from a cold without formal doctor care. (Reep Depo., pp. 69:9-71:6 [Doc. 172], and Ex. 9 [Doc. 172-9]; Billy Decl., ¶¶39.)

Reep's military status was a motivating factor and if he was not a member of the military, Delta's investigation would have never even begun.

## VI.   CONCLUSION

Based on the foregoing, Plaintiff Reep respectfully requests that the Court deny Delta's MSJ in its entirety.

---

USERRA abuse." Livingston Depo., p. 84:17-25 [Doc. 196] and Ex. 2, p. 3 [Doc.196-2] (quoting Lt.Col. Colette Ching, USERRA Plans & Policy, ESGR).

/s/ Charles M. Billy

Charles M. Billy, Esq.*
LAW OFFICES OF CHARLES M. BILLY, P.C.
22706 Aspan Street, Suite 305
Lake Forest, California 92630
Tel: (949) 357-9636
Fax: (949) 715-4311
Email: cbilly@cmblawcorp.com


Gene J. Stonebarger, Esq.*
STONEBARGER LAW, APC
101 Parkshore Dr., Suite 100
Folsom, California 95630
Tel: (916) 235-7140
Email: gstonebarger@stonebargerlaw.com


Stephen J. Anderson
Georgia Bar No. 018325
Kenneth S. Nugent, P.C.
4227 Pleasant Hill Road
Building 11, Suite 300
Duluth GA 30096
Tel: (770) 820-0893
Email: sanderson@attorneykennugent.com

*Admitted Pro Hac Vice

*Attorneys for Plaintiffs Randal Reep, Randal
Smith, Adam Mclean, James Doyle and the
Putative Class*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing has been prepared in Times New Roman, 14-point font, as permitted by Local Rule 5.1B.

*/s/ Charles M. Billy*

Charles M. Billy

*Attorney for Plaintiffs Randal Reep,*

*Randal Smith, Adam Mclean, James*

*Doyle and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2022, I electronically filed the foregoing with the Clerk of The United States District Court for the Northern District of Georgia using the CM/ECF system. All participants are registered CM/ECF users and have been served by the CM/ECF system.

*/s/ Charles M. Billy*
Charles M. Billy
*Attorney for Plaintiffs Randal Reep,*
*Randal Smith, Adam Mclean, James*
*Doyle and the Putative Class*