UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **JEREMY SORENSON, an individual,**<br>**RANDAL REEP, an individual,**<br>**RANDAL SMITH, an individual,**<br>**ADAM MCLEAN, an individual,**<br>**and JAMES DOYLE, an individual, on behalf of themselves and all others similarly situated,**<br><br>      **Plaintiffs,**<br><br>**vs.**<br><br>**DELTA AIR LINES, INC.,**<br>**a Delaware Corporation,**<br><br>      **Defendant.** | **Civil Action No. 1:17-cv-00541-ELR** |

## PLAINTIFF RANDAL REEP'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Randal Reep ("Reep"), by and through his undersigned counsel, hereby submits the following Memorandum of Points and Authorities in Opposition to Defendant Delta Air Lines, Inc.'s ("Delta") Motion for Summary Judgment, showing this honorable Court that summary judgment should be DENIED, as Delta failed to show the absence of a genuine issue of material fact as follows:

/ / /

## I.    INTRODUCTION

This case arises out of Delta's intentional and repeated violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301 *et seq.* Reep, and reservists like him who are or were employed by Delta Airlines, were discriminated against and denied employment benefits such as pension, profit sharing and vacation accrual on the basis of their military obligations. The discovery produced by Delta and depositions of Delta management reveal anti-military animus as well as policies, protocols and practices designed to prevent and discourage pilots from performing military service and cause pilots to resign from the military all together. Reep suffered damages as a result of Delta's actions against military service members.

This response is based upon the following memorandum in opposition, the accompanying response to Delta's Statement of Undisputed Facts, the cited deposition testimony therein, and the Declaration of Plaintiff Reep. Based on the points and authorities set forth herein and incorporated by reference, Delta's Motion for Summary Judgment must be DENIED.

## II.    STATEMENT OF FACTS

Delta created and vigorously enforces discriminatory policies that work hand in glove to reduce or eliminate military duties performed by pilots

employed by Delta.

## A. Delta's Discriminatory Anti-Military Policies and Protocols

*Required Posting of All Military Duty:* Delta policy requires pilots with military reserve obligations to post all dates of military service to their Delta schedule, even when the military service takes place on a day off from Delta. [Plaintiff's Additional Material Fact ("PAMF") set forth in Plaintiff's Response to Separate Statement, ¶1.] This requirement allows Delta to track the amount and timing of all military service performed by its pilots. [PAMF, ¶2.] Critically, Delta pilots are not required to post to their schedule any *other* non-Delta related activities or side-jobs – just military service. [PAMF, ¶3.]

*Concurrent Duty/Double-Dipping Prohibition:* Delta's Concurrent Duty policy provides "It is Delta's policy that a pilot participating in active military duty is ineligible to perform Delta duties in any capacity." [PAMF, ¶4.] This policy targets pilots with military service obligations by prohibiting them from performing military duty on the same day the pilot has an obligation to Delta - even when the military duty does not necessitate an absence from Delta and does not otherwise interfere or conflict with a Delta obligation.[1] [PAMF, ¶5.]

---

[1] This policy has been interpreted to prohibit performing any military duties while the pilot is on sick leave from Delta, even though the pilot could be disqualified from operating an aircraft due to his illness but well enough to

Delta policy does not prohibit any other side-job or hobby a pilot wishes to perform on the same day as a Delta obligation. [PAMF, ¶6.] For example, the pilot can work as a dentist on the same day he/she works for or is on sick leave from Delta, but that same pilot cannot work as a military dentist. [Graham Depo, 99:19-100:7; Davis Depo: 193:10-14:11, Mangie Depo, 202:7-19.]

Delta uses these two policies as bases for investigating and ultimately harassing, threatening, intimidating, and terminating service member pilots.

*Military Leave Log:* Since at least 2008, Delta pilots seeking a military leave of absence on or near a designated Delta holiday[2] or military leave greater than thirty (30 days) are required to submit a Military Leave Log ("MLOA Log"). [PAMF, ¶7.] The MLOA Log, which is required by Delta but violative of USERRA (*see* 38 U.S.C. §§ 4302(b) and 4312(a)(1); 20 C.F.R. 1002.85(c)), demands a comprehensive list of information including, the *reason* for the military leave and the names and contact information for the pilot's chain of command (squadron and wing commander). [PAMF, ¶8.]

Submission of the MLOA Log does not automatically reflect military

---

perform administrative duties. (Frederick Depo, 99:1-4 "sick leave with a twist")

[2] Holidays vary but have included the Super Bowl, Easter, Mother's Day, Memorial Day, Father's day, Fourth of July, Labor Day though many of those (like Father's Day) are not high demand flying periods.

leave on the pilot's schedule. [PAMF, ¶9.] Instead, submission of the MLOA Log auto-generates an email to Delta military leaves management, Jim Mangie ("Mangie"). [PAMF, ¶10.] Mangie forwards the email to the pilot's Chief Pilot (boss) who supervises approximately 1500 pilots[3]. [PAMF, ¶11.] Upon receipt of the email from Mangie, the Chief Pilot makes contact with the pilot seeking military leave to "obtain more information" to determine "if the leave is really necessary", to "verbally counsel" the pilot on the amount of military leave he is taking or to discuss moving the military leave so as to not conflict with Delta's schedule. [PAMF, ¶13] Though this contact may seem innocuous it is anything but innocent.

During the new hire training at Delta pilots are aggressively counseled on Delta's military policies and the impact reserve obligations have on Delta's operations. [Sorenson Decl,¶13.] As a result, reserve pilots submitting military leave requests are already keenly aware of the impact their leave will have on Delta and they have already contemplated if there is flexibility in the leave. Yet despite these facts – and because Delta wishes to discourage military leave – each time a service member seeks military leave through the mil log, he or

---

[3] Given the number of pilots supervised, pilots seldom interact with their chief pilot except for military leave and unique personnel issues. [PAMF, ¶12.]

she can almost be sure they will receive a call from the Chief Pilot's office. [PAMF, ¶14, citing to Tully Depo, 42:1.]

And, if the requested leave is on or near a designated Delta holiday, too early in the pilot's career [PAMF 15], is "excessive" in amount or duration [PAMF 16] or occurs during the summer months when "any military leave is excessive", or if the leave is considered "unusual" or causes a scheduling issue for crew scheduling [PAMF 17], the pilot would receive a call and would be "verbally counseled" [PAMF 18] to help the pilot to better understand who his "primary employer" is. [PAMF 19.]

If there is no flexibility in the military leave dates, the pilot can be sure that his/her squadron or wing commander will receive a call from Delta management. [PAMF 20]

A pilot who fails to respect the needs of his "primary employer" by continuing to perform military service in a manner Delta finds threatening to its schedule or its bottom line be harassed, intimidated, threatened and even terminated. [Frederick Depo 74:9; 75:2-3; 75:24-25; 76:1, Ex. 5; 77:9; 81:1-88:25, Ex. 6; 111:9-16, Ex. 11; 110-117:25; Behnfeldt Depo, 90:5-91:14, Ex. 6]

**B. Plaintiff Reep's History at Delta**

Reep enlisted in the Florida Air National Guard in 1989, was commissioned and trained as an F-15 pilot and presently holds the rank of

Lieutenant Colonel. [Doc. 172, 16:15-16; 18:17-21.] Reep was hired by Delta as a full-time pilot on April 16, 1998. [*Id.* at 19:21] At all times relevant herein, Reep was based in Atlanta, Georgia as a Boeing 757/767 First Officer. [Reep Depo, 21:10.] During his employment with Delta, Reep performed various periods of short-term and long-term military duty. [Reep Decl., ¶6.]

In 2010, at Jim Mangie's direction, Steve Tate (Delta Assistant Chief Pilot) contacted Reep to request documents concerning Reep's prior military leave. [Reep Depo, 79:22-80:4.] Tate advised Reep that Reep's excessive military leave was

> putting [Tate] in a 'bad spot' with… Jim Mangie…and what [Reep] needed to do is stay off Jim Mange[]'s radar. And the way to do that is not report or take – report or take military leave. Work it on a de-confliction basis from Delta.

[Reep Depo, 80:13-20; Reep Decl., ¶12.] To stay off Mangie's radar, Reep did just that, avoided taking military leave and/or notifying Delta as to when he was performing military service, but in so doing violated Delta's policies that required pilots to post all military duty to their schedule and not perform military duty on the same day as a Delta obligation. [Reep Depo, 79:31-81.]

On March 17, 2015, Reep submitted a Military Leave Log request seeking military leave for April 3 to April 6, 2015. [Frederick Depo, 126:11-127:9, Ex. 15, p.4.] The leave request was not for a holiday period, it was for

just three days, and was not requested at the last minute. So, it is unclear why Reep had to fill out the military leave log. Nevertheless, Reep's request precipitated an email chain between Delta management about Reep's "unusual military leave activity" and discussions about ways they can "encourage more productivity from some of our military guys." [Frederick Depo, 128:17-129:3] In correspondence concerning Reep's leave, management discusses that if they took "a few guys to the mat," Delta could make a "dent in the numbers." [Frederick Depo, Ex. 15.] Thereafter on April 21, 2015, Jim Mangie states "F/O Reep has a long MLOA history....might be time to take action again." [Frederick Depo, 142:1-10, Ex. 17.]

On or about October 5, 2015, Captain Chris Frederick, Reep's Chief Pilot, traveled from Atlanta, Georgia, to Jacksonville, Florida, to meet with Reep's military unit. [Frederick Depo 143:19-22, Ex. 18, Ex.26, p.2.] Importantly, at the time of Frederick's visit, Reep held the rank of Lieutenant Colonel (Frederick Depo 18:21) and held supervisory authority over other pilots in his military unit, several of whom were also Delta pilots. [Reep Decl., ¶16.] Frederick testified that he met with Reep's unit for two purposes: (1) to discuss Reep's military leave of absence usage and (2) to let the command structure know that Delta was not biased against the unit "regardless of what was transpiring with Mr. Reep, the other pilots in the units weren't going to be

effected." [Frederick Depo, 143:24-144:8.] Frederick testified that he wanted to make sure Reep's unit knew that Delta was "concerned" about Reep's "excessive military leave of absence." [Frederick Depo, 146:14-20.] During his visit, Frederick learned that Reep's unit was significantly undermanned, the unit would take any time Reep could spare and that they "could not accomplish their mission without him." [Frederick Depo, 162:9-10.] They acknowledged that Reep had a lot of administrative duties and that Delta's concurrent duty policy forces a pilot "to choose between Delta and the military." [Frederick Depo, 160:12-15.] Frederick acknowledged the concurrent duty policy could result in less military leave being taken. [Frederick Depo, 156:21-24.]

In December 2015, Frederick began drafting a letter notifying Reep that he was being investigated for his use of military leave. Frederick asked Assistant Chief Pilot, Chris Goedeke for feedback on the correspondence. [Frederick Depo, 167:3-25, Ex. 21.] Frederick and Goedeke determine the letter to Reep "probably should not discuss [Reep's] "lack of productivity" (which was directly related to Reep's "excessive military leave") because Reep "used the available processes to drop his trips legally…." [Id.; Frederick, 167:16-25.]

On December 11, 2015, Frederick notified Reep that he was being investigated by Delta related to his "use of military leave and sick leave." [Frederick, Ex. 22.] Delta acknowledges Reep's low sick leave usage but

9

specifically notes that he potentially performed military work on a day he received sick pay. [Frederick Depo, 159:6-20, Ex. 22.]

On April 26, 2016, Jim Graham, V.P. of Flight Operations and Chief Pilot, issues Reep a Notice of Intent to Terminate[4]. [Reep, Ex. 4] Beginning June 2016, Delta investigates Reep's use of sick time in conjunction with a court appearance. [Reep Depo, Ex. 4] In July 2016, the initial Notice of Intent to terminate is rescinded. [Frederick Depo, Ex. 26.] During a meeting on July 29, 2016, Delta management interviewed Reep regarding his use of sick leave in conjunction with a court appearance. Reep admits he was on sick leave and "could not exercise his Class 1 medical" to fly Delta aircraft on those dates. [Frederick Ex. 26, p. 4] On August 15, 2016, Delta issues Reep a new Notice of Intent to Terminate. [Frederick Depo, Ex. 26] Despite admitting there is not a single instance of Reep failing to show up for a Delta assignment notwithstanding his "excessive military duties" [Frederick Depo, 158:6, 175:13-17], Reep was terminated on September 30, 2016. [Reep Depo, Ex. 8] The termination letter alleged Delta had discovered that Reep had served at least 363 days of military duty for his squadron from April 1, 2012 to July 31, 2015

---

[4] Jim Graham had the "final say" with respect to military related policies at Delta. [Behnfeldt Depo, 64:12-14.]

that were not reported to Delta. Reep did not report that military duty because "it was not conflicting in any way with Delta's schedule or operation." [Reep Depo, 56:1-3.] Reep also stated that he did not report the military duty because he "had been penalized greatly for taking military leave in the past" including threats of the disciplinary process. [Reep Depo, 56:7-14, 57:11.] To avoid discipline, Reep had been "instructed to do [his] military performance to not conflict with Delta's operation or schedule." [Reep Depo, 56:7-14.]

Material facts and reasonable inferences remain genuinely in dispute in this action such that Delta failed to meet its burden and summary judgment should be DENIED.

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A. Delta Air Lines Subjected Plaintiff Reep to a Hostile Work Environment in Violation of USERRA

Delta subjected Reep to a hostile work environment in an effort to discourage him from performing military service. When Delta's efforts failed to result in reduced military service, Delta made an example of Reep, to deter other Delta pilots from violating Delta's discriminatory military policies.

USERRA prohibits civilian employers from discriminating against employees based on their military service or status. 38 U.S.C. § 4311(a); 20 CFR § 1002.18. "Under USERRA, a person who is a member of or who has

performed in a uniformed service shall not be denied 'initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership or performance of service." Ward v. United Parcel Serv., 580 F. App'x 735, 737-738 (11th Cir. 2014) (quoting 38 U.S.C. § 4311(a)). USERRA broadly defines "benefit of employment" in 38 U.S.C. § 4303(2). The phrase "terms, conditions, or privileges of employment" encompasses a non-discriminatory working environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

To establish a hostile work environment claim, a plaintiff must demonstrate that the alleged harassment was sufficiently "severe or pervasive as to alter the terms and conditions of employment and create a discriminatorily abusive environment." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 809 (11th Cir. 2010) (en banc). In evaluating a plaintiff's claim, the "workplace conduct is not considered in isolation"; rather, the court considers "the surrounding circumstances, expectations, relationships" and "words and conduct not specifically directed at plaintiff." Id. at 810-811; *see* Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (a hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter  the conditions of the victim's employment..."); *see also*

12

Velasquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 18-19 (1st Cir. 2007) (stray remarks by non-decision makers may be considered evidence of a company's general atmosphere of discrimination, and thus can be relevant. Such evidence does tend to add color to an employer's decision-making process as to the influences behind the actions taken with respect to an individual plaintiff); Wooldridge v. City of Melbourne, 212 F.Supp.3d 1205, 1210 [finding sufficient evidence to establish a prima facie case of discrimination under USERRA where supervisors and administrators made derogatory comments about reserve leave such as "weekend warrior" and "double dipper" – both negative references to his reserve status. Overall the evidence showed a general culture of disdain for reservists at the City.]; Spriggs v. Diamont Auto Glass, 242 F.3d 179 (4th Cir. 2001) [finding conduct targeted at persons other than plaintiffs concerned the "environment of workplace hostility"].

A jury could reasonably conclude that Delta created a hostile working environment for Reep that materially affected the terms of his employment.

Examples of Delta's animus against military service members are well documented in the deposition testimony of Delta management and the documents produced by Delta in this case. [Mangie Depo, Exs. 1, 3, 8, 9, 11, 38; Mangie Depo, 25:16-17, 206:4-6; Graham Depo, Ex. 8; Underwood Depo, 122:1-

5, Ex. 7, 16; Behnfeldt Depo, 155:3-155:1, 139:20-23, 140:5-11, Exs. 5, 25; Frederick Depo, Exs. 2, 15; Frederick Depo, 58:18-25; 59:1]

For Reep, not only was he subjected to an anti-military environment, he was directly harassed based on his military service obligations and the harassment impacted his job performance. For example, in 2010, Steve Tate, Assistant Chief Pilot, told him he was taking too much military leave and that he needed to "stay off the radar." As a result, Reep took less military leave from Delta, but still performed military duty- just on a de-confliction basis with Delta. Once Delta became aware that Reep was still performing military duty and was "not as productive" as they wanted him to be, Delta demanded documentation, made an in-person visit to Reep's military unit to relay "concerns" about the amount of Reep's military obligations, launched an investigation related to his military usage, and ultimately terminated him for violations of Delta's discriminatory military leave policies.

A jury could reasonably determine that Delta's harassment of Reep was sufficient and pervasive enough to cause Reep to alter the terms and conditions of his employment.

Delta unsuccessfully argues that even if the "severe and pervasive standard" were met, Plaintiff has not suffered economic damages. USERRA imposes no requirement that a service member whose rights have been

violated under the Act must suffer an economic loss in order to have an actionable claim under the Act. However, Reep in fact has suffered substantial economic loss: Delta fired him, causing him loss of wages and benefits as a pilot. And, Delta's firing Reep was the culmination and ultimate act of the hostile work environment to which the company subjected him because of his military status and obligations. Accordingly, the relief he is due under USERRA for the hostile working environment is not only recovery of lost wages and benefits, but also equitable relief that includes reinstatement and an order enjoining the company from subjecting him to a hostile work environment and harassment when he returns to work. *See* 38 U.S.C. § 4323(d)(1)(A); 38 U.S.C. § 4323(e); <u>Serricchio v. Wachovia Securities LLC</u>, 658 F.3d 169, 193 (2d Cir. 2011) (USERRA "provides for the remedy of reinstatement by permitting courts to 'require the employer to comply with the provisions of [USERRA],' 38 U.S.C. § 4323(d)(1)(A), and by granting a court 'full equity powers … to vindicate fully the rights or benefits' of veterans seeking reemployment, 38 U.S.C. § 4323(e)."). Construing the evidence in the light most favorable to Reep, this Court must DENY Delta's Motion for Summary Judgment.

## B. Delta's Concurrent Duty Policy Violates USERRA

Delta subjects pilots with military obligations to prohibitions which non-military pilots are not subject to. Delta's Concurrent Duty Policy, also referred

to as the "Double-Dipping" Policy, is identified in the Flight Operations Manual as "Performing Delta Duty While on Military Duty" and provides:

> It is Delta's policy that a pilot performing military duty (on orders, UTA drill periods, proficiency training periods, flight training periods, or any other duty that is paid by the State or U.S. government) is ineligible to perform Delta duties in any capacity (except while on military terminal leave).

Delta does not prohibit pilots from other activities on a day that the pilot also has a Delta obligation. [Tully Depo, 39:1-22.] A Delta pilot could complete his rotation at 10:00 a.m. on any given day and run any number of side businesses or have any number of hobbies. Therefore, on its face Delta's concurrent duty policy changes the terms and conditions of employment for military service members it employs. [Behnfeldt Depo, 181:14-18, Ex. 36 (no dispute that military pilots are being singled out for double-dipping, when pilots for other side businesses are not.).]

Delta argues that the concurrent duty policy provides a clear demarcation between when the employee is performing military duty and when the employee is available for civilian work. [MSJ Brief, p. 21-22.] To that end, Delta claims it is just adhering to USERRA's requirements that the pilot be treated as though he is on furlough. Delta's attempt to rely on USERRA § 4316(b)(1) gets it nowhere. To read § 4316(b)(1) as authorizing discriminatory treatment of pilots performing military duty differently from those performing

nonmilitary secondary employment or engaging in other nonmilitary activities creates a direct conflict with § 4311(a) of the Act. Moreover, § 4316(b)(1) itself requires equal treatment of employees absent from work to perform military service and employees who are absent for nonmilitary reasons. *See* 38 U.S.C. § 4316(b)(1)(B); <u>White v. United Airlines, Inc.</u>, 987 F.3d 616, 625 (7th Cir. 2021); *Travers v. Fed. Express Corp.*, 8 F.4th 198, 202 (3d Cir. 2021).

Delta's reliance on the unpublished <u>Tucsan</u> case is entirely misplaced. <u>Tucsan</u> involved an ***active-duty*** service member, not a military reservist, who had a part-time job at a nightclub. This distinction was critical to the *Tuscan* court's analysis, "[m]embers of the reserves are deployed to active military duty for a specified purpose and duration, and given the formal release orders upon completion of deployment …In contrast, Plaintiff was/is a full-time enlisted member in the air force, with a specified period of active uniformed service required to complete his initial uniformed service obligation. <u>Drake v. Tucsan, Inc.</u>, No. CV-09-392 TUC DCB, 2010 U.S. Dist. LEXIS 2288, at *8-9 (D. Ariz. Jan. 11, 2010). Further, <u>Tucsan</u> was a reemployment case involving application of USERRA's reemployment prerequisites in the context of "moonlight" civilian employment occurring during a period of full-time active-duty military service. USERRA's reemployment provisions are not at issue in the instant case.

Delta's argument conveniently omits the fact that not all military *duty* requires an absence from civilian employment. [Cite; *see* CFR language re "absence".) For example, military duties include administrative and other duties which can be performed from virtually anywhere and on terms that do not interfere or conflict with Delta operations. [Cite]

Delta's concurrent duty policy forces the pilot to "choose between the military and Delta Air Lines." [Frederick Depo, 149:24-150:4.]

Without merit is Delta's argument that its Concurrent Duty policy did not deny Plaintiffs a benefit of employment within the meaning of § 4311(a) of USERRA. USERRA § 4303(2) defines "benefit of employment" as "the terms, conditions, or privileges of employment." On its face, the Concurrent Duty applied only to "pilot[s] performing military duty." Pilots performing any other type of non-Delta duty were not subject to the same restriction. Accordingly, pilots with military obligations were denied the term, condition, or privilege of employment enjoyed by non-military peers.

Delta's suggestion that any chilling effect of the policy on Plaintiffs' military participation is not remediable under the Act is unavailing. Wages and benefits recoverable from an employer under USERRA can include those that would have been available from the military but for the employer's violation of the Act. *See* <u>Kolkhorst v. Tilghman</u>, 897 F.2d 1282 (4th Cir. 1990).

## C. Reep's Military Status was a Motivating Factor in His Discharge

The evidence establishes that Reep's military service or obligations was a motivating factor in Delta's decision to terminate his employment. *See* 38 U.S.C. § 4311(c)(1). Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration. Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005). A motivating factor in an USERRA case need not be the sole cause of the decision. *Id.* A court can infer a discriminatory motivation from a variety of considerations such as:

> (1) the temporal proximity between the plaintiff's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members of the protected class combined with its knowledge of the plaintiff's military activity; and (4) disparate treatment of similarly situated employees.

*Id.* (quoting *Sheehan v. Dep't of the Navy,* 240 F.3d 1009, 1014 (Fed. Cir. 2001).)

### 1. The Evidence Establishes Hostility and Temporal Proximity

Here the temporal proximity and Delta's expressed hostility toward members of the military is strong proof that Reep's membership in the Florida Air National Guard motivated Delta's termination of him. Following Reep's request for military leave in relation to his productivity at Delta, his chief pilot said that if Delta starts to make an example of reservists that take military

leave by "taking them to the mat" then Delta could "make a dent in the numbers" meaning productivity. [Frederick Depo, 139: 13-15, Ex. 15.] As a follow on, Jim Mangie, senior Delta management stated: "F/O [First Officer] Reep has a long MLOA (military leave of absence) history…might be time to take action again." [Frederick Depo, 142:1-10, Ex. 17.] In the following months, Delta investigated Reep's military usage and ultimately visited his unit to share Delta's "concerns" about Reep's excessive military obligations. [Frederick Depo, 146:14-23.] *See* Maxfield v. Cintas Corp. No. 2, 427 F.3d 544, 552 (8th Cir. 2005) (fact-finder could infer discriminatory motivation from phone call by employee's boss to military official asking whether employee was present for duty at military base and whether it was imperative for him to be on military leave at that time).

2. The Evidence Establishes Inconsistencies Between the Proffered Reason for Delta's Decision and Delta's Other Actions

Evidence abounds that Delta's stated reason for terminating Reep is due to his military service obligations.

*(i) Reep's Supposed Sick Leave Abuse is Unsupported*

Delta management acknowledged that Reep's sick time usage was low. [Frederick Depo, 171:12-13] However, after a lengthy investigation into Reep's military service obligations which "concerned" Delta management enough to

travel to his military unit, Delta decided to peek into activities they allege Reep performed on days he called in sick to Delta. Just because someone does not meet FAA medical requirements to fly an aircraft does not mean they are too sick to do anything else. Delta management acknowledges that though a pilot may not be physically capable to fly an aircraft that does not mean he could not do a myriad of other activities on that day.

### (ii) The "Independent Basis" for Terminating Reep Based on Reep's USERRA Violation is Based on a Misunderstanding of the Law

Delta unsuccessfully attempts to claim as an "independent basis" for firing Reep USERRA's advance-notice-of-service requirement. Such requirement is one of several prerequisites for reemployment under § 4312 of the Act and is set forth at § 4312(a)(1). Delta carefully omits the most important provision of the law. The provision comes into play when an employee's "absence from a position of employment is necessitated by reason of service in the uniformed services."[5] Since Reep did not intend to be absent from Delta to perform his military duties, he was not required by USERRA to notify Delta. In fact, Delta did not find a single instance of Reep missing a Delta assignment for the entire period investigated. [Frederick Depo, 158:6,

---

[5] 38 U.S.C. § 4312(a).

175:13-17.] So, Delta's "independent basis" for terminating Reep based on his violation of USERRA is unfounded. A jury could reasonably determine Reep was terminated based upon his military service obligations.

Delta couches Reep's termination as being related to "policy violations" and violations of USERRA. But it is exactly these alleged violations that prove Reep's case. Delta put Reep in a catch-22. It maintained an overtly hostile attitude towards Reep because he logged – according to Delta management – too much military time. To avoid the issue, Reep admitted he attempted to stay off the radar by not posting military leave on his off days and avoiding taking military leaves of absence. But then Delta turns around and, effectively says "Ah ha! You didn't report all of your leave and you violated the concurrent duty policy." But Reep did this **_precisely because_** of Delta's hostile attitude against him and his military service. It would be perverse indeed to allow Delta to blatantly pressure Reep and other pilots not to take military leave then use these policies against pilots when they attempt to avoid being on Delta Management's "radar" by reporting less leave. Together there is substantial evidence to show the investigations arose out of Reep's military service. Whether these investigations–which caused Reep to report less leave and ultimately led to his termination–were motivated by Delta's animus toward military personnel, is a question of fact. It is reasonable for a fact finder to

determine that Delta's investigation against Reep was part of a series of events that were intertwined and motivated by an intent to discriminate against service members, and pressure them into either (i) taking less leave or (ii) taking leave but not reporting it – or worse yet (iii) leave the military altogether. Delta's surveillance of Reep itself reflected its discriminatory motive. *See* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 921 (11th Cir. 1993) ("[S]urveillance 'strongly suggests the possibility of a search for a pretextual basis for discipline, which in turn suggests that subsequent discipline was for purposes of retaliation.'" (quoting Schlei & Grossman, *Employment Discrimination Law* 554, 2d ed. 1983).

> 3. Delta Management Consistently Expressed Hostility Toward the Protected Class of Military Service Members and Management was Aware of Plaintiff Reep's Military Activity

Delta Management was aware of Reep's military activity because submission of the military leave log auto-generates an email to Jim Mangie, who then forwards the communication to the pilot's Chief Pilot. [Behnfeldt Depo, 72:12-25.] Delta consistently expressed hostility toward military service members. [Frederick Depo 60:6-63:2, Ex. 2, 74:9; 75:2-3; 75:24-25; 76:1, Ex.5, 77:9; 81:1-88:25, Ex. 6, 103:17-110:1, Ex. 10, 111:9-16, Ex. 11, 110:4, 114:4-117:25, Ex. 11, 125:16-128:23, Ex. 15, Underwood Depo, 197:7; 198:2-7, Ex. 15.]

> 4. Delta Treated Other Reservist Pilots Similarly

Delta consistently investigated pilots due to their military service obligations. [Frederick Depo, 77:9; 81:1-88:25, Ex. 6; 98:8-99:18, Ex. 9; 111:9-16, Ex. 11], 110:4 114:4-117:25, Ex. 11; 125:16-128:23, Ex. 15.]

## IV. PLAINTIFF RANDAL REEP JOINS CO-PLAINTIFFS SMITH, DOYLE AND MCLEAN'S RESPONSE TO DELTA'S MOTION FOR SUMMARY JUDGMENT AS TO THE (1) PENSION CONTRIBUTION, (2) VACATION ACCRUAL AND (3) PROFIT SHARING CAUSES OF ACTION

*Pension:* Delta argues the methodolog(ies) it applied to pension contributions made on behalf of Plaintiffs were lawful under USERRA. Plaintiffs dispute the lawfulness of the methodologies. Though the individual Plaintiffs damages may be different based upon their individual pension contributions, the legal argument concerning the methodology used to calculate those contributions and the concomitant factual analysis pursuant to the Pilot Working Agreement remains consistent across all five Plaintiffs. For these reasons, Reep joins his co-plaintiffs Smith, Doyle and McLean's arguments to Delta's Motion for Summary Judgment as to the pension contribution cause of action and incorporates those arguments and supporting evidence herein.

*Vacation Accrual:* Plaintiffs argue Delta's policy of not allowing pilots on long term military leave to accrue vacation, violates USERRA because Delta provides vacation accrual to employees on other comparable forms of leave.

Though individual Plaintiffs vacation accrual damages may be different, the legal argument and analysis concerning as to whether pilots on long term military leave are entitled to receive vacation accrual will apply consistently to all five Plaintiffs. For this reasons, Reep joins his co-plaintiffs Smith, Doyle and McLean's response and arguments to Delta's Motion for Summary Judgment as to the vacation accrual cause of action and incorporates those arguments and supporting evidence herein.

*Profit-Sharing:* Delta argues the methodology it applied to profit sharing contributions made on behalf of Plaintiffs were lawful under USERRA. Plaintiffs dispute the lawfulness of the methodology. Though individual Plaintiffs damages may be different based upon their individual annual compensation and other factors, the legal argument concerning the methodology used to calculate those contributions and the concomitant factual analysis remains consistent across all five Plaintiffs. For these reasons, Reep joins his co-plaintiffs Smith, Doyle and McLean's response and arguments to Delta's Motion for Summary Judgment as to the profit-sharing cause of action and incorporates those arguments and supporting evidence herein.

## V.    CONCLUSION

Based on the arguments and evidence presented by the Plaintiff, Delta's Motion for Summary Judgment should be denied.

s/ Crystal L. Matter, Esq.
California Bar No. 278084
MATTER LAW, APC
101 Parkshore Drive, Suite 100
Folsom, California 95630
Tel: (916) 735-7495
Email: crystal@matterlawapc.com
*Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D of the Local Rules for the United States District Court for the Northern District of Georgia, I hereby certify that the foregoing has been prepared in Century Schoolbook, 13-point font, as permitted by Local Rule 5.1(B).

Respectfully submitted this 13th day of May 2022.

s/ Crystal L. Matter, Esq.
California Bar No. 278084
MATTER LAW, APC
101 Parkshore Drive, Suite 100
Folsom, California 95630
Tel: (916) 735-7495
Email: cmatter@matterlawapc.com
*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the within and foregoing **PLAINTIFF RANDAL REEP'S RESPONSE IN OPPOSITION TO DEFENDANT DELTA AIR LINES MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system, which will automatically serve the following counsel of record:

Thomas Munger, Esq.
tom.munger@mungerandstone.com

Charles Michael Billy, Esq.
cbilly@cmblawcorp.com

Benjamin Stone, Esq.
ben.stone@mungerandstone.com

Gene J. Stonebarger, Esq.
gstonebarger@stonebargerlaw.com

Ira G. Rosenstein, Esq.
irosenstein@orrick.com

Joseph Coomes, Esq.
ajc@jcoomeslaw.com

Joseph J. Ranjo, Esq.
jason.ranjo@morganlewis.com

This 13th day of May 2022.

s/ Crystal L. Matter, Esq.
California Bar No. 278084
MATTER LAW, APC
101 Parkshore Drive, Suite 100
Folsom, California 95630
Tel: (916) 735-7495
Email: cmatter@matterlawapc.com
*Admitted Pro Hac Vice*