# EXHIBIT 1

Agreement

Between

DELTA AIR LINES, INC.

And

THE AIR LINE PILOTS IN THE SERVICE OF
DELTA AIR LINES, INC.

As Represented by the

AIR LINES PILOTS ASSOCIATION,
INTERNATIONAL

| | |
|---|---|
| Date of signing | June 1, 2006 |
| General Effective Date | June 1, 2006 |
| Duration | June 1, 2006 – December 31, 2009 |

DELTA 000001

Agreement

Between

# DELTA AIR LINES, INC.

and

# THE AIR LINE PILOTS IN THE SERVICE OF DELTA AIR LINES, INC.

as Represented by the

# AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

Duration July 1, 2012 – December 31, 2015

DELTA 000509

Agreement

Between

# DELTA AIR LINES, INC.

and

# THE AIR LINE PILOTS IN THE SERVICE OF DELTA AIR LINES, INC.

as Represented by the

# AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

Date of Signing: December 1, 2016
Amendable Date: December 31, 2019

DELTA 000955

# EXHIBIT 2

## Transfer to Inactive Status

Any type of leave that results in 30 consecutive days without earning any pay will result in a transfer to an "NBC" inactive status. These designations include NBC MIL, NBC PLA, and NBC SIC. When this occurs, several important changes occur to a pilot's benefit profile. These changes may include pass benefits, vacation, retirement benefit accrual, health insurance, and Flexible Spending Account payments and withdrawals. Prior to reaching this 30 day point, pilots should contact the Employee Service Center, Pilot Support Center, and Crew Resources to determine requirements for the particular leave being used. For further information, refer to Return to Work, this chapter. Additionally for military pilots on NBC MIL, refer to Military Leave, this section.

## Military Leave

Delta is committed to supporting personnel in the uniformed services of the United States. This includes the Reserves, Coast Guard, Army, and Air National Guard. Delta will work with its pilots to enable them to meet all these components' service obligations. This includes both voluntary and involuntary service, whether on active duty, active duty for training, inactive duty training, or annual training, and the necessary time for an examination to determine fitness to serve.

The Uniformed Services Employment and Reemployment Rights Act (USERRA) requires employers to provide eligible uniformed service members:

- prompt reinstatement,
- accrued seniority,
- training and retraining, and
- protection against discharge, except for cause.

Delta fully supports USERRA. While USERRA does not apply to state activation of the National Guard for disaster relief, riots, etc.; it is Delta's policy to extend the same rights and provisions of USERRA to all pilots involved in a state call-up on a case-by-case basis where the operations of the company permit.

It is Delta's policy that a pilot participating in active military duty is ineligible to perform Delta duties in any capacity.

### Military Leave Notifications

Employees will be granted military leaves of absence without pay for the length of such service, not to exceed five years as defined in USERRA.

Copyright © Delta Air Lines, Inc. See title page for details.

CONFIDENTIAL

DELTA000607866

## Military Leave

Delta is fully committed to supporting pilots in the uniformed services of the United States. This includes the Reserves, Coast Guard, Army and Air National Guard.

Delta will cooperate with pilots to enable them to meet their service obligations. This includes periods of inactive duty, training, and both voluntary and involuntary recall to active duty. It also includes any time necessary for examinations to determine fitness to serve.

## USERRA

Delta fully supports the Uniformed Services Employment and Reemployment Act (USERRA).

USERRA requires employers to provide eligible uniformed service members:
- Prompt reinstatement to employment
- Accrued seniority
- Training and retraining
- Protection against discharge, except for cause

USERRA does not apply to state activation of the National Guard for disaster relief, riots, etc. However, it is Delta's policy to extend the same rights and provisions of USERRA on a case-by-case basis to pilots involved in a state recall, when Company operations permit.

## Eligibility for Duty While on Orders

A pilot on active military orders is ineligible to perform duties at Delta in any capacity.

## Duration of Military Leave

Pilots will be granted military leaves of absence without pay for the entire length of such service, not to exceed five years (as defined in USERRA).

Copyright © Delta Air Lines, Inc. See title page for details.

CONFIDENTIAL

# MLOA Policies

## Military Contact Information in iCrew

A pilot shall keep military information current in iCrew. This information must include the applicable unit phone number and commander's contact information. As allowed by USERRA, Delta may contact a pilot's Commanding Officer to confirm military leave or request rescheduling/deferral of military leave. The CPO will attempt to notify a pilot prior to attempting any contact with the pilot's unit leadership.

## Travel to/from MLOA

It is Delta's policy to grant sufficient time for travel prior to and immediately following military duty. Travel days, if needed, should be included in your MLOA notification and limited to one day each way for travel to/from the pilot's address of record or base and location of military duty. Additional travel days or alternate city pairs requires CPO approval.

Use of non-rev travel privileges (including the jumpseat) is authorized for use for travel to/from military duty where government authorized travel is not provided. When government authorized travel is provided in conjunction with the military duty, the pilot is expected to use the government funded travel.

## Training Conflict with MLOA

If a pilot has been awarded an Advanced Entitlement (AE) that requires training, the pilot should contact Crew Resources to schedule training before or after the projected MLOA. Additionally, a pilot should pre-post MLOA or use CQ golden days to avoid conflicts between military leave and CQ training. In order to avoid conflicts, military leave dates should be entered in iCrew no later than the first day of the month prior to the CQ bid month. If a conflict occurs, contact the CPO as soon as possible to reschedule

## Performing Delta Duty While On Military Duty

A pilot is not allowed to perform any Delta duty while performing military duty. Examples of military duty include, but are not limited to: active duty orders, UTA, proficiency training periods, flight training periods, reserve manning periods or any other duty that is accounted for or paid by the state or the U.S government. Performing Delta duty while on military duty is known as concurrent duty and is not allowed. The only exception to this policy is when a pilot is on terminal leave, as defined by military guidelines. A pilot may perform Delta duty while on terminal leave.

CONFIDENTIAL

DELTA000285264

# EXHIBIT 3

Transcript of the Testimony of:

**BARRY BEHNFELDT**

SORENSON, et al.

vs.

DELTA AIRLINES INC.

August 23, 2021

Volume 1



IMAGINE
REPORTING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| JEREMY SORENSON, an individual, RANDAL REEP, an individual, RANDAL SMITH, an individual ADAM MCLEAN, an individual, and JAMES DOYLE, an individual, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| DELTA AIRLINES, INC., a Delaware Corporation. | ) ) ) ) |
| Defendant. | ) ) |

Civil Action No.
1:17-cv-00541-ELR

DEPOSITION OF

BARRY BEHNFELDT

DATE:  Monday, August 23, 2021

TIME:  10:00 a.m. - 6:43 p.m.

LOCATION:  999 Peachtree Street, N.E., Suite 2850, Atlanta, Georgia  30309

REPORTED BY:  Tamika Burnette, RPR, CSR No. 2870

```
 1                          APPEARANCES

 2   For them Plaintiff:

 3        STONEBARGER LAW, APC
          BY:  Ms. Crystal L. Matter, Attorney at Law
 4          Mr. Gene Stonebarger, Attorney at Law
          Mr. Charles "Chuck" Billy, Attorney at Law
 5        101 Parkshore Drive, Suite 100
          Folsom, California 95630
 6        (916) 235-7140
          cmatter@stonebargerlaw.com
 7
     For the Defendant:
 8
          MUNGER & STONE, LLP
 9        BY:  Mr. Benjamin A. Stone, Attorney at Law
          999 Peachtree Street, NE, Suite 2850
10        Atlanta, Georgia 30309
          (404) 815-1884
11        Ben.stone@mungerandstone.com

12

13   Also Present:

14        Jeremy Sorenson

15                          ---oOo---

16

17

18

19

20

21

22

23

24

25
```

1   resources.   We -- we generally dealt with the first that

2   I mentioned there.   The military, sick, personal, and

3   maternity.

4         Q.   What about vacation?

5         A.   Vacation was tracked in career resources.

6         Q.   Okay.   Now, in some of documents that we'll be

7   going over today, and, in your experience working as the

8   aid to the managing director, would it fair to say

9   that -- that MLOA often referred to or refers to

10  Military Leaves of Absence?

11        A.   Yes.

12        Q.   Who trained you for your position as the aid to

13  the managing director of flying operations?

14        A.   I guess that'd be Lawrence Marciano in our turn

15  over.

16        Q.   Does Lawrence Marciano still work for Delta

17  Airlines?

18        A.   He does.

19        Q.   And how long did he train you?

20        A.   It was probably -- it was two weeks of overlap.

21        Q.   Was anybody else involved in training?

22        A.   So part of the military leave, I'll say Jim

23  Mangie was also part of some training.

24        Q.   What was Jim Mangie's role as he was training

25  you?

1       A.  He was the military leave liaison.

2       Q.  Do you know what time period he served as the

3   military leave liaison?

4       A.  I'm not sure when he started that -- doing that

5   position.

6       Q.  Do you know if he still does that position?

7       A.  I -- I don't know.  I don't know what he's --

8       Q.  Was he -- I apologize.  In his role as military

9   liaison, during the time period that you were the aid to

10  the managing director, was he acting in that military

11  leave liaison capacity?

12      A.  He was in a more strategic role, I guess you

13  might say.  He liaisoned with the outside entities of

14  Delta.  I -- my responsibilities were for the pilots at

15  Delta.  It was my focus, right, his was outside Delta,

16  maybe, say, the Pentagon level and ESGR.  Those sorts of

17  things.

18      Q.  And ESGR, what does that stand for?

19      A.  Employee Support of the Guard and Reserve, or

20  Employer Support of the Guard and Reserve.

21      Q.  Okay.  So Jim Mangie was involved in training

22  you at least in some respect; is that correct?

23      A.  Correct.

24      Q.  And what did he train you on, with respect to

25  your position as the aid to the managing director?

1      A.   The primary was to use iCrew, and then iCrew

2   would direct them to the military leave log process, if

3   it was asked for.

4      Q.   Under what circumstances would a pilot be

5   directed to use the military leave log process?

6      A.   If it's an extend leave, not a short -- if it

7   goes over 30 days, it'll trigger it, and also for

8   certain holidays in the year, holiday periods are

9   programed in there to trigger to go to a leave, to the

10  log process.

11     Q.   Which holidays are those?

12     A.   They're Christmas, New Years, Thanksgiving,

13  like, Memorial Day, Fourth of July and focused on the

14  high demand times where Delta's schedule is pretty much

15  at its max.

16     Q.   And generally speaking, what are the high

17  demand times?

18     A.   What are the high demand times.

19     Q.   Correct.  So I understood you to specifically

20  point out various holidays.

21     A.   Correct.

22     Q.   And then you mentioned the high demand times

23  where scheduling is at its max.

24     A.   Okay.

25     Q.   So if that's a category, what does that usually

1      A.   So a high demand time is when -- what I define

2  as is where there's -- there's a lot of people

3  traveling, so the -- so the network is going to throw in

4  as many flights onto the schedule as they can, so that

5  we make money.

6      Q.   Understood.

7      A.   That's the bottom line goal.

8      Q.   Is that typically the summer months?

9      A.   The summer months are -- the entire summer is a

10 busy time, correct.

11     Q.   Okay.  Any other really high demand times like

12 the summer?

13     A.   Well, those would be, like, Thanksgiving.

14     Q.   Okay.

15     A.   Those holidays that I mentioned, Thanksgiving,

16 Christmas, New Years, when people travel a lot.

17     Q.   Okay.  So a pilot would go through the iCrew

18 process if he or she needs to take military leave less

19 than 30 days, correct?

20     A.   Uh-huh.

21     Q.   Yes?

22     A.   Yes.  So far so good.

23     Q.   Then, if, that short-term military leave, is on

24 or near certain holidays or high demand times, that

25 pilot, when he or she goes to the iCrew process, will be

1   directed to go to the military league process?

2       A.   The log process.

3       Q.   The military log process?

4       A.   Correct.

5       Q.   Thank you.

6       A.   Correct.

7       Q.   The pilot will also be directed to go through

8   the military leave log process, if it is military leave

9   greater than 30 days?

10      A.   Correct.

11      Q.   Wonderful.  Why -- why are there two processes?

12      A.   Well, when a -- if the leave is over 30 days,

13  for the -- for the extended leaves, for over 30, crew

14  resources, there's an off payroll event that occurs when

15  a pilot goes inactive for over 30 days, so it's an alert

16  to them that a pilot will be basically leaving the

17  payroll and perform those -- whatever those transactions

18  are in the career resources systems or the HR systems to

19  basically take that pilot off the payroll.

20      Q.   Okay.

21      A.   Right.

22      Q.   So it sends an alert -- I don't think I follow.

23  So there's two processes, because when there is military

24  leave greater than 30 days somebody has to be -- the

25  pilot has to be taken off payroll for inactive purposes?

1      A.   (Nodding yes.)

2      Q.   Is there any other reason why there's two

3  processes?

4      A.   Well, you've got the holiday leave or during

5  the holiday periods where it drives you to the log,

6  right.

7      Q.   Right.  Why couldn't that just be run through

8  iCrew?

9      A.   It's a -- it's a process that was set up before

10 I arrived there.  That was the established process.  And

11 I really don't know the, you know, reasons why it was

12 set up that way, but that's the way it was set up when

13 I -- when I got there.

14     Q.   I ventured off of my path here, so let me go

15 back.

16              In your position as the aid to the managing

17 director of flying operations, did you directly report

18 to O.C. Miller?

19     A.   I did.

20     Q.   Is there anyone else you reported to?

21     A.   No -- well, there were other jobs, like,

22 collateral duty jobs, I guess, that I did that that

23 would work -- did work for other individuals, but it

24 wouldn't in a reporting fashion.  I only reported to

25 O.C.

1  if a pilot's going out on leave and they have questions

2  about that leave.  If there -- if there's -- so

3  specifically, leaves, any of them, right, military,

4  sick, personal, maternity, they would come to us.  And

5  it's a liaison -- all the policies are in the flight

6  operations manual, typically, but it's just being a

7  human being to help the pilot, guide them through the

8  processes of -- of those leaves and other things.

9      Q.  Aside from assisting with leaves of absence, in

10  your position as the assistant chief pilot, what else

11  did you do, if anything, regarding military reservists?

12      A.  So, in the office, we had individuals and I was

13  one of them, which we were kind of the focal points for

14  military leave, if there was any liaison that needed to

15  go on between one of our pilots, in Detroit, that --

16  that we would be the ones that would reach out to that

17  pilot.  If it was warranted.

18      Q.  Under what circumstances would it be warranted

19  to reach out to a pilot?

20      A.  So it was typically a call or an e-mail or some

21  sort of communication from Jim Mangie, who was the

22  liaison at that time, in Atlanta.

23      Q.  Okay.  Just for the sake of clarity, so in

24  June 2012, you were the assistant chief pilot?

25      A.  Uh-huh.

1       Q.   And at that point, Jim Mangie is -- is the

2    military affairs liaison, correct?

3       A.   Correct.

4       Q.   And he was the military affairs liaison through

5    at least February of 2017, based on your testimony; is

6    that correct?

7       A.   From a strategic standpoint, not on the

8    day-to-day let's say, care and feeding of the pilots.

9       Q.   Okay.

10      A.   Right.

11      Q.   In this June 2012 time period, was Jim Mangie

12   more involved with the pilots directly as opposed to

13   third parties such as the Pentagon and ESGR as you

14   mentioned before?

15      A.   I have no way of knowing that.

16      Q.   Okay.  Then -- then let's parse out this --

17   these calls or e-mails from Jim Mangie.

18      A.   Yes.

19      Q.   I think you mentioned that -- that in your

20   position as the assistant chief pilot in Detroit, you

21   would be a focal point for military leaves, that if --

22   if you needed to reach out to the pilots, if it were

23   warranted, that your office would do that, and that such

24   circumstances would be precipitated by a call or e-mail

25   from Jim Mangie; is that correct so far?

1    -- if there's a question as far as whether it be, like,

2    extremely short notification of the leave, would be a

3    case where we might want to reach out to the pilot, and

4    say, hey, what are the circumstances of this, not from

5    a, you can't take it standpoint but just from a, you

6    know, what's going on standpoint type thing.

7         Q.  Sure.

8         A.  So that's a -- that's an example, where -- I'm

9    trying to think of the words that would best fit that

10   category other than long term.  It would be a leave that

11   kind of falls outside the normal notification, let's

12   say.

13        Q.  What is a normal notification?

14        A.  Through iCrew, and to where it just seamlessly

15   goes in and -- and manipulates the pilot's schedule.

16        Q.  Okay.

17        A.  To where if -- so let's say, it's a day prior

18   to a trip, iCrew won't let you put that in.

19        Q.  Okay.

20        A.  So there needs to be a verbal, if you will, I

21   guess from the pilot to notify crew schedules, I'm not

22   going to be there for my trip.

23        Q.  Okay.

24        A.  And that would set up probably a chain of

25   events where crew scheduling would get that

```
 1   that back for me, please?
 2                   THE REPORTER:  No problem.
 3                   (Whereupon the last answer was read back.)
 4                   THE WITNESS:  You did that on purpose.
 5                   MS. MATTER:  Okay.  No, I didn't.
 6                   THE WITNESS:  Okay.  I'll try to do better.
 7       Q.  BY MS. MATTER:  Okay.  So it was your
 8   responsibility to ensure the policies were conducted
 9   appropriately, and if necessary, you would have
10   conversations with the regional director?
11       A.  Correct.
12       Q.  Okay.  Thank you.  Who ultimately had the final
13   say with respect to military related policies at Delta?
14       A.  Jim Graham.
15                   MR. STONE:  I'm going to object only in
16   that there's no time frame for that question.  So I
17   presume to know the history of Delta Airlines?
18                   MS. MATTER:  That's fair.
19                   THE WITNESS:  Yes, or during my tenure.
20       Q.  BY MS. MATTER:  Would it be appropriate to say
21   that Jim Graham had final say from 2012 to 2017?
22       A.  Yes.
23       Q.  Are there any years outside that 2012 to 2017
24   time frame that you'd like to expand upon with respect
25   to Jim Graham's final say, if you will?
```

1      Q.   Was there ever a time during your career at

2   Delta that you did interface with Jason frequently?

3      A.   Yes.

4      Q.   When was that?

5      A.   That was from November 2014 to February of

6   2017.

7      Q.   And under what circumstances would you

8   interface with Jason Zawislak during the November 14th

9   to February 2017 time period?

10     A.   We would -- over military leave issues, he was

11  the manager of pilot leaves.  So if he had questions on

12  -- on any list of military leave issues, he would come

13  to me and we would discuss it.

14     Q.   Okay.  During that time frame, would you have

15  considered yourself to kind of be an expert, if you

16  will, on the military leaves at Delta?

17     A.   I wouldn't -- I don't know.  I wouldn't

18  consider myself an expert.

19     Q.   Okay.  Who do you think would have been the

20  most informed about military leaves at Delta during that

21  2014 to 2017 time period?

22     A.   As far as overall, I would say Jim Mangie had a

23  -- grasp of the large issues.

24     Q.   And what makes you say that?

25     A.   He had -- I'm not sure.  I think I already

1    him a cup of coffee and we just talked.

2        Q.  Okay.

3            MR. STONE:  Are you done with 3?

4            MS. MATTER:  Yes.  Will you mark this as

5    Exhibit 4, please?

6            (Exhibit 4 marked for identification.)

7            THE WITNESS:  (Witness examining document.)

8        Q.  BY MS. MATTER:  And just let me know when

9    you've had an opportunity to review it.

10       A.  Okay.

11       Q.  Okay.  Is this your e-mail on the first page of

12   Exhibit 4 at the top, under the cc line?

13       A.  (Witness examining document.)  It is.

14       Q.  Wonderful.  Have you seen this e-mail before?

15       A.  I can't -- I can't recall it.

16       Q.  Okay.  Would you have any reason to dispute

17   that you received this e-mail at or near July 11th,

18   2014, at 8:41 a.m.?

19       A.  No.

20       Q.  Okay.  Do you recall this situation at all?

21       A.  I don't.

22       Q.  Okay.  On page 2, which ends in Bates 198, can

23   you tell me what this is?

24       A.  (Witness examining document.)

25       Q.  What this reflects, this particular page?

1      A.   This is a military leave log.

2      Q.   So at the top, where it says Thursday, July 10,

3  2014, at 9:42 p.m.

4               Do you see that?

5      A.   Uh-huh.

6      Q.   Is that a yes?

7      A.   Yes.

8      Q.   Under that it says to Jim Mangie and Barry W.

9  Behnfeldt.

10              Do you see that?

11     A.   Yes.

12     Q.   Does that mean that when a pilot fills out the

13  military leave log, it automatically generates an e-mail

14  notification to you and Jim Mangie, for at least this

15  time period, 2014?

16     A.   Well, it's an auto-generated e-mail, so, yes.

17     Q.   Is that consistent with your recollection of

18  that time period?

19     A.   As far as --

20     Q.   Receiving these auto-generated e-mails from

21  military leave logs?

22     A.   Yes.

23     Q.   Would that be the same for 2014 through 2017,

24  did you receive these auto-generated e-mails?

25     A.   '14 through '17, yes, I did receive them.

1       Q.   Okay.

2       A.   But that was the process that we went through

3   within flying operations to have that change made.

4       Q.   As we go through this today, if you end up

5   recalling when that time period was or best estimate,

6   would you do me a favor and just put that on the record

7   for me?

8       A.   Sure.

9       Q.   Thank you.  With respect to this first page

10  that ends in Bates 197, in the middle of the page,

11  there's an e-mail sent from you Friday, July 11, 2014,

12  at 8:19 a.m., to Leonard B.  Willy and James W. Breaugh.

13               Do you see that?

14      A.   I do.

15      Q.   Who -- what was Leonard Willy's responsibility

16  at that time period?

17      A.   He was a chief pilot in the office, in Detroit.

18      Q.   Well, what about James Breaugh?

19      A.   Same, chief pilot, Detroit.

20      Q.   Now, in that first sentence it says: "To me,

21  this borders on harassment."

22               Can you explain what you meant in that

23  e-mail?

24      A.   I'm trying to look at the -- what's the

25  substance from above which would have driven me to

 1   that --

 2        Q.   Sure.

 3        A.   -- making a statement like that.

 4        Q.   If you wouldn't mind, take a look at the e-mail

 5   below, and it's from Jim Mangie, Friday, July 11, 2014,

 6   at 1:10 a.m.

 7                  And it says:  Show new hire pilot 73N

 8   DiGuido, D-i-G-u-i-d-o, MLOA, 18 August through 7

 9   September.

10                  Do you see that?

11        A.   Okay.  Yes, I do.

12        Q.   Okay.  And then under that, is a paragraph

13   talking about NYC CPO Brian Dickerson --

14        A.   Okay.

15        Q.   -- do you see that?

16        A.   Yes, I see it now, yes.

17        Q.   Does that help you figure out why you would

18   have written the phrase, "to me, this boarders on

19   harassment"?

20        A.   So it was based on the e-mail that Jim sent

21   to -- it looks like the New York Chief Pilots Office

22   (witness reading to himself) -- eight general and how in

23   July, and it's now taking two weeks in August, and maybe

24   a week in September, please talk about Delta

25   employment --

1          I didn't -- I felt like my mode of

2    operation, if you will, my piece was not to determine

3    how much was an acceptable level of military leave use

4    that a pilot would take.  That's not for -- that was

5    never for me to determine that.  And any time I felt

6    like someone was potentially making a claim that a pilot

7    was taking too much military leave, that's where it

8    leads, to my standard, might be potentially

9    inappropriate.

10       Q.  So just for the sake of clarity, and I probably

11   should have done this before answering -- asking the

12   question.

13          So Jim Mangie's e-mail on Friday, July 11,

14   2014, at 1:10 a.m., and the last sentence says, "please

15   talk with him, meaning Mr. DiGuido, about his MLOA this

16   early in his Delta employment, and if this level of use

17   will continue."

18          For the sake of clarity, the MLOA refers to

19   Military Leave of Absence, correct?

20       A.  Correct.

21       Q.  And this level of use is implying to be amount

22   of military leave, correct?

23       A.  Correct.

24       Q.  So is it your opinion that Jim Mangie was

25   basically saying that this person, Mr. DiGuido, was

1  taking a lot of military leave this early in his career,

2  and we should have a discussion with him about the

3  amount of military leave that he was taking, correct?

4       A.   That's correct.

5       Q.   And what you're stating is, to me, this

6  boarders on harassment?

7       A.   That's what I said.

8       Q.   Okay.

9       A.   At that time.

10      Q.   Now in the e-mail, the next e-mail, but it

11  appears higher on the page because of how they're

12  printout -- printed out from Jim Breaugh.

13           Do you see that?  Where it's at 8:25 a.m.?

14      A.   I do.

15      Q.   Where it says, "it's not clear to me who Jim is

16  asking to talk to the young lad.  NYC, CPO, or Nose."

17           What does "nose" refer to?

18      A.   Nose is Brian Dickerson.

19      Q.   Who is Brian Dickerson?

20      A.   Brian Dickerson is in the e-mail down here

21  further.

22      Q.   I see.

23      A.   And I'm trying to think what Brian's -- yeah,

24  you know, that's -- that's who it refers to.

25      Q.   Okay.  Do you remember what Brian Dickerson's

Date:       Friday, July 11 2014 08:41 AM
Subject:    Re: MLOA-DiGuido 214329
From:       Willey, Leonard B
To:         Breaugh, James W <james.breaugh@delta.com>;
CC:         Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >;

Sounds to me like the guy's trying to get caught up with his part time gig after training. If it's not handled correctly it's going to look like harassment.

Sent from my iPhone
On Jul 11, 2014, at 8:25 AM, "Breaugh, James W" <james.breaugh@delta.com> wrote:

> Its' not clear to me who Jim is asking to talk to the young lad.  NYC CPO or Nose?
>
> Depending on who ask him the question, it 'may' be a fair question but it is a dangerous and slippery slope. Delta has the strong reputation of being very military friendly.  Probably better to come from the CPO and not above.
>
> Just between us girls...
>
> Regards,
> <image004.png>
> **Jim Breaugh | Delta Air Lines | Chief Pilot | DTW CPO** | (o) **734.229.5747** | (c) **404.697.7905**
> <image003.jpg>
>
> **From:** Behnfeldt, Barry W
> **Sent:** Friday, July 11, 2014 8:19 AM
> **To:** Willey, Leonard B; Breaugh, James W
> **Subject:** FW: MLOA-DiGuido 214329
>
> To me this borders on harassment.  If I was running the program.  I would push this all to the
> people who lead/manage the military folks...the CPO.  I think this is a way for JM to justify his
> existence.
>
> Just between us girls I'd like to get your perspective.
>
> BB
>
> -----Original Message-----
> From: Mangie, Jim
> Sent: Friday, July 11, 2014 1:10 AM
> To: Delta, PilotSched
> Cc: Fidler, Thomas E; Rutigliano, Michael S; Terry, Richard L; Dickerson, Bryan L
> Subject: MLOA-DiGuido 214329
>
> Hello Scheduling,
>
> Please show new hire pilot 73N DiGuido MLOA 18Aug-07Sep.
>
> Thanks,
>
> Jim
> -----------------------------------------------
> NYC CPO/Bryan Dickerson-F/O DiGuido finished his OEs 10Jun. He took 9 days of MLOA in July and
> is now taking two weeks in August and a week in September. Please talk with him about his MLOA
> this early in his Delta employment and if this level of use will continue.  Thanks
>
> -----Original Message-----

CONFIDENTIAL

DEPOSITION
EXHIBIT
4
8-23-21
PENGAD 800-631-6989

DELTA000034197

4.1

From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Thursday, July 10, 2014 9:42 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: Non-Holiday Period
actual_dates_needed: 18 August to 7 September 2014
pilot_name: Nicholas DiGuido
employee_number: 214329
city: Virginia Beach
state: VA
email_address: ndiguido@gmail.com
phone_number: 757-748-5456
fleet: 737
position: B-First Officer
base: NYC
squadron_unit_name: VFA-106 SAU
squadron_unit_base: NAS Oceana
branch_of_service: USNR
unit_city: Virginia Beach
unit_state: VA
unit_phone: 757-433-9099
rank: O-4
billet: F/A-18 Instructor Pilot
co_do_xo_ops_wingco_higher: No
unit_commander_rank: O-4
unit_commander_name: LCDR Lee Smallwood
unit_commander_status: Active
unit_commander_phone: 757-433-9099
wing_name_location: CSFTL
wing_phone: 757-433-9273
wing_commander_rank: O-6
wing_commander_name: Capt Mark Weisgerber
wing_commander_status: Active
wing_commander_phone: 757-433-9273
duty_performing: Instructing F/A-18 pilots.
duty_location_performed: NAS Oceana & NAS Key West
duty_performed_another_time: No
other_information:
B1: Submit

CONFIDENTIAL

```
 1                    MS. MATTER:  Yes, sir, it is Exhibit 5.

 2        Q.   BY MS. MATTER:   What I've given you has been

 3   marked as Exhibit Number 5, and it is a five-page

 4   document.  If you'll take a moment to review it.  Just

 5   let me know when you're done.

 6        A.   (Witness examining document.)  Okay.

 7        Q.   I've handed you what's been marked as

 8   Exhibit 5, it's a five-page document, and it begins with

 9   Delta Bates Stamp 000035771 and ends in 775.

10                    Have you had an opportunity to review this

11   document?

12        A.   I have.

13        Q.   Okay.  And do you see your name and your e-mail

14   address in the to line on the beginning e-mail?

15        A.   I do.

16        Q.   Okay.  Would it be fair to say that your e-mail

17   address appears throughout these documents?

18        A.   Yes.

19        Q.   As e-mails that you would have received in

20   December of 2014?

21        A.   Correct.

22        Q.   Okay.  And it's your understanding they would

23   have been maintained by the company since they were

24   drafted and received in 2014?

25        A.   Yes.
```

 1  back.)

 2       Q.  BY MS. MATTER:  It sounds like you don't

 3  approve of the military leave until the pilot is asked

 4  if the dates can be moved; is that correct?

 5       A.  You said approve of?

 6       Q.  Approve?

 7       A.  You said approve of.

 8       Q.  Okay.

 9       A.  And there's -- I don't post the leave until the

10  liaison is complete.  It's not an approval process for

11  me.  This is -- again, this is a notification of

12  military leave.

13       Q.  Right.

14       A.  And the posting doesn't take place until --

15  because there's no approval process, if you will, for a

16  military leave notification, right?

17       Q.  Sure.

18       A.  But in this case, there was liaison that was

19  going on, right --

20       Q.  Sure.

21       A.  -- on or around the same time that the military

22  leave log was generated.  So I want to make sure that

23  the liaison was finished, so that what ends up on the

24  pilot's schedule is accurate and correct to what the

25  pilot wants and desires.

1      Q.   I guess I'm a little bit confused, because what

2    you've just mentioned is that we want to make sure that

3    it's what the pilot wants and desires?

4      A.   Yes.

5      Q.   But the pilot is notifying the company of

6    military leave.  It's not as though the pilot is going

7    on vacation to Florida --

8      A.   -- correct.

9      Q.   -- or something?

10     A.   Right.

11     Q.   So I guess I'm a little bit confused when you

12   say, "we want to make sure that it's what the pilot

13   desires"?

14     A.   Right.

15     Q.   Why would there even need to be a call between

16   the chief pilot office and the pilot?

17              Why wouldn't it simply just be posted?

18     A.   The program under me, I want to make sure that

19   the pilot has all the resources and it has all the

20   information available to them when it comes to posting

21   of the leave, right.

22              So when training is involved, it's not that

23   we can't move training dates, which we can, but there's

24   -- there's, you know, there's fallouts to that, you

25   know, there's implication to the pilot.  It creates a

1  training?

2      A.  No.

3      Q.  Right.

4      A.  It's their Air Force training.

5      Q.  Right.  This is more about holiday --

6      A.  Right.

7      Q.  -- that this pilot --

8      A.  Right.

9      Q.  -- is going to impact the holiday schedule?

10     A.  Right.

11     Q.  Okay.  In your e-mail on -- on page 3, it

12  reads:  We know how the machine runs during certain

13  times of the year and that's why we put the higher

14  limits on PD/APD.  DeRo needs to beat us about the head

15  and shoulders, and insist that any PDs around these

16  times, be closely considered for necessity.

17              What did you mean by that?

18     A.  So if a non-military -- so during those high

19  times where they raise the limits on.  So, if a normal

20  pilot, to go through what's called the PCS process,

21  which is the Pilot Change Schedule Process, just to get

22  the day off, if they want that day off, to put in a

23  personal drop, over holidays, the threshold is higher,

24  on the reserve coverage, before they can drop either

25  reserve days or a trip, right, through personal drop.

1          So that would have to be a manual.  If a
2    pilot was to call the chief pilot office, and say
3    non-military, and they need a specific day off, like,
4    the 23rd or 24th, there needs -- there -- I mean, it
5    can't be for my dog didn't get up this morning, or, you
6    know, it's got to be a bonafide, like, a -- and it's a
7    judgment call at the chief pilot level at that point, on
8    what meets the threshold, but that's what the -- the PD
9    comment is.
10        Q.   Okay.  So in other words, how does Delta
11   determine if the military really needs the pilot for
12   that day?
13        A.   That's a conversation that the chief pilot
14   office would have with the military member, to see if
15   there's any -- any availability to shift the training or
16   shift the military duty as an ask.  It was -- like, I
17   said, as an ask.
18        Q.   So the next sentence says:  "This is why the
19   MLOA log was set up, to be used when the requested dates
20   touched holiday periods."
21             Would you agree then it was designed -- the
22   log was designed to make pilots reconsider or think hard
23   about their military leave near or during holidays,
24   correct?
25             MR. STONE:  Well, I'm going to object to

1   that question.  I'm going to object to that question.

2   He said he wasn't involved in setting up the log.  So to

3   the extent that you're asking for motivations in setting

4   up the log or something like that.

5                   MS. MATTER.  Okay.  Let's not.

6                   THE WITNESS:  That's how I was going to

7   answer.  I don't know.

8       Q.  BY MS. MATTER:  You would have no --

9       A.  Recollection of the log process and why it was

10  set up.

11      Q.  What about the calls to the pilot, though?  Was

12  that to motivate them to reconsider military leave?

13      A.  Never.

14      Q.  Around holidays?

15      A.  Never.  Not on my watch.

16      Q.  Okay.  So next, a little bit further down in

17  that paragraph, now, you've said never, not on my watch,

18  but then it says, quote, we want them to understand the

19  consequences of their actions in a strictly business

20  sense when they drop the notification first and

21  foremost.  But when it touches a certain date, we now

22  ask them to fill out a military leave log, and they're

23  probably going to get a call from someone, and someone

24  is maybe going to call their unit or ring leadership to

25  check on some things.  Is this harassment question mark,

1   to some it probably is.

2              You wrote that statement, correct?

3   A.  I did.

4   Q.  Okay.  Nothing further on that for now.

5              (Exhibit 6 marked for identification.)

6   Q.  BY MS. MATTER:  I'm going to hand you what has

7   been marked as Deposition Exhibit No. 6, Delta000183687.

8   The second page is Delta00183686.  It's just the way

9   they were produced, but I believe they go one after the

10  other.  Take a look at them.

11  A.  Okay.

12  Q.  Okay.  Was this an e-mail sent from you to Mr.

13  Jason Zawislak on Tuesday, December 16th, 2014?

14  A.  Yes, it looks like it.

15  Q.  Okay.

16  A.  Yes.

17  Q.  And it also includes a military leave log

18  auto-generated e-mail to you and Jim Mangie on Tuesday,

19  December 16, 2014, at 2:19 p.m.

20              Do you see that?

21  A.  I do.

22  Q.  And it is for military leave around Christmas,

23  December 15th; is that correct?

24  A.  It is.

25  Q.  And that is for Mr. Hiram Gates, correct?

Yes Barry, we are. The plan is that as soon as the MLOA is on his schedule, we will move the days. DeRo prefers to do it in that order, and I pretty much concur. If that doesn't make sense, or you have any questions, as usual, don't hesitate to give me a call.

Phil

-----Original Message-----
From: Behnfeldt, Barry W
Sent: Wednesday, December 10, 2014 6:15 AM
To: Davis, Philip T
Subject: FW: [FOP10193] Military Leave Log - Autogenerated email

Phil,
I thought we were going to move reserve days?

v/r,
Barry

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Tuesday, December 09, 2014 10:22 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: Non-Holiday Period
actual_dates_needed: 23 DEC 14- 24 DEC 14
pilot_name: Thomas Jones
employee_number: 732627
city: Kirkland
state: WA
email_address: moosepilot@gmail.com
phone_number: 2537200050
fleet: 757/767
position: B-First Officer
base: SEA
squadron_unit_name: 728th AS
squadron_unit_base: Joint Base Lewis McChord
branch_of_service: USAFR
unit_city: TACOMA
unit_state: WA
unit_phone: 2537200050
rank: O-4
billet: Instructor

CONFIDENTIAL

DEPOSITION
EXHIBIT
S
8-23-21
PENGAD 800-631-6989

DELTA000035771

5.1

co_do_xo_ops_wingco_higher: Yes
unit_commander_rank: O-5
unit_commander_name: Steve Kurpius
unit_commander_status: Reserve
unit_commander_phone: 253-982-6885
wing_name_location: 446th Air Wing
wing_phone: 253-982-5651
wing_commander_rank: O-6
wing_commander_name: Scott Snyder
wing_commander_status: Reserve
wing_commander_phone: 253-982-5651
duty_performing: Required Phase simulator
duty_location_performed: McChord Field, WA
duty_performed_another_time: No
other_information: I sent an email to the regional CPO and local CPO detailing that I had originally had the simulator scheduled for 22-23rd and was going to be available to the company on the 24-28th of Dec. The squadron that owned the sim took it back and I was forced to slip to another a day later pushing me into the 24th of Dec. I was unable to complete this training earlier in the quarter because I was in 7ER Requal training and OE. Thank you for your support. I am available to depart out the night of the 24th if required after the sim is complete.
B1: Submit

CONFIDENTIAL

DELTA000035772

Date:     Thursday, December 11 2014 04:31 PM
Subject:  RE: SEA 7ER B Jones 732627
From:     Davis, Philip T
To:       Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >;

Thanks Barry,
   Yeah, it is a tough call sometimes.  I know you and I are pretty close on this, and I will welcome a lively discussion on the matter  as long as it includes a cold beer!!

Phil

**From:** Behnfeldt, Barry W
**Sent:** Thursday, December 11, 2014 6:01 AM
**To:** Davis, Philip T
**Subject:** RE: SEA 7ER B Jones 732627

Phil,
Allow me to ramble if you would.  This really is something we should have a discussion about at our next Flying Ops meeting.

Having gone back and reread your reply, I just want to share some thoughts in a general sense and not reference to Scott's situation.  I agree that we can't "insist" on members to move MLOA dates, but before we hit the execute button on the schedule change we cover our bases.  90 percent of the year we put in our MLOA without even the wink of an eye, but when it comes to holiday periods everyone gets on edge.  We know how the machine runs during certain times of the year and that's why we put the higher limits on PD/APD.  DeRoe loves to beat us about the head and shoulders and insists that any PDs around these times be closely considered for necessity.  This is why the MLOA log was setup to be used when the requested dates touch the holiday periods.  Preaching to the choir I know.  So when it comes to holidays, how do we stick to our core values with our people of: Always tell the truth HONESTY, Always keep your deals INTEGRITY, Don't hurt anyone RESPECT, and Treat each other with dignity and respect.  So here's where I think we walk a fine line with our military folks.  We want them to understand the consequences of their actions in a strictly business sense when they drop the notification first and foremost, but when it touches a certain date, we now ask them to fill out a military leave log and they are probably going to get a call from someone and someone is maybe going to call their unit or wing leadership to check on some things.  Is this "harassment "? To some it probably is.  This is an area where I think we should have a discussion as to what means we want to go as a company in holiday notifications.  What we don't want guys doing is using MLOA as a means to circumvent seniority and have a personal agenda attached to it.  What I mean by that would be, I drill in New Orleans, I live in New Orleans, I am based with Delta in Atlanta and a way of getting time off before a holiday to spend time with my family I schedule a couple of drill periods on or around that holiday period.  Civilian guys wouldn't be able to pull this off through PCS so it's not fare if a military guy uses that card...for family reasons.  It can only be a business decision when it comes to MLOA being put on a schedule and I know you know that.  So I think your reference to family would be building the case to not do the X day move so he can still have those days with his family.

You know I understand the pressures that surrounds our reserve and guard members when juggling the three balls, but from a company standpoint we can't have people making drill decisions based on family desires.

The challenge:  Creating a corporate culture of trust and respect without being harassing when we deal with an entitled benefit.

I'll say it again, I want to have a lively discussion at our next RD meeting on how we do this.  You are our leadership out there at the tip of the spear and in mine and OC's minds it's your leadership that should and will establish the culture.

Give me a call if you wish to discuss, especially if my ramblings got off mark.  I need your help going forward with this transition.

v/r,
BB

CONFIDENTIAL                                                                    DELTA000035773

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393



---

**From:** Davis, Philip T
**Sent:** Monday, December 08, 2014 5:34 PM
**To:** Behnfeldt, Barry W
**Subject:** RE: SEA 7ER B Jones 732627

Barry,
   I cannot say with 100% certainty that he cannot do the sim on his days off. However, I don't think we can insist on it either. He does have a right to have some days off with his family, etc. I will go ahead with the X day move as I think it is the best for us as well. We will get additional coverage on days where we are short staffed, and he will still have at least 4 days of availability including Christmas in his last block of on call days.

Thanks,

Phil

---

**From:** Behnfeldt, Barry W
**Sent:** Monday, December 08, 2014 2:45 PM
**To:** Davis, Philip T
**Cc:** CPO, SEA; Mangie, Jim
**Subject:** RE: SEA 7ER B Jones 732627

Phil,
Thanks for your deep dive. We just want to confirm if possible the fact that he is unable to perform this training earlier in the month during his Xdays. I am assuming this is the case based on the earlier discussions and if this is the case, then we support what you believe to be the best course of action going forward.

v/r,
Barry

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393



---

**From:** Davis, Philip T
**Sent:** Monday, December 08, 2014 1:32 PM
**To:** Behnfeldt, Barry W
**Cc:** CPO, SEA; Mangie, Jim
**Subject:** SEA 7ER B Jones 732627

Greetings Barry,
   Per our communications regarding Scott Jones request for mil leave on 23 and 24 Dec.
   I have worked with Scott on a couple of other issues, and in fact, he is performing very well as a new hire Mentor. I dealt with him this weekend as we handled a DIF for one of our new hires.
   My conversation with Scott was centered around the specific request for 23/24 December, but also addressed the larger issue of overall considerations when mixing MLOA with Delta's needs. I stressed, that MLOA was not to be used to manipulate the scheduling system and I believe that Scott understands that.
   Regarding this request, he has stated that he does not believe he can schedule his sim on an earlier date.   To accommodate his needs and ours, I suggested we move the "X" days from 13/14 December to 23/24 December. Our "Required vs. Available " on 13/14 is short, and on 23/24, it is exactly even.   On the down side, it does split up a large block of RES days, but does

leave him with four days on call from 25-28 Dec. Scott mentioned that he wanted to use this solution earlier, but the X day move would not go thru.   I can make it happen as his RD.
 Let me know if you have any issues with this solution.
Thanks,

Phil


Captain Phil Davis
Regional Director-Chief Pilot West Region
Delta Flight Operations
801-744-4486  Office
404-291-4376  Cell

CONFIDENTIAL

1    to some it probably is.

2              You wrote that statement, correct?

3        A.   I did.

4        Q.   Okay.  Nothing further on that for now.

5              (Exhibit 6 marked for identification.)

6        Q.   BY MS. MATTER:   I'm going to hand you what has

7    been marked as Deposition Exhibit No. 6, Delta000183687.

8    The second page is Delta00183686.  It's just the way

9    they were produced, but I believe they go one after the

10   other.  Take a look at them.

11       A.   Okay.

12       Q.   Okay.  Was this an e-mail sent from you to Mr.

13   Jason Zawislak on Tuesday, December 16th, 2014?

14       A.   Yes, it looks like it.

15       Q.   Okay.

16       A.   Yes.

17       Q.   And it also includes a military leave log

18   auto-generated e-mail to you and Jim Mangie on Tuesday,

19   December 16, 2014, at 2:19 p.m.

20              Do you see that?

21       A.   I do.

22       Q.   And it is for military leave around Christmas,

23   December 15th; is that correct?

24       A.   It is.

25       Q.   And that is for Mr. Hiram Gates, correct?

```
 1        A.   It is.

 2        Q.   Now the information at the bottom, it says:

 3   "Sorry for the short notice.  This is due to a schedule

 4   disruption caused by a crew delayed on duty overseas,"

 5   paren.  "I would much rather be doing the trip with the

 6   OGG layover exclamation point," closed paren.

 7        A.   Yes.

 8        Q.   What is the OGG layover?  What does that mean?

 9        A.   That's a -- I think it's -- is it Hawaii?

10        Q.   Okay.

11        A.   I think it's Hawaiian airport layover.  He's

12   saying he'd much rather go to Hawaii then --

13        Q.   Okay.  So the top of this e-mail, you write to

14   Jason Zawislak, should we put the screws to this guy?

15             What did you mean?

16        A.   I don't know.

17        Q.   Okay.

18        A.   If we should look closer at the situation.

19        Q.   Does that mean that there should be an

20   escalation that was described in Exhibit No. 5, at the

21   third page in, with respect to leave out or near a

22   holiday?

23        A.   Since it was over Christmas, I can speculate

24   that -- yes.

25             MS. MATTER:  Can you read that back to me,
```

**Date:** Tuesday, December 16 2014 03:22 PM
**Subject:** FW: [FOP10193] Military Leave Log - Autogenerated email
**From:** Behnfeldt, Barry W
**To:** Zawislak,Jason E <Zawislak>;

Should we put the screws to this guy?

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Tuesday, December 16, 2014 2:19 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: Christmas (23DEC15�26DEC15)
actual_dates_needed: 24-30 Dec
pilot_name: Hiram Gates
employee_number: 168001
city: Faribault
state: MN
email_address: hpgates@hotmail.com
phone_number: 612-281-5376
fleet: 7ER
position: B-First Officer
base: MSP
squadron_unit_name: 434 Operations Group
squadron_unit_base: Grissom ARB
branch_of_service: USAF
unit_city: Peru
unit_state: IN
unit_phone: 765-688-2689
rank: O-5
billet: Deputy Commander
co_do_xo_ops_wingco_higher: Yes
unit_commander_rank: O-6
unit_commander_name: Jerry Malloy
unit_commander_status: Reserve
unit_commander_phone: 765-688-2687
wing_name_location: 434th Air Refueling Wing
wing_phone: 765-688-4340
wing_commander_rank: O-6
wing_commander_name: Douglas Schwartz
wing_commander_status: Reserve
wing_commander_phone: 765-688-4341
duty_performing: DoD contingency alert crew
duty_location_performed: Grissom ARB, IN
duty_performed_another_time: No
other_information: Sorry for the short notice. This is due to a schedule disruption caused by a crew delayed on duty overseas. (I would much rather be doing the trip with the OGG layover!)
B1: Submit

CONFIDENTIAL

DEPOSITION
EXHIBIT
6
8-23-21
PENGAD 800-631-6989

DELTA000183687

6.1

pilot_name: Hiram Gates
employee_number: 168001
city: Faribault
state: MN
email_address: hpgates@hotmail.com
phone_number: 612-281-5376
fleet: 7ER
position: B-First Officer
base: MSP
squadron_unit_name: 434 Operations Group
squadron_unit_base: Grissom ARB
branch_of_service: USAF
unit_city: Peru
unit_state: IN
unit_phone: 765-688-2689
rank: O-5
billet: Deputy Commander
co_do_xo_ops_wingco_higher: Yes
unit_commander_rank: O-6
unit_commander_name: Jerry Malloy
unit_commander_status: Reserve
unit_commander_phone: 765-688-2687
wing_name_location: 434th Air Refueling Wing
wing_phone: 765-688-4340
wing_commander_rank: O-6
wing_commander_name: Douglas Schwartz
wing_commander_status: Reserve
wing_commander_phone: 765-688-4341
duty_performing: DoD contingency alert crew
duty_location_performed: Grissom ARB, IN
duty_performed_another_time: No
other_information: Sorry for the short notice. This is due to a schedule disruption caused by a crew delayed on duty overseas. (I would much rather be doing the trip with the OGG layover!)
B1: Submit

CONFIDENTIAL

DELTA000183686

1  his answer?

2                  (Whereupon the last answer was read back.)

3                  MS. MATTER:  Can you mark this as

4  Exhibit 8.

5                  (Exhibit 7 marked for identification.)

6       Q.  BY MS. MATTER:  What I've handed you has been

7  marked as Exhibit 7, Delta000025570.

8                  Take as much time as you need to review the

9  document.

10      A.  (Witness examining document.)  Okay.

11      Q.  So this is a two page document.  It's

12  referencing or includes the military leave log for John

13  Poulter, P-o-u-l-t-e-r, for a non-holiday period, and

14  contains an auto-generated e-mail to you and Jim Mangie,

15  correct?

16      A.  Correct.

17      Q.  So we know at least in -- in January of 2015,

18  Jim Mangie is still receiving these auto-generated

19  e-mails?

20      A.  Correct.

21      Q.  BY MS. MATTER:  Now you write an e-mail saying,

22  "Please show FO Poulter MLOA 18 to 21, June 2015, as

23  requested."  And then Jim Mangie writes an e-mail to

24  you, January 26th at 5:14 p.m., "FO Poulter is another

25  one to watch.  The discussion he had with the ATL CPO

```
 1   was interesting.  Also there is history back from his

 2   return to DL."

 3                 Do you have any understanding of what that

 4   means that I just read?

 5        A.  Jim would occasionally -- see, this is

 6   occasional, where Jim would send this, you know, for

 7   this or, actually, once he got the military leave log,

 8   if he had a recollection of the history with a -- you

 9   know, an interaction with a pilot during his liaison

10   time, he would -- he would throw that in there so that's

11   what this is.

12        Q.  When he says, "another one to watch."

13                 What does he mean?

14        A.  I took that to mean to watch his behavior, I

15   guess as far as posting a military leave.

16        Q.  Meaning his military leave?

17        A.  Correct.

18        Q.  The amount of leave?

19        A.  Not -- not specific amount or -- or when, let's

20   say.

21        Q.  So -- so here, I guess what I'm confused as to

22   why you and Jim are receiving the military leave log

23   notification because it says it's for a non-holiday

24   period.

25                 Do you know why you would have received
```

 1   that notification for a non-holiday period?

 2       A.  I believe, at that time, Father's Day was still

 3   one of the triggers for, generally in the military leave

 4   office.

 5       Q.  Is there a lot of flying on Father's Day?

 6       A.  Probably not.  It's not what I would call one

 7   of those high demand.  I mean that's summer, so it's the

 8   normal high demand but...

 9       Q.  Right.  But I think you told me before that --

10   that there are specific dates within high demand, but

11   this isn't a block of, say, summer where people --

12       A.  Correct.

13       Q.  -- have to fill out military leave.

14              So why would he have needed to fill out a

15   military leave log for three days?

16       A.  Because it -- we could go back and look.  If

17   between 18 and 21, June of 2015 was Father's Day.

18       Q.  Okay.

19       A.  But it was -- the log was mechanized to where

20   -- or actually iCrew was mechanized to when it touched

21   those holiday periods, that it would drive the pilot to

22   the military leave log.

23       Q.  Okay.

24       A.  So.

25       Q.  So the holiday periods aren't necessarily high

 1  demand periods, they're just dates that are put into

 2  iCrew that would -- that would trigger the military

 3  leave log?

 4      A.  Correct.  It's not based on the schedule that's

 5  going on actually, at Delta at the time, it's just put

 6  in as date -- a date period range around a holiday.

 7      Q.  Okay.  Is the list of holidays provided to all

 8  of Delta's pilots?

 9      A.  I believe -- I'm thinking we put that in the

10  FOM.

11      Q.  Okay.

12      A.  I think we did provide that.

13      Q.  Okay.  So if I were to look at the FOM for

14  June, I would be able to find, say, Father's Day, June,

15  2015, I can find Father's Day as a listed day, such that

16  if I am a reservist pilot, I will know, that if I have

17  to do military leave, I go into iCrew, it's going to

18  deny my request, because it's called a request in iCrew,

19  and it's going to shoot me over to that military leave

20  log, and I'm going to fill that out, correct?

21      A.  It's going to deny you the normal iCrew posting

22  processing --

23      Q.  Sure.

24      A.  -- and drive you to the military leave log,

25  correct.

1  his motives were, knowing Jim.  And his -- I'll just say

2  I believe his concerns to be, that a pilot that's

3  learning to fly at Delta, needs to learn how, you know,

4  the preference is to learn how to do that and do it

5  good.

6      Q.  Okay.

7      A.  Without a whole lot of external extractors.

8  That was Jim's -- that was part of Jim's style.

9      Q.  Okay.

10          MS. MATTER:  Exhibit 9, please.

11          (Exhibit 9 marked for identification.)

12      Q.  BY MS. MATTER:  And if you'll take a moment to

13  review what we've marked as Exhibit 9.  This is a

14  two-page document with Bates Stamp Delta000264357 to

15  358.  Take your time.

16      A.  (Witness examining document.)

17      Q.  Okay.  This is an e-mail exchange regarding

18  military leave log submitted for Labor Day of 2015; is

19  that correct?

20      A.  Well, it's long term.  This would be a long

21  term.

22      Q.  Sure.  My apologies.  I misspoke.  It was from

23  May 2015 to September 30th, 2015?

24      A.  Right.  So this would be a long term.

25      Q.  Long-term military leave.

1        A.   Correct.

2        Q.   But it also touches Labor Day, so it's two

3   triggers for that military leave log, correct?

4        A.   Well, I -- to my knowledge, it would be because

5   it's over 30 days.

6        Q.   Okay.   But it also says at the top here,

7   primary period, Labor Day, correct?

8        A.   Right.   But because that was encompassed, and

9   that's the way the log was mechanized, evidently.   But

10  it's -- it's really -- it's a long-term leave.

11       Q.   Okay.   So here, this is Jim Mangie on

12  April 1st, 2015, is writing to you.

13            Do you see that?

14       A.   I do.

15       Q.   He says, "First Officer Kamataris just finished

16  OE in January and has been on MLOA a good portion of his

17  time here.   This duty doesn't justify his being gone as

18  long as he's going for this early in this employment."

19            Was his suggesting his employment at Delta?

20       A.   I believe so.

21       Q.   It says, "suggest we discuss it with him and

22  his unit."

23            Was he meaning discussing his military

24  leave?

25       A.   Yes.

Tell him to back off the logs and help with RTWs :)

Sent from my iPad

> On Apr 1, 2015, at 9:35 PM, Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com > wrote:
>
> WHY AM I DOING THESE FUCKING LOGS IF HE'S GOING TO CONTINUE TO FUCKING DIG INTO THEM!!!
>
> Ok...vent complete...back to pushing these through!!
>
> Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393
>
>
>
> ----—Original Message-----
> From: Mangie, Jim
> Sent: Wednesday, April 01, 2015 6:29 PM
> To: Behnfeldt, Barry W
> Subject: FW: [FOP10193] Military Leave Log - Autogenerated email
>
> F/O Kamataris just finished OE in January and has been on MLOA a good portion of his time here. This duty doesn't justify his being gone as long as he's going for this early in his employment. Suggest we discuss it with him and his unit. Thx
>
> Captain Jim Mangie
>
> Flight Operations
>
> Delta Air Lines
>
> 404 715 1883-Office
>
> 404 918 5481-Cell
>
>
> ----—Original Message-----
> From: noreply@delta.com [mailto:noreply@delta.com]
> Sent: Wednesday, April 01, 2015 6:02 PM
> To: Mangie, Jim; Behnfeldt, Barry W
> Subject: [FOP10193] Military Leave Log - Autogenerated email
>
>
> primary_period: Labor Day (04SEP15�07SEP15)
> actual_dates_needed: 12 May 15 - 30 Sep 15
> pilot_name: Andrew Kamataris
> employee_number: 892969
> city: Beavercreek

DEPOSITION
EXHIBIT

8-23-21

PENGAD 800-631-6989

CONFIDENTIAL

DELTA000264357

> state: OH
> email_address: andykam99@hotmail.com
> phone_number: 520 205 1209
> fleet: MD88/90
> position: B-First Officer
> base: ATL
> squadron_unit_name: 104 FS
> squadron_unit_base: Warfield ANG
> branch_of_service: USAF
> unit_city: Baltimore
> unit_state: MD
> unit_phone: 410 918 6227
> rank: O-4
> billet: Flight CC
> co_do_xo_ops_wingco_higher: No
> unit_commander_rank: O-5
> unit_commander_name: Douglas Baker
> unit_commander_status: N/A
> unit_commander_phone: 443 790 2898
> wing_name_location: 175WG Warfield ANG Base
> wing_phone: 410 918 6227
> wing_commander_rank: O-7
> wing_commander_name: Scott Kelly
> wing_commander_status: Active
> wing_commander_phone: 410 918 6227
> duty_performing: Instructor Pilot, PROJO for Exercise Saber Strike 15.
> duty_location_performed: Warfield 'ANG
> duty_performed_another_time: No
> other_information:
> B1: Submit
>

CONFIDENTIAL

DELTA000264358

 1   here, Crystal.  It's 1:00.  We've been going for, I

 2   think a little over an hour now.  We can take a break

 3   now for lunch, we can do it later.  I don't know what,

 4   sort of what your plan is.

 5                    MS. MATTER:  Ten minutes.

 6                    Okay.  Let's mark this one 10.

 7                    (Exhibit 10 marked for identification.)

 8       Q.  BY MS. MATTER:  All right.  Sir, here you go.

 9   And here you go.

10       A.  Okay.

11       Q.  Have you had an opportunity to review

12   Exhibit 10, which is a two-page document?

13       A.  Yes.

14       Q.  Okay.  And that is Delta000013811 to 812.  So

15   in this e-mail, at the top of the page, it appears that

16   you're sending an e-mail to Lynn Ivey; is that correct?

17       A.  That's correct.

18       Q.  And who is Lynn Ivey?

19       A.  She was the -- she was the -- I guess she was

20   just a specialist in career resources.

21       Q.  Okay.  Do you recall sending this e-mail?

22       A.  I mean I sent it -- it was actually -- it

23   wasn't sent directly to Lynn Ivey, right, it was sent to

24   career resources and crew scheduling.

25       Q.  All right.  So this e-mail at the top here, it

```
 1   says Monday, April 13, 2015 --
 2        A.   Okay.
 3        Q.   -- at 3:51 p.m., it says to
 4   LindaIvey@delta.com.
 5        A.   Right.  I see that.
 6        Q.   And where it says, "really need to figure out a
 7   way to change the culture of some of these guys"; is
 8   that correct?
 9        A.   That's correct.
10        Q.   And the nature of the e-mail has to do with the
11   amount of military leave that is being taken by this
12   particular pilot, who is Nathan Graber; is that correct?
13        A.   Correct.
14        Q.   Okay.  No further questions on that one.
15        A.   Could you restate what you just -- your last
16   statement just there please?
17                  (Whereupon the last question was read
18   back,)
19        Q.   So -- so you wrote to Lynn Ivey, I did.
20   "Really need to figure out a way to change the culture
21   of some of these guys"?
22        A.   Okay.  But I don't know if it was about the
23   amount of military leave that he was taking.
24        Q.   Sure.  So in that e-mail below, Lynn's writing
25   to you, "did you see his April schedule"?  Meaning
```

**Date:** Monday, April 13 2015 03:51 PM
**Subject:** Re: MLOA 30 GRABER, NATHAN 678913
**From:** Behnfeldt, Barry W
**To:** Ivey, Lynn <Lynn.Ivey@delta.com>;

I did. Really need to figure a way to change the culture of some of these guys.

Sent from my iPhone

> On Apr 13, 2015, at 15:49, Ivey, Lynn <Lynn.Ivey@delta.com> wrote:
>
> Did you see his April schedule? Already looks like a professional.
>
> Lynn
>
> -----Original Message-----
> From: Behnfeldt, Barry W
> Sent: Saturday, April 11, 2015 3:42 PM
> To: ATL061, CrewSchedMgmt; CrewResources
> Cc: CPO, REGIONNY; Behnfeldt, Barry W; Zawislak, Jason E; Mangie, Jim
> Subject: MLOA 30 GRABER, NATHAN 678913
>
> Crew schedules,
> Please show FO Graber MLOA 2 May - 1 Jun 2015 as requested.
>
> Crew resources,
> This will be an off payroll event of 31 days.
>
> NYC CPO,
> This is FO Graber's first off payroll leave. Please make sure he is familiar with the MLOA guide on DLNet.
>
> Thanks all,
> Barry
>
> Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393
>
>
>
> -----Original Message-----
> From: noreply@delta.com [mailto:noreply@delta.com]
> Sent: Saturday, April 11, 2015 2:39 PM
> To: Mangie, Jim; Behnfeldt, Barry W
> Subject: [FOP10193] Military Leave Log - Autogenerated email
>
>
> primary_period: Mother's Day (10MAY15)
> actual_dates_needed: 02 MAY 15 - 01 JUN 15
> pilot_name: NATHAN GRABER
> employee_number: 678913
> city: JERICHO CENTER
> state: VT
> email_address: wizf16@gmail.com
> phone_number: 8023245009

CONFIDENTIAL


DEPOSITION
EXHIBIT
10
8-23-21

DELTA000013811

10.1

> fleet: MD88/90
> position: B-First Officer
> base: NYC
> squadron_unit_name: 134 FS
> squadron_unit_base: BURLINGTON ANGS, VT
> branch_of_service: USAF / ANG
> unit_city: S. BURLINGTON
> unit_state: VT
> unit_phone: 8026605213
> rank: O-5
> billet: FLIGHT COMMANDER
> co_do_xo_ops_wingco_higher: No
> unit_commander_rank: O-5
> unit_commander_name: CHRIS TUMILOWICZ
> unit_commander_status: Active
> unit_commander_phone: 8023385584
> wing_name_location: 158 FW, S. BURLINGTON, VT
> wing_phone: 8026605212
> wing_commander_rank: O-6
> wing_commander_name: PATRICK GUINEE
> wing_commander_status: Active
> wing_commander_phone: 8026605223
> duty_performing: Annual Training (AT)4 May - 1 Jun in lead up to overseas deployment over the summer months Jun-Sep.
2-3 May is Unit Training Assembly (UTA).
> duty_location_performed: BURLINGTON ANGS, VT
> duty_performed_another_time: No
> other_information:
> B1: Submit
>

CONFIDENTIAL

1  says already looks like a professional --

2      A.  No, I said I did see the schedule.

3      Q.  Right.

4      A.  And my comment back really needed to figure a

5  way to challenge the culture, to change the culture of

6  some of these guys, would be to maybe have a discussion

7  with them about better ways, perhaps, to post their

8  military leave, to perhaps cause a lesser impact on

9  Delta Airlines.  But again, without looking at the April

10 schedule, I really don't know what the concern she might

11 have had was.

12     Q.  Okay.

13         MS. MATTER:  This is going to be

14 Exhibit 11.

15         (Exhibit 11 marked for identification.)

16     Q.  BY MS. MATTER:  I'm handing you what has been

17 marked as Exhibit 11, Delta0000183946 to 947.  If you

18 can take a moment to look at this.

19     A.  (Witness examining document.)  Okay.

20     Q.  Okay.  Have you had an opportunity to review

21 the document?

22     A.  I have.

23     Q.  Okay.  So this is concerning a military leave

24 log auto-generated e-mail concerning time needed,

25 military time for Jason Walborn; is that correct?

```
 1        A.   Correct.
 2        Q.   And it's military leave for February 2nd and
 3   3rd?
 4        A.   Correct.
 5        Q.   Okay.  Now this is a non-holiday period, right?
 6        A.   I guess.  Yes, correct.
 7        Q.   Isn't that what it says?
 8        A.   Yes, it does.
 9        Q.   Okay.
10        A.   But I'm just looking at the date to see if it's
11   based on my -- correct.
12        Q.   So there were occasions, when pilots who were
13   taking short-term military leave, here, two days, on an
14   non-holiday period, were forced to go through the
15   military leave log process; is that correct?
16        A.   Correct.
17        Q.   Okay.  Now on the bottom of the second page of
18   this exhibit, when Mr. Walborn filled out the request,
19   under other information it says, "VR57 has been very
20   understanding, thus far, to make room for Delta
21   training/consolidation and I need to put a little time
22   in with the squadron."
23        A.   Yes.
24        Q.   Jim Mangie writes, "interesting comments on the
25   bottom."  Your response and e-mail to Jim Mangie dated
```

1  January 21, 2015, at 6:39 p.m., you write, "true,"

2  period. "May have to reset expectations," dot, dot, dot.

3                Did you write that e-mail?

4      A.  I did.

5      Q.  Okay.  By "resetting expectations," what did

6  you mean?

7      A.  I think I probably meant if there was going to

8  be a conversation with a -- with a -- if with a pilot,

9  in this case, it would be to have the same discussion

10 that I always have, on the best way to create a positive

11 relationship between the pilot and their company, and

12 best ways to post leave, and the taking of military

13 leave that serves both their military unit and Delta.

14              But there -- this is -- to me, this one

15 looks like a straight up, as I look at it.  I don't -- I

16 know I didn't call the pilot on this, but that would be

17 what a may recent expectations would be, I guess.

18     Q.  So I'm a little bit confused, because this is

19 -- it's more than seven days out, it's not on a holiday

20 period?

21     A.  Right.

22     Q.  It's not long term leave, but this pilot has to

23 fill out the military leave log, and you're saying, we

24 may have to reset expectations on the best way to create

25 a positive relationship with the -- with Delta.

1           Are you meaning that you want him to move

2    his military leave to his off days or his days that he's

3    not flying for Delta?

4        A.   In -- no.  No.  I mean, like I said, this is a

5    notification of leave and the -- just to go to the

6    broader scheme in where -- what I said earlier, it's the

7    best way to manage the relationship between Delta and --

8    and, of course, there were conversations that our chief

9    pilots and I might have had with the service member, to

10   see if there's any ability to, perhaps, move their

11   military leave dates.  If it's during a busy time, you

12   know, one of those busy holidays.

13       Q.   But it's not.

14       A.   Right.  And I don't under -- I don't know why

15   the second through the third was -- was triggered out

16   into the log, because -- there's sometimes when they're

17   in training that it'll do this.  If there's something on

18   their schedule that iCrew won't let an automatic posting

19   go on, like, training, that kind of stuff, it drives it

20   to the log also, as I now recall.  So there -- there

21   must have been something on the pilot schedule that

22   drove him on the log.

23       Q.   Could it have been the Super Bowl?

24       A.   It might have been, at that time, perhaps.

25       Q.   Now, when you say, "the best way to create a

True. May have to reset expectations...

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

-----Original Message-----
From: Mangie, Jim
Sent: Wednesday, January 21, 2015 5:08 PM
To: Behnfeldt, Barry W
Subject: FW: [FOP10193] Military Leave Log - Autogenerated email

Interesting comments on the bottom.

-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Wednesday, January 21, 2015 4:34 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: Non-Holiday Period
actual_dates_needed: 2-3FEB.
pilot_name: Jason Walborn
employee_number: 856965
city: San Diego
state: CA
email_address: jwalborn78@me.com
phone_number: 4438224700
fleet: 7ER
position: B-First Officer
base: NYC
squadron_unit_name: VR57
squadron_unit_base: NAS North Island
branch_of_service: USNR
unit_city: San Diego
unit_state: CA
unit_phone: 619-545-6924
rank: O-4
billet: Operations Officer
co_do_xo_ops_wingco_higher: Yes
unit_commander_rank: O-5
unit_commander_name: CDR Wood
unit_commander_status: Active
unit_commander_phone: 619-545-6914
wing_name_location: CFLSW
wing_phone: (817) 782-7880
wing_commander_rank: O-5

CONFIDENTIAL

DEPOSITION
EXHIBIT
11
8-23-21
PENGAD 800-631-6989

DELTA000183946

11.1

wing_commander_name: CDR Legan
wing_commander_status: Active
wing_commander_phone: (817) 782-7880
duty_performing: - Actual C40A Mission (KNZY- KNQX
- Operations Officer duties since being away from squadron for all but 7 days in the last 3 months.
-Annual Flight physical
duty_location_performed: NAS North Island, NAS Norfolk
duty_performed_another_time: No
other_information: VR57 has been very understanding thus far to make room for Delta training/consolidation and I need to put a little time in with the squadron.
B1: Submit

CONFIDENTIAL

1   getting the lines of responsibility straight.  And they
2   were straight, but I just was taking some of this
3   communication every now and then.
4        Q.  Did you have occasion to have discussions with
5   O.C. Miller or Jason Zawislak, regarding e-mails like
6   this, where Jim Mangie is involved in what is
7   functionally your role at that point?
8        A.  I did.
9        Q.  And what were those conversations?
10       A.  Along these lines.  I was just a little
11  frustrated.
12       Q.  Okay.  Do you know about how long after this
13  e-mail that Jim Mangie was taken off the military leave
14  log auto-generated list?
15       A.  I don't.
16            (Exhibit 17 marked for identification.)
17            MS. MATTER:  Thank you.
18       Q.  BY MS. MATTER:  Here you are.  Okay.  Take a
19  look at this document that we've marked as Exhibit 17.
20  This has been produced by Delta as 000075576 to 577.
21  And let me know when you've completed that review.
22       A.  (Witness examining document.)  Okay.
23       Q.  Okay.  On the second page, the document that
24  ends in Bates Stamp 75577, you see the exchange between
25  Jim Mangie and Tony, where Jim says, "I saw the military

 1  leave form you submitted a little while ago, and you

 2  previously said that you'll be back sometime in October.

 3  The form if you submitted says 1 January 2016.  Has

 4  something changed since the last time we talked."

 5              Do you see that?

 6      A.  Uh-huh.  I do.

 7      Q.  And the following on, with Tony, being sent

 8  July 1, 2015, at 11:41 a.m., where he mentions that --

 9  that the latest deployment plan is to be back in the

10  country around mid-October, which would put him back at

11  Delta around November 1.

12              And he states, "assuming those dates do not

13  change again, any postdeployment orders would allow for

14  reconstitution leave and to help the squadron with the

15  transition from the deployment."

16              He says, "however, I can break those orders

17  at any time, not AGR orders.  I'm trying to balance my

18  number one job with my obligation to the squadron during

19  and immediately after deployment.  That said, if you

20  think the plan is excessive, please, let me know" and he

21  goes on.

22              Where he says, "I'm trying to balance my

23  number one job," do you take that to mean Delta?

24              Was he referring to Delta there?

25      A.  I really -- I don't know what he was -- I don't

 1  know what he was thinking.

 2      Q.  Okay.  On your e-mail dated Thursday, July 2nd,

 3  2015, at 12:34 p.m., you sent an e-mail to Jim Mangie,

 4  have you reviewed that e-mail at the top of the page?

 5      A.  I did.

 6      Q.  Did you send that e-mail?

 7      A.  I -- it looks like I did.  Yes.

 8      Q.  Do you have any reason to dispute that you sent

 9  that e-mail?

10      A.  No.

11      Q.  Okay.  You wrote, "his comment about, let me

12  know if it's excessive, that's the million dollar

13  question, isn't it the summer schedule dot, dot, dot,

14  any MLOA is excessive."

15          It appears that you'd prefer that pilots

16  not take military leave in the summer of 2015, would you

17  agree?

18      A.  To help the Delta pilot schedule, that would be

19  a perfect world, if we didn't have any military leave

20  use, yes.

21      Q.  Was Delta short on pilots that summer?

22      A.  We were hiring a lot of pilots then and I can

23  just -- I don't remember the amount or the level of how

24  short we may or might not have been.  But, yes, we were

25  having challenges of staffing, so...

| | |
|---|---|
| **Date:** | Thursday, July 2 2015 12:34 PM |
| **Subject:** | Re: Dates for Military Leave |
| **From:** | Behnfeldt, Barry W |
| **To:** | Mangie, Jim <Jim.Mangie@delta.com>; |
| **Attachments:** | image003.jpg |

I think I already did that, but I will check when I get back in full connectivity. His comment about let me know if it's excessive. That's the million dollar question isn't it!! This summer's schedule...any MLOA is excessive.

Saw a guy from the Toledo unit (retired active duty) yesterday on my commute home and he conveyed that with all the dudes getting out of the active duty, there is funding for almost whatever a guy wants to do on a voluntary basis. Doesn't help our cause. I understand active duty draw down, but it's bullshit if they don't actually draw down, but just fund the work through other channels...the guard/reserve.

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

**From:** Jim Mangie
**Sent:** Wednesday, July 1, 2015 5:25 PM
**To:** Barry Behnfeldt

Talked to him today. He understands our concerns and the need to be back as soon as the deployment is over. He is worried about the deployment being extended. Please put him through with the 01 Jan date. Thx

Captain Jim Mangie
Flight Operations
Delta Air Lines
404 715 1883-Office
404 918 5481-Cell

▲ DELTA ✈
AIR LINES

**From:** Tony Bierenkoven [mailto:baronf15@gmail.com]
**Sent:** Wednesday, July 01, 2015 11:41 AM
**To:** Mangie, Jim
**Subject:** Re: Dates for Military Leave

Sir,

My intent with using a 1 Jan return date was to account for the worst case scenario. The latest deployment plan is to be back in country around mid October which would put me back at Delta around 1 Nov. Assuming those dates do not change again, any post deployment orders would allow for reconstitution leave and to help the squadron with the transition from the deployment. However, I can break those orders at any time (not AGR orders).

I'm trying to balance my #1 job with my obligation to the squadron during and immediately after the deployment. That said, if you think that the plan is excessive, please let me know. Delta has been great working with me and the last thing I want to do is to upset the company.

CONFIDENTIAL


DEPOSITION
EXHIBIT
17
8-23-21

DELTA000075576

17.1

Please let me know your thoughts on how I should proceed.

Thanks,

Tony
757-971-7730

On Jun 30, 2015, at 2:00 PM, Mangie, Jim <Jim.Mangie@delta.com> wrote:

> Hi Tony,
>
> I saw the mil leave form you submitted a little while ago. You had previously said that you'd be back sometime in October. The form you submitted says 1 Jan 16. Has something changed since we last talked?
>
> Thanks,
>
> Jim
>
> Captain Jim Mangie
> Flight Operations
> Delta Air Lines
> 404 715 1883-Office
> 404 918 5481-Cell

CONFIDENTIAL

DELTA000075577

17.2

Date: Wednesday, September 2 2015 10:58 AM
Subject: RE: MLOA 30 CLIFFORD, GEORGE 886756
From: Behnfeldt, Barry W
To: Holmes, Barry P <Barry.P.Holmes@delta.com >; Goedeke, Christopher W
<christopher.goedeke@delta.com>;
Attachments: image002.jpg; image004.jpg; image005.jpg

I NEEDED THAT THIS MORNING!!!

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393



**From:** Holmes, Barry P
**Sent:** Wednesday, September 02, 2015 10:58 AM
**To:** Behnfeldt, Barry W; Goedeke, Christopher W
**Subject:** RE: MLOA 30 CLIFFORD, GEORGE 886756

CG is an MLOA friggin genius!



CONFIDENTIAL



DELTA000062263

19.1

1          Q.   An e-mail from Phil Davis where it says, "Jason
2     and I are already doing background work on him.  And I'm
3     following his schedule on a daily basis.  He will, at
4     the very least, be coming in to explain this."
5                    Are they speaking about James Doyle?
6                    MR. STONE:  Well, I'm going to object,
7     calls for speculation, but you can answer.
8          Q.   BY MS. MATTER:  And I'll just direct your
9     decision to the subject line of that e-mail where it
10    says Doyle?
11         A.   I would assume that if it's in the subject line
12    of Doyle, yes.
13         Q.   Would you have any reason to dispute that it's
14    concerning Doyle?
15         A.   No.
16         Q.   Okay.  Do you know what he's referring to as
17    far as background work on him?
18         A.   No. I don't know what Phil was or Jason, he
19    didn't tell me what he was doing.
20         Q.   I'd also like to direct your attention about
21    three quarters of the way down, on the first page of
22    Exhibit 21, in an e-mail from Phil Davis to Alex Cimos,
23    dated November 9th, 2015, at 1:55 p.m.
24                    Do you see that?
25                    MR. STONE:  I think you said it backwards,

1   Crystal.

2                   THE WITNESS:  Alex to Phil.

3       Q.  BY MS. MATTER:  So I'm down at the bottom here.

4   It says to --

5                   MS. MATTER:  You're right.

6       Q.  BY MS. MATTER:  To Phil Davis from Alex Cimos,

7   sent Monday, November 9th, 2015, at 1:55 p.m.  The

8   e-mail thread, "the e-mail threads begins with Eaton,

9   but ends with Doyle.  BB's rant, below, references

10  Doyle, period.  We probably need to call Doyle in for an

11  ass kicking."

12                  Do you see that?

13      A.  I do.

14      Q.  Would you have any reason to dispute that you

15  received that e-mail -- that e-mail as a result of this

16  text stream that I've just provided to you as

17  Exhibit 21?

18      A.  No.

19      Q.  Now, I'd like to direct your attention, same

20  exhibit, but the fourth page in, Delta187704, an e-mail

21  from Alex Cimos to you, Monday, November 9th, 2015, at

22  3:01 p.m.

23                  Let me know when you're there.

24      A.  I'm there.

25      Q.  Okay.  It reads "BB will have a third tune up

Date:        Tuesday, November 10 2015 08:38 AM
Subject:     RE: Doyle
From:        Behnfeldt, Barry W
To:          Davis,Philip T <Philip.T.Davis@delta.com >; Cimos,Alex <Alex.Cimos@delta.com>;
CC:          Zawislak,Jason E <Jason.E.Zawislak@delta.com >;
Attachments: image001.jpg

Roger that Phil. Shout if you need anything from me.

Vr,
Barry

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | O: 404.715.1534 | M: 404.725.8393

 **DELTA** 🌐

**From:** Davis, Philip T
**Sent:** Monday, November 09, 2015 8:15 PM
**To:** Cimos, Alex
**Cc:** Behnfeldt, Barry W; Zawislak, Jason E
**Subject:** RE: Doyle

Greetings BB,
  This is the guy at Hill AFB that I mentioned to you.   Jason and I are already doing background work on him, and I am following his schedule on a daily basis.    He will at the very least be coming in to explain this.

Phil

Capt. Phil Davis
Regional Director and Chief Pilot-West Region
Delta Flight Operations
(801)-744-4486 (O)
(404)-291-4376 (M)

**From:** Cimos, Alex
**Sent:** Monday, November 09, 2015 1:55 PM
**To:** Davis, Philip T
**Subject:** FW: MLOA EATON, TIMOTHY 627481

Email thread begins with Eaton but ends with Doyle. BB's rant, below, refs Doyle. We probably need to call Doyle in for an ass-kicking.

**From:** Behnfeldt, Barry W
**Sent:** Monday, November 09, 2015 1:34 PM
**To:** Cimos, Alex
**Subject:** RE: MLOA EATON, TIMOTHY 627481

Roger.

CONFIDENTIAL





DEPOSITION
EXHIBIT
21
8.23.21
PENGAD 800-631-6989

DELTA000187701

21.1

Doyle,

It really annoys me when a guy places MLOA to take himself out of the 3 day trip bucket!!! He did it three months in a row. Also look at the timing of placing the MLOA on his RES on call days. As the squadron DO, I would almost bet that he is doing military duty on those one/two RES days between MLOA and violating our double dipping policy.

I would maybe talk with Phil because we have talked about individuals in the past with this behavior. I think it may be time to call these guys out and ask them for a "point credit summary" for the periods we're interested in. That report would show if they were performing duty in those periods, thereby violating our double dipping policy.

Vr,
Barry

```
AME: DOYLE, J S              0665315 LOCKER: SLC- 984  11/09/15  15:10:5
OT: 0509 SLC 7ER B 01AUG15 / 30AUG15    SECND-CAT:                /
U:
DTE OR DES OFF  STAT  ROT1 D R1 STAT  ROT2 D R2 RPT1 RPT2 E/L R CALL BLKN DTE
01S     RES **                                                       01S
02S     RES XX                                                       02S
03M     RES XX                                                       03M
04T     RES XX                                                       04T
05W     RES XX  OKNF                                                 05W
06T     RES         .0217            1935                            06T
07F     RES         ----                                            07F
08S     RES         ----                                      0953 08S
09S     RES         .0338            1920                            09S
10M     RES         ----                              R       2323 10M
11T     RES **                                                       11T
12W     RES **                                                       12W
13T     RES **                                                       13T
14F     RES **                                                       14F
15S     RES **                                                       15S
16S     RES XX                                                       16S
17M     RES XX                                                       17M
18T     RES                                                          18T
19W     RES    MLOA    (Posted 1323/18 Aug)                          19W
20T     RES                                                          20T
21F     RES    MLOA    (Posted 1320/21 Aug)                          21F
22S     RES                                             .1200        22S
23S     RES                                                          23S
24M     RES    MLOA    (Posted 2322/24 Aug)                          24M
25T     RES    MLOA                                                  25T
26W     RES    MLOA                                                  26W
27T     RES    MLOA                                                  27T
28F SP  RES         .0912            1400                            28F
29S SP  RES         ----                                            29S
30S SP  RES         ----                                            30S
31M SP  RES         ----                                      1420 31M
REMARKS:

OT: 0510 SLC 7ER B 31AUG15 / 30SEP15    SECND-CAT:                /
U:
DTE OR DES OFF  STAT  ROT1 D R1 STAT  ROT2 D R2 RPT1 RPT2 E/L R CALL BLKN DTE
31M SP  RES         0912             1420 31M
01T     RES                                                          01T
02W     RES                                                          02W
03T     RES XX                                                       03T
```

CONFIDENTIAL

DELTA000187702

21.2

```
04F    RES XX                                      04F
05S    RES XX                                      05S
06S    RES      SVAC      *                        06S
07M    RES      SVAC      *                        07M
08T    RES      SVAC      *                        08T
09W    RES      SVAC      *                        09W
10T    RES      SVAC      *                        10T
11F    RES      SVAC      *                        11F
12S    RES      SVAC      *                        12S
13S    RES                                         13S
```

```
15T    RES                                         15T
16W    RES                                         16W
17T    RES **                                      17T
18F    RES **                                      18F
19S    RES **                                      19S
20S    RES XX                                      20S
21M    RES                                         21M
```

```
23W    RES                               .1000     23W
24T    RES                                         24T
25F    RES **                                      25F
26S    RES **                                      26S
27S    RES XX                                      27S
28M    RES                                         28M
```

```
30W    RES                               .1000     30W
REMARKS:
```

OT: 0505 SLC 7ER B 01OCT15 / 31OCT15     SECND-CAT:              /
U:

| DTE | OR DES OFF | STAT | ROT1 | D | R1 STAT | ROT2 | D | R2 | RPT1 | RPT2 | E/L R CALL BLKN | DTE |
|-----|-----------|------|------|---|---------|------|---|----|------|------|-----------------|-----|
| 01T | RES | | | | | | | | | | | 01T |
| 02F | RES XX | | | | | | | | | | | 02F |
| 03S | RES XX | | | | | | | | | | | 03S |
| 04S | RES XX | | | | | | | | | | | 04S |
| 05M | RES | | | | | | | | | | | 05M |
| 06T | RES | | | | | | | | | | | 06T |
| 07W | RES | | | | | | | | | | | 07W |
| 08T | RES | | | | | | | | | | | 08T |
| 09F | RES ** | | | | | | | | | | | 09F |
| 10S | RES ** | | | | | | | | | | | 10S |
| 11S | RES ** | | | | | | | | | | | 11S |
| 12M | RES ** | | | | | | | | | | | 12M |
| 13T | RES ** | | | | | | | | | | | 13T |
| 14W | RES XX | | | | | | | | | | | 14W |
| 15T | RES XX | | | | | | | | | | | 15T |
| 16F | RES XX | | | | | | | | | | | 16F |
| 17S | RES XX | | | | | | | | | | | 17S |
| 18S | RES XX | | | | | | | | | | | 18S |
| 19M | RES | | | | | | | | | | | 19M |
| 20T | RES | .0545 | | | | 1010 | | .0600 | | | | 20T |
| 21W | RES | ---- | | | | | | | | | | 21W |
| 22T | RES | ---- | | | | | | | | | | 22T |
| 23F | RES | ---- | | | | | | | | | | 23F |
| 24S | RES | ---- | | | | | | | | | | '1025 24S |

CONFIDENTIAL

DELTA000187703

```
25S     RES                              R        25S
26M     RES      APD                              26M
27T     RES                            .1300      27T
28W     RES                                       28W
────────────────────────────────────────────────────
30F     RES                                       30F
31S     RES **                                    31S
REMARKS:
```

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | O: 404.715.1534 | M: 404.725.8393



**From:** Cimos, Alex
**Sent:** Monday, November 09, 2015 3:01 PM
**To:** Behnfeldt, Barry W
**Subject:** RE: MLOA EATON, TIMOTHY 627481

BB,

Will have a third tune-up session w/ Mr. Eaton and his ALPA rep on Thursday.

Alex

O8TW – have you looked at Doyle 665315?

**From:** Behnfeldt, Barry W
**Sent:** Monday, November 09, 2015 12:55 PM
**To:** Delta, PilotSched
**Cc:** CPO, SLC; Behnfeldt, Barry W; Zawislak, Jason E; Mangie, Jim
**Subject:** MLOA EATON, TIMOTHY 627481

Crew schedules,
Please show FO Eaton MLOA 25 Dec 2015 – 9 Jan 2016 as requested.

SLC CPO,
Thanks for reaching out to FO Eaton and discussing this leave.

Thanks all,
Barry

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | O: 404.715.1534 | M: 404.725.8393



-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Wednesday, October 28, 2015 11:36 AM
To: Behnfeldt, Barry W; FlightOps, PltLeaves; Mangie, Jim
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: New Year's Day (31DEC - 01JAN)

CONFIDENTIAL

DELTA000187704

**21.4**

al_dates_needed: 25 DEC 2015 - 01 Jan 2015
pilot_name: Timothy J Eaton
employee_num: 062748100
city: Park City
state: UT
email: tbone.tj@gmail.com
phone: 605-390-9827
fleet: A320
position: B-First Officer
base: SLC
squadron_unit_name: 151 Air Refueling Wing
squadron_unit_base: Salt Lake City, UT
svc_branch: USAF
unit_city: Salt Lake City
unit_state: UT
unit_phone: 801-245-2196
rank: O-4
billet: KC-135R Pilot
co-do-xo-ops-wingco: No
unit_commander_rank: O-5
unit_commander_name: Dan Boyak
unit_commander_status: Reserve
unit_commander_phone: 801-245-2276
wing_name_location: 151 ARW, Salt Lake City, UT
wing_phone: 801-245-2276
wing_commander_rank: O-6
wing_commander_name: Dar Craig
wing_commander_status: Active
wing_commander_phone: 801-245-8040
duty_performing: Squadron Deployment supporting PACOM taskings and CBP
duty_location_performed: PGUA
duty_performed_another_time: No
other_info:
B1: Submit

CONFIDENTIAL

DELTA000187705

1      Q.   Have you ever said that?

2      A.   No.

3      Q.   You've never mentioned Delta as being the

4 primary employer?

5      A.   I might have.  I mean, it is -- it is their --

6 it is a full-time job.  It's their -- I would say their

7 primary job, with the military being a part-time job as

8 a -- I mean, I might have categorized it like that --

9      Q.   Okay.

10      A.   -- at one point.

11      Q.   So you might have categorized Delta as being

12 the pilot's primary employer?

13      A.   I might have.

14      Q.   Okay.

15              (Exhibit 23 marked for identification.)

16      Q.   BY MS. MATTER:  Sorry.  I can give this to you

17 and you can look at it while --

18              MR. STONE:  He can look at this --

19              MR. BILLY:  We'll give it right back.

20              MR. STONE:  Could we hold on to that one

21 for a moment, just to review it.

22              MS. MATTER:  Absolutely.

23      Q.   BY MS. MATTER:  Okay.  Just take a look at this

24 document that we've marked as Exhibit 23.  It's a

25 two-page Document, Bate Stamped Delta0000262831 to

| Date: | Monday, November 9 2015 03:34 PM |
| Subject: | RE: MLOA-Eaton 627481Barry, |
| From: | Mangie, Jim |
| To: | Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >; |
| Attachments: | image002.jpg; image003.jpg |

Thx.

Captain Jim Mangie
Flight Operations
Delta Air Lines
404 715 1883-Office
404 918 5481-Cell

**DELTA**
AIR LINES

**From:** Behnfeldt, Barry W
**Sent:** Monday, November 09, 2015 2:56 PM
**To:** Mangie, Jim
**Subject:** RE: MLOA-Eaton 627481Barry,

Barry,

I had a brief conversation with T.J. about his upcoming MLOA and you can feel confident in posting it. I did look a bit at T.J.'s past MLOA use and some of his actions over his probationary year as well and probably feel it is worthwhile to have FO Eaton come in and talk to us. Alex is going to meet with him on the 12th and, as you said, make sure he knows who his primary employer is and maybe give him some techniques to better balance his Delta and military careers.

Regards,
Jim

James W. Hailey
Asst. Chief Pilot
West Region – SLC
801-744-4461 (office)
801-425-3973 (cell)

**From:** Behnfeldt, Barry W
**Sent:** Wednesday, November 04, 2015 9:39 PM
**To:** CPO, SLC
**Cc:** Behnfeldt, Barry W; Zawislak, Jason E
**Subject:** TIMOTHY EATON 627481 XMAS MLOA

Team SLC,
Could you please make contact with FO Eaton and discuss this leave. Holiday time is a busy time for us as you know. Would just like for him to understand with all things considered that we would like to have him on OUR flight schedule for the holiday period. Looks like he's maybe going to Anderson AFB in Guam for contingency ops. No harassment...just an understanding.

Please let me know your read before I post this leave.

Thanks,
Barry



CONFIDENTIAL

DELTA000017224

22.1

Barry Behnfeldt | Special Assignment Supervisor | **Flying Operations** | O: 404.715.1534 | M: 404.725.8393



Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

-----Original Message-----
From: Mangie, Jim
Sent: Wednesday, October 28, 2015 1:40 PM
To: Behnfeldt, Barry W
Subject: MLOA-Eaton 627481

Can you please let me know the results of this call from the CPO? Thx

-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Wednesday, October 28, 2015 11:36 AM
To: Behnfeldt, Barry W; FlightOps, PltLeaves; Mangie, Jim
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: New Year's Day (31DEC - 01JAN)
al_dates_needed: 25 Dec 2015 - 9 Jan 2015
pilot_name: Timothy J Eaton
employee_num: 062748100
city: Park City
state: UT
email: tbone.tj@gmail.com
phone: 605-390-9827
fleet: A320
position: B-First Officer
base: SLC
squadron_unit_name: 151 Air Refueling Wing
squadron_unit_base: Salt Lake City, UT
svc_branch: USAF
unit_city: Salt Lake City
unit_state: UT
unit_phone: 801-245-2196
rank: O-4
billet: KC-135R Pilot
co-do-xo-ops-wingco: No
unit_commander_rank: O-5
unit_commander_name: Dan Boyak
unit_commander_status: Reserve
unit_commander_phone: 801-245-2276
wing_name_location: 151 ARW, Salt Lake City, UT
wing_phone: 801-245-2276
wing_commander_rank: O-6
wing_commander_name: Dar Craig
wing_commander_status: Active
wing_commander_phone: 801-245-8040
duty_performing: Squadron Deployment supporting PACOM taskings and CBP

CONFIDENTIAL

duty_location_performed: PGUA
duty_performed_another_time: No
other_info:
B1: Submit

CONFIDENTIAL

DELTA000017226

22.3

1          Q.   Have you ever said that?

2          A.   No.

3          Q.   You've never mentioned Delta as being the

4    primary employer?

5          A.   I might have.  I mean, it is -- it is their --

6    it is a full-time job.  It's their -- I would say their

7    primary job, with the military being a part-time job as

8    a -- I mean, I might have categorized it like that --

9          Q.   Okay.

10         A.   -- at one point.

11         Q.   So you might have categorized Delta as being

12   the pilot's primary employer?

13         A.   I might have.

14         Q.   Okay.

15              (Exhibit 23 marked for identification.)

16         Q.   BY MS. MATTER:  Sorry.  I can give this to you

17   and you can look at it while --

18              MR. STONE:  He can look at this --

19              MR. BILLY:  We'll give it right back.

20              MR. STONE:  Could we hold on to that one

21   for a moment, just to review it.

22              MS. MATTER:  Absolutely.

23         Q.   BY MS. MATTER:  Okay.  Just take a look at this

24   document that we've marked as Exhibit 23.  It's a

25   two-page Document, Bate Stamped Delta0000262831 to

```
 1   262832.
 2              Let me know when you've had a moment to
 3   finish reviewing that.
 4        A.   (Witness examining document.)
 5              Okay.  Excuse me.
 6        Q.   BY MS. MATTER:  Do you have an understanding
 7   that USERRA prohibits employers from controlling the
 8   frequently or timing of military leave?
 9        A.   Yes.
10        Q.   On November 9th, it appears you sent an e-mail
11   to the Atlanta Chief Pilot's Office, that if a pilot
12   takes military leave over Christmas or New Year's, you
13   want the Chief Pilot's Office to call the pilots; is
14   that correct?
15        A.   (Witness examining document.)  If they can.
16   Just a discussion with how busy we are over the holiday
17   schedule, and if at all possible, if they could shift
18   their military duty as an ask.
19        Q.   Your e-mail states:  "The desired general
20   discussion would be the nature of the orders, and, to,
21   perhaps, try to move the needle on expressing the
22   importance of our deployment cycle, dot, dot, dot,
23   summer schedule, and holiday periods."
24              It goes on to state, "if in your
25   conversation you feel like throwing the BS flag?"
```

```
 1                MS. MATTER:  BS upper case.
 2        Q.  BY MS. MATTER:  -- "I would gladly call the
 3   unit leadership and verify the duty."
 4                By "move the needle," what did you mean?
 5        A.  To see, if, perhaps, there might be an
 6   individual who would be willing to adjust their military
 7   duty to accommodate Delta's busy flying schedule.
 8        Q.  Meaning to not take military leave over the
 9   holidays?
10        A.  To adjust their military duty, so as not to
11   coincide with our busy flying schedule, over the
12   holidays.
13        Q.  And if the pilot wasn't able to move the
14   military leave days, you will, "gladly call the unit
15   leadership and verify duty," correct?
16                MR. STONE:  I'm going to object in that it
17   states -- I think you've misread the e-mail.
18                MS. MATTER:  Sure.
19        Q.  BY MS. MATTER:  I'll read the sentence in its
20   entirety.  If in your conversation, meaning the
21   conversation with the pilot, you feel like throwing the
22   BS flag, which I understand to mean the bullshit flag, I
23   would gladly call the unit leadership and verify duty;
24   is that correct?
25        A.  Yes.
```

| Date: | Monday, November 9 2015 05:16 PM |
|---|---|
| Subject: | BRUCE WILHITE 868324 XMAS MLOA |
| From: | Behnfeldt, Barry W |
| To: | Holmes, Barry P <Barry.P.Holmes@delta.com >; Goedeke, Christopher W <christopher.goedeke@delta.com >; West, James C <James.C.West@delta.com >; |
| CC: | Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >; Zawislak, Jason E <Jason.E.Zawislak@delta.com >; Frederick, Chris <Chris.Frederick@delta.com >; |
| Attachments: | image001.jpg |

Team ATL,

This is more than likely just the beginning of MLOA logs that will be coming in over the Christmas/New Year holiday. My game plan will be that if it looks like it is a deployment order or if they have already been in contact with your office, I will not request any additional contact with the pilot other than perhaps a first time off payroll call. The desired general discussion would be the nature of the orders and to perhaps try to move the needle on expressing the importance of our "deployment cycle"...summer schedule and holiday periods. If in your conversation you feel like throwing the BS flag, I will gladly call the unit leadership and verify the duty.

So with that brief intro, could you please reach out to FO Wilhite and discuss the nature of these orders?

Hired Sep14/BHF 543/Lives BHM/Drills BHM

Vr,
Barry

**Barry Behnfeldt** | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

 **DELTA**

-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Monday, October 26, 2015 9:22 AM
To: Behnfeldt, Barry W; FlightOps; PltLeaves; Mangie, Jim
Subject: [FOP10193] Military Leave Log - Autogenerated email


primary_period: New Year's Day (31DEC - 01JAN)
al_dates_needed: 16 December 2015 - 17 January 2016
pilot_name: Bruce Wilhite
employee_num: 086832400
city: Gardendale
state: ALA
email: bwilhite49@gmail.com
phone: 2053945167
fleet: MD88/90
position: B-First Officer
base: ATL
squadron_unit_name: 106 Air Refueling Squadron
squadron_unit_base: Birmingham ANG Base
svc_branch: ANG
unit_city: Birmingham
unit_state: AL
unit_phone: 2057142441
rank: O-3
billet: EP

CONFIDENTIAL





DEPOSITION
EXHIBIT
23
8-23-21

DELTA000262831

co-do-xo-ops-wingco: No
unit_commander_rank: O-5
unit_commander_name: Allen King
unit_commander_status: Reserve
unit_commander_phone: 2057142406
wing_name_location: 117 ARW/Birmingham
wing_phone: 2057142441
wing_commander_rank: O-6
wing_commander_name: Cliff James
wing_commander_status: Reserve
wing_commander_phone: 2057142441
duty_performing: Noble Eagle Alert
duty_location_performed: Squadron
duty_performed_another_time: No
other_info: No
B1: Submit

CONFIDENTIAL

```
 1              Do you see that?
 2      A.   I do.
 3      Q.   Where it says "Cappelli called back just now,
 4  dot, dot, dot.  He dropped the T day MLOA, I, quote,
 5  convinced, end quote, him."
 6              Do you see that?
 7      A.   I do.
 8      Q.   Is "T" day, Thanksgiving Day?
 9      A.   It is.  I don't see the log.  There should be a
10  log that goes with this, but it is Thanksgiving Day, I'm
11  sure.
12      Q.   Okay.
13      A.   I don't see the dates for it, but...
14      Q.   And Barry Holmes, again, was who?
15      A.   Barry Holmes was a pilot in the Atlanta chief
16  pilot office.
17      Q.   And Barry writes an e-mail Monday,
18  November 23rd, 2015, at 9:28 a.m. to you and Chris
19  Goedeke, Barry writes, quote, "isn't he the guy that
20  suddenly got his shoulder dislocated after visiting
21  Goedeke, question mark," end quote.
22              Do you see that?
23      A.   I do.
24      Q.   And Chris responds -- Chris Goedeke responds
25  six minutes later, saying quote, "I made him an offer he
```

1  couldn't refuse, dot, dot, dot," end quote.

2           Do you see that?

3     A.  I do.

4     Q.  Does that sound like he intimidated

5  Mr. Cappelli?

6     A.  I didn't take it as that.  Knowing Chris

7  Goedeke is a former Marine, it was just -- no.

8     Q.  Okay.

9           (Exhibit 26 marked for identification.)

10    Q.  BY MS. MATTER:  I've just handed you

11  Exhibit 26, Delta000018547 to 18548.  I'll give you an

12  opportunity to review it.  Just let me know when you're

13  done.

14          MR. STONE:  Is there another one.

15          MR. BILLY:  Sorry.

16          THE WITNESS:  (Witness examining document.)

17  Okay.

18    Q.  BY MS. MATTER:  If I could direct your

19  attention to the middle of the first page of Exhibit 26.

20    A.  Yes.

21    Q.  There is an e-mail from you to Jim Mangie dated

22  Wednesday, December 23, 2015, 10:52 a.m.

23          Do you see that?

24    A.  I do.

25    Q.  It says, quote, "I'm getting more feelings from

Date:        Monday, November 23 2015 09:34 AM
Subject:     RE: STEVEN CAPPELLI 929887 T-DAY MLOA
From:        Goedeke, Christopher W
To:          Holmes, Barry P <Barry.P.Holmes@delta.com >;
Attachments: image001.jpg; image002.jpg

I made him an offer he couldn't refuse...

Chris Goedeke
Assistant Chief Pilot
Atlanta Chief Pilot's Office
O - 404-714-9473
C - 404-780-2879

**From:** Holmes, Barry P
**Sent:** Monday, November 23, 2015 9:28 AM
**To:** Behnfeldt, Barry W; Goedeke, Christopher W
**Subject:** RE: STEVEN CAPPELLI 929887 T-DAY MLOA

Isn't he the guy that suddenly got his shoulder dislocated after visiting Goedeke?

*Barry Holmes*
Chief Pilot ATL
(o)404 714-1699 (c)404 291-4263

▲ DELTA

**From:** Behnfeldt, Barry W
**Sent:** Monday, November 23, 2015 9:24 AM
**To:** Goedeke, Christopher W
**Cc:** West, James C; Holmes, Barry P; Frederick, Chris
**Subject:** Re: STEVEN CAPPELLI 929887 T-DAY MLOA

Thanks Chris!

vr,
Barry

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

**From:** Christopher W Goedeke
**Sent:** Wednesday, November 11, 2015 2:47 PM
**To:** Barry Behnfeldt
**Cc:** James West, Barry Holmes, Chris Frederick

Capelli called back just now...
He dropped the T-Day MLOA.
I "convinced" him

CONFIDENTIAL


DEPOSITION
EXHIBIT
25
8-23-21

DELTA000061069

25.1

Chris Goedeke
Assistant Chief Pilot
Atlanta Chief Pilot's Office
O - 404-714-9473
C - 404-780-2879

**From:** Behnfeldt, Barry W
**Sent:** Monday, November 09, 2015 1:00 PM
**To:** Goedeke, Christopher W
**Subject:** RE: STEVEN CAPPELLI 929887 T-DAY MLOA

Any word on Mr. Cappelli?

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | O: 404.715.1534 | M: 404.725.8393

 **DELTA**

**From:** Goedeke, Christopher W
**Sent:** Wednesday, October 28, 2015 3:29 PM
**To:** Behnfeldt, Barry W; CPO, REGIONATL
**Cc:** Zawislak, Jason E
**Subject:** RE: STEVEN CAPPELLI 929887 T-DAY MLOA

Got it

Chris Goedeke
Assistant Chief Pilot
Atlanta Chief Pilot's Office
O - 404-714-9473
C - 404-780-2879

**From:** Behnfeldt, Barry W
**Sent:** Wednesday, October 28, 2015 2:18 PM
**To:** CPO, REGIONATL
**Cc:** Behnfeldt, Barry W; Zawislak, Jason E
**Subject:** STEVEN CAPPELLI 929887 T-DAY MLOA

ATL CPO,

This one has the same flavor as the last one I sent you on Saul.

New Hire 20 Jan 15/311 BHF/Excellent assessments

Same sort of conversation as Saul wrt what this trip drop will cause. We also will split this one if he can't change his duty.

Thanks,

CONFIDENTIAL

DELTA000061070

1   couldn't refuse, dot, dot, dot," end quote.

2                Do you see that?

3       A.  I do.

4       Q.  Does that sound like he intimidated

5   Mr. Cappelli?

6       A.  I didn't take it as that.  Knowing Chris

7   Goedeke is a former Marine, it was just -- no.

8       Q.  Okay.

9                (Exhibit 26 marked for identification.)

10      Q.  BY MS. MATTER:  I've just handed you

11  Exhibit 26, Delta000018547 to 18548.  I'll give you an

12  opportunity to review it.  Just let me know when you're

13  done.

14               MR. STONE:  Is there another one.

15               MR. BILLY:  Sorry.

16               THE WITNESS:  (Witness examining document.)

17  Okay.

18      Q.  BY MS. MATTER:  If I could direct your

19  attention to the middle of the first page of Exhibit 26.

20      A.  Yes.

21      Q.  There is an e-mail from you to Jim Mangie dated

22  Wednesday, December 23, 2015, 10:52 a.m.

23               Do you see that?

24      A.  I do.

25      Q.  It says, quote, "I'm getting more feelings from

1  the field that we need to stop hiring as many military

2  guys, period," end quote.

3                    Do you see that?

4      A.  I do.

5      Q.  Did Delta consider not hiring military pilots?

6      A.  No.

7      Q.  What feelings from the field were you getting?

8      A.  Just inputs from the chief pilot offices on

9  they're seeing all these military leave, long-term

10  orders and such that they're -- we've hired an asset,

11  and their leaving for long term, which really doesn't

12  help to our pilot staffing issue.  So that was their

13  frustration that they were conveying.

14      Q.  And in response, five minutes later, Jim Mangie

15  writes to you and I quote, "I think if we focus on the

16  more senior military guys and adjust the scoring, we can

17  correct some of the problems we're having, period.  I'll

18  schedule the meeting we discussed for just after the

19  first of the year, period," end quote.

20                    By "scoring," did he mean the hiring

21  criteria such as a pilot and command time is weighted

22  this way?

23      A.  Could you repeat that please?

24      Q.  What did he mean by the scoring criteria?

25                    MR. STONE:  I'm going to object to the

I think if we focus on the more senior military guys and adjust the scoring we can correct some of the problems we're having. I'll schedule the meeting we discussed for just after the first of the year.

Captain Jim Mangie

Flight Operations

Delta Air Lines

404 715 1883-Office

404 918 5481-Cell

-----Original Message-----
From: Behnfeldt, Barry W
Sent: Wednesday, December 23, 2015 10:52 AM
To: Mangie, Jim
Subject: RE: [FOP10193] Military Leave Log - Autogenerated email

Roger...posting the leave. I'm getting more feelings from the field that we need to stop hiring as many military guys.

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

-----Original Message-----
From: Mangie, Jim
Sent: Wednesday, December 23, 2015 10:46 AM
To: Behnfeldt, Barry W
Subject: RE: [FOP10193] Military Leave Log - Autogenerated email

I just finished an interesting conversation with the OG. He's on long term MLOA from AA. Got the same "we're short of pilots, the position just came open, we're hiring the best guys, etc. No help.

Captain Jim Mangie

Flight Operations

Delta Air Lines

404 715 1883-Office

404 918 5481-Cell

-----Original Message-----

CONFIDENTIAL



DEPOSITION
EXHIBIT
PENGAD 800-631-6989
26
8-23-21

DELTA000018547

26.1

From: Behnfeldt, Barry W
Sent: Wednesday, December 23, 2015 9:00 AM
To: Mangie, Jim
Subject: FW: [FOP10193] Military Leave Log - Autogenerated email

Any word back on Casey's deal?

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393


-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Friday, December 18, 2015 7:33 PM
To: Behnfeldt, Barry W; FlightOps, PltLeaves; Mangie, Jim
Subject: [FOP10193] Military Leave Log - Autogenerated email


primary_period: -- select --
al_dates_needed: Long Term Military Leave. Expected 01 Jan 2016 through 01 Jan 2019 (3 years).
pilot_name: Edward Casey
employee_num: 093003200
city: Auburn
state: AL
email: edcasey@icloud.com
phone: 602-799-6711
fleet: 737
position: B-First Officer
base: ATL
squadron_unit_name: 100th Fighter Squadron / 187 Fighter Wing
squadron_unit_base: Dannelly Field, AL ANG
svc_branch: Air Force
unit_city: Montgomery
unit_state: AL
unit_phone: 334-394-7255
rank: O-5
billet: Director of Operations
co-do-xo-ops-wingco: Yes
unit_commander_rank: O-6
unit_commander_name: Len Borowski
unit_commander_status: Active
unit_commander_phone: 334-394-7201
wing_name_location: 187th Fighter Wing, Montgomery, AL
wing_phone: 334-394-7101
wing_commander_rank: O-6
wing_commander_name: Randy Efferson
wing_commander_status: Active
wing_commander_phone: 334-394-7101
duty_performing: Full time 100th Fighter Squadron Director of Operations in an Active Guard & Reserve
(AGR) position. F-16 Instructor / Evaluator in deployable Combat Air Forces (CAF) Unit.
duty_location_performed: Dannelly Field, 187th FW, Montgomery, AL
duty_performed_another_time: No
other_info: I will be sending AGR orders in to crew resources when I receive them.
B1: Submit

CONFIDENTIAL

DELTA000018548

Date:       Tuesday, August 2 2016 04:10 PM
Subject:    RE: Flying Ops Project Handout
From:       Behnfeldt, Barry W
To:         Zawislak, Jason E <Jason.E.Zawislak@delta.com >;
Attachments: image001.jpg

Did I do the YoY percentages correct?

## Military leave log MLOA postings

**2015**
Holiday (12 holiday periods): 529
Over 30 days: 353

**2016 YtD**
Holiday (6 holiday periods): 152
Over 30 days: 279

**2016 vs 2015 YoY comparison (1 Jan thru 30 Jul)**
Holiday: 152 vs 374 (-222/-59%)
Over 30 days: 279 vs 188 (+91/+48%)

**Barry Behnfeldt** | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393

 **DELTA**

**From:** Bennett, Ryan M
**Sent:** Friday, July 22, 2016 8:39 AM
**To:** Behnfeldt, Barry W
**Subject:** Flying Ops Project Handout

BB – can you take a look at this and offer any suggestions on anything I missed?  This is the handout for OC to reference in the offsite that shows all the projects we are working on as a team. I can wait until closer to 8/11 to get an update from Beth F. on the FOM, but I for sure need a few bullets from you on MLOA stuff.  Thx.

Regards,

*Ryan M. Bennett*
General Manager
Flying Operations
T: (404) 714-1448
F: (404) 773-1916
ryan.m.bennett@delta.com

CONFIDENTIAL

DEPOSITION
EXHIBIT
29
8-23-21
PENGAD 800-631-6989

DELTA000267601

29.1

1      Q.   Okay.   So you're asking Jason Zawislak to

2   double check the numbers of the middle leave log

3   posting, before they get sent to O.C. Miller; is that

4   correct?

5      A.   Correct.

6      Q.   And based on this document, it appears, from

7   2015 to 2016, there is a 59 percent reduction in

8   holiday, military leave; is that correct?

9      A.   Correct.

10      Q.   Is it accurate to say that the new policies

11   that were put in place in 2014 to 2015 significantly

12   reduced holiday leave for Delta pilots?

13              MR. STONE:   Object to form.   I think it's

14   vague and ambiguous, but go ahead.

15      A.   I don't know what -- I do know that part of

16   this, is most likely, we removed Super Bowl, Father's

17   Day, Mother's Day as high volume flying periods, from

18   the military leave log process, which would reduce the

19   percentage.   Other than that, I don't know -- other than

20   that, I don't know what would cause a percentage to go.

21      Q.   BY MS. MATTER:   So is it your testimony that a

22   59 percent reduction in holiday military leave would be

23   because Delta removed the Super Bowl, Father's Day and

24   Mother's Day from the military leave log?

25      A.   I'm not saying that that contributes to all of

1      Q.   What are mentors?

2      A.   New hire pilots are teamed up with a mentor.

3  It's a whole mentor program that -- that came out after,

4  I don't know.  It's an FA mandated program to where the

5  pilot has to be -- a new hire pilot has to be given a

6  mentor and then they communicate with them and ask them

7  questions about, you know, being a new hire and such.

8      Q.   Okay.  And Exhibit 36, on the first page, it

9  appears that Walter Judy sent you and Jim Mangie an

10 e-mail on Friday, September 23rd, 2016, at 10:03 a.m.,

11 and subject is rumor control.

12          Do you recall receiving that e-mail?

13     A.   I do.

14     Q.   Do you recall any discussions around this

15 particular e-mail?

16     A.   No, but I think out of this came a -- we didn't

17 initially give any military liaison talk to the mentors

18 during their training, and I believe, out of this, we

19 instituted having the military liaison provide a

20 briefing of the military leave program, if you will, to

21 the mentors so that they understood what, you know, the

22 goals, I guess, of our program was at Delta.

23     Q.   Now under Number 2 it reads, "pilots are being

24 singled out for double dipping, while pilots with side

25 businesses are not."

1      A.   Uh-huh.

2      Q.   This is -- this is true in the sense that

3  pilots, military pilots, were being singled out, whereas

4  people with other businesses weren't being singled out,

5  right?

6      A.   Not just were but are.

7      Q.   Are.  Okay.

8      A.   Under the current policy, yes.

9      Q.   And then on Number 3 it says, "Delta is an" --

10  that "Delta is anti-military, that our guys are being

11  signed out and punished for using any MLOPA at all."

12           Do you see that?

13      A.   I do.

14      Q.   Okay.  So you wouldn't dispute No. two, that

15  they are being singled out for double dipping, when

16  pilots for other side businesses are not being singled

17  out?

18      A.   Correct.

19      Q.   Do you dispute No. three?

20      A.   (Witness examining document.)

21           I don't dispute what Walter is saying in

22  that statement.  If that's his antidotal data that he

23  has from his mentors, then I took that on board.

24      Q.   Okay.  With respect to Number 1, if a military

25  pilot has a training issue at Delta, we feed that back

Date:        Friday, September 23 2016 10:40 AM
Subject:     Re: Rumor control
From:        Behnfeldt, Barry W
To:          Mangie, Jim <Jim.Mangie@delta.com >;
Attachments: image001.jpg; image001.jpg

You're more than welcome if you have the bandwidth. I will talk to Walter on Monday as well.

**Barry Behnfeldt** | Special Assignment Supervisor |**Flying Operations** | O: 404.715.1534 | M: 404.725.8393

On Sep 23, 2016, at 10:13 AM, Mangie, Jim <Jim.Mangie@delta.com > wrote:

Do you want me to respond to this or do you want to? We might need to start talking to the mentors at their meetings and/or training.

**From:** Judy, Walter D
**Sent:** Friday, September 23, 2016 10:03 AM
**To:** Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >; Mangie, Jim <Jim.Mangie@delta.com >
**Subject:** Rumor control

Morning Gents,

Some of the mentors have recently brought up a few military related rumors...:

1) That if a military pilot has a training issue at Delta, we feed that back to their unit commander and it can negatively affect their military career.
   a. This was given as a reason why pilots aren't self-identifying as military in iCrew.
   b. I don't believe this rumor in the least but would love to know definitively.
2) That military pilots are being singled out for double-dipping where pilots with side-business are not.
   a. Example: a pilot can have a business at home and get paid for that while sitting long call (or even short call), but a Military pilot cannot perform Military service while on long call without fearing for retribution if he is ever asked for orders. I wonder if there is something in USERRA that forbids this (benefits, the five-year exempt time limit, etc).
   b. I don't know how we could track pilots with side-gigs that could overlap with their Delta duties (because there are so, so many side-gigs) but nevertheless it's out there.
   c. USERRA is not my specialty, so any help here is appreciated
3) That Delta is anti-military, that our guys are being singled out and punished for using any MLOA at all.
   a. Clearly they aren't being punished, and we continue to hire a large proportion of military pilots, but the perception and rumor persist.

I continue to address these as they come up, especially that last one, however I don't know the answers to the first two rumors. Can either of you help educate me on these, please? I don't want to publish anything, just be armed to counter rumors as they roll in.

Thank you so much for the help, have a great weekend!

Best Regards,

Walter Judy

Manager Probationary Pilots and Mentors
404-715-4546 (O) | 718-300-0450 (C)

DEPOSITION
EXHIBIT
36
8-23-21
FENGAD 800-631-6989

CONFIDENTIAL

DELTA000084493

36.1



CONFIDENTIAL

1                         CERTIFICATE OF REPORTER

2

3          STATE OF GEORGIA)

4                          )

5          COUNTY OF DEKALB)

6

7               I, TAMIKA M. BURNETTE, hereby certify

8 that the foregoing proceedings were taken before me at

9 the time and place therein designated; that a review of

10 the transcript was not requested, and that the foregoing

11 pages numbered 1 through 216 are a true and correct

12 record of the aforesaid proceedings.

13               I further certify that I am not a

14 relative, employee, attorney or counsel of any of the

15 parties, nor am I a relative or employee of any of the

16 parties' attorneys or counsel connected with the action,

17 nor am I financially interested in the action.

18

19               DATED this 7th day of September, 2021.

20

21

22

23               TAMIKA M. BURNETTE

24         CERTIFIED COURT REPORTER, RPR, CSR-2870

25

**EXHIBIT 4**

Transcript of the Testimony of:

# WILLIAM E. UNDERWOOD

SORENSON, et al.

vs.

DELTA AIRLINES, INC.

September 20, 2021

Volume 1



IMAGINE

R E P O R T I N G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


JEREMY SORENSON, an individual,
RANDAL REEP, an individual,
RANDAL SMITH, an individual,
ADAM MCLEAN, an individual, and          Civil Action No.
JAMES DOYLE, an individual,
on behalf of themselves and all          1:17-cv-00541-
others similarly situated,               ELR

       Plaintiffs,

   vs.

DELTA AIRLINES, INC., a
Delaware Corporation,

       Defendant.

_____


VIDEOCONFERENCED DEPOSITION OF WILLIAM E. UNDERWOOD

MONDAY, SEPTEMBER 20, 2021

10:32 A.M. EASTERN STANDARD TIME


APPEARING REMOTELY VIA ZOOM FROM

ATLANTA, GEORGIA


REPORTED BY:  Stephani L. Loder, CSR No. 138840

```
 1  APPEARANCES VIA ZOOM:

 2

 3  For Plaintiffs:

 4       STONEBARGER LAW, APC
         BY:  CRYSTAL L. MATTER, ESQ.
 5       BY:  GENE J. STONEBARGER, ESQ.
         101 Parkshore Drive
 6       Suite 200
         Folsom, California 95630
 7       916.235.7140
         Cmatter@stonebargerlaw.com
 8       Gstonebarger@stonebargerlaw.com

 9       LAW OFFICES OF CHARLES M. BILLY, P.C.
         BY:  CHARLES M. BILLY, ESQ.
10       22706 Aspan Street
         Suite 305
11       Lake Forest, California 92630
         949.357.9636
12       Cbilly@cmblawcorp.com

13

14  For Defendant Delta Airlines, Inc.:

15       MORGAN, LEWIS & BOCKIUS
         BY:  JASON J. RANJO, ESQ.
16       502 Carnegie Center
         Princeton, New Jersey 08540-6241
17       609.919.6669
         Jason.ranjo@morganlewis.com

18

19  Also Present:

20       JEREMY SORENSON

21

22

23

24

25
```

1  was doing that job or in one of these meetings.  But I
2  don't recall.
3       I know, obviously, in 2011, that I am -- I'm
4  communicating with him.  So, clearly, I -- and when I
5  say met, if it's not in person, it's by email and/or
6  telephone conversation.  But, most likely, there was a
7  meeting or two where we've met each other.
8       Q. Have you ever reported to Jim Mangie?
9       A. No.  Not directly.
10      Q. What do you mean, not directly?
11      A. Well, he's not in my supervisory chain of
12  command.  So I wouldn't say I reported to him.  I may be
13  responding to inquiries or correspondence he sends, but
14  I'm not reporting to him.
15      Q. Did you have any understanding of what Jim
16  Mangie's roles and responsibilities were in this 2011
17  time frame?
18      A. As I said, I don't recall.  I don't recall his
19  job function.  He's clearly dealing with some military
20  affairs or military leave in the context of this email,
21  but I don't know what other responsibilities he had at
22  the time.
23      Q. Did you have an understanding that he handled
24  military leaves of absence in some capacity during 2011?
25      A. In some capacity, yes.  I'm not sure exactly

1      Q. Oh, okay.  So you were just referring to people

2  in the military, currently being in the military, as

3  being baby killers.

4      A. Not all, but, yeah, jokingly, yes.  Intended

5  humor there between Barry and myself.

6      Q. Now, I think you mentioned a moment ago that

7  you and Barry had a close association and friendship,

8  and you knew he was dealing with military leave at the

9  time of this email; right?

10         MR. RANJO:  Object to the form.

11         THE WITNESS:  I don't know what all his -- what

12  his responsibilities were when he was serving as an

13  assistant chief pilot in the Detroit chief pilot office.

14         I assumed, because of his military background,

15  much as mine, that he probably was dealing with military

16  leave matters, but I'm not sure -- I don't know

17  specifically who, if Barry or others in the office, were

18  tasked to dealing with military leave issues at this

19  time.

20  BY MS. MATTER:

21      Q. I suppose you would also say that you didn't

22  know that Jim Mangie was handling military leave issues

23  at this time too; right?

24      A. I would say that I knew -- well, handling

25  directly or as an additional duty.

**EXHIBIT**

**7**

William Underwood

9/20/2021

Stephani L. Loder, CSR 13884

Barry,

Good seeing you and tell Scott thanks again for letting me drink on Detroit's dime!

Not sure when you are taking over for Mangie in regards to the Mil Leave (a.k.a "baby killers") stuff. I didn't have a chance to bend your ear on addressing the issue with our new hires, but I know that I did so in the past when I was in Chris Jones' position (however I realize he does not have a military {or Navy} background). I know that the specific topic is not a part of the indoc curriculum and in fact we will probably only have a handful of former military types as new hires in the future. However, my personal opinion is it's an important topic for those that will be continuing to serve and it may be an opportune time to address the subject while the "millenniums" are a captive audience in ATL.

Just food for thought. Now get back to work!

R-

Dog

Captain Bill Underwood
Chief Pilot - Minneapolis
Delta Air Lines
(877) 325-2359
william.e.underwood@delta.com

CONFIDENTIAL

1  senior in a longevity standpoint than Mr. Jones is at

2  Delta Airlines, but I'm not concerned about rank within

3  the military unit.

4      Q. Did Mr. Jones become a mentor in 2014?

5      A. I do not recall.

6      Q. And in this email that we've marked as

7  Exhibit 10, it says -- you state:  A question has arisen

8  at a much higher level than mine as to his -- meaning

9  Jones -- suitability to be a mentor, quote, due

10 primarily to his use of military leave.

11     Do you see that, sir?

12     A. Yes.

13     Q. What level or who did this question concerning

14 suitability come from?

15     A. I can't state specifically who it was from.

16     In general, the process when people apply for

17 these types of positions is there's a what's called a

18 vetting list which gets circulated through all the chief

19 pilot offices and basically all the upper-level

20 managerial positions for people to provide input as to

21 whether they know the individual in question.

22     Typically, there's people from pilot leaves

23 that will populate specifics regarding the use of all

24 types of leave.  Sick leave, military leave.  That type

25 of data is on this document also.

1      A. Well, at the time -- this was 2014.  I believe,
2   at that point, it would be Captain Miller, whoever the
3   serving managing director of flying ops was at the time,
4   or beyond.
5      Q. So would it be fair to say that military leave
6   usage is a factor in deciding the suitability to be
7   hired as a mentor?
8      A. It can be a -- it can be a discriminator,
9   amongst many others.  Not the specific use of military
10  leave.  I would say absolutely not the specific use, but
11  an inappropriate use.  If there is inappropriate use
12  going on, it's certainly of concern.
13     Q. The use that you've identified here, is it
14  prohibited by any of the Delta policies?
15     A. Is it prohibited?  No.  There's no prohibition
16  against using military leave.
17     Q. So if Mr. Jones's conduct is not prohibited by
18  Delta's policies, then why would you reach out to his
19  peer in the military and the supervisor to him in Delta
20  to raise concerns as to his suitability to be a new hire
21  mentor?
22     A. Because of the pattern that I viewed when I
23  looked at his schedule, and the pattern is outlined in
24  this email.
25         That pattern is not what I would term normal

**From:** Underwood, William E
**Sent:** Wednesday, June 18, 2014 11:34 AM
**To:** Lee, Steven S
**Subject:** Scott Jones



EXHIBIT
10
William Underwood
8/30/2021
Stephani L. Loder, CSR 13884

Steve,

Tried to catch you at the office but they said you had escaped to AMS.

Scott Jones is a MSP based MD88 F/O who has been approved as a new hire mentor and attended training. He recently came to MSP from DTW where he was a 7ER F/O. A question has arisen at a level much higher than mine as to his suitability as a Mentor due primarily to his use of mil leave & sick. When I checked DBMS for his mil info, I saw he is in the 728th at McChord and was wondering if you knew of him or of his reputation.

I checked his schedule for the past 14 months and there are quite a few months where I would have to agree that he appears to be using a significant amount of mil over weekends (not preposted) and often in conjunction with sick. Most of the mil leave trip drops are for a single day of mil leave over a 4 day trip. Some of the more interesting months;

May 2013 he used mil followed by sick followed by sick (no flying for Delta)
Aug 2013 hue used mil followed by sick
Nov 2013 he used mil (trip drop) followed by mil (another trip drop) followed by mil (another trip drop)
Dec 2013 he used mil followed by sick followed by vacation followed by FMLA
Mar 2014 he dropped a trip, then picked up a W/S trip that overlapped the dropped trip, then called in sick over the W/S trip
Apr 2014 two trips dropped for mil (not preposted)

Scott's sick leave use last year was 117:35.

Not trying to pass judgment on Scott but rather seek any input you might have regarding his use of mil leave. More importantly, if you know Scott do you believe he is a good candidate for the Mentor program. Any insight you have would be greatly appreciated and will be held in strictest confidence.

Many thanks,

Bill

*Capt. Bill Underwood*
Chief Pilot - Minneapolis
Delta Air Lines
612-266-8770 (O)
404-713-5845 (C)
william.e.underwood@delta.com



**DELTA**

1      Q. Okay. Barry Behnfeldt mentions Delta's

2  concurrent duty policy. Can you describe that policy?

3      A. In general, it prohibits a Delta employee or

4  Delta pilot from performing military duty on a day that

5  they're on a paid status or being paid for work at Delta

6  Airlines.

7      Q. Barry Behnfeldt then asked for documentation

8  for this pilot's short-term military leave that occurred

9  the previous two months; isn't that correct?

10     A. I believe that's what his email asks for, yes.

11     Q. And your office performed that lookback; is

12 that correct?

13     A. I don't recall. I don't recall how much of

14 this had gone on before I became involved in it. So

15 unless there's a subsequent thing, I won't be able to

16 answer that regarding documentation.

17     Q. Okay. And in this email at the bottom of

18 249993, you state that your office should look at --

19 look for concurrent duty, quote, or otherwise

20 inappropriate use of mil leave for schedule

21 manipulation, end quote.

22         Do you see that, sir?

23     A. Yes.

24     Q. What do you mean by use of the word

25 "inappropriate" or "inappropriately"?

1          Okay.  We will mark as next in line, which I

2    think is Exhibit 15.

3          MS. MATTER:  Is that correct?

4          THE REPORTER:  Yes.

5          (Exhibit No. 15 marked.)

6    BY MS. MATTER:

7    Q. Okay.  Exhibit 15 has been produced by Delta as

8    250336 to 250337.

9          Sir, I'll start at the bottom of 337, and then

10   we'll work our way up, the same way we've done with the

11   prior exhibits.

12   A. Okay.

13   Q. Have you had an opportunity to read Gordon

14   Goss's email, May 10, 2017?  If so, I'll scroll up.  I

15   just want to make sure you get an opportunity.

16   A. All right.  I have.

17          Okay.  Okay.

18   Q. Okay.  That's the end of that particular

19   exhibit.

20          Who is Gordon Goss?

21   A. Gordon Goss was hired to take my position in

22   the chief pilot's office in Minneapolis when I left.

23   Q. What does "in command" mean?

24   A. In command is a couple-day class for new

25   captains at Delta Airlines.  Typically come about 18 to

```
 1   24 months after they've been a captain for the airline.
 2       Q. Mr. Goss emails you with a few concerns or
 3   issues raised at an in command meeting held on
 4   5/10/2017.  Goss mentions that, quote:
 5               Multiple groups want to talk about how much
 6               harassment our new mil pilots were getting
 7               from the CPO.
 8           End quote.
 9           Do you recall this email?
10       A. Vaguely.
11       Q. Goss then says:
12               I know how much you dislike the military and
13               how you try to make it hard for pilots to do
14               both.
15           Do you recall reading that?
16       A. I do.
17       Q. What is this reference to CA in the email on
18   250336?
19       A. Contract admin.  That would be ALPA contract
20   administration.
21       Q. Up above here, in this second full paragraph,
22   you ask Gordon Goss:
23               On the MLOA front, did you get the sense
24               that the message delivery was coming from
25               any particular CPO, during indoc, or dot,
```

**EXHIBIT**
**15**
William Underwood
9/20/2021
Stephani L. Loder, CSR 13884

Thanks for the pass down.

So we have at least one Captain that thinks it's too much to ask for a new hire pilot to actually meet face-to-face with their CPO. He probably thinks it should be OK to Skype the gatehouse from the cockpit during a IROP rather than actually get out of his seat and do his job. Where do we find such men . . .

On the MLOA front, did you get the sense that the message delivery was coming from any particular CPO, during indoc, or . . .? Up until OC stole Brian Tully from me, I know Brian was outstanding in his handling of mil leave issues. Ed Antoine's now handling for us and he's a retired O-5 zoomie academy grad so also knows how to soft pedal the message. I think there's a lot of unsubstantiated rumors still floating about, and I also suspect that some prior addresses to indoc classes (not from BB or Tully) may have had a lot to do with where we are today.

We have an RD meeting at the end of the month. I'm sure MLOA will be on the agenda for discussion as it always seems to be. I'll make sure to raise the topic regarding perceptions on the line. I think we all just need some more sensitivity training.

R-

Dog

**Captain Bill Underwood**
Regional Director & Chief Pilot
New York
O: 718-704-2342 / M: 404-545-9618

**△ DELTA**

**From:** Goss, Gordon W
**Sent:** Wednesday, May 10, 2017 2:00 PM
**To:** Underwood, Bill <bill.underwood@delta.com>; Cardis, Gregory D <gregory.cardis@delta.com>
**Cc:** CPO, REGIONNY <REGIONNY.CPO@delta.com>
**Subject:** Fwd: Pilot Hats/Probation Interview Issue

Hey Dog -
Just passing along some info a few of your pilots raised at "In Command" today.

The "hat" chain w/Mike Williams is below.

The other issue was a CA concerned that a probationary pilot had to travel from/to DEN to NYC to perform just the interview. This CA was taking the position that w/ Skype and other similar technology a face to face for every probation interview was not required. I disagreed, but advised him I'd pass along his input.

And so I have.

Oh, one more thing. I had multiple groups want to talk about how much harassment our newer military pilots were getting from the CPO. I know how much you dislike the military and how you try to make it hard for our

pilots to do both - so I thought you should know. ;-)

In all seriousness, I think we are letting a few bad actors w/ a grudge and a computer control the message. We need to get in front of the topic. I'll be writing an info item for Greg, JZ, Dave Pekrul, and Tully - BUT I would respectfully lobby that from the RD level perhaps you guys can push our message w/ OC, JG, & SD.

v/r,
Captain Gordy Goss
Chief Pilot - MSP
Delta Air Lines
Sent from my iPhone

Begin forwarded message:

> **From:** "Goss, Gordon W" <gordon.goss@delta.com>
> **Date:** May 10, 2017 at 13:42:20 EDT
> **To:** "Williams, Michael Z" <Michael.Z.Williams@delta.com>
> **Cc:** "CPO, REGIONCENTRAL" <REGIONCENTRAL.CPO@delta.com>
> **Subject: Re: Pilot Hats**
>
> Good to know...
>
> We don't have a lot of new CA's or F/O's in MSP needing new hats - and these were all NYC pilots.
>
> I'll forward this chain to CA Underwood in NYC so he knows....but by the time a pilot hits a CPO office he/she should have already solved this issue.
>
> Captain Gordy Goss
> Chief Pilot - MSP
> Delta Air Lines
> Sent from my iPhone
>
>
> On May 10, 2017, at 13:37, Williams, Michael Z <Michael.Z.Williams@delta.com> wrote:
>
> Gordon
>
> We are still working on the hats. The current supplier are pushing back on working with the new uniform vendor. Crew outfitters still have hats.
>
> Mike Williams
> Flying Ops Program Manager
> Delta Air Lines
> 404-715-1146 Work
> 404-242-9580 Cell
> 404-677-2716 Fax
> Michael.Z.Williams@Delta.Com

CONFIDENTIAL

**Class Stats:**

| | |
|---|---|
| Total attending | 27 Captains |
| Average years with Delta | 16 years |
| Range of years with Delta | 16-28 years |
| Average number of months as Captain | 19 months |
| Range of Captain experience | 12-26 months |

**The Participants listed the following as expectations for the class:**

**Class Expectations:**

- Company vision for the future
- Marketing tools for pilots on the line
- What happens to FCR's? Do they go off into cyberspace?
- Legal support for pilots
- Clarification of fatigue rules and definition of fatigue
- 117 clarification
- Financial future
- Are we self-insured and how many hull losses?
- Future M88 Fleet plan
- ATC mumbling and not speaking clearly-not putting mic to their mouth-multiple problems with ATL
- Plan for printer/paper replacement
- Military leave issues for new hire pilots- rumor of not hiring military pilots due to leave issues
- Future hiring plan
- Why does management feel like crew meals, turn time and rest facilities are not important? Overall quality of life while on the job.
- Surface 3 functionality- no Microsoft Office
- WiFi access available at the gate, but not available on Surface. Why?
- Why can't we get wx on the Surface? WiFi/real time wx info
- Why not keep pilots and F/A crews together?
- 

*Note: The comments are copied verbatim when possible. The editing is kept at a minimum (made only for clarity or content).*

**SPEAKERS/MODULES BY ORDER OF APPEARANCE:**

**Introduction:**
*Captain Kathaleen Wildhaber, Captain Jamie Bosworth & Captain Ann Nelson*

- Friendly environment. Thanks for lunch!
- Good
- Good
- More healthy food choices please

EXHIBIT 16
William Underwood
9/20/2021
Stephani L Loder, CSR 13884

1                  REPORTER'S CERTIFICATE

2

3          I, Stephani L. Loder, CSR No. 13884, Certified

4    Shorthand Reporter, certify:

5          That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time the witness was put under oath by me;

8          That the testimony of the witness and all

9    objections made at the time of the examination were

10   recorded stenographically by me and were thereafter

11   transcribed;

12         That the foregoing transcript comprises a true

13   record of the testimony and of all objections made at

14   the time of the examination;

15         I further certify that I am in no way related

16   to the parties in this action, nor interested in the

17   outcome thereof.

18         I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21

22   Dated:  October 15, 2021.

23

24   _____

     STEPHANI L. LODER,
25   CSR NO. 13884

# EXHIBIT 5

```
          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF GEORGIA
                   ATLANTA DIVISION

JEREMY SORENSON, an individual;
RANDAL REEP, an individual;
RANDAL SMITH, an individual;
ADAM MCLEAN, an individual;  and
JAMES DOYLE, an individual, on
behalf of themselves and all others
similarly situated,
    Plaintiffs,
                              CIVIL ACTION FILE
    vs.                       NO. 1:17-cv-00541-ELR

DELTA AIR LINES, INC., a
Delaware Corporation,
    Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~

                 DEPOSITION OF
                 RANDAL REEP



                 August 4, 2021
                  10:00 a.m.



            1201 Peachtree Street, NE
            Building 400, Suite 2000
               Atlanta, Georgia



             DANA NEW, RPR, CCR
            CCR# 5825-5963-4974-3104
```

```
 1                    APPEARANCES OF COUNSEL

 2

 3     On behalf of the Plaintiffs:

 4        CRYSTAL MATTER, Esquire
          Matter Law, APC
 5        101 Parkshore Drive, Suite 100
          Folsom, California 95630
 6        (916)735-7495
          crystal@matterlawapc.com
 7
          BRIAN JOSEPH LAWLER, Esquire
 8        Pilot Law, P.C.
          850 Beech Street, Suite 713
 9        San Diego, California 92101
          (619)255-2398
10        blawler@pilotlawcorp.com

11

       On behalf of the Defendant:
12
          THOMAS J. MUNGER, Esquire
13        Munger & Stone, LLP
          999 Peachtree Street, NE, Suite 2850
14        Atlanta, Georgia 30309
          (404)815-1884
15        (404)815-4687 (Fax)
          tom.munger@mungerandstone.com
16

17     Also present:

18        Chuck Billy, Esquire
          Jeremy Sorenson, Plaintiff
19

20

21

22

23

24

25
```

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 3

```
 1                 INDEX TO EXAMINATIONS

 2
     WITNESS:  RANDAL REEP
 3

 4   EXAMINATION                          Page

 5   By Mr. Munger                          4

 6                        - - -

 7

 8                 INDEX TO EXHIBITS

 9   Exhibit            Description        Page

10   Defendant's 1     11/17/2015 letter    26

11   Defendant's 2     Flight record        33

12   Defendant's 3     Point credit summary 38

13   Defendant's 4     4/26/16 letter       52

14   Defendant's 5     6/9/16 letter        53

15   Defendant's 6     8/23/16 letter       53

16   Defendant's 7     9/30/16 letter       54

17   Defendant's 8     Letter of termination 54

18   Defendant's 9     Parthenon medical record 69

19   Defendant's 10    Supp responses set 1 71

20   Defendant's 11    10/20/16 letter      74

21   Defendant's 12    Supp responses set 2 77

22   Defendant's 13    Supp responses set 3 91

23   Defendant's 14    Haley-Reep complaint 99

24
     (Original Exhibits 1 through 14 have been attached to
25   the original transcript.)
```

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 13

1  be upset if you called that East Lansing.

2      Q.  Yeah, right.  Right.  Okay.  When did you

3  graduate from Cooley Law School?

4      A.  2008 or 9.

5      Q.  And what I'm going to do, just so you know, I'm

6  going to go kind of through your legal career, your

7  military career, and then your Delta career.

8      A.  Okay.

9      Q.  Just to kind of get a -- okay.  Tell me about any

10  law practice you've been a part of or any legal job

11  you've had since high school.

12      A.  I was an assistant state attorney.

13      Q.  Where is that?

14      A.  Jacksonville, Florida.

15      Q.  Okay.  Was that your first legal position?

16      A.  It was.

17      Q.  Okay.  And when did that start?

18      A.  '09.

19      Q.  Okay.

20      A.  Maybe '08.  Early '9, late '08.

21      Q.  Okay.  Was that a full-time position?

22      A.  Essentially, yes.

23      Q.  Okay.  And where were your offices?

24      A.  Jacksonville.

25      Q.  Okay.  All right.  How about after that?

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                        August 04, 2021

Page 16

1    could give you the 1270 Mayfield as being 12 miles, that

2    might be a little more comfortable.  You know what I

3    mean?

4        Q.  Okay.  Yeah.

5        A.  Apologize for saying it wrong.

6        Q.  No, that's fine.

7        A.  I'll tell you this, and I think you want to know

8    this:  It was equal distance to the state attorney's

9    office.

10       Q.  Okay.  Tell me about your military career.  When

11   did you first --

12       A.  So you were asking about my college history,

13   right?

14       Q.  Yes.

15       A.  So in 1989, I enlisted in the Florida Air

16   National Guard to help me pay for school.  $145 a month

17   seemed like a tremendous amount of money to pump in gas

18   in Tallahassee, so I enlisted as a security policeman in

19   1989.

20       Q.  All right.  Why don't you kind of go -- progress

21   through that period.

22       A.  Okay.  From 1989 to approximately -- and

23   Mr. Munger, if you could let me have some freedom with

24   the dates on this --

25       Q.  Sure.

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                          August 04, 2021

                                                            Page 18

1    alternate.  And that is when I start going to Daytona

2    and some work in Jacksonville, trying to get my MBA

3    thinking this flying program may not work out.  The

4    subsequent selection, which I think was late '93, I was

5    selected as the UPT candidate to go to undergraduate

6    pilot training.  I was commissioned and went to pilot

7    training where I graduated in 1995.

8         Is that a stopping point you'd like to make there

9    or --

10   **Q.  No, you're good.  Keep going.**

11   A.  Okay.  My squadron was converting from one

12   fighter to another, and I went directly to the new

13   weapons system F-15.  By no means was it new; it was a

14   very old weapons system even then.  But it was new to

15   us.

16        So I went and became an F-15 pilot, and then came

17   back to Jacksonville.  Was a guardsman F-15 pilot, and

18   have been doing that now since 1995 in a myriad of

19   capacities.

20   **Q.  What is your rank?**

21   A.  I'm a Lieutenant Colonel O5.

22   **Q.  In your role -- let's go back now for the last 10**

23   **years or so.  What -- when you say in varied capacities,**

24   **what have you been doing for the military?  Obviously**

25   **flying, but other than flying?**



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 19

1    A.   What years -- how far back did you say?

2    **Q.   Say 2010 to the present.**

3    A.   Okay.  My current title is assistant director of

4    operations.  Mr. Munger, I believe you're asking me from

5    a supervisory standpoint or a credential standpoint?

6    **Q.   Why don't you start with supervisory.**

7    A.   Okay.  I've been a flight commander.  I've been

8    an ADO.  I've been a squadron safety officer.  I was the

9    wing safety officer.  And for a minute, I was the wing

10   inspector general.  I say a minute.  To a be more

11   precise, say probably about six months I was the wing

12   inspector general.

13   **Q.   Who is your commanding officer now?**

14   A.   My direct report is a gentleman named -- this

15   will embarrass me, but I think his name is Dan Schiller

16   -- Lieutenant Dan Schiller.  Sin is what I know him as,

17   but Dan Schiller.  Keep in mind, at my rank I report to

18   the squadron commander, because I today am a squadron

19   asset.

20   **Q.   All right.  When were you hired by Delta?**

21   A.   April 16th, 1998.  Well, that was my start date.

22   **Q.   I meant to ask you one other thing:  The entire**

23   **time for, say, the last 10 years, you've been performing**

24   **your military duties at what location?**

25   A.   My unit is located at the Jacksonville



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 21

```
 1    Atlanta; I did that for approximately a year and a half.
 2    And then I was displaced again -- that's how I met my
 3    wife -- as a 737200 in Orlando.  I believe that was
 4    next.
 5          Did I take an 800 stop in between?  I don't think
 6    I did.  I think I went 727, 737200 first officer in
 7    Orlando till we closed.  I feel like I might have gone
 8    back to the 800, but I don't have that in mind.  So I
 9    think what happened was I then become a 76FO, which I
10    did for the vast time -- 7576ER.
11          If I missed an aircraft system in there, I
12    apologize, but I think that's right.
13    Q.  Is that the last position you held at Delta?
14    A.  Yep.  Yes, sir.
15    Q.  Okay.  And so going back from your termination,
16    how long had you been in that position?
17    A.  I probably was doing that, if you'll excuse the
18    variance, probably from '05.  If I'm wrong by a couple
19    years, please forgive me, but for our purposes, I think
20    that's pretty accurate.
21    Q.  Was that always based in Atlanta?
22    A.  Yes.  My only bases ever have been Orlando and
23    Atlanta, and I was in Orlando a couple times.
24    Q.  As a Delta pilot, your terms and conditions of
25    employment are covered by a collective bargaining
```





**△ DELTA**

**Internal Memorandum**

**Date:  April 26, 2016**

**To:**  First Officer Randal Reep, # 273605

**From:**  Captain Jim Graham, Vice President Flying Operations and Chief Pilot

**Subject:**  NOTICE OF INTENT TO TERMINATE

This letter is being presented to you in accordance with *Section 18 C.* of the Pilot Working Agreement ("PWA") between Delta Air Lines, Inc. ("Delta" or "the Company") and the Air Line Pilots in the service of Delta, as represented by the Air Line Pilots Association, International ("ALPA").

A thorough investigation conducted by Flight Operations has revealed that during a period of over three years you routinely and repeatedly violated Company policies that govern the use of military leave. Additionally, during the same time period you violated the Company's sick leave policy. Your repeated violations of Company policies between April 2012 and July 2015 enabled you to receive at least $66,369.86 in pay and benefits that you were not entitled to receive.

*Section 13 D. 1.* of the PWA states that military leave is to be provided "in accordance with applicable law," in reference to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Delta trusts and expects that pilots in the armed services will follow the few Company policies and procedures, in accordance with the applicable USERRA provisions, that govern the use of military leave at the Company. Amongst these policies and procedures are requirements that pilots provide advance notice of military leave, where possible, and that all military duty must be reported. Additionally, Delta policy states that "a pilot performing military duty (on orders, UTA drill periods, proficiency training periods, flight training periods, or any other duty that is paid by the state or the U. S. Government) is ineligible to perform Delta duties in any capacity (except while on military terminal leave)." This policy, often referred to and understood as the "double dipping" policy, does not permit pilots to simultaneously be on military orders but refrain from taking military leave at Delta. Consequences of "double dipping" include, but are not limited to: (1) placing Delta's operation at risk due to a pilot's uncertain availability created by simultaneous military obligations, and (2) the obtainment of pay, benefits and other privileges when inappropriately remaining on an active status at Delta. Indeed, your actions on several occasions reporting military leave establish that you were well aware of the requirement to report military leave to Delta.

Although you were required to report military leave to Delta and were aware of this requirement, the Company's investigation has determined that during the 40-month period from April 1, 2012 through July 31, 2015, you served at least 357 days of military duty for

- 1 -



DEFENDANT'S
EXHIBIT
4  Reep
8|4|21  DN

DELTA000005267

your squadron, based in Florida but deployable to other locations, that was not reported to Delta. Instead, you misrepresented yourself as being on active status at Delta and were based in Atlanta in the 7 ER category. The Company's investigation has revealed, in particular, the following:

- On 71 of these 357 days of unreported military duty, you were on on-call reserve days at Delta for which you were paid and expected to be able to report for duty with as little as 12 hours – or even as few as two hours – notice from Crew Scheduling;
- On 14 of these 357 days of military duty, you actually performed flying or training for Delta, or were removed from a trip to accommodate the training of another pilot; you were paid for all this duty or assigned duty but should have been on military leave;
- You were on "long-term" military orders in excess of 30 days on five (5) different occasions throughout this period but failed each time to provide the advance notice required by both Company policy and USERRA. *See* 38 U.S.C. § 4312(a)(1); 20 C.F.R. § 1002.85(d) (USERRA requires service members to give "notice as far in advance as is reasonable under the circumstances" and at least 30 days is recommended);
- Your misuse of military leave allowed you to obtain 18 vacation days you were not entitled to receive and prevented the Company from accurately accounting for the amount of cumulative leave you have used and that USERRA allows;
- On at least one instance you admit you knew in advance of such long-term military orders (between April 1, 2015 and July 15, 2015), but you continued to bid your regular monthly schedule at Delta and on three (3) occasions during that extended military duty period waited to report your military leave until very close to any assigned reserve on call days or trips that you would not be able to perform at Delta due to your military obligations;
- You engaged in sick leave abuse. On at least five (5) occasions during this period, you called in sick and received pay for assigned duty at Delta while you were also on military orders; a pilot who should be on military leave is, of course, not simultaneously entitled to the benefit of sick leave at Delta.

Throughout the Company's investigation, you were asked to provide documentation of your military orders and activities and to respond to other relevant and reasonable inquiries. In a letter dated December 11, 2015, you were given a specific request for documents in advance of a meeting with your Regional Director and Chief Pilot (copy enclosed as Attachment A). This letter also informed you that failure or refusal to respond to the Company's investigative requests could result in the drawing of negative inferences by the Company relating to the inquiries and your responses, or lack thereof, to the Company's investigation. Despite your claims that you desired to cooperate fully, at a meeting on December 16, 2015 you pled ignorance as to why your conduct was subject to investigation and claimed you did not know you were expected to bring documents to the meeting. To this date, you have refused to provide any substantive responses to the Company's investigative requests detailed in Attachment A and have admitted no fault or wrongdoing. Due to your failure to provide responses, the Company has drawn negative inferences that serve as aggravating factors and support the conclusions reached independently in the Company's investigation.

DELTA000005268

The inferences drawn are that on days you called in sick at Delta while you were also on military duty, you were either flying, on alert to fly or on other military duty inconsistent with someone who is sick or someone who is resting and recovering from an illness; and that on days you were on reserve duty at Delta and also on military duty, you were not always readily available to meet your Delta commitments if called to do so.

Even without consideration of the negative inferences noted above, your conduct merits termination. Delta demands that its pilots exercise the highest standards of professionalism, integrity, conduct, judgment, character and trust, and you have failed to meet those standards. Your repeated abuse of Delta's military leave policies and your repeated violation of Delta's sick leave policies constitute separate and independent bases for your termination. Delta considered several factors that could potentially mitigate your conduct, but the facts and circumstances revealed in the investigation weighed heavily against excusing or accepting your behavior. Accordingly, Delta intends to terminate your employment.

You are hereby advised that you are entitled to contact your ALPA representative.

Captain Jim Graham

I hereby acknowledge receipt of this letter.

Date: 3 May 2016

Randal Reep

cc: Captain Hartley Phinney, MEC Contract Administration Committee Chairman
    Captain O.C. Miller, Managing Director – Flying Operations
    Chris Frederick, ATL Director & Chief Pilot
    Personnel file

Enclosure (1)

- 3 -

DELTA000005269

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 55

1    from Captain Graham to yourself, dated September 30,

2    2016.  Did you receive this letter?

3        A.  Yes.

4        Q.  If you could look at the paragraph that starts on

5    page 1 of Exhibit 8 and carries over to page 2 that

6    starts with the word although.  Do you see that?

7        A.  Yes.

8        Q.  The letter states:  Although you were required to

9    report military leave to Delta and were aware of this

10   requirement, Company's investigation has determined that

11   during the 40-month period from April 1, 2012 to July

12   31, 2015 you served at least 363 days of military duty

13   for your squadron based in Florida but deployable to

14   other locations that was not reported to Delta.

15           My first question is, do you have any reason to

16   dispute that you did have -- did perform military duties

17   on 363 days and did not inform Delta?

18       A.  I have no reason to dispute that number as I sit

19   here.

20       Q.  Why did you not report those days to Delta?

21       A.  What was the question?

22       Q.  Why did you not report those days of military

23   duty to Delta?

24               MS. MATTER:  Assumes facts, lacks

25   foundation.



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 56

1    A.  I did not report my military employment because

2    it was not conflicting in any way with Delta's schedule

3    or operation.

4    Q.  Okay.  You used the word employment.  Did you

5    mean duties?

6    A.  I said employment.  Yes, sir.

7    Q.  Is there any other reason you did not report

8    your -- these 363 days of military duty to Delta?

9    A.  Yes.

10   Q.  What else?

11   A.  I had been penalized greatly for taking military

12   leave in the past.  I was instructed to do my military

13   performance to not conflict with Delta's operation or

14   schedule.

15   Q.  When you say penalized, can you tell me what you

16   mean by penalized?  Did you ever receive any discipline?

17   A.  Formal?

18   Q.  Strike that.  Yes.  Did you ever receive any

19   formal discipline -- a warning letter, suspension or

20   termination?

21   A.  Two questions you're asking me there, right?

22   Which one would you like?

23   Q.  Okay.  Did you ever receive -- all right.  Let me

24   start over.

25         The Pilot Working Agreement sets forth that a

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                              August 04, 2021

Page 57

1    pilot can receive formal discipline and can file

2    grievances, correct, to challenge them?

3       A.  My understanding is that's true.

4       Q.  Okay.  Did you ever receive any of that kind of

5    discipline prior to April 1, 2012?

6              MS. MATTER:  Vague as to that kind of

7    discipline.

8       Q.  The kind of discipline I just referred to --

9       A.  The PWA --

10      Q.  Yes.

11      A.  -- grievance process?  Threats only.

12      Q.  Sorry?

13      A.  Only threats of same.

14      Q.  Okay.  Are there any other reasons you didn't

15   report these days of military duty to Delta?

16      A.  No.

17      Q.  If you look at page 2 of Exhibit 8, there's a set

18   of bullet points on the top half of the page.

19           The first bullet point says:  On 77 of these 363

20   days of unreported military duty, you were on on-call

21   reserve days at Delta for which you were paid and

22   expected to be able to report for duty with as little as

23   12 hours or even as few as 2 hours notice from crew

24   scheduling.

25           Do you have any reason to dispute that 77 of

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 58

1    these 363 days of unreported military duty occurred on

2    Delta reserve days?

3      A. No.

4      Q. The second bullet point says: On 14 of these 363

5    days of military duty, you actually performed flying or

6    training for Delta or were removed from a trip to

7    accommodate the training of another pilot. You were

8    paid for all this duty or assigned duty but should have

9    been on military leave.

10      Do you have any reason to dispute on 14 of those

11    days you actually performed flying or training for Delta

12    or were removed from a trip to accommodate the training

13    of another pilot?

14      A. If you end the sentence there, I have no reason

15    to dispute that.

16      Q. And you were paid for that flying and that

17    training, correct? Paid by Delta?

18      A. Paid for training?

19      Q. I'm sorry. I misstated. You were -- you were

20    paid for performing flying on those days for Delta?

21         MS. MATTER: Can you repeat that question?

22         MR. MUNGER: I'll repeat it.

23      Q. (By Mr. Munger) It refers to 14 of these 363

24    days, and it says that on 14 of those days you actually

25    performed flying or training for Delta or were removed



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 59

```
 1    from a trip to accommodate the training of another

 2    pilot.

 3           And I'm focusing on the days -- we don't know the

 4    number of days but the days where you actually performed

 5    flying or training for Delta.  My question is, if you

 6    performed flying or training for Delta on any of those

 7    days, you would have been paid for that by Delta,

 8    correct?

 9       A.  Mr. Munger, I lost you, bro.  Can you please ask

10    me again?  I want to get you an answer.

11       Q.  I'm going to try to make it much simpler.  When

12    you fly for Delta, were you paid by Delta?

13       A.  Certainly.

14       Q.  When you did training for Delta, were you paid by

15    Delta?

16       A.  Yes.

17       Q.  The third bullet point states:  You were on

18    long-term military orders in excess of 30 days on five

19    different occasions throughout this period but failed

20    each time to provide the advanced notice required by

21    both company policy and USERRA.

22           And I'm not going to read the rest of it.

23           I'm not going to ask you whether you agree

24    whether you were required to do this by USERRA, but do

25    you have any reason to dispute that you were on
```

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep
August 04, 2021

Page 60

1    long-term military orders in excess of 30 days on five

2    different occasions and did not report that to Delta?

3        A.   I heard your question to specifically be:  Do I

4    dispute that I was on those orders in excess of 30 days?

5        Q.   Yes.

6        A.   I do not dispute that.

7        Q.   And you did not inform Delta of that?

8        A.   I take exception to that question.

9        Q.   You did not give Delta advanced notice of the

10   long-term military orders in excess of 30 days on five

11   different occasions?

12       A.   On those specific occasions, no, but I believe I

13   provided general notice to Delta as to that behavior.

14       Q.   What are you referring to as general notice as to

15   that behavior?

16       A.   Several, but specifically, I would reference the

17   letter I wrote Jim Graham in 2010.

18       Q.   But did that letter specifically refer to the 30

19   days that -- I'm sorry.  Strike that.

20            Did that letter that you're referring to

21   specifically refer to the long-term military orders in

22   excess of 30 days on the five occasions that occurred

23   during the period that Mr. Graham is referring to in

24   this letter?

25       A.   As I stated, no as to specifics.



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 61

1    Q.   Okay.   The second to last bullet point says:   On

2    at least one instance you admit you knew in advance of

3    such long-term military orders between April 1, 2015 and

4    July 15, 2015, but you continued to bid your regular

5    monthly schedule at Delta.

6         Do you have any reason to dispute that?

7    A.   You end at, at Delta?

8    Q.   I did, intentionally.

9    A.   Yep.   I do not dispute that.

10   Q.   The second part of that sentence says:   And on

11   three occasions during that extended military duty

12   period waited to report your military leave until very

13   close to any assigned reserve on-call days or trips that

14   you would not be able to perform at Delta due to your

15   military obligations.

16        Let me break that down because I see that's two

17   different points.   Let me first say, on three occasions

18   during that extended military duty period waited to

19   report your military leave until very close to any --

20   gonna say it on:   And on three occasions during the

21   extended military duty period waited to report your

22   military leave until very close to any assigned reserve

23   on-call days.

24        Do you dispute that?

25            MS. MATTER:   I would say compound and vague

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 62

```
 1    as to those occasions referenced in the letter.

 2       A.  And I do dispute it.

 3       Q.  I'm sorry?

 4       A.  And I do dispute it.

 5       Q.  Okay.  So you -- why do you dispute it?

 6       A.  Lacks specificity.  I can't adopt that.  I have

 7    no idea what he's talking about.

 8       Q.  Is it possible that you did on three occasions

 9    during this April 1, 2015 to July 2015 period of

10    military duties that you did wait to report your

11    military leave until very close to a reserve day?

12              MS. MATTER:  Calls for speculation.

13       A.  Bear with me a moment.

14       Q.  Sure.

15       A.  I strongly believe not.  I do not think that

16    is -- very strongly do not believe that is possible, but

17    I don't know what dates we're speaking of.

18       Q.  Why do you think it's not possible?

19              MS. MATTER:  Again, calls for speculation.

20       A.  Well, one of the problems, Mr. Munger, is we're

21    using a modifier very close.

22       Q.  Fair enough.  What -- how do you read very close?

23       A.  I don't.  That's not my word.

24       Q.  How would you yourself define very close?

25       A.  Please, Mr. Munger, contextually what do you
```

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 63

1    mean?

2    **Q.  What do you think is very close in this context?**

3    A.  I don't know.

4    **Q.  Okay.**

5    A.  I didn't write it.  Respectfully.

6    **Q.  I understand.  That's why I'm asking for your**

7    **view of it.  The last --**

8    A.  That's not how I would type -- not how I would

9    write it.

10   **Q.  Okay.  The last bullet point says -- second**

11   **sentence of the last bullet point says:  On at least**

12   **five occasions during this period you called in sick and**

13   **received pay for assigned duty at Delta while you were**

14   **also on military orders.**

15         **Do you have any reason to dispute that?**

16         MS. MATTER:  Vague and compound as to those

17   occasions -- compound, and vague as to those occasions.

18   A.  My answer would be, I know that that happened.  I

19   think when he's using five occasions, he's playing loose

20   with wording because I think it was two occasions for

21   five days.  But please forgive me, I don't remember.

22   **Q.  Okay.**

23   A.  It is knowable, but I don't remember.

24   **Q.  Okay.  The next paragraph after the bullet**

25   **points, there is -- it's the second last full sentence.**



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                                    August 04, 2021

Page 64

 1   So it's five lines up from the bottom of page 2.

 2      A.  Okay.

 3      Q.  It starts with the word despite.  You see that

 4   sentence?

 5      A.  Yes, sir.

 6      Q.  Despite numerous opportunities to do so, you

 7   chose not to respond to the bulk of the Company's

 8   requests for information aimed at showing the locations,

 9   times, and type of military duty you were performing.

10         Is that accurate?

11      A.  No.

12      Q.  Did you ever produce to Delta any documents

13   showing the location of your military duties?

14      A.  No.

15      Q.  Did you ever produce any documents as to the

16   times of your military duties, meaning the times during

17   the date?

18      A.  I didn't have them to give.  No.

19      Q.  Did you ever produce Delta any documents that

20   would show the type of military duty you were

21   performing?

22      A.  Yes.

23      Q.  What are those?

24      A.  Exhibit 1.

25      Q.  And you testified today that based on Exhibit 1

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep
August 04, 2021

Page 66

1   appeared in court to argue cases on days where you had

2   also called in sick for Delta.

3          Is that correct?

4   A.  Absolutely not.

5          MS. MATTER:  It's compound.  Are you

6   asking --

7          MR. MUNGER:  Can you answer the question?

8          MS. MATTER:  -- is that what it reads?

9   Q.  (By Mr. Munger) Is it true that on at least five

10  separate occasions you appeared in court to argue cases

11  on days where you've called in sick on Delta trips?

12         MS. MATTER:  Compound; vague as to time; and

13  calls for speculation.

14  A.  Mr. Munger, I've reread that sentence.  May I

15  trouble you or Madam Court Reporter either to read back

16  that last question for me?

17  Q.  Okay.  Is it true that on at least five separate

18  occasions you appeared in court to argue cases on days

19  where you had also called in sick for Delta four times

20  or called in sick on a reserve day one time?

21  A.  I don't know.

22  Q.  Okay.  The letter states that you called in sick

23  to Delta on July 12, 2013.  Do you have any reason to

24  dispute that?

25  A.  No.



Page 67

1    Q.  On July 12, 2013 you were in court for a

2  sentencing hearing and called five witnesses to the

3  stand, correct?

4    A.  I don't know.

5    Q.  Is it correct that you told a presiding judge in

6  a legal matter in Jacksonville that you were available

7  on dates when you knew you had a Delta rotation

8  scheduled for those dates?

9    A.  The way you asked that question, I certainly

10  would not have done that.  I assume when I'm saying

11  we're available or I'm available, meaning the office,

12  and we are.  So that is -- I don't know which specific

13  event you're referring to, but that would be my

14  expectation.

15    Q.  Not sure I understand the answer, so let me just

16  ask the question again.  Were there occasions when you

17  as a lawyer in court -- you, not your law firm -- you

18  told the judge you were available on a particular date

19  when you had knowledge at that time that you had a Delta

20  rotation scheduled for that day that covered that date?

21         MS. MATTER:  Compound.

22    A.  I do not think so.

23    Q.  And is it also true on those occasions where you

24  had told the judge you were available to be in court on

25  that date during a period of time in which you had a



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                    August 04, 2021

Page 68

1    scheduled Delta rotation you then called in sick so that

2    the rotation was dropped and then you appear in court;

3    is that true?

4            MS. MATTER:  Compound; misstates prior

5    testimony.

6            MR. MUNGER:  I'm not stating his prior

7    testimony.  It's a question.

8            MS. MATTER:  Well, you said also --

9            THE WITNESS:  You did say also.

10            MR. MUNGER:  All right.  I'll say it again.

11    Q.  (By Mr. Munger) Is it true that you -- that you

12    were aware of a court appearance and that you told the

13    judge you were available for that court appearance on a

14    date when you had a Delta rotation that covered that

15    date of the court appearance, and then you then called

16    in sick so that the rotation was dropped and you then

17    appeared in court on that date?

18            MS. MATTER:  Compound.

19    A.  I cannot imagine.  If you have context to that,

20    I'd love to see it so I can explain myself, but that is

21    certainly not a representation I would have made.  Not

22    the way you're characterizing it, for sure.

23    Q.  Are you aware that Delta obtained transcripts in

24    certain court hearings in which you were the attorney

25    speaking to the judge?



Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 69

1    A.   I believe that.  I've not seen them.

2    **Q.   Have you ever looked at them?**

3          MS. MATTER:  Vague as to, have you ever

4    looked at them -- vague as to the time.

5    **Q.   Have you ever read them?**

6    A.   Read what?

7    **Q.   These transcripts.**

8    A.   I've never seen them, sir.

9    **Q.   Do you know why you called in sick on the period**

10   **of July 12 and July 15 and July 16?**

11   A.   I've generated medical releases to you guys.  I

12   do not recall.

13         (Defendant's Exhibit No. 9 was marked.)

14   **Q.   Mr. Reep, I've put in front of you what's been**

15   **marked as Exhibit 9, that is a handwritten document**

16   **under a heading Parthenon Medical Center, progress note**

17   **July 11, 2013.**

18   A.   Yes.

19   **Q.   Have you ever seen this document?**

20   A.   I -- I don't know.

21   **Q.   Do you recall whether you submitted this document**

22   **to Delta?**

23   A.   Through discovery or previous?

24   **Q.   Previous.  Before you were terminated.**

25   A.   I believe I gave a release for this document.  I

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                      August 04, 2021

Page 70

1    don't know that I produced it.  I don't believe I did.

2       Q.  Did you see a medical professional at Parthenon

3    Medical Center?

4       A.  Yes.

5       Q.  Who was that?

6       A.  Dr. Philip Carnevale.

7       Q.  Where is his practice located?

8       A.  Jacksonville, Florida.

9       Q.  Was he also your AME at the time -- air medical

10   examiner?

11      A.  Yes, I'm sure he was.

12      Q.  And you went to see him on July 11, 2013?

13      A.  I -- it appears I did.

14      Q.  Do you have any reason to believe that any of the

15   information on Exhibit 9 is inaccurate?

16      A.  No.  I think it was -- yeah, I think it's very

17   accurate.

18      Q.  You see there is a date in -- in the paragraph

19   we've been looking at -- of July 23, 2015.

20      A.  Can you help me.  Are we back to D-4?

21      Q.  We're back to Exhibit 8.

22      A.  Page 3, sir?

23      Q.  Page 3.

24      A.  Okay.

25      Q.  And there's a -- you see the date January 23,

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                                    August 04, 2021

Page 71

1    2015?

2        A.  Yes, sir.

3        Q.  Okay.  Do you have any reason to dispute that you

4    called in to Delta sick and dropped a trip that was

5    scheduled for January 22 through January 24?

6        A.  I have no reason to dispute that.

7        Q.  Do you have any reason to dispute that in

8    January 23 you informed a judge in court that you had

9    been on vacation on January 22, were driving home from

10   vacation and got home about three o'clock in the

11   afternoon on January 22, 2015?

12       A.  I've not seen that.  I do not recall.

13       Q.  Do you have any reason to dispute that you were

14   in court on January 23, 2015?

15       A.  I don't recall, but I -- I don't recall.

16                (Defendant's Exhibit No. 10 was marked.)

17       Q.  Mr. Reep, I've put in front of you a set of

18   interrogatories, and they're entitled Plaintiff Randal

19   Reep's Supplemental Response to Special Interrogatories

20   Set 1.  And it's identified as set number 1.  This has

21   been marked as Exhibit 10.

22       A.  Yes, sir.

23       Q.  These are interrogatory responses you served on

24   Delta in this case?

25       A.  Where are you?

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep
August 04, 2021

Page 72

1    Q.  I'm on page 7, supplemental response to

2    Interrogatory Number 10.

3    A.  Okay.

4    Q.  And it states:  Subject to and without waiving

5    the above-stated objections, the responding party

6    responds as follows:  Through the meet and confer

7    process, propounding party -- which would be Delta --

8    requests medical records for the days responding party

9    called in -- I'm sorry, responding party, which would be

10   yourself -- called in sick to propounding party from

11   January 1, 2013 to December 31, 2016, if responding

12   party sought medical care for the injury or illness that

13   resulted in the absence.

14        You see that?

15   A.  Yes.

16   Q.  So this period of time that I referred to -- the

17   January 22 through January 24, 2015 period -- assuming

18   you did call in sick -- I know you said you don't have

19   the records, but assuming you did call in sick, that

20   would have fallen between this period January 1, 2013

21   and December 31, 2016, correct?

22   A.  Now that I understand your question, can you --

23   or now that I understand the time frame, would you

24   repeat it?

25   Q.  Yes.  If you called in sick for a rotation on

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep
August 04, 2021

Page 73

1 January 22 through 24, 2015, it would be within the time

2 frame of this interrogatory request?

3    A. Yes, sir.

4    Q. Okay. And if you look at page 8, it says: The

5 days responding party called in sick to propounding

6 party during the relevant period is located in

7 confidential Plaintiff's schedule data with Delta TBD

8 produced on or about November 13th, 2019. Responding

9 party has previously provided medical releases and

10 documents for the following.

11       And then you see it has certain dates?

12    A. Yes, sir.

13    Q. None of those dates, however, are in January of

14 2015, correct?

15    A. That is correct.

16    Q. Okay. And then it says: Responding party does

17 not recall the dates or reasons for other sick days at

18 this time.

19       You see that?

20    A. Yes, sir.

21    Q. Thus, if you did call in sick for January 23

22 through January 25, 2015, you do not recall the reasons

23 you called in sick -- reason or reasons you called in

24 sick?

25    A. That is a correct statement.

```
 1                  (Defendant's Exhibit No. 11 was marked.)
 2       Q.  Mr. Reep, I've put in front of you what's been
 3   marked as Exhibit 11 --
 4       A.  Yes, sir.
 5       Q.  -- and this is a letter from Captain Tim
 6   Canoll -- C-a-n-o-l-l -- from the Airline Pilots
 7   Association International to Brendan Branon --
 8   B-r-a-n-o-n -- director of labor relations at Delta.
 9   And it refers to a grievance by First Officer Randal
10   Reep.
11       A.  Yes.
12       Q.  Did you file a grievance through the Pilot
13   Working Agreement process to challenge your termination?
14       A.  First, I can't help you with this letter.  I've
15   never seen it.
16       Q.  Okay.
17       A.  I don't know.  I don't know the answer to that
18   question.
19       Q.  Did you ever ask ALPA to file a grievance on your
20   behalf to challenge your termination?
21       A.  I believe so.  Would have been proven.  But it
22   wasn't me unilaterally asking them; it was in
23   conversation.  Does that make sense?
24       Q.  Yes.  Who would you have conversation with about
25   that?
```

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                                    August 04, 2021

Page 75

1     A.  That's a good question.  Her name was -- if you

2   could help refresh my memory as to that woman's name.

3   Do you know?

4     **Q.  I don't.**

5     A.  Zamuda.  Is that possible?

6     **Q.  That name does ring a bell.**

7     A.  Okay.  Rachel Zamuda.  I'm not going to be able

8   to help you with spelling there.

9         Dana, you're on your own.

10        There's another male attorney there who sat own a

11  beach ball for his desk -- sorry for the extra stuff --

12  but I don't know his name.

13    **Q.  How did they respond to your request?**

14    A.  Poorly.

15    **Q.  Did they say whether they would or would not file**

16  **a grievance?**

17    A.  To answer your question, yes, they said if they

18  would or wouldn't.

19    **Q.  What did they say?**

20    A.  They said they would.

21    **Q.  Okay.  And I know you've not seen Exhibit 11, but**

22  **it indicates that they did file a grievance on your**

23  **behalf.**

24    A.  That's interesting.

25    **Q.  Did you ever -- was there ever any system board**

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                          August 04, 2021

Page 76

1    hearing -- either four-member or five-member system

2    board hearing on any grievance that you filed

3    challenging your termination?

4        A.  No.

5        Q.  Do you know why?

6        A.  Well, unless you would tell me otherwise, no.

7            MS. MATTER:  Calls for speculation.

8        A.  Not that I was at.

9        Q.  Okay.  Do you know why?

10           MS. MATTER:  Calls for speculation.

11       A.  I actually believe I indicated to them that they

12   did not have to.  To say that they came kicking and

13   screaming to that process would be an understatement.

14       Q.  When you say they did not have to, you told ALPA

15   they did not have to pursue your grievance?

16       A.  They made it extraordinarily clear they were not

17   going to be in the batter's box with me the way I would

18   have expected.

19       Q.  And so you told them that they did not need to

20   pursue the grievance?

21       A.  No.  That's not how that conversation went.

22       Q.  How did it go?

23       A.  They were of the view that military pilots did

24   not have access to the resources of ALPA as it relates

25   to USERRA.  It was very clear to me that the people

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 77

1   representing me were not going to be very engaged.

2       **Q. Did you ever attempt to obtain your own attorney**

3   **to represent you in a system board hearing?**

4       A. I did -- I actually specifically think that was

5   not an option.  I think somebody told me that.  I think

6   one of them told me that.

7       **Q. Are you sure about that?  Because that is**

8   **permitted and happens not infrequently.**

9       A. I am not sure about that.

10      **Q. Okay.**

11      A. Can I have just a minute though to think about

12  it?

13      **Q. Sure.**

14          MS. MATTER:  Belated objection that the

15  question's ambiguous.

16      A. In fairness, I'm certainly not certain.  But I

17  was not given that counsel; I can absolutely tell you

18  that.

19      **Q. Okay.**

20          MR. MUNGER:  Can we go off the record.

21          (Recess was taken from 12:06 to 12:15 p.m.)

22          (Defendant's Exhibit No. 12 was marked.)

23  BY MR. MUNGER:

24      **Q. I put in front of you what's been marked as**

25  **Exhibit 12, which is another separate set of**

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 78

1  interrogatory responses from you in this case, Mr. Reep,

2  and I'm going to direct your attention to

3  interrogatory -- supplemental response to Interrogatory

4  Number 18, which is on page 6 of Exhibit 12.

5      A.  Yes, sir.

6      Q.  The interrogatory says:  With respect to any of

7  the alleged harassment by Delta in violation of USERRA

8  identified in response to Interrogatory Number 18 (SIC),

9  identify any damages you claim to have suffered because

10  of such alleged harassment.  If those damages include

11  any economic damages, identify specifically the amount

12  and source of such economic damages.

13          You see that?

14      A.  I do.

15      Q.  Okay.  If you look now at page 7 -- I'm going to

16  ask you about the middle two paragraphs, so the first

17  two full paragraphs on page 7.  So why don't you read

18  those first to yourself and then...

19      A.  (Reading.)

20          Yes.  Okay.

21      Q.  Okay.  In the first paragraph, there is a

22  sentence that says:  But for Defendant's unlawful

23  concurrent duty policy, Plaintiff would have and could

24  have spent more of his free and personal time working at

25  and earning income and retirement credits from

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 79

1    Plaintiff's military unit.

2         You see that?

3    A.  Yes.

4    Q.  Are you stating there that if Delta did not have

5    the concurrent duty policy you would have earned more

6    money and more retirement credits from the military?

7    A.  I am stating that.

8    Q.  Okay.  Why is that?

9         MS. MATTER:  Ambiguous.

10   A.  Can I go back to something you asked me

11   earlier --

12   Q.  Yes.

13   A.  -- to explain this to you?  Did you ask me why I

14   did not report my military duty?  You asked me that,

15   right?

16   Q.  Yes.

17   A.  Okay.  You've been a gentleman, but my brain is

18   still a little foggy.  Did I reference Winfred Speakman.

19   Q.  No?

20   A.  Did I reference Steve Tate?

21   Q.  No.

22   A.  Okay.  So 2010 time frame, Steve Tate -- there

23   were other events than this, but Steve Tate in 2010

24   called me and wanted a bunch of stuff from me that

25   wasn't related to any ongoing military leave request

1    that I can recall.  I think it was a reaction to

2    military leave I had taken.

3         And he demanded a lot of stuff, which I am

4    certain was volatile of USERRA, and I told him so.  He

5    then went through Jim Mange.  Jim Mange tried to use

6    some back-channel stuff to penalize me, as I referenced

7    through my military career, by influencing senior

8    officers.

9         I went directly to Jim Graham.  I think I

10   mentioned to you how I in general told Jim Graham how I

11   was going to resolve the Jim Mange problem.  You haven't

12   asked me questions about that.

13        But -- so I was told by -- at the conclusion of

14   that, Steve Tate said essentially the following:  Look

15   man, you're putting me in a bad spot with my boss -- who

16   I assumed to be Jim Mange.  Not assumed.  I knew it was

17   Jim Mange -- and what you need to do is stay off Jim

18   Mange's radar.  And the way to do that is not report or

19   take -- report or take military leave.  Work it on a

20   de-confliction basis from Delta.

21        Steve Tate was an assistant chief pilot -- maybe

22   the assistant chief pilot.  I don't know.  I don't

23   remember.

24        So to your question, I would have taken more

25   military leave and performed more military duty than I

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep
August 04, 2021

Page 81

1    did in those off years -- because what I think you'll

2    see is a -- after that 2010 incident, a dramatic

3    reduction in the amount of military leave I took.

4         Because I then at Tate's -- and then ultimately

5    there's a letter that supports that from Winfred

6    Speakman that supported staying off of Jim Mange's

7    radar.  And leave was the thing that was generating

8    that, so I quit taking military leave and I performed

9    this double-dipping policy, was the title, which is

10   whatever.

11        During that time, I performed in a

12   not-to-conflict-with-Delta basis, so I had to do that

13   less because I had to be certain I could be available to

14   Delta when I was telling them I was available.  So by

15   not taking military leave, I lost more opportunity at

16   the military.

17   Q.  I understand what you just said.  The sentence

18   doesn't refer to the 2010 events, but just simply says

19   that the concurrent duty policy -- in other words, the

20   policy -- but for the policy, you're claiming you would

21   have earned more money and retirement credits from the

22   military, correct?

23        MS. MATTER:  Asked and answered.

24   A.  Yes.  I would say that that is correct.

25   Q.  Okay.  And what is it about the concurrent duty

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 82

1     policy that prevented you from earning more from the

2     military?

3         A.   I guess it actually may have only a relationship

4     interest to concurrent duty, but how military leave was

5     treated among senior management, at least specific to

6     me.   So how I'd answer the question is, the concurrent

7     duty policy is the hand-in-hand to the taking too much

8     military leave.   Delta was essentially telling me you've

9     got to perform less duty at the military.

10        Q.   Do you have an understanding what the concurrent

11    duty policy states?

12        A.   Concurrent duty was a term that was generated

13    after my termination, so I don't know what the policy --

14    as we sit here today, I don't know -- I know what was

15    explained to me.   I think we went over that in the

16    letter.

17        Q.   What is your understanding of what the concurrent

18    duty policy prohibited?

19        A.   Today --

20             MS. MATTER:   Vague as to time.

21        Q.   Any time.

22        A.   Well, it didn't exist all the time.

23        Q.   When it existed.

24        A.   I'm not sure when it existed.   But as my

25    understanding is, Delta's position is you can't be on

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 83

1   duty to Delta and duty to the military at the same time.

2       Q.   Okay.   So let's use an example of a reserve day.

3       A.   Okay.

4       Q.   Okay.   You're on a Delta reserve day.   You're on

5   an on-call day, and you decide to perform military

6   duties that day.   And let's assume you decide to do a

7   performance review that you say generally takes several

8   hours and you're going to do it from your home.

9       A.   Okay.   That's not how that would go, but I'll go

10  with your hypothetical.

11      Q.   I'm sorry.   Say that again.

12      A.   I said, that is not how that would go, but I can

13  go with your hypothetical.

14      Q.   Well, tell me how that would go.

15      A.   It's your hypothetical.   I don't know.   But what

16  you just stated is not kind of how that path walks.

17      Q.   Okay.   Were there times when you performed

18  military duties at home on a Delta reserve day?

19      A.   I don't think so.

20      Q.   Okay.

21      A.   That wouldn't have been my practice.   My home

22  during the relevant time was 1.3 miles from the guard.

23  Many of the guard systems at the time didn't interface

24  smoothly.   They did, but not smoothly.   So if I was

25  doing any kind of material work, I would probably be at

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 84

1    the squad room, where I like to be anyway.

2       Q.  Okay.  If you look at that second paragraph, it

3    says:  As directed by Delta management, to reduce its

4    military leave, Plaintiff dropped at least 94 trips and

5    availability days resulting in damages of approximately

6    $77,550 plus market rate of returns and liquidated

7    damages.

8        You see that?

9    A.  Yes.

10    Q.  Are you talking about dropped 94 Delta trips?

11    A.  Yes.

12    Q.  Okay.

13    A.  And that was in -- well, you'll ask the question.

14    Q.  How were you -- how did you determine that you

15    dropped at least 94 trips?

16    A.  I believe we went back over my schedule for that

17    period of time to look at the number of trips that I

18    personal dropped or -- authorized personal dropped or

19    perhaps traded but less likely.

20    Q.  Do you have the dates of those dropped trips or

21    swaps?

22    A.  In front of me, no.  And by memory, absolutely

23    not.

24    Q.  Okay.  But there are -- you could answer that

25    question if you had the right documents in front of you?

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep                                    August 04, 2021

Page 85

1    A.  Yes, sir.  I think so.

2    Q.  It also says you dropped availability dates.  Are

3    those reserve days?

4    A.  Yes, sir.

5    Q.  Okay.  This -- could you also determine by

6    looking at your schedule which reserve days you dropped?

7    A.  I would anticipate that.

8         MS. MATTER:  If I could, I'd like to make a

9    belated objection with respect to this line of

10   questioning to the extent it calls for attorney-client

11   privilege.

12        MR. MUNGER:  Okay.

13   Q.  I've put in front of you what's been marked as

14   Exhibit 13, which is an additional set of supplemental

15   responses to Delta's special interrogatories set one.

16        Before we talk about these interrogatories, one

17   of your claims in this lawsuit is that Delta's method of

18   calculating pension contributions for periods of

19   military leave violates USERRA, correct?

20   A.  It is.

21   Q.  And the same for the profit sharing calculations,

22   right?

23   A.  That is correct.

24   Q.  Okay.  If you look at --

25        MS. MATTER:  Could we go off the record

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 86

1  really quickly?

2          MR. MUNGER:  Sure.

3          (Discussion off the record about duplicate

4          exhibits.)

5  Q.  (By Mr. Munger) Again, if you'd look at page 4 --

6          THE WITNESS:  Do you mind if we just clean

7  this part of the record?

8          MR. MUNGER:  We are now looking at Exhibit

9  10, which is Mr. Reep's supplemental responses to

10  special interrogatories set one, which were served on

11  March 1, 2021.

12          MS. MATTER:  And we're withdrawing --

13          MR. MUNGER:  And we're withdrawing the

14  previous Exhibit 13.

15          THE WITNESS:  Yes, sir.

16  BY MR. MUNGER:

17  Q.  If you look at Request Number 8 on page 2, it

18  says:  Identify each Delta profit sharing payment that

19  Plaintiff alleges was unlawfully delayed, withheld,

20  underpaid to Plaintiff during his employment with Delta,

21  and to the extent that Plaintiff contends that any

22  profit sharing payment was underpaid, state the amount

23  of which such payment was underpaid and the method for

24  Plaintiff's calculation for the underpayment.

25          You see that?

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 87

1    A.  Yes, I do.

2    Q.  And you may or may not know this, but the parties

3    -- there were objections, and the parties met and

4    conferred and that led to your supplemental responses.

5    Okay?

6    A.  I certainly believe you.

7    Q.  So if you look at page 4, the third paragraph

8    says:  The methodology described in Plaintiff's October

9    21, 2020 supplemental initial disclosures was utilized

10   to determine responding party's damages response for

11   this interrogatory.  Deemed compensation for any month

12   with any military leave is calculated by using the

13   greater of the total pay hours included in Delta's pilot

14   pay data confidential spreadsheet or 94 hours.  This

15   value is applied to any month in which responding party

16   dropped rotations to perform military duty rather than

17   utilizing military leave.

18        I actually did not mean to say the second

19   sentence.  I want to just focus on:  Deemed compensation

20   for any month with any military leave is calculated by

21   using the greater of the total pay hours included in

22   Delta's pilot pay data confidential spreadsheet or 94

23   hours.

24        Do you see that?

25   A.  I do.

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep
August 04, 2021

Page 88

1    Q.  Are you familiar with total pay hours included in

2    Delta pilot pay data?  Do you know what that is?

3    A.  I -- you say familiar.  I've been exposed to

4    that.  To say I'm familiar or have a working knowledge

5    of it, the answer to that would be no.

6    Q.  Okay.  So if you are -- if you were on a military

7    leave for two months, let's say, and you didn't earn

8    anything from Delta -- you're on unpaid military leave

9    status -- is it -- it's my understanding, correct, of

10   your damages theory, that Delta should have determined

11   that had you worked for Delta you would have worked to

12   earn the total pay hours for that -- for those two

13   months on the pilot pay data or 94 hours?

14              MS. MATTER:  Objection to the extent that it

15   calls for attorney-client privilege.

16              MR. MUNGER:  Not asking for privilege.  Just

17   asking about your damages theory.

18   A.  Got a little worked up in the objection.  Do you

19   mind?

20   Q.  Yes.  I'm trying to understand this theory.  Just

21   make sure that I understand it.  I'm not going to debate

22   with you.

23   A.  I appreciate that.

24   Q.  Yeah.  There is a -- your understanding is

25   there's a Delta pilot pay data spreadsheet, and it

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 89

1    includes total pay hours?

2      A.  Yes.

3      Q.  Okay.  And let's say you were out January and

4    February of 2015 on military leave.  And your contention

5    is, to determine what you would have earned from Delta

6    for purposes of property sharing, Delta should have used

7    the total pay hours on the pilot pay database for those

8    two months or if it -- or 94 hours?

9      A.  That is my understanding.

10     Q.  Okay.

11     A.  It gets into a lot of math, and there's a reason

12   I'm doing the business I'm doing now.  But yes, that's

13   my understanding.

14     Q.  Okay.  If the pay hours was under 94 hours on the

15   pilot pay data, is it your theory you should have got 94

16   hours or whatever was on the pilot pay data?

17          MS. MATTER:  Same objection.

18     A.  Mr. Munger, I'm not real in the weeds on the

19   damage portion as to this as far as the math portion of

20   that goes.  That is my belief of the theory though, as

21   you expressed it.

22     Q.  Okay.  Do you know why the number 94 hours is put

23   in your interrogatory answer?

24     A.  I apologize, I do not.  Maybe I once knew.  As I

25   sit here, I don't.  It makes sense, but I don't remember

Jeremy Sorenson, et al. vs Delta Air Lines, Inc., et al.
Randal Reep

August 04, 2021

Page 90

1    that discussion.

2        **Q.  During bid periods where you were a regular line**

3    **pilot and you did not have any military leave and you**

4    **did not take any vacation and you didn't have any sick**

5    **leave.  So you were --**

6        A.  Straight active.

7        **Q.  -- active, yeah -- do you have any sense as to**

8    **the number of hours you typically flew per month during**

9    **the 2010 to 2017 period?**

10               MS. MATTER:  Calls for speculation.

11       A.  The behavior changed greatly during those years,

12   as we've discussed.  To combine those is -- it would

13   challenge your answer a little bit -- challenge your

14   question a little bit.

15           You know, I think a month, as you described with

16   none of those issues in them, would have been probably

17   in the 80- to 85-hour time frame of block hour.  That's

18   what -- you know, from the pay standpoint.  It was never

19   a focus of mine.  It was always the -- you know

20   [unintelligible] of those issues I was always kind of an

21   ER pilot.

22           I can't answer that question with fidelity.  I

23   think there are documents that would help me, but I

24   don't know.

25       **Q.  Okay.**





**▲ DELTA**

**Internal Memorandum**

**Date: September 30, 2016**

**To:**        First Officer Randal Reep, # 273605

**From:**    Captain Jim Graham, Vice President Flying Operations and Chief Pilot

**Subject:**  LETTER OF TERMINATION

This letter is being presented to you in accordance with ***Section 18 C.*** of the Pilot Working Agreement ("PWA") between Delta Air Lines, Inc. ("Delta" or "the Company") and the Air Line Pilots in the service of Delta, as represented by the Air Line Pilots Association, International ("ALPA").

A thorough investigation conducted by Flight Operations has revealed that during a period of over three years you routinely and repeatedly violated Company policies that govern the use of military leave. Additionally, during the same time period you violated the Company's sick leave policy. Your repeated violations of Company policies between April 2012 and July 2015 enabled you to receive at least $81,699.19 in pay and benefits that you were not entitled to receive.

***Section 13 D. 1.*** of the PWA states that military leave is to be provided "in accordance with applicable law," in reference to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Delta trusts and expects that pilots in the armed services will follow the few Company policies and procedures, in accordance with the applicable USERRA provisions, that govern the use of military leave at the Company. Amongst these policies and procedures are requirements that pilots provide advance notice of military leave, where possible, and that all military duty must be reported. Additionally, Delta policy states that "a pilot performing military duty (on orders, UTA drill periods, proficiency training periods, flight training periods, or any other duty that is paid by the state or the U. S. Government) is ineligible to perform Delta duties in any capacity (except while on military terminal leave)." This policy, often referred to and understood as the "double dipping" policy, does not permit pilots to simultaneously be on military orders and Delta duty. Consequences of "double dipping" include, but are not limited to: (1) placing Delta's operation at risk due to a pilot's uncertain availability created by simultaneous military obligations, and (2) the obtainment of pay, benefits and other privileges when inappropriately remaining on an active status at Delta. Indeed, your actions on several occasions reporting military leave establish that you were well aware of the requirement to report military leave to Delta.

Although you were required to report military leave to Delta and were aware of this requirement, the Company's investigation has determined that during the 40-month period from April 1, 2012 through July 31, 2015, you served at least 363 days of military duty for your squadron, based in Florida but deployable to other locations, that was not reported to Delta. Instead, you misrepresented yourself as being on active status at Delta and were based

- 1 -



DEFENDANT'S EXHIBIT

8 Reep

8|4|21 ON

in Atlanta in the 7 ER category. The Company's investigation has revealed, in particular, the following:

- On 77 of these 363 days of unreported military duty, you were on on-call reserve days at Delta for which you were paid and expected to be able to report for duty with as little as 12 hours – or even as few as two hours – notice from Crew Scheduling;
- On 14 of these 363 days of military duty, you actually performed flying or training for Delta, or were removed from a trip to accommodate the training of another pilot; you were paid for all this duty or assigned duty but should have been on military leave;
- You were on "long-term" military orders in excess of 30 days on five (5) different occasions throughout this period but failed each time to provide the advance notice required by both Company policy and USERRA. *See* 38 U.S.C. § 4312(a)(1); 20 C.F.R. § 1002.85(d) (USERRA requires service members to give "notice as far in advance as is reasonable under the circumstances" and at least 30 days is recommended);
- Your misuse of military leave allowed you to obtain 18 vacation days you were not entitled to receive and prevented the Company from accurately accounting for the amount of cumulative leave you have used and that USERRA allows;
- On at least one instance you admit you knew in advance of such long-term military orders (between April 1, 2015 and July 15, 2015), but you continued to bid your regular monthly schedule at Delta and on three (3) occasions during that extended military duty period waited to report your military leave until very close to any assigned reserve on call days or trips that you would not be able to perform at Delta due to your military obligations;
- You engaged in sick leave abuse while on military leave. On at least five (5) occasions during this period, you called in sick and received pay for assigned duty at Delta while you were also on military orders; a pilot who should be on military leave is, of course, not simultaneously entitled to the benefit of sick leave at Delta.

Throughout the Company's investigation, you were asked to provide documentation of your military orders and activities and to respond to other relevant and reasonable inquiries. In a letter dated December 11, 2015, you were given a specific request for documents in advance of a meeting with your Regional Director and Chief Pilot (copy enclosed as Attachment A). This letter also informed you that failure or refusal to respond to the Company's investigative requests could result in the drawing of negative inferences by the Company relating to the inquiries and your responses, or lack thereof, to the Company's investigation. Despite your claims that you desired to cooperate fully, at a meeting on December 16, 2015 you pled ignorance as to why your conduct was subject to investigation and claimed you did not know you were expected to bring documents to the meeting. Eventually, you provided a limited number of flight logs that were not fully responsive to the requests, but did show that you were flying for the Air Force (sometimes twice a day) on Delta reserve days. This fact is inconsistent with your claims that you were always readily available, rested and fit to fly for Delta. Despite numerous opportunities to do so, you chose not to respond to the bulk of the Company's requests for information aimed at showing the location, times and type of military duty you were performing. Due to your failure to provide responses, the Company has drawn negative inferences that serve as aggravating factors and support the conclusions reached independently in the Company's investigation. The inferences drawn are that on days you

called in sick at Delta while you were also on military duty, you were on alert to fly or on other military duty inconsistent with someone who is sick or someone who is resting and recovering from an illness; and that on days you were on reserve duty at Delta and also on military duty, you were not always readily available to meet your Delta commitments, including the duty to be properly rested and fit to fly, if called to do so. Even without consideration of these negative inferences, your conduct merits termination. Your repeated abuse of Delta's military leave policies and your repeated violation of Delta's sick leave policies constitute separate and independent bases for your termination.

After the investigation into your misconduct concluded you received a Notice of Intent to Terminate your employment and were in the grievance process. New information came to light which required the Company to re-open its investigation. Delta learned that you are a licensed attorney in Florida primarily handling criminal matters and you routinely appear in Florida State Courts as lead counsel on behalf of your clients. During the 40-month period from April 1, 2012 through July 31, 2015 a review of available court records from Duval County, Florida showed that on at least five separate occasions you appeared in court to argue cases on days where you had also called in sick for Delta trips (four times) or called in sick on a reserve day (one time). We have reviewed information received from your medical providers in conjunction with those absences and concluded that on January 23, 2015, July 12, 2013, July 15, 2013 and July 16, 2013 you had advance notice of your Delta duties and conflicting court dates and called in sick at Delta so as to resolve the conflict between your obligation to prepare for and be in court and your obligation to fly trips for Delta. Your abuse of Delta sick leave in any one of those instances is an independent grounds for termination. The facts that comprise the totality of your actions establish that you made your duties and responsibilities as a Delta pilot subordinate to your legal work. These facts are wholly consistent with and support the Company's earlier findings that you routinely abused Delta's military leave and sick leave policies.

Delta demands that its pilots exercise the highest standards of professionalism, integrity, conduct, judgment, character and trust, and you have failed to meet those standards. Delta considered several factors that could potentially mitigate your conduct. The facts and circumstances revealed in the investigations as well as your lack of remorse and lack of respect for Delta's policies weighed heavily against excusing or accepting your behavior. Accordingly, Delta is terminating your employment.

Captain Jim Graham

I hereby acknowledge receipt of this letter.

Randall Reep

Date: _10-17-16_

- 3 -

cc: Captain Hartley Phinney, MEC Contract Administration Committee Chairman
Captain O.C. Miller, Managing Director – Flying Operations
Chris Frederick, ATL Director & Chief Pilot
Personnel file

Enclosure (1)

1                    C E R T I F I C A T E

2

3     STATE OF GEORGIA)

4     ATLANTA DIVISION)

5

6          I hereby certify that the foregoing transcript

7     was reported, as stated in the caption, and reduced to

8     typewriting under my direction; that the foregoing pages

9     represent a true, complete and correct transcript, and I

10    further certify that I am not of kin or counsel to the

11    parties in the case; am not in the employ of counsel for

12    any of said parties; nor am I in any way interested in

13    the result of said case.

14

15

16

17

18

19

20                              *Dana New*

21                    Dana New, CCR-5825-5963-4974-3104

22

23

24

25

Elizabeth Gallo
COURT REPORTING, LLC

1                 DISCLOSURE OF NO CONTRACT

2

3          I, Dana New, do hereby disclose pursuant to Article
     10.B of the Rules and Regulations of the Board
     of Court Reporting of the Judicial Council of Georgia

4     that Elizabeth Gallo Court Reporting, LLC was contacted
     by the party taking the deposition to provide court

5     reporting services for this deposition and there is no
     contract that is prohibited by O.C.G.A. 15-14-37(a) and

6     (b) or Article 7.C of the Rules and Regulations of the
     Board for the taking of this deposition.

7

8          There is no contract to provide court reporting
     services between Elizabeth Gallo Court Reporting, LLC or
     any person with whom Elizabeth Gallo Court Reporting,

9     LLC has a principal and agency relationship nor any
     attorney at law in this action, party to this action,

10    party having a financial interest in this action, or
     agent for an attorney at law in this action, party to

11    this action, or party having a financial interest in
     this action.  Any and all financial arrangements beyond

12    our usual and customary rates have been disclosed and
     offered to all parties.

13

14

15

16

17

18              *Dana New*

19              Dana New, CCR-5825-5963-4974-3104
                Elizabeth Gallo Court Reporting, LLC

20

21

22

23

24

25
                               www.GeorgiaReporting.com/Schedule
                                          404.389.1155



# EXHIBIT 6

Transcript of the Testimony of:

**JIM GRAHAM**

SORENSON, et al.

vs.

DELTA AIRLINES INC.

August 25, 2021

Volume 1



IMAGINE
R E P O R T I N G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

JEREMY SORENSON, an                )
individual, RANDAL REEP,    )
an individual,RANDAL SMITH,)
an individual, ADAM                )
MCLEAN, an individual, and )   Civil Action No.
JAMES DOYLE, an individual,)   1:17-cv-00541-ELR
on behalf of themselves        )
and all others                        )
similarly situated,                 )
          Plaintiffs,                   )
     vs.                                    )
DELTA AIRLINES, INC., a        )
Delaware Corporation.           )
          Defendant.                  )
                                              )
_____

DEPOSITION OF

JIM GRAHAM

DATE:  Wednesday, August 25, 2021

TIME:  10:00 a.m. - 6:39 p.m.

LOCATION:  999 Peachtree Street, N.E., Suite

2850, Atlanta, Georgia  30309

REPORTED BY:  Tamika Burnette, RPR, CSR No. 2870

1       Q.  If you're on reserve and -- by your definition,

2   therefore, on duty with Delta, can you perform work for

3   another employer?

4       A.  Delta doesn't track that.

5       Q.  So you can?

6       A.  Yes.  I mean, yes.  We would have to -- I'd

7   have to understand, once again, you know, the vagueness

8   of your question begs me to say I need more detail.  You

9   can't engage with another employer with a conflict of

10  interest.

11      Q.  Then you can't fly for American Airlines?

12      A.  No, you can't.  Well, there are a lot of

13  things, but that is one example.

14      Q.  Okay.  Here's an example.  You have a pilot

15  that's on short-call reserve?

16      A.  Uh-huh.

17      Q.  That pilot's also a dentist.

18      A.  Okay.

19      Q.  While that pilot is on short-call reserve, can

20  that pilot go pull a tooth and get paid for it?

21      A.  Delta would have to knowledge whether that

22  pilot was or not.  So we don't have a policy that states

23  that that's prohibited.

24      Q.  It's not prohibited.  The same if it's a doctor

25  or a plumber, right?

1       A.   Correct.

2       Q.   Okay.   Now if that's a -- if that pilot's a

3    military dentist, then the pilot cannot pull the tooth

4    of another military officer?

5       A.   Correct.   Because that -- that pilot, military

6    dentist, would be going on to orders in order to do

7    that.   A military dentist cannot just show up and say

8    I'm here for 15 minutes to pull this tooth, and then I'm

9    just going to go back and stand duty for Delta.   So

10   there is -- there is no mechanism that I am aware of

11   with a military duty that shows that you can -- that you

12   can show up for a -- a, you know, a -- whenever you

13   would like to and not have that called military duty.

14      Q.   Does that go for regardless of whether the

15   military duty is paid or unpaid military duty?

16      A.   Military duty is military duty.

17      Q.   Regardless of whether you're being paid for it

18   or not?

19      A.   Well, I mean, that's -- yes.

20      Q.   Yes?

21      A.   Once again, I -- I -- I'm not familiar enough

22   with the current state of duties that the military kind

23   of word this point.   What I do know is that if you are

24   on military duty, you fall under their control and that

25   in includes for benefits if something were to happen to

**Date:** Monday, May 6 2013 09:58 PM

**Subject:** FW: FOIA & mil leave

**From:** Mangie, Jim

**To:** Graham, Jim <Jim.Graham@delta.com>; Miller, OC <OC.Miller@delta.com>;

Gentlemen,

I'm happy to see the Leave of Absence program moving forward. As both of you are already aware, we have been engaging pilots on MLOA situations for a few years now. We do this through a network of MLOA SME Chief Pilots. These SMEs, as well as myself, have been making calls to pilots and units on a regular basis throughout this period. There is a good deal of thought and experience that go into when these calls are made and what gets said, keeping in mind our requirements under USERRA. I'm very happy to support Jason's efforts but would like to sit down and discuss how both of you would like the program to move forward. Also, we've discussed using Jason's tracking and notification system for mil leave issues as well as sick leave issues. Are we ready to start that process yet?

Thanks,

Jim

**LAX 7ER-B**..Forrest Brown #495374 – Occurrences – **16 total: 3 VAC / 1 HOL / 12 MIL**. Pilot has extensive usage of MLOA/MLOX while on RES duty/off days. His 36 month look-back history includes:

- 2010(4 sick calls with MIL)
- 2011(4 sick calls with MIL)
- 2012(4 sick calls with MIL)
- DBMS indicates Air Force Reserve with C-17 flying experience
- Jim Mangie indicates pilot has a history with use of MLOA in other cases. We are awaiting a more detailed response from Jim's knowledge of Forrest.

We found that 2 of the 12 MIL occurrences can be taken out(from JUN12 – hand in a cast). However, based on his extensive use of MIL and sick along with his general use of MLOA under the scrutiny of Jim Mangie, we feel we have a good faith basis to make contact.



PLAINTIFF'S EXHIBIT
8
8-25-21
PENGAD 800-631-6989

CONFIDENTIAL

DELTA000092366

8.1

| Date: | Thursday, October 4 2018 11:09 AM |
|---|---|
| Subject: | [EXTERNAL] RE: [Non-DoD Source] RE: Catching up and some military thoughts |
| From: | Branyon, Robert M Maj Gen USAF (US) <robert.m.branyon.mil@mail.mil> |
| To: | Graham, Jim <Jim.Graham@delta.com>; |
| CC: | 'bbranyon@comcast.net' <bbranyon@comcast.net>; Branyon, Robert M Maj Gen USAF (US) <robert.m.branyon.mil@mail.mil>; |

Thanks for the reply Boss. And congratulations on your selection as SVP! I look forward to the end of the lawsuit and your ability to assemble and conduct a strong, productive MLB.

Very respectfully,

Bob

ROBERT M. BRANYON, Maj Gen, USAF
USSOUTHCOM Deputy Commander, Mobilization & Reserve Affairs
Comm: 305.437.2673 DSN: 567 Cell: 904.610.9431
robert.m.branyon.mil@mail.mil
robert.m.branyon.mil@mail.smil.mil

-----Original Message-----
From: Graham, Jim [mailto:Jim.Graham@delta.com]
Sent: Tuesday, October 2, 2018 10:02 AM
To: Branyon, Robert M Maj Gen USAF (US) <robert.m.branyon.mil@mail.mil >
Cc: 'bbranyon@comcast.net' <bbranyon@comcast.net>; Graham, Jim <Jim.Graham@delta.com >
Subject: [Non-DoD Source] RE: Catching up and some military thoughts

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

Bob,

My apologies for a tardy reply. As you probably know, Steve retired effective Oct 1st and we have been in the transition period for about 60 days.

Thank you for your July 15 e-mail. It sounds like it has been a crazy 5 months for you, but also a remarkable opportunity. We have no doubt that you're very competitive for a 3rd star and it would be an incredible achievement if you assumed command of 1AF.

PLAINTIFF'S
EXHIBIT
11
8-25-21

CONFIDENTIAL

DELTA000065091

11.1

On the topic of Delta's military policies, we appreciate the information and your thoughts. The Company's military leave policies are the subject of ongoing litigation and we have temporarily stood down on the Military Liaison Board. It's my strong hope to get that going again in the near term. In the meantime, we are working to identify areas related to our military employees that are not the subject of litigation where the members of the MLB are able to help on an individual basis.

On the broader issues, as you know, Delta has a long and proud tradition of supporting its employees who serve in the military (and, among other things, has been awarded the Secretary of Defense Support Freedom Award). While the ongoing litigation somewhat limits my ability to communicate further on specific policies, we are very comfortable that our policies are consistent with the law and in the interest of both Delta and the military.

Bob, I'm proud to have you on the Delta team and as a Delta pilot. I am equally proud of your accomplishments in the military and thankful for your service. Thank you for reaching out and I look forward to hearing about the results of the 1AF; they would be very fortunate to have you lead in that capacity and I am fully supportive.

Sincere regards,

Jim

-----Original Message-----
From: Branyon, Robert M Maj Gen USAF (US) [Caution-mailto:robert.m.branyon.mil@mail.mil]
Sent: Sunday, July 15, 2018 8:53 AM
To: Dickson, Stephen <Stephen.Dickson@delta.com >; Graham, Jim <Jim.Graham@delta.com >
Cc: Branyon, Robert M Maj Gen USAF (US) <robert.m.branyon.mil@mail.mil >; 'bbranyon@comcast.net' <bbranyon@comcast.net >
Subject: [EXTERNAL] Catching up and some military thoughts

Capt Dickson and Capt Graham,

Sirs, I hope you are well and able to spend some time with family this summer season. It has been a crazy 5 months for me as Air National Guard leadership is trying to enhance my leadership experiences and opportunities to be competitive for a 3rd star as First Air Force Commander at Tyndall AFB. That position opens in the next 12 months, and I am told that I am extremely competitive. In fact, they sent me to Al Udeid in April to the AOC right before the strike on Syria that was in response to the chemical attack. I was shadowing the Deputy CFACC. What a great experience! If 1AF does not work out, I will retire this year from the ANG, which will also be awesome, as then I can finally just be a line pilot and not have to juggle my life every month.

The reason I write this note is that I heard recently that there is some kind of letter at the office of the Director of the ANG that talks about Delta's military policy. I truly don't know what the letter says, but I am told it stems

from some Delta ANG members asking the question: "Why don't our AF leaders stick up for us?" So, I wanted to provide my observations and thoughts to you before you get that letter. I know that, as a Wing Commander and then Commander of the entire Fla ANG, I always wanted to hear what was going on out in the field and what my Airmen were thinking. I don't know exactly what information flows all the way up the chain to you two guys, so, as a senior ANG leader, and hopefully, as a respected "team-player" of Delta Airlines, my opinion and observations (and suggestions) are valued.

First, and foremost, I love Delta, and, overall, Delta has been fantastic supporting my military career. I also want to say that I am disgusted by the few Delta military members who blatantly abuse military leave. I support their being disciplined and terminated from Delta Airlines. And I believe that all of the other solid Delta military members feel the same way. Their action, I believe, has been what has led to Delta's current military policy.

A year ago, you invited some Delta pilots to the Military Liaison Board in your office. During that meeting I heard multiple times from Delta leadership that "Delta wants to be the most military-friendly airline in the business." The reality is that Delta has a very bad reputation for its current military policy, both with its own pilots and the pilots of other airlines. And that reputation continues to get worse; it is talked about constantly. I hear it at every conference I attend. Other military airline pilots shake their head, because their airlines do not have such restrictive policies. It appears to me that, because of some bad apples in the past, Delta has attempted to put in sweeping restrictions in an attempt to control those who have abused the military leave of absence (MLOA) process. Now, everybody suffers. In my opinion, Delta should revise its military policy to be more reasonable, as was during my first 20 or so years as a Delta pilot, and be more like the industry standard. I can tell you that we are driving away young potential future pilots because of our policy. I have heard them say that.

My recommendation is to empower and expect our Chief Pilots to be leaders. In other words, if a Delta military member has questionable activity, then call that person on the phone or have them come in to see a Chief Pilot. I believe that when you shine a light on a cockroach, then that cockroach will scatter/change behavior. I believe that you can easily socialize and justify this by explaining to your pilot group that you are adjusting your policies to be industry standard (or at least close), but that pilots may be called in to discuss questionable activities. You can also implore the rest of the pilot group to take care of its own, i.e. peer pressure, if we want to retain a favorable military policy. I believe that a strong Military Liaison Board could help you accomplish that.

The bottom line, in my opinion, is that this subject requires leadership and communication. We will never control the actions of a few bad apples, just like pilots who call in sick when they are not. But we should not attempt to punish the entire pilot group for those bad actors. I can tell you that your military pilots and other military members are doing their best to serve Delta, their country, and their families. But they sure could serve their families better if they were given more freedom to work efficiently and effectively to achieve days off with their families. I know I sure could.

I am happy to discuss further over a cup of coffee or lunch sometime (my treat!). I have a 4-day AMS trip tomorrow thru Thursday, and, of course I live in Jax as does Capt Graham, so I am available there also.

CONFIDENTIAL

DELTA000065093

Thanks for listening! I am proud to be a Delta pilot!

Very respectfully,

Bob

ROBERT M. BRANYON, Maj Gen, USAF

USSOUTHCOM Deputy Commander, Mobilization & Reserve Affairs

Comm: 305.437.2673 DSN: 567 Cell: 904.610.9431

robert.m.branyon.mil@mail.mil < Caution-mailto:robert.m.branyon.mil@mail.mil >

robert.m.branyon.mil@mail.smil.mil < Caution-mailto:robert.m.branyon.mil@mail.smil.mil >

CONFIDENTIAL

1                    CERTIFICATE OF REPORTER

2

3          STATE OF GEORGIA)

4                          )

5          COUNTY OF DEKALB)

6

7                I, TAMIKA M. BURNETTE, hereby certify

8    that the foregoing proceedings were taken before me at

9    the time and place therein designated; that a review of

10   the transcript was not requested, and that the foregoing

11   pages numbered 1 through 210 are a true and correct

12   record of the aforesaid proceedings.

13               I further certify that I am not a

14   relative, employee, attorney or counsel of any of the

15   parties, nor am I a relative or employee of any of the

16   parties' attorneys or counsel connected with the action,

17   nor am I financially interested in the action.

18

19               DATED this 8th day of September, 2021.

20

21

22

23               TAMIKA M. BURNETTE

24   CERTIFIED COURT REPORTER, RPR, CSR-2870

25

# EXHIBIT 7

Transcript of the Testimony of:

# PHIL DAVIS

SORENSON, et al

vs.

DELTA AIRLINES, INC.

August 30, 2021

Volume 1



IMAGINE
R E P O R T I N G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


JEREMY SORENSON, an individual,
RANDAL REEP, an individual,
RANDAL SMITH, an individual,
ADAM MCLEAN, an individual, and          Civil Action No.
JAMES DOYLE, an individual,
on behalf of themselves and all          1:17-cv-00541-
others similarly situated,               ELR

       Plaintiffs,

   vs.

DELTA AIRLINES, INC., a
Delaware Corporation,

      Defendant.

_____


VIDEOCONFERENCED DEPOSITION OF PHIL DAVIS

MONDAY, AUGUST 30, 2021

10:11 A.M. EASTERN STANDARD TIME


APPEARING REMOTELY VIA ZOOM FROM

ATLANTA, GEORGIA


REPORTED BY:  Stephani L. Loder, CSR No. 138840

1  BY MR. STONEBARGER:

2      Q. And you did not report this conduct in

3  Mr. Poggi sending this to you to anybody in Delta or

4  ALPA; correct?

5      A. Not that I recall.

6      Q. Right.  Instead, you agreed to keep it totally

7  secret so that Mr. Poggi's name would be kept out of any

8  of this; right?

9      A. That's correct.

10     Q. Okay.  Is it your understanding that, at Delta,

11  a pilot can finish a rotation trip in the morning, for

12  instance, and then, when he's relieved from duty at

13  Delta, do any military work on the same day, for

14  example, some administrative work in the afternoon?

15     A. I understand that, technically, that is

16  concurrent duty, and that is against Delta policy.

17     Q. Is it your understanding that a pilot can

18  finish his rotation in the morning and flying for Delta,

19  relieve from Delta duty, and then, in the afternoon, if

20  he's a dentist, to go perform a teeth cleaning?

21     A. Go perform a what?

22     Q. Any dental work.  Teeth cleaning.

23     A. Oh, okay.

24     Q. Root canal.  You name it.  Nonmilitary duty.

25     A. Yes.  Yes, I understand.

1    Q. Yes he can?

2    A. Yes.

3    Q. And same scenario, but the dentist is a

4    military dentist.

5         Can a pilot finish a flight rotation, be off

6    Delta duty in the morning, and then, that afternoon, go

7    and perform dental work in the capacity of a military

8    dentist doing dental work on a military service member

9    in the afternoon?

10    A. That would be, again, concurrent duty and, to

11    the best of my understanding, not permitted.

12         MR. STONEBARGER:  The next document, I believe,

13    is Exhibit 25.  I'm going to ask you every time, Madam

14    Reporter.  Just correct me if I'm wrong, please.

15         THE REPORTER:  That is correct.

16         MR. RANJO:  Hey, Stephani, can you tell me how

17    much time we have on the record?

18              (Discussion off the record.)

19         MR. RANJO:  I take it you're going to take it

20    all the way down to the wire?

21         MR. STONEBARGER:  That's not my intention.

22    We're working at a better pace right now.  And there's

23    just a few more to get through.  So --

24         MR. RANJO:  Yes.  I saw the folder of exhibits.

25    Do you plan to go through each of those?

1          REPORTER'S CERTIFICATE

2          I, Stephani L. Loder, CSR # 13884, licensed

3    court reporter, do hereby certify:

4          That the foregoing proceedings were taken

5    before me at the time and place therein set forth, at

6    which time the witness was put under oath by me;

7          That the testimony of the witness, the

8    questions propounded, and all objections and statements

9    made at the time of the examination were recorded

10   stenographically by me and were thereafter transcribed;

11         That a review of the transcript by the deponent

12   was not requested;

13         That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15         I further certify that I am not a relative or

16   employee of any attorney of the parties nor financially

17   interested in the action.

18         I declare under penalty of perjury under the

19   laws of Nevada that the foregoing is true and correct.

20         Dated this 28th day of September, 2021.

21

22         _Stephani L Loder_

23         Stephani L. Loder, CCR #13884

24

25

# EXHIBIT 8

1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
 2                   ATLANTA DIVISION

 3   JEREMY SORENSON, an individual, )
     RANDAL REEP, an individual,     )
 4   RANDAL SMITH, an individual,    )
     ADAM MCLEAN, an individual, and )
 5   JAMES DOYLE, an individual, on  )
     behalf of themselves and others )
 6   similarly situated,             )
                                     )
                                     ) CIVIL ACTION
 7                  Plaintiffs,      )
                                     ) NO. 1:17-cv-00541-ELR
 8        vs.                        )
                                     )
 9   DELTA AIRLINES, INC., a         )
     Delaware Corporation,           )
10                                   )
                    Defendant.       )
11   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )

12

13

14

15        Deposition of BRIAN TULLY, taken on behalf of

16   the Plaintiffs, at The Peachtree Club, 999 Peachtree

17   Street, NE, Suite 2800, Atlanta, Georgia, commencing

18   on August 3, 2021, at 10:03 a.m., before Christy

19   L. Freyberg, Certified Court Reporter, Registered

20   Professional Reporter and Notary Public within

21   Georgia.

22   _____

23              WHEELER REPORTING COMPANY, INC.
                   1600 Northside Drive, N.W.
24                        Suite 250
                   Atlanta, Georgia  30318
25                     (404) 351-4577
```



2

1              A P P E A R A N C E S

2

3    For the Plaintiffs:

4              CRYSTAL L. MATTER
               Attorney at Law
5              Stonebarger Law, APC
               101 Parkshore Drive
6              Suite 100
               Folsom, California   95630
7                (916) 235-7140
                 cmatter@stonebargerlaw.com
8

9              BRIAN J. LAWLER
               Attorney at Law
10             Pilot Law, P.C.
               850 Beech Street
11             Suite 713
               San Diego, California   92101
12               (866) 512-2465
                 (619) 231-4984 (fax)
13               blawler@pilotlawcorp.com

14

15             CHUCK M. BILLY
               Attorney at Law
               Law Offices of Charles M. Billy, P.C.
16             22706 Aspan Street
               Suite 305
17             Lake Forest, California   92630
                 (940) 357-9636
18               (949) 429-2532 (fax)
                 chuckmbilly@aol.com
19

20

21

22

23

24

25



3

1        A P P E A R A N C E S
              (continued)
2

3  For the Defendant:

4           BENJAMIN A. STONE
            THOMAS J. MUNGER
5           Attorneys at Law
            Munger & Stone, LLP
6           999 Peachtree Street, NE
            Suite 2850
7           Atlanta, Georgia   30309
             (404) 815-1884
8           ben.stone@mungerandstone.com

9

10

11

12

13  Also Present:

14           Jeremy Sorenson

15

16

17

18

19

20

21

22

23

24

25



```
 1      A.     I wouldn't think to do it --

 2      Q.     Sure.

 3      A.     -- because I wasn't acting in that role.  I

 4 guess I wouldn't have considered it.

 5      Q.     How do you think the military would view

 6 that, view someone calling on behalf of a civilian

 7 employer and identifying their military rank?

 8             MR. STONE:  Objection.  Calls for

 9      speculation.

10             You can answer.

11      A.     Yeah.  I can't.  I can't -- that would be a

12 guess.  I wouldn't know.

13      Q.     Okay.  Can you describe Delta's concurrent

14 duty policy as you understood it while acting as a

15 military affairs liaison?

16      A.     The policy that was in place, what it says

17 is you are ineligible -- if you are on any kind of

18 orders you're ineligible to do any Delta duty.  Or any

19 kind of military status, I should say.  You are

20 ineligible to do -- I want to correct that.  If you're

21 on military status, you're ineligible to do Delta duty.

22      Q.     Are you aware of any airlines or companies

23 that have a similar concurrent duty policy?

24      A.     I'm not aware of other airlines' policies.

25      Q.     Did you ever perform military duty on the
```



1    Q.    So in the situation I just gave you,
2    Delta's concurrent policy prevents military duty when
3    it otherwise could be performed without conflicting
4    with a Delta flight; correct?
5                MR. STONE:  Object to form there.
6                You can answer.
7    A.    Could you repeat that again, please?
8    Q.    Sure.  This policy, Delta's concurrent duty
9    policy, prevents military duty when it could otherwise
10   be performed; correct?
11               MR. STONE:  Same objection.
12   A.    The way the policy was written, yes.
13   Q.    Therefore, it results in Delta pilots being
14   forced to perform less military leave than they
15   otherwise would or could; is that correct?
16               MR. STONE:  Same objection, plus calls
17       for speculation.
18   A.    No.  I would say no.
19   Q.    No?  And why is that?
20   A.    Well, there -- when I was a drilling
21   reservist, I had -- there was plenty of time to meet my
22   obligations.
23   Q.    Okay.
24   A.    I didn't have -- I didn't feel I was
25   overtasked, if you will.  Well, there were times,



1  but that was Air Force drilling.

2      Q.     So -- sorry about that.  So if we could go

3  back to your example of doing the performance review

4  during a layover, that performance review, was it for

5  the military?

6      A.     It was.

7      Q.     Okay.  So as I understand it based on what

8  you're telling me, completing that performance review

9  during a layover violated the concurrent duty policy;

10 right?

11     A.     It did.

12     Q.     Okay.  So if you were following the

13 concurrent duty policy to the letter, then you wouldn't

14 have done the performance review during the layover.

15     A.     That's true.

16     Q.     Correct.  So I want to go back to my

17 question of a moment ago that if you weren't supposed

18 to do it during the layover, then you would have

19 performed less military duty because you wouldn't have

20 done the performance review during that layover.  Do

21 you see where I'm going with that?

22     A.     Not really.  I was on a long layover.  I

23 was in Portland, Oregon.  It was raining; it was cold.

24 I figured I would knock out a requirement that I would

25 have to do anyway.



```
1        Q.     Okay.  Were pilots prevented from doing any
2   other activity after their Delta flight at the end of a
3   rotation, meaning they can't perform military service
4   on the same day, we've established that, but is there
5   anything else they couldn't do that day after
6   completing their Delta obligation?
7        A.     Not that I'm aware of.
8        Q.     So pilots could have another job?
9        A.     I don't -- I don't know if they have other
10  jobs.
11       Q.     Okay.  But theoretically it's not
12  prohibited so long as there's not a conflict of
13  interest or something like that; right?
14       A.     I would suppose following that logic, yes.
15       Q.     Okay.  Could they go scuba diving?
16       A.     Sure.
17       Q.     Okay.  If they owned their own private
18  airplane, they could go flying after their Delta
19  flight; is that correct?
20       A.     Yes.
21       Q.     Could they drink at a bar?
22       A.     Yes.
23       Q.     Has the concurrent duty policy changed
24  since you were the military affairs liaison?
25       A.     No.
```



1      Q.     Do you know who else was in attendance?

2      A.     On the flight ops side I believe Barry

3 Behnfeldt, O. C. Miller, I believe Jim Mangie was

4 there, and Jason Zawislak.

5      Q.     Do you recall what was discussed?

6      A.     There was a list of issues that the ALPA

7 military affairs committee had brought to the table.

8 One was new hire briefings, and I believe one was -- I

9 believe concurrent duty was brought up, but I don't

10 know how far they got with that.  I know new hire

11 briefings was a hot topic.

12     Q.     Do you recall why that was a hot topic?

13     A.     It was tone, I believe.  They were

14 concerned about the tone, and O. C. Miller had assured

15 them that I was going to be doing all the new hire

16 briefings from that point forward, and then that was

17 the end of that conversation.

18     Q.     Who had done the new hire briefings before

19 you?

20     A.     Well, Barry Behnfeldt had done it just

21 before me.

22     Q.     Why were they concerned about tone and

23 their concerns --

24     A.     Their concern was -- they brought up Jim

25 Mangie.  My apologies for interrupting.  So


WR WHEELER
REPORTING
COURT REPORTING & VIDEO

1  O. C. Miller had seen to it that Barry Behnfeldt had

2  taken them over from Jim Mangie, and then as we were

3  transitioning out, I was taking them over from Barry.

4      Q.     Okay.  What were the concerns regarding

5  tone?  Can you elaborate on that?

6      A.     It would just be speculation from me.  I

7  did not sit in on any of those briefings.  I didn't

8  hear any of them.

9      Q.     Sure.

10     A.     All I heard was the water cooler talk, and

11  that was it, and it was more about being a little blunt

12  and direct.  That was . . .

13     Q.     What was discussed in the February 2017

14  meeting with respect to tone; do you recall?

15     A.     I think the military affairs committee was

16  concerned about the message that was being sent and how

17  it was different than when some of them -- some of the

18  committee members were drilling reservists.

19     Q.     What was the message that was being sent?

20     A.     Well, their impression was different, I

21  think, than what the flight ops impression was, which

22  is why we were having the conversation.  I think they

23  alluded to the idea that it was discouraging, if you

24  will.  Again, I never -- I never attended any of those

25  briefings so I -- I was just going by what they were



```
 1   alleging so --
 2       Q.    Sure.  When you say alluded to it being
 3   discouraging, discouraging of what?
 4       A.    Well, the conversation they were -- or
 5   their piece of the conversation gave the impression
 6   that Delta didn't want pilots to take military leave,
 7   which I don't think anything could be further from the
 8   truth in that case.
 9       Q.    Okay.  And why were they given that
10   impression?
11             MR. STONE:  Calls for speculation.
12       Objection.
13       A.    Yeah.  I was not in any of those briefings
14   so I don't know where that comes from.
15       Q.    Do you know who was in those briefings?
16       A.    No.  New hires.
17       Q.    Okay.  Do you know for what time period if
18   we were to go back and say okay, who were the new hires
19   during that time period --
20       A.    I don't.  That was all before me, before my
21   time in Atlanta.
22       Q.    Okay.  So pre-2017?
23       A.    Pre -- yeah, I would say before that even.
24       Q.    Okay.  Before 2016?
25       A.    Pre-2017.  Before I got there.
```



57

```
 1   taken.  It was one of the first things I wanted to
 2   eliminate because it was -- there was an error.  It
 3   was -- there was something -- an error in the
 4   calculations, and it's much better to have no
 5   information than wrong information because people are
 6   making career decisions based on erroneous information
 7   and we couldn't have that, so once it came to light
 8   that there was a mistake we took it down.
 9        Q.    Okay.  So is that military leave tracker,
10   is that still being used by Delta?
11        A.    No.
12        Q.    So when did Delta stop using that military
13   leave tracker?
14        A.    Maybe summer of '17 or fall of '17.
15        Q.    For this military leave tracker, would it
16   only track military leave for pilots -- in other
17   words -- strike that question.  Would pilots have to
18   tell Delta when they're taking military leave on an off
19   day?
20        A.    That wasn't -- that wasn't that calculator.
21        Q.    It wasn't tracked there?
22        A.    No.
23        Q.    Is it tracked anywhere else?
24        A.    Just on the monthly schedule.
25        Q.    So on the monthly schedule it would track
```



1  average line value imputed income calculation for

2  profit sharing so it actually gave them an advantage to

3  do that.

4       Q.     Okay.

5       A.     So there were reasons that were good

6  reasons to post it.

7       Q.     Okay.  Did you agree with the policy?

8       A.     For that reason, it certainly benefited the

9  pilots.

10      Q.     I understand.  But did you agree that

11 service members should tell Delta what they're doing on

12 their days off by identifying when they did military

13 work?

14      A.     Not necessarily.

15      Q.     You didn't necessarily agree with that

16 policy?

17      A.     Right.  In all cases, right.  But my job

18 was to enforce the policy.

19      Q.     I understand.  Now, here under successes in

20 this document identified as Exhibit Number 5, here

21 they're stating that Captain Brian Tully briefs new

22 chief pilots and assistants on interacting with

23 military pilots, and we have seen more support and less

24 intimidation from CPOs.  Can you explain why they might

25 have written that, the less intimidation part?



1    A.    Because of the alcohol policy.

2    Q.    Okay.  What is the alcohol policy?

3    A.    I think it's 12 hours now.

4    Q.    Okay.  But the pilot cannot perform

5  military duty even if they're available to make the

6  Delta obligation some 12 hours later?

7    A.    Could you repeat that, please?

8    Q.    So a pilot could do other things, they just

9  have to be available and show up within 12 hours, but a

10  pilot couldn't perform military duty while on long call

11  even if that pilot is available to make that Delta

12  obligation 12 hours from now?

13    A.    The way the policy is, yes.

14    Q.    Do you agree with that policy?

15    A.    Like I said, my job was to enforce the

16  policy so I proposed changes and . . .

17    Q.    But do you agree with that policy?

18    A.    I believe there was room for improvement.

19    Q.    Where does a pilot have to be, do they have

20  to be within two hours if they're on a short call?

21    A.    Well, like I said, I believe the verbiage

22  is promptly available.

23    Q.    Okay.  But so long as they could be

24  available, promptly available, the pilot could work a

25  civilian job?



79

1     Q.    And who is Doug Dunlap?

2     A.    He was an assistant chief pilot in

3 New York.

4     Q.    Okay.  Are all pilots required to post all

5 military duty on their Delta monthly schedule,

6 including days off?

7     A.    To the best of my memory, yes.

8     Q.    In previous flight operations manuals it

9 stated the pilot should input their military duty days.

10 Do you know when that language was changed in the

11 flight op?

12     A.    I don't.

13     Q.    Okay.  Does USERRA require a service member

14 to inform a civilian employer of every military duty an

15 employee performs?

16         MR. STONE:  Objection.  Calls for a

17    legal conclusion.

18     Q.    Does an employee have to inform their

19 civilian employer of all military duty or just when

20 they need to be absent and miss work?

21         MR. STONE:  Same objection.  Are you

22    asking him under USERRA?

23         MS. MATTER:  I didn't ask under

24    USERRA.

25         MR. STONE:  Oh, okay.



1          THE WITNESS:  Would you repeat the
2     question again?
3     Q.     (By Ms. Matter)  Sure.  Does an employee
4  have to inform their civilian employer of all military
5  duty or just when they need to be absent and miss work?
6          MR. STONE:  Object to form.  I also
7     think it calls for a legal conclusion.
8     A.     Per the form, yes.
9     Q.     So, for instance, if a pilot is on a long
10  layover and decides to do administrative military work,
11  is he or she required to notify Delta or take a day off
12  from military leave?
13     A.     Per the FOR, notify Delta.
14     Q.     What was the process for requesting
15  military leave at Delta over the years?
16     A.     It was to notify the company via iCrew --
17     Q.     Okay.
18     A.     -- for short-term military leave.  And
19  long-term military leave, meaning 31 days or more, now
20  there's a log that you go into to notify the company.
21     Q.     Can you describe this log for me?
22     A.     Sure.  It's a link on the Delta app under
23  the pilot leaves section.
24     Q.     Okay.
25     A.     And it opens up a Smartsheet.  You fill in



129

1                    D I S C L O S U R E

2

3    STATE OF GEORGIA              DEPONENT:  BRIAN TULLY

4    COUNTY OF COBB

5

6            Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
7    Judicial Council of Georgia, I make the following
     disclosure:

8

9            I am a Georgia Certified Court Reporter.  I
     am here as an independent contractor for Wheeler
10   Reporting Company, Inc.

11

12           Wheeler Reporting Company, Inc., was
     contacted by the offices of Stonebarger Law, APC, to
13   provide court reporting services for this deposition.
     Wheeler Reporting Company, Inc., will not be taking
14   this deposition under any contract that is prohibited
     by O.C.G.A. Sec. 9-11-28 (c).

15

16           Wheeler Reporting Company, Inc., has no
     contract/agreement to provide reporting services with
17   any party to the case, any counsel in the case, or any
     reporter or reporting agency from whom a referral might
18   have been made to cover this deposition.  Wheeler
     Reporting Company, Inc., will charge its usual and
19   customary rates to all parties in the case, and a
     financial discount will not be given to any party to
20   this litigation.

21

22   *Christy L. Freyberg*

23

24   CHRISTY L. FREYBERG, CCR-B-1730
     Registered Professional Reporter
     Certified Court Reporter

25



130

1                C E R T I F I C A T E

2    STATE OF GEORGIA        )
                             ) ss.
3    COUNTY OF COBB          )

4

5              I, CHRISTY L. FREYBERG, Certified Court

6    Reporter, Registered Professional Reporter and Notary

7    Public within Georgia, do hereby certify that previous

8    to the commencement of the examination, the witness was

9    duly sworn by me; that the said proceedings were taken

10   in machine shorthand by me at the time and place

11   aforesaid and were thereafter reduced to typewritten

12   form under my direction, pages 1 - 130; that the

13   foregoing is a true, complete and correct transcript of

14   said proceedings.

15              I further certify that I am not

16   employed by, related to, nor of counsel for any of the

17   parties herein, nor otherwise interested in the

18   outcome of this litigation.

19              IN WITNESS WHEREOF, I have affixed my

20   signature and seal this 31st day of August 2021.

21

22              *Christy L. Freyberg*

23
             CHRISTY L. FREYBERG, CCR-B-1730
24           My commission expires the
             1st day of April 2022.
25



# EXHIBIT 9

Transcript of the Testimony of:

# CHRIS FREDERICK

SORENSON, et al.

vs.

DELTA AIRLINES INC.

August 26, 2021

Volume 1



IMAGINE

R E P O R T I N G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| JEREMY SORENSON, an | ) | |
| individual, RANDAL REEP, | ) | |
| an individual, RANDAL SMITH, | ) | |
| an individual, ADAM | ) | |
| MCLEAN, an individual, and | ) | Civil Action No. |
| JAMES DOYLE, an | ) | 1:17-cv-00541-ELR |
| individual, on behalf of | ) | |
| themselves and all others | ) | |
| similarly situated, | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| DELTA AIRLINES, INC., a | ) | |
| Delaware Corporation. | ) | |
| Defendant. | ) | |
| _____ | ) | |

DEPOSITION OF

CHRIS FREDERICK

DATE:  Thursday, August 26, 2021

TIME:  10:00 a.m. - 6:47 p.m.

LOCATION:  999 Peachtree Street, N.E., Suite
2850, Atlanta, Georgia  30309

REPORTED BY:  Tamika Burnette, RPR, CSR No. 2870

```
 1                           APPEARANCES

 2

 3    For them Plaintiff:

 4

 5        STONEBARGER LAW, APC

 6        BY:  Ms. Crystal L. Matter, Attorney at Law

 7          Mr. Gene Stonebarger, Attorney at Law

 8          Mr. Charles "Chuck" Billy, Attorney at Law

 9        101 Parkshore Drive, Suite 100

10        Folsom, California 95630

11        (916) 235-7140

12        cmatter@stonebargerlaw.com

13

14    For the Defendant:

15

16        MUNGER & STONE, LLP

17        BY:  Mr. Benjamin A. Stone, Attorney at Law

18        999 Peachtree Street, NE, Suite 2850

19        Atlanta, Georgia 30309

20        (404) 815-1884

21        Ben.stone@mungerandstone.com

22

23    Also Present:

24        Jeremy Sorenson

25
```

1       A.   I can give you a few of the names, but I would miss a

2  few.

3       Q.   Sure.  Okay.  As best you can remember.

4       A.   John O'Neil, Tom Duda, Glenn Think, Tom Steckel.  I'm

5  digging now.  I'm sorry.  Given time, I could probably write

6  more of them down for you.

7       Q.   No problem.

8       A.   There were a total of, if I recall, five captains and

9  five first officers, so there were ten, if I recall, total,

10 besides me.  And there were also -- there was a staff of one,

11 two, three, three or four administrative staff non-pilot

12 administrative staff as well.

13      Q.   Did Jim Mangie ever report to you?

14      A.   No, ma'am.

15      Q.   From the 2013 to 2017 time frame, what's your

16 understanding of who Jim Mangie reported to?

17      A.   2013 to 2017.  I'm not positive about that.  Jim was

18 in the position of military liaison for at least part of that

19 time period, but that position also was subject to the three or

20 four, five year turnover, and I believe that it turned over

21 during that time period that I was in the chief pilot's office

22 so I can't remember exactly when.

23      Q.   Do you have any reason to dispute that he reported to

24 Jim Graham?

25      A.   No, ma'am.

1   violate Delta's policies as it relates to military service

2   members?

3       A.   To be sure I understand what you're telling me, the

4   pilot had vacation on the second and third, and his unit gave

5   him credit for a work day on the first and the fourth and that

6   pilot did not report that military duty to Delta --

7       Q.   Correct.

8       A.   -- that would be a violation.  Yes, ma'am.

9       Q.   And why is that, sir?

10      A.   Because he's required to report his military duty to

11  Delta.

12      Q.   He is required?

13      A.   By policy.

14      Q.   By policy.  To report military, all military duty to

15  Delta?

16      A.   Yes, ma'am.

17      Q.   Even on a day off for Delta?

18      A.   Even on a day off for Delta.

19      Q.   I'll give you one final hypothetical in this arena.

20  In the example of March second, and third, the pilot is on

21  vacation leave of absence, from Delta, second and third of

22  March, and the pilot takes military leave of absence on the

23  second and third of March, the same days that he's taking

24  vacation for Delta.

25              Is that a violation of Delta's military leave of

1  and procedure is, but it's a multistep process.  A pilot

2  applies, there's a website that he goes to to make his

3  application.  The applications are vetted.  Pilots that pass

4  the vetting process are asked to come to Delta for an interview

5  and testing.  They come to Delta and do that testing and have

6  an interview and then selections are made.  That's a broad

7  overview.  There's a lot more to it then that but that's the

8  broad overview.

9      Q.  Understood.  I appreciate the explanation.  Does

10 Delta review PRIA, the FAA pilot record as part of its hiring

11 process?

12     A.  Yes, ma'am.

13     Q.  If a pilot had a termination from another airline in

14 their PRIA, would Delta hire that pilot?

15     A.  You're asking for my judgment at this point, I can't

16 say yes, and I can't say no.  I would say the adds are long.

17 A pilot that's been fired from an airline, certainly that would

18 come up in an interview, and there would be discussion about

19 that, so I would say, likely, no, but not necessarily for sure.

20 No.

21     Q.  Okay.  Thank you.  Is there a weighted system that

22 Delta uses when they select their pilots for hire?

23     A.  Can you define "weighted" for me, please.

24     Q.  Is there a -- almost like a metric or a point system

25 whereby if a pilot in the selection process gets a certain

1   list instructors.

2       Q.   Are you aware of the process for hiring seniority

3   list instructors?

4       A.   I'm aware, in general terms, of the process that the

5   fleet captains used.  It varied a little fleet by fleet.  But I

6   am aware of, in general terms, the process that we use, yes,

7   ma'am.

8       Q.   And what is that general process, sir?

9       A.   A pilot would apply to be an instructor.  The fleet

10  captain or the fleet manager who helps him run the fleet would

11  keep a record of those applications.  When the fleet captain

12  assesses that there were going to be future needs for

13  instructors, he would review the a available applications and

14  assess the applicants, and make a decision about how many and

15  who he wanted to interview.  There would be an interview

16  process and then the selections would be made.

17                  (Exhibit 1 marked for identification.)

18      Q.   BY MS. MATTER:  I've handed you what has been marked

19  as Exhibit Number 1.  It bears Delta Bates stamp 000088686 to

20  88689.

21                  If you'll take a look at that document, and let

22  me know when you've finished your review, please.

23      A.   (Witness examining document.)  Okay.

24      Q.   As part of the instructor hiring process, would the

25  pilots usage of military leave be reviewed?

 1      A.    It appears that it has here, or at least some sort of

 2   review has taken place.  That wouldn't necessarily be a

 3   required part of the review process.

 4      Q.    When you say, "it wouldn't necessarily be part of

 5   it," under what circumstances would it not be reviewed as part

 6   of until hiring process?

 7      A.    When the fleet captain reviews an application, I

 8   would expect that a pilot with a military commitment would

 9   include that on his or her application, and the fleet captain

10   might choose to see what kind of commitment that particular

11   pilot would have with regard to military duty.  So he might ask

12   someone, he may not have access to all of the records so he

13   might ask someone, hey, can you take a look at this particular

14   pilot's record and let me know what you see with regard to

15   military duty.  He might ask the pilot him or herself, tell me

16   about your military duty and the commitment there, so there

17   might be a review involved.

18      Q.    If the pilot or the candidate had heavy MLOA

19   requirements, would it be fair to say that that pilot would not

20   be hired as an in instructor?

21      A.    No, ma'am.  It wouldn't be fair to say that.

22      Q.    Would it be fair to say that it would be a

23   consideration as to whether or not to hire that pilot as an

24   instructor?

25      A.    It would be fair to say that it might be a

 1  consideration.  Yes, ma'am.

 2       Q.   Okay.  You can set that one to the side for now.

 3            Do you know who Rodney Landsberg is?

 4       A.   No, ma'am.

 5       Q.   Okay.  I'll represent to you in 2014 he applied to be

 6  a senior line instructor.

 7            Do you know who Glenn Fink is?

 8       A.   Yes, ma'am.

 9       Q.   And who is he?

10       A.   Glenn is currently the fleet captain on the A330 and

11  A350 fleet.

12       Q.   Was he an Atlanta chief pilot in 2014?

13       A.   Yes, ma'am.

14       Q.   Do you recall talking to Glenn Fink in June 2014 to

15  discuss Pilot Landsberg's military leave history?

16       A.   No, ma'am, I don't.

17       Q.   With respect to the pilot mentor program that we

18  spoke about a short while ago, is that a competitive

19  application process to become a mentor?

20       A.   I didn't run the program, so I'm not as familiar with

21  the selection process for mentors as I am some of the other --

22  areas of responsibility pilots had, so I really can't answer

23  your question.

24       Q.   Would you consider it an entry level management

25  position?

1      A.   Yes, ma'am.

2      Q.   And would an applicant's military leave usage be

3  looked at as part of the process or selection to be to be part

4  of the mentor program?

5      A.   I have no idea.

6           (Exhibit 2 marked for identification.)

7      Q.   BY MS. MATTER:  I've handed you what's been marked as

8  Exhibit Number 2, and it bears Delta's Bates stamp 0000016817

9  to 16819.

10          If you'll take a look at the that document, and

11 let me know when you've completed your review.

12     A.   (Witness examining document.)  Okay.

13     Q.   Okay.  Do you have any reason to dispute that you

14 sent or received the e-mails marked as Exhibit 2?

15     A.   I'm sorry.  What was the question?

16     Q.   Do you have any reason to dispute --

17     A.   No, ma'am.

18     Q.   That you received --

19     A.   No, ma'am.  No reason to dispute.  Sorry I cut in on

20 there.  No reason to dispute.

21          MS. MATTER:  Did you get that full question?

22          THE REPORTER:  Yes.

23     Q.   BY MS. MATTER:  What was your e-mail address while

24 you worked for Delta airlines?

25     A.   Chris.fredrick@delta.com

```
 1        Q.   After about a year with Delta, a pilot by the name of

 2   Patric Coggin received military orders putting him on MLOA from

 3   Delta for about three years.

 4             Do you see that?

 5        A.   I do.

 6        Q.   Okay.

 7        A.   Yes, ma'am.

 8        Q.   On the second page of the document in an e-mail dated

 9   October 13, 2015, at 2:16 p.m., there's an e-mail from you to

10   Barry Behnfeldt reading:  Geez, dot, dot, dot --

11        A.   Yes, ma'am.

12        Q.   -- this is the kind of thing that makes one think

13   twice about having res and guard guys --

14        A.   Yes, ma'am.

15        Q.   -- six days on probation and going off for three

16   years.

17             Do you see that?

18        A.   Yes, ma'am.

19        Q.   When you mention res and guard guys, are you talking

20   about reserve and guard guys?

21        A.   Yes, ma'am.

22        Q.   You sent this e-mail on October 13th?

23        A.   I believe it looks like I did.  Yes, ma'am.

24        Q.   So you wouldn't have any reason to dispute it?

25        A.   No, ma'am.
```

1      Q.    And then an e-mail on the first page of Exhibit 2,
2  dated October 13th, 2015, at 2:44 p.m., there's another e-mail
3  from you to Barry Behnfeldt.
4               Do you see that?
5      A.    Yes, ma'am.
6      Q.    And you also comment: "This is a case of the
7  airlines subsidizing the military slash government, and it
8  says, cooperation is one thing, but this has a direct impact on
9  operations, period.  It will make us start looking at whether
10  to hire these guys or not to, period.  Then, comma, when we
11  show the intent to be more discriminatory, they start leaving,
12  reserve slash guards in droves, period, cause and effect,
13  period.
14      A.    Yes, ma'am.
15      Q.    Do you see that?
16      A.    Yes, ma'am.
17      Q.    You have no reason to dispute that you sent that
18  e-mail to Barry Behnfeldt; is that correct?
19      A.    No, ma'am.
20      Q.    In this e-mail, you're plainly stating that Delta
21  should reconsider hiring those with future military
22  commitments; isn't that correct?
23      A.    No, ma'am.  That's not what I'm doing here.  I'm
24  blowing off steam, I believe.
25      Q.    You were in charge of pilot hiring during your time

1    at Delta; is that correct?

2        A.    During part of my time at Delta, yes, ma'am.

3        Q.    Okay.  I'm done with that exhibit for now.

4        A.    Okay.

5                (Exhibit 3 marked for identification.)

6        Q.    I'm handing you what's been marked as Exhibit

7    Number 3.  This is Delta 000061454 to 61455.

8                If you'll take a moment to review that and let

9    me know when you've completed your review.

10       A.    (Witness examining document.)  Okay.

11       Q.    On this document, do you see an e-mail dated June 4,

12   2016, at 1:11 p.m.?

13       A.    At one --

14       Q.    (Indicating.)

15       A.    Yes, ma'am.  I'm sorry.

16       Q.    Wonderful.

17       A.    Yes, ma'am.

18       Q.    First page, is that an e-mail from you?

19       A.    Yes, ma'am.

20       Q.    In that -- that first part, I'll read it aloud:  Guys

21   and Tony, comma, about three hours spent yesterday afternoon

22   discussing various forms of manipulation, we, and other regions

23   have seen, period.  All Rd's, O.C., Jim Graham, B.B. Brannon,

24   and Puckett, Henne-roed, H.R., flight ops, finance, and data

25   collection teams were in attendance, period.  We went over the

**Date:** Tuesday, October 13 2015 02:54 PM
**Subject:** RE: MLOA 30 COGGIN, PATRIC 898876
**From:** Frederick, Chris
**To:** Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >;
**Attachments:** image001.jpg

Yep, that will be the attitude until they don't have pilots to fly anymore. The 125th In JAX is 5 or 6 pilots short, and they've resorted to sponsoring new guys in pilot training, betting they will be able to get their Fighter/Attack/Recce qual and also able to hack F-15 RTU. Time was, they had a good pool of F-15 experienced guys wanting in. I think 20 years of constant deployments and long-term orders and the environment of airlines hiring is going to change the game.

*Captain Chris Frederick*
*Director and Chief Pilot · ATL*
*404-714-1595*

**From:** Behnfeldt, Barry W
**Sent:** Tuesday, October 13, 2015 2:47 PM
**To:** Frederick, Chris
**Subject:** RE: MLOA 30 COGGIN, PATRIC 898876

Agreed. Mangie has been to the pentagon several times. Not sure if he's getting any traction or how long it will take. My guess is they could give a crap about us. They have jets to put in the air and missions to fly.

**Barry Behnfeldt** | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393



**From:** Frederick, Chris
**Sent:** Tuesday, October 13, 2015 2:44 PM
**To:** Behnfeldt, Barry W
**Subject:** RE: MLOA 30 COGGIN, PATRIC 898876

I think an Industry level issue to discuss. This is a case of the airlines subsidizing the military/government. Cooperation is one thing, but this has a direct impact on operations. It will make us start looking at whether to hire these guys or not to. Then, when we show intent to be more discriminatory, they start leaving the reserve/guard in droves. Cause and effect.

*Captain Chris Frederick*
*Director and Chief Pilot · ATL*
*404-714-1595*

**From:** Behnfeldt, Barry W
**Sent:** Tuesday, October 13, 2015 2:27 PM
**To:** Frederick, Chris
**Subject:** RE: MLOA 30 COGGIN, PATRIC 898876

We're having a MLOA summit next month and it will be a topic of discussion for sure. Not sure if we're going to be able to move the needle as long as the guard/reserve are being HUGE enablers with $$$$. Really makes you wonder the state of our military these days!!

Vr,
Barry

**Barry Behnfeldt** | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393



CONFIDENTIAL

DELTA000016817

2.1



**From:** Frederick, Chris
**Sent:** Tuesday, October 13, 2015 2:16 PM
**To:** Behnfeldt, Barry W
**Subject:** RE: MLOA 30 COGGIN, PATRIC 898876

Geezzz . .

This is the kind of thing that makes one think twice about hiring Res and Guard guys. 6 days off probation and going out for 3 years.

Geezzz . .

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*

**From:** Behnfeldt, Barry W
**Sent:** Tuesday, October 13, 2015 2:06 PM
**To:** CrewResources; FlightOps, PltLeaves
**Cc:** CPO, REGIONATL; Behnfeldt, Barry W; Zawislak, Jason E
**Subject:** MLOA 30 COGGIN, PATRIC 898876

Crew resources,
Please show FO Coggin MLOA 16 Nov 2015 – 15 Nov 2018 as requested.

Leaves,
SPCO

ATL CPO,
LtCol Coggin will be off probation 10 Nov. His first time off payroll. You all were very engaged with his NH discussions about MLOA. Thank you for your leadership...and with that...he will be gone for three years.

Thanks all,
Barry

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | **O: 404.715.1534** | **M: 404.725.8393**



-----Original Message-----
**From:** noreply@delta.com [mailto:noreply@delta.com]
**Sent:** Thursday, October 08, 2015 10:19 AM
**To:** Mangie, Jim; Behnfeldt, Barry W
**Subject:** [FOP10193] Military Leave Log - Autogenerated email

primary_period: -- select --
al_dates_needed: ▓▓▓▓▓▓▓▓▓▓▓▓
pilot_name: Patric Coggin
employee_num: 089887600
city: Fort Smith

CONFIDENTIAL

DELTA000016818

2.2

 1                    THE COURT:  It can be along question, and then
 2    if he doesn't understand, then he can say that.
 3                    (Whereupon the last question was read back.)
 4        Q.   BY MS. MATTER:  Would it surprise you to know that
 5    Delta had a military leave log triggered by holiday military
 6    leave of absences, that actually automatically generated an
 7    e-mail to Jim Mangie and others that necessitated a response?
 8        A.   No, ma'am.  It wouldn't surprise me.
 9                    (Exhibit 5 marked for identification.)
10        Q.   BY MS. MATTER:  If you can take a look at what's been
11    marked as Exhibit 5, which has been produced by Delta with a
12    Bates stamp ending in 414883.
13        A.   (Witness examining document.)  Okay.
14        Q.   Okay.  Did you send this e-mail dated May 16th, 2014,
15    at 9:06 a.m.?
16        A.   It appears that I did.  Yes, ma'am.
17        Q.   Okay.  And do you have any reason to dispute that you
18    did?
19        A.   No, ma'am.
20        Q.   And this e-mail was written to Jim Graham, O. C.
21    Miller and Jim Mangie.
22                    Do you see that?
23        A.   Yes, ma'am.
24        Q.   And in this e-mail you write to those individuals
25    about two pilots, do you see?

1     A.   Yes, ma'am.

2     Q.   About the pilots who have been, quote, on the radar

3  in the past for, quote, convenient Military duty.

4           Do you see that?

5     A.   Yes, ma'am.

6     Q.   And -- and it states:  We are having an internal

7  discussion about what, if any, next steps to take?

8     A.   Yes.

9     Q.   Who weren't you having the internal discussions with?

10    A.   Six years ago, I'll have to make an assumption that

11  were talking about it within the chief pilot's office.  But I

12  don't know that for a fact.

13    Q.   Can you describe convenient military duty?

14    A.   No, ma'am.  I'm not really sure what I meant by that.

15    Q.   Okay.  Could it be military duty on a holiday or a

16  weekend?

17    A.   It could be.

18    Q.   So it's legitimate military duty but -- but one you

19  don't necessarily like the timing of, correct?

20    A.   I'm -- would you repeat that?

21    Q.   Sure.  So -- so it's legitimate military duty, but

22  one that you don't necessarily like the timing of.  Is that

23  correct?

24    A.   I would say that it was documented military duty that

25  we didn't necessarily like the timing of or were suspicion of

```
 1  the timing of.

 2                  (Exhibit 6 marked for identification.)

 3      Q.   BY MS. MATTER:  I've handed you what's been marked as

 4  Exhibit 6, it's been produced by Delta with a Bates Stamp

 5  ending in 88840 to 88842.

 6                  If you can review that, and let me know when you

 7  finished your review, please.

 8      A.   (Witness examining document.)

 9                  (Exhibit 7 marked for identification.)

10                  THE WITNESS:  Okay.

11      Q.   BY MS. MATTER:  I've also handled you what's been

12  marked as Exhibit 7.  It ends in Delta Bates stamp 89043.  I

13  think it's a continuation of the e-mail chain, so if you don't

14  mind reviewing that, so we can talk about that together?

15      A.   Okay.  Does this one go with these or it's a separate

16  issue?

17      Q.   I believe they go together, but I'll ask for you to

18  confirm that.  It's just how they've been produced by Delta,

19  they had to be two separate documents.

20      A.   (Witness examining document.)  Okay.  The reason that

21  it's a little confusing to me is that some of the documentation

22  refers to a gentleman by the name of Greenlaw , and some of the

23  documentation refers to a gentleman named DeFazio, and without

24  the context, this is a very complicated e-mail string.

25      Q.   Sure.
```

| Date: | Friday, May 16 2014 09:06 AM |
|---|---|
| Subject: | FW: Daily Sick Report - 15MAY2014 |
| From: | Frederick, Chris |
| To: | Graham, Jim <Jim.Graham@delta.com>; Miller, OC <OC.Miller@delta.com>; Mangie, Jim <Jim.Mangie@delta.com>; |
| Attachments: | Daily_Sick_Report_for_15MAY2014.pdf |

Greenlaw and Lowe have been on the radar in the past for "convenient military duty". We are having an internal discussion about what, if any, next steps to take.

Captain Chris Frederick
Director and Chief Pilot - ATL
404-7141595


---–Original Message----
From: crewres@dpd28n.delta.com [mailto:crewres@dpd28n.delta.com] On Behalf Of Jason.E.Zawislak@delta.com
Sent: Friday, May 16, 2014 6:37 AM
To: Zawislak, Jason E; Miller, OC; HennieRoed, Timothy; Marciano, Lawrence A; Hill, Phyllis; Dickson, Stephen; Graham, Jim; Branon, Brendan M; Puckett, Chris; Sigler, Chad; Frederick, Chris; Terry, Richard L; Hoffmann, Leonard W; Davis, Philip T; Cooney, Patrick B
Cc: Hummel, Andrew; Nayar, Viresh
Subject: Daily Sick Report - 15MAY2014

# Redacted - Privilege

Jason Zawislak
Manager - Flying Ops Admin
Department 026/ATG

Office: (404) 715-0806
Mobile: (404) 273-1162

Pilot Leaves Fax: (404) 677-3018
Pilot Leaves Email: PltLeaves.FlightOps@delta.com



PLAINTIFF'S
EXHIBIT
S
8-26-21

CONFIDENTIAL

DELTA000414883

state: AR
email: hawgcogs@gmail.com
phone: 520-401-1990
fleet: A320
position: B-First Officer
base: ATL
squadron_unit_name: 188OSS
squadron_unit_base: Fort Smith, AR
svc_branch: Air Nat'l Guard
unit_city: Fort Smith
unit_state: AR
unit_phone: 479573-5502
rank: O-5
billet: Squadron Commander
co-do-xo-ops-wingco: Yes
unit_commander_rank: O-6
unit_commander_name: Brian Burger
unit_commander_status: Reserve
unit_commander_phone: 479-573-5502
wing_name_location: 188 Wing, Fort Smith, AR
wing_phone: 479-573-5188
wing_commander_rank: O-6
wing_commander_name: Bobbi Doorenbos
wing_commander_status: Reserve
wing_commander_phone: 479-573-5188
duty_performing: Squadron Commander, 188th Operational Support Squadron, RPA Instructor Pilot
duty_location_performed: Fort Smith, AR
duty_performed_another_time: No
other_info: While the overall orders are not USERRA exempt, there will be times in this period that are USERR exempt. I will provide orders once they are written.
B1: Submit

CONFIDENTIAL

1    A.    Without the context, I'm struggling to figure out

2  what exactly was going on.

3    Q.    Sure.  I can appreciate that.

4    A.    Yes.

5    Q.    We'll just go kind of case by case through it.

6    A.    Okay.  I've read both of these.

7    Q.    Okay.  First I'd like to make sure you -- you have

8  all of the pages.  Do you have-- can you tell me the Bates

9  number of the -- where Exhibit Number 6 ends for you?

10   A.    8843.

11   Q.    Okay.  Then Tom, you might be missing a page, do you

12 mind taking a look?

13            MR. MUNGER:  I've got 8843.

14            MS. MATTER:  Okay.

15            MR. MUNGER:  8842 and 8843 appear to be a

16 separate e-mail chain.

17            MS. MATTER:  Okay.  Just making sure you have

18 all the pages.

19   Q.    BY MS. MATTER:  Okay.  Beginning on the bottom of

20 88842, it's dealing with Dominic DeFazio.

21            Do you see that?

22   A.    Yes, ma'am.

23   Q.    Okay.  And on the bottom of the -- the page, and it's

24 dated -- well, actually, about halfway though the page, it's an

25 e-mail dated Monday, June 23rd 2014 at 11:33 a.m.

1  and this has to do with Mr. Greenlaw.  It appears there's an

2  e-mail from Donald Hansen to you dated June 10th, 2014.

3             Do you see that?

4      A.   Yes, ma'am.

5      Q.   And have you had an opportunity to review that

6  exchange?

7      A.   Yes, ma'am.

8      Q.   Okay.  It says Blair Greenlaw's scheduled

9  manipulation with sick and Mil are appalling.

10            Do you have any recollection of this situation?

11     A.   No, ma'am.

12     Q.   It says Johnny O. and I have discuss and recommended

13 the following action.  Who is Johnny O?

14     A.   John O'Neil was one of the chief pilots that worked

15 for me in the chief pilot's office.

16     Q.   And who is Kevin Hansen?

17     A.   Kevin Hansen was achieve pilot who worked in the

18 chief pilot's office.

19     Q.   And he goes by Jug?

20     A.   He goes by, Jug.  Yes, ma'am.

21     Q.   He's recommending an action here to have Jim Mangie

22 contact Blair's command, and it states:  Not the squadron

23 commander but his wing commander.

24            A wing commander is above squad commander,

25 correct?

1     A.    Yes, ma'am.

2     Q.    It says, and discuss how much he is really needed.

3           Do you know why that would be requested?

4     A.    No, ma'am.  I'd have to speculate.  I don't have

5     context here.

6     Q.    Okay.  Under what circumstances do you think it would

7     be appropriate to jump the chain of command and go straight to

8     somebody's wing commander?

9     A.    I would struggle to give you parameters for that.  It

10    wasn't something that we did frequently that -- that I recall.

11    Q.    It could have a negative impact on that service

12    member's reputation within his -- within his unit, isn't that

13    correct?

14    A.    Again, I -- I -- I -- I suppose it would depend on

15    the unit, but I don't -- I don't know what impact it might have

16    on the member.

17    Q.    Well, based on your military experience, what kind of

18    impact do you think it would have if somebody went above your

19    immediate supervisor to talk about you?

20    A.    Well, it might be a good thing, it might be a bad

21    thing.  Depends on what they would talk about, I suppose.

22    Q.    Well, in this circumstances.  I think we can agree it

23    would be a bad thing, right?

24    A.    Not necessarily.  It depends on who they talked to

25    and what they talked about.

1    Q.    Well, they said to discuss Blair's poor reliability

2    at Delta, that would have negative ramifications on other

3    reserve officers, who are able to balance both professional

4    responsibilities.

5              So couldn't we agree that it would be bad in

6    this circumstances?

7    A.    I believe it's just Kevin giving his opinion.  I

8    don't necessarily think that would be the case.

9    Q.    Next it says, have Jason and AMP, or A-M-P start a

10   good faith basis investigation and have Blair verify all future

11   occurrences for sick leave.

12             What does that mean?

13   A.    This is a long time ago.  Let me think for a moment.

14   I'm struggling a little bit with -- again, too many years ago,

15   I recall that we had a process where we occasionally required a

16   pilot to verify sick occurrences with a doctor's note.  That

17   may be what we're talking about here.

18   Q.    So here, because -- because there's a suspicion that

19   Blair Greenlaw has manipulated his schedule, the recommendation

20   coming from Kevin Hansen is to have Blair verify all future

21   occurrences for sick leave.  And you read that to mean every

22   time that Blair Greenlaw goes to take sick leave in the future,

23   that is to be verified with a doctor's note; is that correct?

24   A.    That's what Kevin is recommending.

25   Q.    Okay.  That number three is, invite Blair into the

1  office for a face-to-face with you, me, Johnny O, Jim and Alba

2  so that would be -- he's directing this e-mail to you, correct?

3      A.   Yes.

4      Q.   So the face-to-face would be with Mr. Frederick and

5  Mr. Hansen, with Mr. O'Neill, with Mr. Mangie and Alta, as

6  desired.

7              Is that your understanding?

8      A.   That's Kevin's recommendation.

9      Q.   Understood.

10     A.   Yes, ma'am.

11     Q.   To discuss Blair's obligations to Delta Airlines,

12 correct?

13     A.   That's what Kevin recommends.  Yes, ma'am.

14     Q.   The requirement to pre-post all known periods of

15 military leave in advance, and to perform such duty on his days

16 off.

17             Do you see that, sir?

18     A.   Yes, ma'am.

19     Q.   Okay.  So all known periods of military leave are to

20 be performed on his days off is the recommendation.

21             Do you see that?

22     A.   Yes, ma'am.

23     Q.   And the number four is, require documentation for all

24 periods of military duty going forward until he retires or

25 resigns from the reserves.

1              Do you see that?

2     A.   Yes, ma'am.

3     Q.   In your e-mail dated June 10, 2014, at 4:42 p.m., you

4  state, among other things, quote, I agree on the suggested

5  course of action.

6              Do you see that?

7     A.   No, ma'am.  You lost me.  Where are we?

8     Q.   On top of the page that we were just on.

9     A.   Okay.

10    Q.   Delta Bates stamp ending in 88841.

11    A.   8841.  Okay.

12    Q.   Do you see the e-mail dated Tuesday, June 10th, 2014?

13    A.   Yes, ma'am.

14    Q.   442 --

15    A.   Yes, I caught up with you.

16    Q.   Wonderful.  Do you see where you wrote, I agree on

17  the suggested course of action, end quote?

18    A.   Yes, ma'am.

19    Q.   The next sentence reads:  John and Jim, please

20  contact Mangie with our request, see below, period.  This sort

21  of manipulation should be brought to the Command's attention,

22  period.  We should, and will, if I have my way, require orders

23  for all of Greenlaw's MLOA request going forward, period.

24              Do you see that?

25    A.   Yes, ma'am.

1        Q.   Okay.  Are orders required for all periods of

2   military leave at the time that you were the director and chief

3   pilot from 2013 to 2017?

4        A.   No, ma'am.

5        Q.   Next is, you write as for GFB, does that mean Good

6   Faith Basis?

7        A.   Good Faith Basis.

8        Q.   It says, I can petition for that.

9             What is a good-faith basis investigation?

10       A.   Again, we're going back six years, so I'll give you

11   my general recollection of that.  There were some cases of sick

12   leave that, for whatever reason, we felt were somewhat

13   suspicious, and we had the -- a process in place called Good

14   Faith Basis where we could require that a pilot verify a

15   sickness with a note from a doctor.

16       Q.   Where is this Good Faith Basis process printed is

17   that -- is that in the FOM?

18       A.   I'm sorry.  It's been too long.  I can't recall where

19   it was documented.

20       Q.   Okay.  So -- so if I understand standard correctly,

21   it would be would the good faith basis investigation, under

22   that, if there is a suspicion that -- that sick leave was

23   improperly taken, that would give the chief pilot the authority

24   to demand a doctor's note for an illness; is that correct?

25       A.   No, ma'am.

1      Q.   Okay.  Could you explain?

2      A.   As you can see as for GFB, I can petition for that.

3   We didn't have the unilateral authority to ask for a Good Faith

4   Basis.  It was something that had to be discussed at a higher

5   level, it was very rare and, so this would have been a big step

6   for us to take.  So I reply to Kevin, I can petition for that,

7   meaning that if we decide to go forward with requiring good

8   faith basis and notes, I will go to the powers of be and see if

9   we can get authority to do that in this case.

10     Q.   And who are the powers to be?

11     A.   At the time, there was -- I don't recall where that

12  authority would have come from.  My boss, O. C. Miller, would

13  have been one of the first contacts in that case.  I don't

14  recall whether we had to have labor relations involved with

15  that.  I don't recall whether we had to go to Jim Mangie for

16  that.  I don't recall what the approval of authority was for

17  Good Faith Basis, but it was above my level, so I couldn't just

18  automatically implement it.

19     Q.   Understood.  And with this good faith basis, if you

20  were to petition for that, and if it was granted, that would

21  provide the authority to demand a doctor's note the next time

22  that Mr. Greenlaw put in for sick leave; is that correct?

23     A.   That would be the intent.  Yes, ma'am.

24     Q.   Okay.  And then it wouldn't give you blanket

25  authority to do it for the rest of Mr. Greenlaw's career; is

1  that correct?

2     A.   I can't think of a single case where we ever required

3  Good Faith Basis from here on out, for anybody.  It was on a

4  one time basis, as I recall.

5     Q.   Understood.  So in this e-mail, you are agreeing with

6  Mr. Hansen's course of action whereby he is stating that he

7  wants to demand -- he wants to demand a doctor's note for every

8  time Mr. Greenlaw takes sick leave until the end of his Delta's

9  career; is that correct?

10    A.   That's what Kevin is recommending.

11    Q.   And that's what you're agreeing with, right?

12    A.   That's what I said I agreed with, but if you read a

13 little further down in the e-mail, you can see that I know

14 that's not going to be possible.  I can petition for that

15 Kevin.  But Kevin knows that we're not going to get approval to

16 do that.

17    Q.   Okay.  But you wouldn't dispute that you say above I

18 agree on the suggested course of action?

19    A.   I would agree that's what it says.  Yes, ma'am.

20    Q.   Understood.  And you also agreed with until suggested

21 course of action to require documentation for all periods of

22 military duty going forward for Mr. Greenlaw until he retires

23 or resigns from the reserves; is that correct?

24    A.   You're reading Kevin's recommendation, again.  Yes,

25 ma'am.

| Date: | Wednesday, June 11 2014 09:50 AM |
|-------|----------------------------------|
| Subject: | RE: Greenlaw.xls |
| From: | Frederick, Chris |
| To: | Mangie, Jim <Jim.Mangie@delta.com>; |
| Attachments: | image001.jpg |

OK, review complete. I went back all the way to Jan '13 and took a month-by-month look at his schedule. We talked to him back in April '13 about his habits and lack of availability, and at that point we "threatened" to require orders for all MLOA and validation for all sick. That was just before I came into the office, and frankly, I was unaware of Greenlaw up until this '14 discussion.

He is an abuser of the highest order, Jim. We will call him in next week and review his schedule with him. I will ask him to explain, which of course he will be unable or unwilling to do. In any case, I believe it within my authority to require orders/records for every MLOA going forward, and if his attitude is problematic, I will also require him to provide mil orders for everything over the past year. Additionally, I will require him to verify all sick going forward (assuming I am not blocked from doing so by LR, which is a 50-50 proposition). But, I need to make a point about this sort of abuse, and this seems to be the perfect example. If you put a dollar cost on this, it would fall into the felony category.

If you feel it appropriate, I think contact with his upper level chain of command is in order. I suspect his squadron level command either knows or doesn't care about his abuse or Delta. But, I also suspect there are very good people at higher levels that understand how hard Delta works to make our handshake with the military work. Not trying to get anyone in trouble, but they need to know. Perhaps such contact would have a trickle-down effect on others in the chain of command.

Let me know if you need any more info from my office. Thanks for the support.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Mangie, Jim
**Sent:** Tuesday, June 10, 2014 6:32 PM
**To:** Frederick, Chris
**Subject:** FW: Greenlaw.xls

We can ask for him to validate all of his past and/or future MLOA. Once we decide on a course forward, I will contact his wing leadership. I can lobby for the GFB up here as well. Thx

Captain Jim Mangie
Flight Operations
Delta Air Lines
404 715 1883-Office
404 918 5481-Cell
 **△ DELTA ⧉**
AIR LINES

**From:** West, James C
**Sent:** Tuesday, June 10, 2014 4:47 PM
**To:** Mangie, Jim
**Cc:** Frederick, Chris; Oneil, John A; Hansen, Donald K
**Subject:** FW: Greenlaw.xls

Jim,

Plz ref Chris and Kevin's emails below for follow-up on Greenlaw. V/r,



PLAINTIFF'S
EXHIBIT
6
8-26-21

CONFIDENTIAL

DELTA000088840

6.1

*Jim West*
*Flight Operations Manager*
*Atlanta Chief Pilot Office*
*404-797-9805 cell*

---

**From:** Frederick, Chris
**Sent:** Tuesday, June 10, 2014 4:42 PM
**To:** Hansen, Donald K
**Cc:** Oneil, John A; West, James C
**Subject:** RE: Greenlaw.xls

This is pretty gross. I agree on the suggested course of action.

John and Jim, please contact Mangie with our request, see below. This sort of manipulation should be brought to the Command's attention. We should, and will if I have my way, require orders for all of Greenlaw's MLOA requests going forward.

As for GFB, I can petition for that. I haven't had great success with GFB in the past, but this one is worth another effort.

Once we settle on a plan as noted above, we will call Greenlaw in for a reckoning.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

---

**From:** Hansen, Donald K
**Sent:** Tuesday, June 10, 2014 3:01 PM
**To:** Frederick, Chris
**Cc:** Oneil, John A; West, James C
**Subject:** Greenlaw.xls

Chris,

Blair Greenlaw's schedule manipulation with SICK and Mil leave are appalling. Johnny O and I have discussed, and I recommend the following action.

    1.   Have Jim Mangie contact Blair's command, Not the squadron commander, but his wing commander and discuss how much he is really needed. Also discuss that Blair's poor reliability at Delta will have negative ramifications on other reserve officers who are able to balance both professional responsibilities.
    2.   Have Jason and AMP team start a good faith basis investigation and have Blair verify all future occurrences for SICK leave
    3.   Invite Blair into the office for a face to face with you, me, Johnny O, Jim, and ALPA (if desired) to discuss his obligations to Delta Air lines, the requirement to pre-post all known periods of military leave in advance, to perform such duty on his days off, etc.
    4.   Require documentation for all periods of Military duty going forward until he retires or resigns from the reserves.

Let me know how you would like us to proceed.

R/

Jug

CONFIDENTIAL

DELTA000088841

6.2

**Date:** Monday, June 23 2014 06:51 PM
**Subject:** RE: Additional Military Leave of Absence Request
**From:** Mangie, Jim
**To:** Dickerson, Bryan L <bryan.dickerson@delta.com>;
**CC:** Jones, Christopher P <Christopher.P.Jones@delta.com >;

My thoughts: He needs to finish consolidation before leaving. Additionally, his time away should as little as possible. We need to talk with the people he mentions below and come to an understanding on how long he'll be away prior to working the final arrangements. If you'd like me to talk to them, please ask F/O Defazio for contact info. Thx

-----Original Message-----
From: Dickerson, Bryan L
Sent: Monday, June 23, 2014 12:15 PM
To: Defazio, Dominic J; Jones, Christopher P; Mangie, Jim
Cc: defazio4@mac.com
Subject: RE: Additional Military Leave of Absence Request

Dominic - Jim Mangie handles our Mil Leave - let me discuss with him...

BD

-----Original Message-----
From: Defazio, Dominic J
Sent: Monday, June 23, 2014 11:33 AM
To: Jones, Christopher P; Dickerson, Bryan L
Cc: defazio4@mac.com
Subject: Additional Military Leave of Absence Request

Gents,

I'm currently finishing a 28 day MLOA for my reserve unit as my squadron supported the Reserve Integrated Training Exercise 4-14 in 29 Palms, California. During this time, my active duty Inspector Instructor (Full Time Support) has been relieved. As the Commanding Officer, I have been asked to come on orders for a short period of time to guide the Squadron through these changes.

Bottom line up front, I do not want any military orders to have a negative impact my standing at Delta and I'm looking for some guidance on how to proceed. I'm still on probation and I need about 15 hours to complete consolidation. I have informed both Marine Air Group 49, Colonel Robert Tobin and 4th Marine Air Wing, Major General Collins, that before I accept any orders I would like to discuss this with Delta to find an acceptable way forward.

Both the General Collins and Col Tobin would like to offer an explanation of the situation, as they fully understand the implications this has on Delta as well as my progression as a new pilot.

Your attention to this matter is greatly appreciated, I look forward to hearing back from you soon.

Respectfully,

Dominic DeFazio
540 520-8918
defazio4@mac.com

CONFIDENTIAL

DELTA000088842

6.3

**Date:** Monday, June 23 2014 12:14 PM

**Subject:** RE: Additional Military Leave of Absence Request

**From:** Dickerson, Bryan L

**To:** Defazio, Dominic J <dominic.defazio@delta.com>; Jones, Christopher P <Christopher.P.Jones@delta.com >; Mangie, Jim <Jim.Mangie@delta.com>;

**CC:** defazio4@mac.com;

Dominic - Jim Mangie handles our Mil Leave - let me discuss with him...

BD

----Original Message----
From: Defazio, Dominic J
Sent: Monday, June 23, 2014 11:33 AM
To: Jones, Christopher P; Dickerson, Bryan L
Cc: defazio4@mac.com
Subject: Additional Military Leave of Absence Request

Gents,

I'm currently finishing a 28 day MLOA for my reserve unit as my squadron supported the Reserve Integrated Training Exercise 4-14 in 29 Palms, California. During this time, my active duty Inspector Instructor (Full Time Support) has been relieved. As the Commanding Officer, I have been asked to come on orders for a short period of time to guide the Squadron through these changes.

Bottom line up front, I do not want any military orders to have a negative impact my standing at Delta and I'm looking for some guidance on how to proceed. I'm still on probation and I need about 15 hours to complete consolidation. I have informed both Marine Air Group 49, Colonel Robert Tobin and 4th Marine Air Wing, Major General Collins, that before I accept any orders I would like to discuss this with Delta to find an acceptable way forward.

Both the General Collins and Col Tobin would like to offer an explanation of the situation, as they fully understand the implications this has on Delta as well my progression as a new pilot.

Your attention to this matter is greatly appreciated, I look forward to hearing back from you soon.

Respectfully,

Dominic DeFazio
540 520-8918
defazio4@mac.com

CONFIDENTIAL

DELTA000088843

6.4

```
 1        Q.   And he might well be doing military duties on his day
 2   off, you write, or more likely giving his 15 sick occurrences
 3   in the past 12 months, might be doing military duty on sick
 4   days and double-dipping with a twist.
 5                  Do you see that?
 6        A.   Yes, ma'am.
 7        Q.   What do you mean by that?
 8        A.   I'm going to make an assumption here, it's a long
 9   time ago, but it looks like there was some suspicion that one,
10   he was probably doing military leave that he was not reporting
11   to us, which would have been a policy violation.  And also, I
12   felt like it was possible or someone in my office, perhaps,
13   felt that it was possible he was doing -- he was calling in
14   sick to get paid for Delta duty days, and then doing military
15   duty on those sick days and not reporting it.
16        Q.   Is it a -- a violation of the double-dipping policy
17   to be on sick leave and perform military duty?
18        A.   I can't recall whether that -- it appears from the
19   e-mail that that was my implication, but it's been so long ago
20   I can't recall whether we required -- whether we prohibited
21   military duty on sick days or not.  Let me add a statement
22   here, though.  If -- if he was on military duty, then he
23   shouldn't be on sick and military at the same time.  If he's on
24   military, it should show military on his schedule, and he
25   shouldn't be paid sick time for that day.  So that's probably
```

1        A.    I -- I don't know.

2        Q.    You don't know?

3        A.    It's a term that I use on occasion.  It has a -- it

4   has an implied meaning, but I don't have all the my e-mails

5   here in front of me, so I can't tell you how many times I've

6   used it.

7        Q.    Do you know what the irony, right?  What's the

8   implied meaning?

9        A.    I'm sorry.  What was the question?

10       Q.    What's the implied meaning here?

11       A.    Just --

12       Q.    -- you mentioned an implied meaning?

13       A.    Just a big investigation, a big deal.

14       Q.    We're done with those for now.

15             (Exhibit 10 marked for identification.)

16       Q.    BY MS. MATTER:  I handed you what's been marked as

17   Exhibit 10.  It bears a Delta Bates stamp ending in 90640 to

18   90645.

19             It's several pages, so you're welcome take

20   whatever time you need to review it.

21       A.    Okay.  (Witness examining document.)  Okay.  It looks

22   like the back three pages are a copy of the front with just an

23   added note from me to, looks like, internal to my office.

24       Q.    Which is the internal note, sir?

25       A.    43.  If you look at the front page 40, you can see

1  that from Mangie, Jim; hello, gentleman, please, see the e-mail

2  package below.  And then if you look on page 43, you can see

3  two thirds of the way up:  Hello, gentleman, please read the

4  e-mail package below.  So that's Jim's e-mails to me, and I

5  have copied some of the guys in my office, who were handling

6  this particular situation.  A little confusing.  That's why I'm

7  bringing this up.

8      Q.   And I want to make sure that you have all the same

9  pages that I have as well.

10     A.   Okay.

11     Q.   So what I see on -- on the top of page 90640, is an

12  e-mail from you saying, I'd be interested in what his command

13  says about this.  He's been a habitual offender of sick leave

14  for a long time.  Do we have any leverage at all?  And then on

15  the top of 90643, I see a different e-mail.  He's just one

16  notch below, top -- top on my most wanted list.

17               Do you see that?

18     A.   Yes, ma'am.

19     Q.   Does that -- does that help at all?

20     A.   Well, everything below the top e-mail on page 40 and

21  page 43 is exactly the same.

22     Q.   Sure.  Sure.

23     A.   Okay.

24     Q.   I understand that.

25     A.   I just want to be sure.  It's -- there's a lot here,

1  and I didn't want to have to go through and digest it twice.

2       Q.    No, I appreciate that.

3       A.    Okay.

4       Q.    What it looked to me like, was that the

5  communications kind of went to different directions, and I

6  wanted to make sure you knew it was the same communication.

7       A.    Yes, ma'am.  I looks like the "to line" is the same

8  on both, so I'm making two different comments about the same

9  information to the same group.

10      Q.    Okay.  Good.  That helps.  Thank you.  Okay.  So

11  beginning with the group that -- the group of pages that 90643

12  to 90645?

13      A.    Yes, ma'am.

14      Q.    If you'll go to that group.

15      A.    (Witness complying.)

16      Q.    Would you agree that the e-mail begins at the bottom

17  of 906343 is -- appears to be from Mr. Greenlaw?

18      A.    Yes, ma'am.

19      Q.    And -- and would you agree that that e-mail is him

20  providing some context or explanation for his -- that he's

21  requesting military leave of absence?

22      A.    Yes, ma'am.

23      Q.    Okay.  And that's -- he's providing the explanation

24  because it falls over the Christmas Holiday, correct?

25      A.    Yes, ma'am.

1    Q.    And -- and he is addressing the fact that -- that he

2  just received orders, and due to funding issues and the

3  necessity that these -- these items be handled before the end

4  of the year, it's necessary for him to work over the holiday?

5    A.    Yes, ma'am.

6    Q.    Then in response to Mr. Greenlaw's e-mail dated

7  Friday, December 19th, 2014, at 2:47, Jim Mangie, sends an

8  e-mail stating that he's already left a message to the unit,

9  and will reattempt to contact them Monday.  So one call Friday.

10  One call Monday.

11         Is that -- and that's just to -- to get more

12  information.  It says, I'm ready to take this above his unit if

13  we deem it necessary.

14         Do you understand -- do you see that?

15    A.    Yes, ma'am.

16    Q.    Is it your understanding that what he means by taking

17  it above the unit, is to see if this leave can be moved?

18    A.    I don't know what he means.  He may mean to see

19  whether the leave can be moved.  He may mean just informing the

20  higher command that short notice Christmas military orders

21  have -- have come to Delta.  I don't know what Jim was

22  inferring.

23    Q.    Sure.

24    A.    Or referring to there.

25    Q.    Sure.  But would it be fair -- would it be fair to

1    assume that he wants to get it removed because it's a high

2    demand time for Delta?

3         A.   I think we can assume that that's one of the

4    objectives that he might have.

5         Q.   Sure.  And it might also be the notice part, right?

6         A.   Yes, ma'am.

7         Q.   Now in -- in response, there's an e-mail from you,

8    6:15 p.m., so -- so about an and a half later, where you write:

9    He's just one notch below on Tutwiler on my most wanted list.

10             Do you see that.

11        A.   Yes, ma'am.

12        Q.   Who is Mr, Tutwiler?

13        A.   Again, a long time ago.  I think Mr. Tutwiler was one

14   of four or five military leave pilots in the base that we felt

15   we had to constantly watch.

16        Q.   And you say, "on my most wanted list."

17             What do you mean by that?

18        A.   Figure of speech.

19        Q.   Okay.  What did you mean by that, "figure of speech"?

20        A.   Just figure of speech.  He's one of the guys that

21   we've been watching.

22        Q.   He's on -- he's on your radar for his -- his military

23   leave; is that correct?

24        A.   I'm assuming that's what I'm -- I mean.  Yes, ma'am.

25        Q.   And you've said, I've had a conversation with him

1  previously.  Are you meaning Mr. Greenlaw, because the e-mail

2  is about Mr. Greenlaw?

3      A.    I would assume that that's about.  I had a

4  conversation with Mr. Greenlaw.  Yes, ma'am.

5      Q.    Right.  It says obviously ineffective.  It's

6  obviously ineffective because he's put in military leave over a

7  holiday, correct?

8      A.    Again, I would assume that's what that means.  Yes

9  ma'am.

10     Q.    Ask then you write, let's remind him that someone

11 else will be flying in his place.  Is that to -- to guilt trip

12 Mr. Greenlaw because he's taking military leave over a holiday,

13 and now someone else is going to have to take over for him?

14     A.    I think that's what that means.  Yes, ma'am.

15     Q.    Next, I'd like to refer you to the document Bates

16 stamped 90640.  At the top of the page, there's an e-mail from

17 you dated December 2nd, 2014.  So this will be three days

18 later --

19     A.    Later.  Yes, ma'am.

20     Q.    -- it appears.  It says:  I'd be interested in what

21 his command says about this.  He's been a habitual offender of

22 leave/sick for a long time.

23           Do you see that?

24     A.    Yes, ma'am.

25     Q.    Do we have any leverage at all, question mark.

1          What do you mean by, "do we have any leverage at

2    all"?

3        A.    The e-mail appears to be to Jim -- primary to Jim

4    Mangy, and I see the other recipients are on there as well, so

5    it appears I'm informing the rest of the team about the follow

6    up here, and, again, I'm going to make an assumption here that

7    I'm asking Jim Mangie if there's any leverage with the command

8    structure to keep the short notice Christmas MLOA's from

9    continuing to happen with Greenlaw.

10       Q.    But what you do you mean by "leverage," does that

11   mean, hey, we know people, higher up in that group?

12       A.    I don't know.  Again, it's six years ago, seven years

13   ago.  I don't know what it meant.

14       Q.    Would you typically try to find leverage that you

15   could use with respect to a pilot's military leave to dissuade

16   them from taking it?

17       A.    It wouldn't be me.  I didn't contact the units as a

18   general rule.  Jim Mangie did all of that, so I'm assuming what

19   I'm asking Jim Mangie, does he have anyway of contacting

20   command structure to see if this could be curtailed.

21       Q.    Like going to the wing commander?

22       A.    It doesn't say that, but I'm assuming that's --

23   that's what we mean.

24       Q.    Or above his unit because, that's -- that's what it

25   says on 90643, is we'll go above his unit if we deem that

1   necessary?

2        A.   Yes, ma'am.

3        Q.   Okay.

4                 (Exhibit 11 marked for identification.)

5        Q.   BY MS. MATTER:  I've handed you what he's been

6   marked as Exhibit 11, it's been produced by Delta with a Bates

7   stamp ending in 13734 to 13737.

8                 If you'll take a moment to take a look at the

9   that three-page document, and let me know when you're finished,

10  please.

11       A.   (Witness examining document.)  Okay.

12       Q.   I'd like to begin at the back two pages first.  The

13  two pages that ended in 13736 and 13737.

14       A.   Yes, ma'am.

15       Q.   This has to do with Andrew Kamitarus.

16                 Do you see that?

17       A.   Yes, ma'am.

18       Q.   Do you see at the bottom of the page where there's an

19  e-mail to Jim Mangie and Barry Behnfeldt, dated Wednesday April

20  1st, 6:02 p.m.?

21       A.   (Witness examining document.)

22       Q.   Sorry.  It's about half way down the page?

23       A.   April 1st.  Yes, ma'am.

24       Q.   Do you see where it reads in the subject line.

25  Military leave log auto-generated e-mail?

**Date:** Monday, December 22 2014 10:31 AM
**Subject:** RE: MLOA-Greenlaw 718792
**From:** Frederick, Chris
**To:** Mangie, Jim <Jim.Mangie@delta.com>; Hansen, Donald K <Donald.Hansen@delta.com>; West, James C <James.C.West@delta.com>; Holmes, Barry P <Barry.P.Holmes@delta.com>;

I'd be interested in what his command says about this. He's been a habitual offender of leave/sick for a long time. Do we have any leverage at all?

Captain Chris Frederick
Director and Chief Pilot - ATL
404-7141595

-----Original Message-----
From: Mangie, Jim
Sent: Friday, December 19, 2014 5:41 PM
To: Hansen, Donald K; West, James C; Holmes, Barry P
Cc: Frederick, Chris
Subject: MLOA-Greenlaw 718792

Hello Gentlemen,

Please see the email package below. R received this MLOA notification today for F/O Greenlaw's MLOA on 24-25Dec. This MLOA drops a 24-26Dec BSB trip. I left a message at the unit today and will reattempt contact on Monday. Since he has orders, I don't think we'll be able to get any relief so I'll put it through today. You'll see his explanation for the duty below and his orders are attached. It's interesting that this type of duty would be done on Christmas Eve and Christmas Day. Can you please contact him and get more information? I'm ready to take this above his unit if we deem necessary.

Thanks,

Jim

Captain Jim Mangie

Flight Operations

Delta Air Lines

404 715 1883-Office

404 918 5481-Cell


From: Greenlaws [mailto:jaxbchterps@gmail.com]
Sent: Friday, December 19, 2014 2:47 PM
To: FlightOps, CPSC
Subject: Greenlaw MLOA 718792

CPSC,

I will be submitting a MLOA request in a moment for 24 December but I wanted to submit some background information to your office before I do so. Currently, I am the PXO of Fleet Logistics Support Squadron 62. In this role I assist the Commanding and Executive officers fulfilling the mission of a 200 person naval squadron. During this MLOA I will be completing very important

CONFIDENTIAL

PLAINTIFF'S EXHIBIT

10
8-26-21
PENGAD 800-631-6989

DELTA000090640

10.1

tasking that has been ignored due Navy funding issues, stemming from congressional budget shortfalls. Funding for orders has just been made available and I cannot defer this tasking to a future date. Additionally, I will be addressing personnel issues that must be responded to prior to sending the squadron on holiday liberty. In short, the active duty and reserve components of this command depend on my participation during this MLOA.

The late submission of this request is a product of the absence of congressional funding and my continued attempts swap / drop my rotation U365 checking in on 24 Dec. I have spent dozens of hours trying to free these days on my schedule but have been unsuccessful. If you check my schedule you will notice I have MLOA on 30 Dec as well. During this period I will be cleaning up tasking needed to be complete by the end of 2014, and supporting personnel as they return from this holiday period.

If you review my request you will notice I only submitted it for 24 Dec. Once I forward you my orders you will see they cover the period of 23-24 Dec. I wanted to ensure I completed rotation U373 so as not to force Delta to use another reserve pilot for this period. After I block in on the 23rd I will travel to my drill site and commence duties described above.

I received notification at 1412 that my orders for the 23-24 period were funded. You will receive a forwarded copy of them once they make it through the system and my operations department sends me an email copy.

 If you need to confirm any of this you may call my immediate supervisor, Commander Casella, at 904-542-8557.

Regards,

Blair Greenlaw
F/O   718792


-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Friday, December 19, 2014 2:55 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email


primary_period: Christmas (23DEC14◆26DEC14)
actual_dates_needed: 24 Dec
pilot_name: Blair Greenlaw
employee_number: 718792
city: Jacksonville Beach
state: Florida
email_address: jaxbchterps@gmail.com
phone_number: 6016042464
fleet: 757/767
position: B-First Officer
base: ATL
squadron_unit_name: Fleet Logistics Suport Squadron 62
squadron_unit_base: Jacksonville
branch_of_service: USN
unit_city: Jacksonville
unit_state: FL
unit_phone: 904-542-8557


CONFIDENTIAL

DELTA000090641

10.2

rank: O-5
billet: PXO
co_do_xo_ops_wingco_higher: Yes
unit_commander_rank: O-5
unit_commander_name: CDR Casella
unit_commander_status: Active
unit_commander_phone: 904-542-8557
wing_name_location: FLETLOGSUPWING, FT Worth,TX
wing_phone:
wing_commander_rank: O-6
wing_commander_name: CAPT Bailey
wing_commander_status: Active
wing_commander_phone:
duty_performing: Executive department tasking. I sent an email further describing my duties to the CPSC.
duty_location_performed: NAS Jacksonville
duty_performed_another_time: No
other_information:
B1: Submit

| Date: | Friday, December 19 2014 06:15 PM |
|---|---|
| Subject: | Re: MLOA-Greenlaw 718792 |
| From: | Frederick, Chris |
| To: | Mangie, Jim <Jim.Mangie@delta.com>; |
| CC: | Hansen, Donald K <Donald.Hansen@delta.com>; West, James C <James.C.West@delta.com>; Holmes, Barry P <Barry.P.Holmes@delta.com >; |

He is just one knotch below Tutwiler on my most wanted list. I have had a conversation with him previously. Obviously Ineffective. Let's remind him that someone else will be flying in his place.

Sent from my iPhone

> On Dec 19, 2014, at 4:40 PM, Mangie, Jim <Jim.Mangie@delta.com> wrote:
>
> Hello Gentlemen,
>
> Please see the email package below. R received this MLOA notification today for F/O Greenlaw's MLOA on 24-25Dec. This MLOA drops a 24-26Dec BSB trip. I left a message at the unit today and will reattempt contact on Monday. Since he has orders, I don't think we'll be able to get any relief so I'll put it through today. You'll see his explanation for the duty below and his orders are attached. It's interesting that this type of duty would be done on Christmas Eve and Christmas Day. Can you please contact him and get more information? I'm ready to take this above his unit if we deem necessary.
>
> Thanks,
>
> Jim
>
> Captain Jim Mangie
>
> Flight Operations
>
> Delta Air Lines
>
> 404 715 1883-Office
>
> 404 918 5481-Cell
>
>
> From: Greenlaws [mailto:jaxbchterps@gmail.com]
> Sent: Friday, December 19, 2014 2:47 PM
> To: FlightOps, CPSC
> Subject: Greenlaw MLOA 718792
>
> CPSC,
>
> I will be submitting a MLOA request in a moment for 24 December but I wanted to submit some background information to your office before I do so. Currently, I am the PXO of Fleet Logistics Support Squadron 62. In this role I assist the Commanding and Executive officers fulfilling the mission of a 200 person naval squadron. During this MLOA I will be completing very important tasking that has been ignored due Navy funding issues, stemming from congressional budget shortfalls. Funding for orders has just been made available and I cannot defer this tasking to a future date. Additionally, I will be addressing personnel issues that must be responded to prior to sending the squadron on holiday liberty. In short, the active duty and reserve components of this command depend on my participation during this MLOA.
>
> The late submission of this request is a product of the absence of congressional funding and my continued attempts swap /

CONFIDENTIAL

drop my rotation U365 checking in on 24 Dec. I have spent dozens of hours trying to free these days on my schedule but have been unsuccessful. If you check my schedule you will notice I have MLOA on 30 Dec as well. During this period I will be cleaning up tasking needed to be complete by the end of 2014, and supporting personnel as they return from this holiday period.
>
> If you review my request you will notice I only submitted it for 24 Dec. Once I forward you my orders you will see they cover the period of 23-24 Dec. I wanted to ensure I completed rotation U373 so as not to force Delta to use another reserve pilot for this period. After I block in on the 23rd I will travel to my drill site and commence duties described above.
>
> I received notification at 1412 that my orders for the 23-24 period were funded. You will receive a forwarded copy of them once they make it through the system and my operations department sends me an email copy.
>
> If you need to confirm any of this you may call my immediate supervisor, Commander Casella, at 904-542-8557.
>
> Regards,
>
> Blair Greenlaw
> F/O   718792
>
>
>
>
>
> -----Original Message-----
> From: noreply@delta.com [mailto:noreply@delta.com]
> Sent: Friday, December 19, 2014 2:55 PM
> To: Mangle, Jim; Behnfeldt, Barry W
> Subject: [FOP10193] Military Leave Log - Autogenerated email
>
>
> primary_period: Christmas (23DEC14◆26DEC14)
> actual_dates_needed: 24 Dec
> pilot_name: Blair Greenlaw
> employee_number: 718792
> city: Jacksonville Beach
> state: Florida
> email_address: jaxbchterps@gmail.com
> phone_number: 6016042464
> fleet: 757/767
> position: B-First Officer
> base: ATL
> squadron_unit_name: Fleet Logistics Suport Squadron 62
> squadron_unit_base: Jacksonville
> branch_of_service: USN
> unit_city: Jacksonville
> unit_state: FL
> unit_phone: 904-542-8557
> rank: O-5
> billet: PXO
> co_do_xo_ops_wingco_higher: Yes
> unit_commander_rank: O-5
> unit_commander_name: CDR Casella
> unit_commander_status: Active

CONFIDENTIAL

> unit_commander_phone: 904-542-8557
> wing_name_location: FLETLOGSUPWING, FT Worth,TX
> wing_phone:
> wing_commander_rank: O-6
> wing_commander_name: CAPT Bailey
> wing_commander_status: Active
> wing_commander_phone:
> duty_performing: Executive department tasking. I sent an email further describing my duties to the CPSC.
> duty_location_performed: NAS Jacksonville
> duty_performed_another_time: No
> other_information:
> B1: Submit
>
> <greenlaw.pdf>

```
 1                 Do you see that?

 2      A.   Yes, ma'am.

 3      Q.   At this point in time, both Jim Mangie and Barry

 4 Behnfeldt were handling military leave issues; is that correct?

 5      A.   I'd have to assume so, but I don't know for sure.

 6 They both handled it at one point.  Maybe they were co-handling

 7 it at this point.  I don't recall.

 8      Q.   Would you agree that the -- the e-mail has to do with

 9 a Brigadier General Weeks and his use of military leave of

10 absence?

11      A.   Military leave of absence, and looks like sick

12 occurrences as well.  So it looks like two -- two different

13 issues were looking at.

14      Q.   I appreciate that, that clarification.  Do you have

15 an understanding -- strike that.

16                 You state at the top of the e-mail, take a look

17 at this dude's schedule for the past couple of years.  We may

18 want to ask him for orders.  He is a BG, are you mentioning

19 Brigadier General, is that the purpose of the BG?

20      A.   Yes, ma'am.

21      Q.   But he only has six or seven days of military, Mil

22 leave on his schedule, question mark.  And then you say a BG.

23                 Would have expected to see more military leave

24 for a Brigadier General; is that the reason for the question?

25      A.   Yes, ma'am.
```

1      Q.   And he might well be doing military duties on his day

2   off, you write, or more likely giving his 15 sick occurrences

3   in the past 12 months, might be doing military duty on sick

4   days and double-dipping with a twist.

5            Do you see that?

6      A.   Yes, ma'am.

7      Q.   What do you mean by that?

8      A.   I'm going to make an assumption here, it's a long

9   time ago, but it looks like there was some suspicion that one,

10  he was probably doing military leave that he was not reporting

11  to us, which would have been a policy violation.  And also, I

12  felt like it was possible or someone in my office, perhaps,

13  felt that it was possible he was doing -- he was calling in

14  sick to get paid for Delta duty days, and then doing military

15  duty on those sick days and not reporting it.

16     Q.   Is it a -- a violation of the double-dipping policy

17  to be on sick leave and perform military duty?

18     A.   I can't recall whether that -- it appears from the

19  e-mail that that was my implication, but it's been so long ago

20  I can't recall whether we required -- whether we prohibited

21  military duty on sick days or not.  Let me add a statement

22  here, though.  If -- if he was on military duty, then he

23  shouldn't be on sick and military at the same time.  If he's on

24  military, it should show military on his schedule, and he

25  shouldn't be paid sick time for that day.  So that's probably

| | |
|---|---|
| Date: | Friday, January 27 2017 11:02 AM |
| Subject: | RE: Jon Weeks, 417668 |
| From: | Frederick, Chris |
| To: | Mangie, Jim <Jim.Mangie@delta.com>; Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com>; |
| Attachments: | image001.png |

Take a look at this dude's schedule for the past couple of years. We may want to ask him for orders. He's a BG, but he only has 6 or 7 days of MIL LEAVE on his schedule? A BG? He might well be doing mil duties on days off . . or more likely, given his FIFTEEN sick occurrences in the past 12 months . . might be doing mil duty on sick days and double dipping with a twist. His specialty is going sick on White Slip days. Why we continue to allow this sort of thing, I'll never understand.

Not sure he is a candidate for a Section 15 review . . we are looking at his verifications to see if there's any reason Faulkner might question his Class 1 eligibility.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404·714·1595*

**From:** Mangie, Jim
**Sent:** Thursday, January 26, 2017 10:38 PM
**To:** Robbins, Brian <Brian.Robbins@delta.com>
**Cc:** Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com>; Goedeke, Christopher W <christopher.goedeke@delta.com>; Frederick, Chris <Chris.Frederick@delta.com>
**Subject:** RE: Jon Weeks, 417668

Will do. I'll get back with you as soon as I have more info. Thx

**From:** Robbins, Brian
**Sent:** Thursday, January 26, 2017 3:13 PM
**To:** Mangie, Jim <Jim.Mangie@delta.com>
**Cc:** Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com>; Goedeke, Christopher W <christopher.goedeke@delta.com>; Frederick, Chris <Chris.Frederick@delta.com>
**Subject:** Jon Weeks, 417668

Jim,

We are trying to track down in the CPO some questionable practices by CA Weeks. He is (or was) a Brig Gen in the AF. Can you find out his current military assignment and status, as he still occasionally uses MLOA. We can't find any assignments for him past 2014. See link to article below.

Close hold for now.

http://www.wjhg.com/home/headlines/Gen-Jon-Weeks-Relieved-of-Duties-239606681.html

Regards,

**Brian Robbins**
Chief Pilot ATL
O 404.714.9997
C 404.394.0365





PLAINTIFF'S EXHIBIT 9 8-26-21

CONFIDENTIAL

DELTA000180958

9.1

1  policy --

2      A.    The policy is that you can't be sick and on military

3  duty on the same day --

4      Q.    Okay.

5      A.    -- as I recall.  Again, long time ago, but I believe

6  that was the policy.

7      Q.    Now, as you'll understand it, a pilot could be on

8  sick pay for Delta, but could do pretty much anything else like

9  be a real estate agent, or be a dentist or be anything else.

10             There's no policy prohibiting that, right?

11     A.    Not that I'm aware of.  No, ma'am.

12     Q.    And that the e-mail that's been marked as Exhibit 8.

13  It's from you to John Weeks.  It's dated March 23rd, 2017, at

14  11:07 a.m.

15             Do you see that?

16     A.    Yes, ma'am.

17     Q.    And it's to Christopher Goedeke and Jim Mangie?

18     A.    Yes, ma'am.

19     Q.    And with respect to John Weeks, it says, decision

20  made not to pursue this, there's some shady stuff going on, but

21  not enough to warrant a Jihad.

22             Do you see that?

23     A.    Yes, ma'am.

24     Q.    Do you often use the term "Jihad" when referring to

25  investigations about military leave?

1   necessary?

2        A.   Yes, ma'am.

3        Q.   Okay.

4                  (Exhibit 11 marked for identification.)

5        Q.   BY MS. MATTER:   I've handed you what he's been

6   marked as Exhibit 11, it's been produced by Delta with a Bates

7   stamp ending in 13734 to 13737.

8                  If you'll take a moment to take a look at the

9   that three-page document, and let me know when you're finished,

10  please.

11       A.   (Witness examining document.)   Okay.

12       Q.   I'd like to begin at the back two pages first.   The

13  two pages that ended in 13736 and 13737.

14       A.   Yes, ma'am.

15       Q.   This has to do with Andrew Kamitarus.

16                  Do you see that?

17       A.   Yes, ma'am.

18       Q.   Do you see at the bottom of the page where there's an

19  e-mail to Jim Mangie and Barry Behnfeldt, dated Wednesday April

20  1st, 6:02 p.m.?

21       A.   (Witness examining document.)

22       Q.   Sorry.   It's about half way down the page?

23       A.   April 1st.   Yes, ma'am.

24       Q.   Do you see where it reads in the subject line.

25  Military leave log auto-generated e-mail?

1      A.   Yes, ma'am.

2      Q.   And do you see where this auto-generated e-mail is

3   for a period that covers Labor Day?

4      A.   Yes, ma'am.

5      Q.   Above that, there's an e-mail from Kevin Hansen and

6   it reads, Donald K. Hansen at the top.

7           Do you see that e-mail?

8      A.   Yes, ma'am.

9      Q.   And it says, talked with Andy, he is the project

10  officer for an upcoming for exercise for his unit.  I explained

11  to him that's he's gotten our attention because of his

12  excessive Mil leave use, period.  He said the unit needs him

13  for continuity, since most of squadron's pilots have been hired

14  by the airlines, period.  I explained to him that we hired him

15  with the expectation that he would be a full time employee, and

16  that he was not living up to that expectation, period.

17           Do you see that?

18     A.   Yes, ma'am.

19     Q.   Do you see the term excessive Mil leave use?

20     A.   In the same document?

21     Q.   Yes, sir.

22     A.   Yes, ma'am.

23     Q.   Do you have an understanding of what is considered

24  excessive Mil leave use?

25     A.   This is -- this is written by Kevin Hansen, and I

That's really the essential question: Can we fire a probationary pilot for low productivity because he choose to drill in his hometown instead of come to work at Delta?

I don't think we have much of a case with USERRA but I am not a lawyer.

Kevin

**From:** Frederick, Chris
**Sent:** Thursday, April 09, 2015 2:39 PM
**To:** Hansen, Donald K; Judy, Walter D; Holmes, Barry P
**Cc:** Behnfeldt, Barry W; Jones, Christopher P
**Subject:** RE: Adam Estes New Hire

Ok, got it. I will need a review or our grievances against Mr. Estes with bullet points where he's gone outside the expectations. I will elevate to DEALS if appropriate.

Is this "that case" where we want to go full tilt against an MLOA abuser?

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Hansen, Donald K
**Sent:** Thursday, April 09, 2015 2:35 PM
**To:** Judy, Walter D; Frederick, Chris; Holmes, Barry P
**Cc:** Behnfeldt, Barry W; Jones, Christopher P
**Subject:** RE: Adam Estes New Hire

Not yet, but I will. Thanks for the look.

Kevin

Chris: Adam Estes popped again on the radar. MLOA abuser from day 1 at Delta. I had Walter take a look. I recommend you elevate this to LR for review. As Barry Holmes says, "What's the point of probation?"

Jug

**From:** Judy, Walter D
**Sent:** Thursday, April 09, 2015 2:22 PM
**To:** Hansen, Donald K;
**Cc:** Behnfeldt, Barry W; Jones, Christopher P
**Subject:** Re: Adam Estes New Hire

Hey Kevin,

Chris Jones and I both agree this needs more scrutiny. I'm sure he's aware, but did you let Chris Frederick know of Adam's issues? Before we press forward with LR, we'd just like to make sure he's in the loop.

CONFIDENTIAL


PLAINTIFF'S
EXHIBIT
11
8-26-21

DELTA000013734

**11.1**

Thank you!

Best Regards,


Walter Judy
Delta Air Lines
Flight Operations Manager, NYC
On Apr 9, 2015, at 13:43, Hansen, Donald K <Donald.Hansen@delta.com> wrote:

Walter, Barry,

Please take a deep dive on Adam Estes.  He has had very poor reliability since he was hired.  He goes off probation on 3
MAY.  I recommend an FORB.  I think we may have hired a 30 year mistake.

| Comments - Pilots | | | |
|---|---|---|---|
| **Date** | **Staffin** | **Comments** | **EmployeeID** |
| 8/20/2014 9:27:45 AM | Hansen | Talked with Adam Estes. He is an F/A-18 aggressor pilot in Oceana who is obligated to fly 100 hours per year. He is flying old airplanes with poor reliability. I told Adam that his military leave usage is way outside the norm, that he is expected to drill on his off days at Delta and make himself more available. I told him he has 13 off days a month at Delta and he has to balance both careers. | 0623695 |
| 10/7/2014 4:13:28 PM | Jim West | THANKSGIVING MLOA 06-29Nov14. | 0623695 |
| 1/5/2015 7:42:0 AM | Bill Thurber | Sicked out mid rotation. Authorized to non rev (commute) home while sick | 0623695 |
| 1/7/2015 1:29:25 PM | Hansen | MLOA SUPERBOWL and PRESIDENTS DAY 31 JAN - 23 FEB 15. Key West Det. | 0623695 |
| 3/24/2015 9:05:26 AM | Hansen | Long Term Military leave. 1 year exempted orders 15 May 15 to 16 May 16. Individual augmentee mobilization. | 0623695 |
| 4/2/2015 7:19:53 AM | Jim West | Add MLOA 17 Apr 2016 | 0623695 |
| 4/9/2015 7:10:51 AM | Fink | AMP-SLOA TRIGGER: 15 Consecutive Days | 0623695 |
| 4/9/2015 1:04:59 PM | Toni Wysong | Pilot called in sick on 24MAR for trip on 25-28MAR. Pilot had MLOA on 06-08APR. Pilot has not called in OK. Pilot next trip starts on 12APR. | 0623695 |

Jug


CONFIDENTIAL

**Date:** Thursday, April 9 2015 03:32 PM
**Subject:** RE: [FOP10193] Military Leave Log - Autogenerated email
**From:** Hansen, Donald K
**To:** Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >;

Talked with Andy. He is the project officer for an upcoming exercise for his A-10 unit. I explained to him that he has gotten our attention because of his excessive Mil Leave use. He said the unit needs him for continuity since most of squadron's pilots have gotten hired by the airlines. I explained to him that we hired him with the expectation that he would be a full time employee and that he was not living up to that expectation. I don't think he cared. He just said "Ok."

Jug

-----Original Message-----
From: Behnfeldt, Barry W
Sent: Thursday, April 09, 2015 11:21 AM
To: Hansen, Donald K
Subject: FW: [FOP10193] Military Leave Log - Autogenerated email

Take a look at the whole picture on this guy and let's talk.

Vr,
BB

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393


-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com]
Sent: Wednesday, April 01, 2015 6:02 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email


primary_period: Labor Day (04SEP15�07SEP15)
actual_dates_needed: 12 May 15 - 30 Sep 15
pilot_name: Andrew Kamataris
employee_number: 892969
city: Beavercreek
state: OH
email_address: andykam99@hotmail.com
phone_number: 520 205 1209
fleet: MD88/90
position: B-First Officer
base: ATL
squadron_unit_name: 104 FS
squadron_unit_base: Warfield ANG
branch_of_service: USAF
unit_city: Baltimore
unit_state: MD
unit_phone: 410 918 6227
rank: O-4
billet: Flight CC


CONFIDENTIAL

co_do_xo_ops_wingco_higher: No
unit_commander_rank: O-5
unit_commander_name: Douglas Baker
unit_commander_status: N/A
unit_commander_phone: 443 790 2898
wing_name_location: 175WG Warfield ANG Base
wing_phone: 410 918 6227
wing_commander_rank: O-7
wing_commander_name: Scott Kelly
wing_commander_status: Active
wing_commander_phone: 410 918 6227
duty_performing: Instructor Pilot, PROJO for Exercise Saber Strike 15.
duty_location_performed: Warfield 'ANG
duty_performed_another_time: No
other_information:
B1: Submit

CONFIDENTIAL

1       A.    I have no idea.

2       Q.    Okay.  But you have any reason to dispute that --

3       A.    No, ma'am.

4       Q.    Wonderful.  Here, Mr. Hansen's saying, I told Adam

5   that his military leave usage is way outside the norm, and that

6   he is expected to drill on his off days at Delta, and make

7   himself more available.

8             Do you see that?

9       A.    Yes, ma'am.

10      Q.    And the next entry has to do with Thanksgiving and

11  then a sick -- a sick note and then MLOA over Super Bowl and

12  President's Day.

13            Do you see that?

14      A.    Yes, ma'am.

15      Q.    Do you have an understanding about the -- the drill

16  weekends being on the first weekend of the month for reservist?

17      A.    I have no idea what week of the month they did their

18  drills.

19      Q.    And then there's an entry for March 24th for

20  long-term military leave.

21            Do you see that?

22      A.    24.  Yes, ma'am.

23      Q.    And then another for adding MLOA for -- that was an

24  entry on 42?

25      A.    Yes, ma'am.

1      Q.   And it's got an SLOA trigger for the entry on

2   4/9/2015.

3                 Do you see that?

4      A.   Yes, ma'am.

5      Q.   What's an SLOA trigger?

6      A.   I'm sorry.  I can't recall.  Sick Leave of Absence,

7   SLOA, but I don't recall what a trigger was.

8      Q.   Well, it writes next to it or it reads next to it, 15

9   consecutive days?

10     A.   Yes, ma'am.

11     Q.   Do you recall there being a trigger of someone out on

12  leave for a period of time it's going to be a triggering

13  effect?

14     A.   Digging deep here.  As I recall, when a pilot reached

15  a certain number of consecutive days, we got a note or an

16  e-mail from the system and it was our habit, the chief pilots

17  office would call and just see if they were okay.  Is

18  everything okay, is there anything we can do, that sort of

19  thing.  I think that's what it was, but, again, it's been a

20  long time.

21     Q.   Understood.  That last very refers to sick leave and

22  military leave of absence.

23                 Do you see that?

24     A.   The last one.  Let me read it real quick.

25                 Yes, ma'am.  I see it.

1      Q.    Okay.  Great.  Referring -- now that we've got the

2   background of -- of what's going on with this pilot, I'd like

3   to refer you to the first page of the exhibit.

4              And if you'll just review the content of that

5   first page.

6      A.    34?

7      Q.    Yes.

8      A.    Okay.

9      Q.    It says, I will elevate to DEALS if appropriate in

10  your e-mail dated April 9th, 2015 a 2:39.

11             Do you see that?

12     A.    Yes, ma'am.

13     Q.    What is the DEALS meeting?

14     A.    DEALS was a meeting of the regional directors and

15  labor relations and O.C. Miller, where we discussed

16  high-profile cases, sometimes those cases had to do with

17  training failures.  Sometimes those cases had to do with

18  personal behavior.  Sometimes those cases had to do with some

19  sort of alcohol incident.  Sometimes it had to do with a

20  pilot's interaction with a flight attendant.  It was a broad

21  range of issues that could be discussed in DEALS, and, so, in

22  this case, it looks like I'm suggesting maybe this was

23  something that should be discussed at DEALS.

24     Q.    So -- so having -- having reviewed the comments on

25  page 2, the history, that's attached to this e-mail, what made

1   Mr. Estes -- what made Mr. Estes' rise to the level of a

2   high-profile case that would be brought up in a DEALs meeting?

3        A.   Too long ago.  I have no idea --

4        Q.   Okay.

5        A.   -- why it would rise to that level.

6        Q.   Well, the next sentence reads, is this, quote, that

7   case, end quote, where we want to go full tilt against an MLOA

8   abuser.

9             Do you see that?

10       A.   Yes, ma'am.

11       Q.   What did you mean by "full tilt"?

12       A.   I'm assuming we're answering the question you just

13  asked me.  I'm asking the team, is this a situation where we

14  feel that military leave abuse has gotten to a high enough

15  point that it needs to be discussed in DEALS.

16       Q.   So what is abusive about this document that's on

17  number two, that's forming the basis for the e-mails?

18       A.   I don't have -- I don't have the rest of the context

19  here.  I don't -- I'd have to have the rest of his schedule and

20  the entire history to know the answer to that question.  I

21  don't really know.

22       Q.   But it would be fair to say that it's -- it's his

23  military leave that's causing him to be placed on the radar and

24  on the -- on the daily DEALS meeting agenda?

25       A.   It appears from the e-mail that that is the case,

1      Q.    When you say "he's a bit of an usual person," what do

2  you mean?

3      A.    I find his appearance a little unusual.  He's -- he

4  has a shaved head, and it's not something you see that often.

5  And he has a very confident manner about him, and having grown

6  up in the F-15 world myself, I recognize that personality quite

7  well, and, so it was something that I remembered after he

8  reminded me.

9      Q.    Did you know Mr. Reep was an attorney as well as a

10 Delta pilot back in '20 -- March of 2015; isn't that correct?

11     A.    Could you repeat the question, please?

12     Q.    You were aware that Mr. Reep was an attorney as well

13 at a Delta pilot back in March of 2015; is that correct?

14     A.    I was made aware of that.  I wasn't aware prior to

15 that.

16     Q.    Understood.  What first prompted your office to

17 investigate Mr. Reep's military leave?

18     A.    I believe some of the answer to that question is in

19 these e-mails.  As I recall, Kevin Hansen, again, was -- was

20 reviewing some of the military leave for the month of April,

21 and came to me with a concern that a second opportunity at a

22 short notice military leave had popped up on Mr. Reep's

23 schedule, and that Mr. Reep was someone that Kevin had noticed

24 before, as having some unusual military leave activity, and so

25 I believe that's how Mr. Reep came to our attention.

1      Q.   When you say "unusual military leave activity," what
2   are you referring to?

3      A.   Again, there isn't a good definition for that.  It
4   could -- it could come in several forms.  Normally, it would be
5   context from the scheduling group, the pilot, the crew
6   scheduling group with a concern or a complaint about a very
7   short notice, military leave request that made it difficult for
8   them to cover a trip or required that we canceled training of
9   some kind or in some way shape or form caused a wrinkle in the
10  operation.

11     Q.   Now, would you agree that this e-mail chain was
12  precipitated due a military leave log auto-generated e-mail
13  dated March 17th, 2015, for Mr. Reep, for leave April 3rd
14  through April 6th?

15     A.   Can you repeat that question, please?  I'm sorry.  I
16  didn't understand what you were asking me.

17     Q.   No problem.  So -- so starting at the back two pages
18  of this e-mail, if you -- if you look at 12643 in the
19  bottom-right corner?

20     A.   Yes, ma'am.

21     Q.   You'll see about half way up the page, there's a
22  military leave log auto-generated e-mail.

23               Do you see that?

24     A.   Yes, ma'am.

25     Q.   And it's for leave dates for Mr. Reep, April 3rd to

1    April 6th.

2              Do you see that?

3       A.   Yes, ma'am.

4       Q.   And it appears, based on this e-mail, that Mr. Reep

5    has put in for military leave on March 17th, 2015, at 7:53 p.m.

6    for military leave that is going to take place April 3rd to

7    April 6th.

8              Would you have any reason to dispute that?

9       A.   No, ma'am.

10      Q.   And this e-mail is being sent to -- that -- that we

11   were just discussing, was auto sent to Mr. Mangie and Mr.

12   Behnfeldt.

13             Do you see that?

14      A.   Yes.

15      Q.   And then it appears that Mr. Behnfeldt sends you an

16   e-mail, which is attaching the auto-generated e-mail and also

17   -- sorry.  That he forwards you an e-mail attaching his

18   auto-generated e-mail saying, has this guy hit your radar in

19   any way previous.

20             Do you see that?

21      A.   (Witness examining document.)

22      Q.   At the bottom of page 12642.

23      A.   Yes, ma'am.  I do see that.

24      Q.   Okay.  And he's included a hyperlink that presumably

25   if -- if you click on it, it's going to show that Mr. Reep is

1    an attorney.

2                    Would you have any reason to dispute that?

3         A.    No, ma'am.

4         Q.    And then it's also got various YouTube links there.

5                    Do you see that?

6         A.    (Witness examining document.)  I don't see YouTube

7    links.

8         Q.    You see here, on the next page.  So Mr. Behnfeldt's

9    e-mail goes on to the next page, which is 1643 at the top?

10        A.    Okay.  I'm sorry.  I didn't see that.

11        Q.    No problem.

12        A.    Yes, ma'am.  I see that.

13        Q.    Okay.  And you write, not until now.  We'll take a

14   good look on March 21, 2015.

15                   Do you see that?

16        A.    Yes, ma'am.

17        Q.    Okay.  Then the next day, on Sunday, you respond to

18   Mr. Behnfeldt stating, let's think about this a little.  How

19   can we, quote, encourage more productivity.

20                   Do you see that?

21        A.    Yes, ma'am.

22        Q.    And -- and you're stating, how can we encourage more

23   productivity with respect to Mr. Reep; isn't that correct?

24        A.    I think I meant it in a more general sense there.

25   Because if you read further on, it says, we will have part-time

1  employees getting full-time pay.  So I think what I was talking

2  about there is, in general terms, are there ways that we can

3  encourage more productivity from some of our military guys.

4      Q.    Sure.  Sure.  And you'll see that e-mail directly

5  below your response of Barry e-mails says, as of late, this is

6  one of these guys who's working less than halftime with Delta

7  as a part-time employee, and getting all the benefits.

8            Do you see that?

9      A.    Yes, ma'am I see that.

10     Q.    Okay.  And does that change your response at all?

11     A.    No, ma'am.

12     Q.    Okay.

13     A.    I still think that's what meant by the "encouraged."

14     Q.    Understood.  Now, in your e-mail at 9:32 a.m., I

15 believe, and, correct me if I'm wrong.  That you're explaining

16 that you've -- you've racked your brain, you've tried to think

17 of ways to try to encourage more productivity, but as long as

18 the PWA allows schedule manipulation, then part-time employees

19 are going to be getting full-time pay.

20            Is that essentially what you were saying, sir?

21     A.    Yes, ma'am.  And I -- if I could elaborate on that a

22 little bit.  As long as the PWA allows want and schedule

23 manipulation through PCS, MLOA, sick leave abuse, et cetera.

24 So I think it was a blanket statement about the fact that the

25 PWA was very liberal in allowing pilots to manipulate their

| Date: | Thursday, April 2 2015 09:14 AM |
|---|---|
| Subject: | RE: RANDAL REEP |
| From: | Frederick, Chris |
| To: | Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >; |
| Attachments: | image001.png; image002.jpg |

Ok, here's the rest of the pay story. He was paid for one vacation day in November, then he was paid the full reserve guarantee in December even though he was NQ. His NQ status was due to his actions in October that caused him to miss his CQ training. He was scheduled for a requal in November, but he had it removed by contacting the training planner (the CPO had no knowledge of this situation). Then, he was not scheduled for requal training until the first week of January, so he took December off with pay.

Obviously, this is troubling.

Pilot has a history of unusual MLOA use, often putting his MLOA on the schedule at the last minute.
Pilot is also a lawyer in Florida with lots of UTube exposure. He has two other jobs besides Delta, military and a legal practice.
Pilot, of his own choice, allowed himself to go unqualified by missing his CQ. Again, the CPO was not involved . . all handled through training planning.
Pilot has once again (April) called in for a late notice MLOA.

A couple of comments. First, unless the CPO or some other authority has visibility into pilots manipulation of their training events, they get away with anything they want, and we never know unless we stumble into them, as in this case. I have no idea how much this is happening around the system. Why would we pay this pilot in December? He was NQ by his own doing. He had a chance to requalify in November and didn't take it. I don't think we owe him anything for December or for January up until the time he requalified. He is a part time pilot and continuously manipulates the system to not fly. He has done this for a long time. Part of the reason our block to pay numbers are so bad is that we allow this to go on without challenge. Above my pay grade, but if we worked a little harder at policing this sort of thing, and if we were willing to take a few guys to the mat, we might make a dent in those numbers. Just my opinion.

Is this worth discussion with OC? With Jim Graham? With Steve Dickson?

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Frederick, Chris
**Sent:** Monday, March 23, 2015 10:54 AM
**To:** Behnfeldt, Barry W
**Subject:** RE: RANDAL REEP

Repp allowed his CQ currency to lapse back in October . . MLOA, a Vacation, then a personal drop during his CQ window. I'm trying now to find out his pay/benefit status during that NQ window of 2 months.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Behnfeldt, Barry W
**Sent:** Sunday, March 22, 2015 9:55 AM
**To:** Frederick, Chris
**Subject:** RE: RANDAL REEP

I agree 100 percent. The one I've seen quite a bit lately is the swap board pure drop. Reep gets awarded a line worth 68:58 and gets it dropped down to 42:31. All through legal means. This month is the same story with a MLOA thrown in. I think if we

CONFIDENTIAL



PLAINTIFF'S EXHIBIT
15
8-26-21
PENGAD 800-631-6989

DELTA000012640

15.1

allow this, there should be a way that we make them payback vacation days at a minimum because he didn't earn them.

| 07488 / 027389540 | | | | JAX + 0738 | | | | | | JAX | JAX + | | JAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REEP Cr.068:58 Days Off: 17 | | | | 010:38 L050 B | | | | | | 015:54 L103 B | 14.00 | | 11 015:49 L160 B |

| | | | | | | |
|---|---|---|---|---|---|---|
| 31S | REG | | | | | 31S |
| 01S | REG | | | | | 01S |
| 02M | REG | | | | | 02M |
| 03T | REG | | | | | 03T |
| 04W | REG | | | | | 04W |
| 05T | REG | | | | | 05T |
| 06F | REG | | | | | 06F |
| 07S | REG | | | | | 07S |
| 08S | REG | | | | | 08S |
| 09M | REG | | | | | 09M |
| 10T | REG | | | | | 10T |
| 11W | REG | | | | | 11W |
| 12T | REG | | | | | 12T |
| 13F | REG | .L103 | | 0848 | | 13F |
| 14S | REG | ---- | | | | 14S |
| 15S | REG | ---- | | | 1550 | 15S |
| 16M | REG | | | | | 16M |
| 17T | REG | .L160 2 | | 1115 | | 17T |
| 18W | REG | ---- | | | | 18W |
| 19T | REG | ---- | | | 1757 | 19T |
| 20F | REG | | | | | 20F |
| 21S | REG | .L060 | | 0725 | | 21S |
| 22S | REG | ---- | | | 1840 | 22S |
| 23M | REG | | | | | 23M |
| 24T | REG | | | | | 24T |
| 25W | REG | | | | | 25W |
| 26T | REG | | | | | 26T |
| 27F | REG | | | | | 27F |
| 28S | REG | | | | | 28S |
| 01S | REG | | | | | 01S |

REMARKS:
MAX P/UP:000.00 BLK LIM:752.10 ~~PROJ CREDIT~~ ACT CREDIT:042.31 MAX RES:000.00

31JAN15          BY: RANDAL REEP               30JAN15 05:48:367
31FEB15 SCHEDULE VIEWED BY PILOT

02FEB15          BY: MICHAEL CHESTER           29JAN15 21:49:190
~~TWICING NUMBER: 00 00 FEB~~ ~~PROCEDING REST: 000 (MINS)~~

31JAN15          BY: RANDAL REEP               29JAN15 21:47:064
31JAN15 SCHEDULE VIEWED BY PILOT


* * * * * * * * * * *

31JAN15          BY: RANDAL REEP               22FEB15 10:27:118
31JAN15 SCHEDULE VIEWED BY PILOT

25FEB15          BY: DANIEL MAYS               21FEB15 15:55:549
~~TWICING NUMBER: 000 FEB~~ ~~PROCEDING REST: 000 (MINS)~~

CONFIDENTIAL

DELTA000012641

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | **O:** 404.715.1534 | **M:** 404.725.8393

 **DELTA**

**From:** Frederick, Chris
**Sent:** Sunday, March 22, 2015 9:32 AM
**To:** Behnfeldt, Barry W
**Subject:** Re: RANDAL REEP

Agreed. Let's think about this a little. How can we "encourage" more productivity? I've wracked my brain trying to think of ways, but as long as the PWA allows wanton schedule manipulation through PCS, MLOA, sick leave abuse, etc . . we will have part time employees getting full time pay. Frankly, it pisses me off.

I understand the thought process behind the PAS, but I don't give it much chance of having an impact. The guys that manipulate won't even look at it. Maybe . . just maybe . . enough guys will look at it that some sense of group accountability will grow. But I don't think that has any effect on the 10%.

Sent from Surface

**From:** Behnfeldt, Barry W
**Sent:** Saturday, March 21, 2015 10:29 PM
**To:** Chris Frederick

As of late, this is one of these guys who's working less than half time with Delta as a part time employee and getting all the benefits. Wish there was something in the contract to prevent this type of non productivity.

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | **O:** 404.715.1534 | **M:** 404.725.8393

 **DELTA**

**From:** Frederick, Chris
**Sent:** Saturday, March 21, 2015 11:10 AM
**To:** Behnfeldt, Barry W
**Subject:** Re: RANDAL REEP

Not until now. We will take a good look. Thx.
Cf

Sent from my iPhone
On Mar 21, 2015, at 10:01 AM, Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com> wrote:

    Has this guy hit your radar in any way previous?


    http://www.avvo.com/attorneys/32202- fl-randal-reep-4043515/aboutme.html

CONFIDENTIAL

DELTA000012642

15.3

https://www.youtube.com/watch?v=h0FBWc13mcg

https://www.youtube.com/watch?v=tSaN4JWwyh0

http://www.news4jax.com/news/Atty-Randy-Reep-talks-Stand-Your-Ground-Law/9693944

vr,

Barry

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | O: 404.715.1534 | M: 404.725.8393
<image001.jpg>

-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com ]
Sent: Tuesday, March 17, 2015 7:53 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: Non-Holiday Period

actual_dates_needed: 03 april - 06 april

pilot_name: randal reep

employee_number: 273605

city: Jacksonvill

state: FL

email_address: rsreep@aol.com

phone_number: 9046314346

fleet: 7ER

position: B-First Officer

CONFIDENTIAL

base: ATL

squadron_unit_name: 159 Fight Squadron

squadron_unit_base: Jacksonville IAP

branch_of_service: ANG

unit_city: Jacksonville

unit_state: FL

unit_phone: 9047417159

rank: O-5

billet: FLT/CC

co_do_xo_ops_wingco_higher: Yes

unit_commander_rank: O-5

unit_commander_name: Paul Reedy

unit_commander_status: Active

unit_commander_phone: 9047417140

wing_name_location: 125 Fighter Wing

wing_phone: 9047317140

wing_commander_rank: O-6

wing_commander_name: Brian Simpler

wing_commander_status: Active

wing_commander_phone: 9047417125

duty_performing: NORAD Alert - FS personnel are deploying overseas and I will back filling the ACA NORAD Alert. I will be on Alert this weekend at Homestead ARS Florida.

duty_location_performed: Homestead ARS Florida

duty_performed_another_time: No

other_information: I have attempted to personal drop this and attempted to drop it via Icrew swap board as well.

B1: Submit

CONFIDENTIAL

1      A.    No, ma'am.

2      Q.    There's an e-mail on Exhibit 13, first page of the

3 e-mail April 2nd, 2015, at 9:14 a.m., you write, above my pay

4 grade, but if we worked a little harder at policing this sort

5 of thing, meaning productivity, because that's what's being

6 discussed, and if we were willing to take a few guys to the

7 mat, the operative phrase --

8      A.    Let me catch up with you.

9      Q.    Sure.

10     A.    Hold on just a second.  Let me find out where you are

11 here.

12     Q.    So I'm just going to draw your attention to the

13 sentence, above my pay grade, but if we worked a little harder

14 at policing this sort of thing, and if we were willing to take

15 a few guys to the mat, we might make a dent in those numbers.

16             Do you see that?

17     A.    Yes, ma'am.

18     Q.    And then you say "worked a little harder at policing

19 this sort of thing," you're referring to the -- the low

20 productivity, correct?

21     A.    I'm referring to all of those items that I mentioned

22 on the previous page.  Use of PCS, MLOA, sick leave abuse, et

23 cetera.  So all of those.

24     Q.    Sir, you're -- you're aware that the e-mail we're

25 looking at here is Thursday April 2nd, and the e-mail that

Date: Thursday, April 2 2015 09:14 AM
Subject: RE: RANDAL REEP
From: Frederick, Chris
To: Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >;
Attachments: image001.png; image002.jpg

Ok, here's the rest of the pay story. He was paid for one vacation day in November, then he was paid the full reserve guarantee in December even though he was NQ. His NQ status was due to his actions in October that caused him to miss his CQ training. He was scheduled for a requal in November, but he had it removed by contacting the training planner (the CPO had no knowledge of this situation). Then, he was not scheduled for requal training until the first week of January, so he took December off with pay.

Obviously, this is troubling.

Pilot has a history of unusual MLOA use, often putting his MLOA on the schedule at the last minute.
Pilot is also a lawyer in Florida with lots of UTube exposure. He has two other jobs besides Delta, military and a legal practice.
Pilot, of his own choice, allowed himself to go unqualified by missing his CQ. Again, the CPO was not involved . . all handled through training planning.
Pilot has once again (April) called in for a late notice MLOA.

A couple of comments. First, unless the CPO or some other authority has visibility into pilots manipulation of their training events, they get away with anything they want, and we never know unless we stumble into them, as in this case. I have no idea how much this is happening around the system. Why would we pay this pilot in December? He was NQ by his own doing. He had a chance to requalify in November and didn't take it. I don't think we owe him anything for December or for January up until the time he requalified. He is a part time pilot and continuously manipulates the system to not fly. He has done this for a long time. Part of the reason our block to pay numbers are so bad is that we allow this to go on without challenge. Above my pay grade, but if we worked a little harder at policing this sort of thing, and if we were willing to take a few guys to the mat, we might make a dent in those numbers. Just my opinion.

Is this worth discussion with OC? With Jim Graham? With Steve Dickson?

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Frederick, Chris
**Sent:** Monday, March 23, 2015 10:54 AM
**To:** Behnfeldt, Barry W
**Subject:** RE: RANDAL REEP

Repp allowed his CQ currency to lapse back in October . . MLOA, a Vacation, then a personal drop during his CQ window. I'm trying now to find out his pay/benefit status during that NQ window of 2 months.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Behnfeldt, Barry W
**Sent:** Sunday, March 22, 2015 9:55 AM
**To:** Frederick, Chris
**Subject:** RE: RANDAL REEP

I agree 100 percent. The one I've seen quite a bit lately is the swap board pure drop. Reep gets awarded a line worth 68:58 and gets it dropped down to 42:31. All through legal means. This month is the same story with a MLOA thrown in. I think if we

CONFIDENTIAL



PLAINTIFF'S EXHIBIT
15
8-26-21
PENGAD 800-631-6989

DELTA000012640

15.1

allow this, there should be a way that we make them payback vacation days at a minimum because he didn't earn them.

| 07488 / ▓▓▓▓▓▓▓ | | | JAX ▓ + | | | | | | JAX ▓ | JAX + | JAX ▓ |
| REEP | | | 07▓▓▓▓ | | | | | | 08▓▓ | | 11▓▓▓ |
| Cr:068:58 | | | 010:38 | | | | | | 015:56 | | 015:49 |
| Days Off: 17 | | | L060 | | | | | | L103 | | L160 |
| | | | B | | | | | | B | | B |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 31S | REG | | | | | | 31S |
| 01S | REG | | | | | | 01S |
| 02M | REG | | | | | | 02M |
| 03T | REG | | | | | | 03T |
| 04W | REG | | | | | | 04W |
| 05T | REG | | | | | | 05T |
| 06F | REG | | | | | | 06F |
| 07S | REG | | | | | | 07S |
| 08S | REG | | | | | | 08S |
| 09M | REG | | | | | | 09M |
| 10T | REG | | | | | | 10T |
| 11W | REG | | | | | | 11W |
| 12T | REG | | | | | | 12T |
| 13F | REG | .L103 | | 0848 | | | 13F |
| 14S | REG | ---- | | | | | 14S |
| 15S | REG | ---- | | | | 1550 | 15S |
| 16M | REG | | | | | | 16M |
| 17T | REG | .L160 2 | | 1115 | | | 17T |
| 18W | REG | ---- | | | | | 18W |
| 19T | REG | ---- | | | | 1757 | 19T |
| 20F | REG | | | | | | 20F |
| 21S | REG | .L060 | | 0725 | | | 21S |
| 22S | REG | ---- | | | | 1840 | 22S |
| 23M | REG | | | | | | 23M |
| 24T | REG | | | | | | 24T |
| 25W | REG | | | | | | 25W |
| 26T | REG | | | | | | 26T |
| 27F | REG | | | | | | 27F |
| 28S | REG | | | | | | 28S |
| 01S | REG | | | | | | 01S |

REMARKS:
MAX P/UP:000.00 BLK LIM:752.10 ▓▓▓▓▓▓▓▓▓ ACT CREDIT:042.31 MAX RES:000.00

31JAN15          BY: RANDAL REEP                    30JAN15 05:48:367
31JAN15 SCHEDULE VIEWED BY PILOT

02FEB15          BY: MICHAEL CHESTER                29JAN15 21:49:190
▓▓▓▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓ ▓▓▓  ▓▓▓▓▓▓▓ ▓▓▓▓ ▓▓▓ ▓▓▓▓

31JAN15          BY: RANDAL REEP                    29JAN15 21:47:064
31JAN15 SCHEDULE VIEWED BY PILOT

* * * * * * * * * * * *

31JAN15          BY: RANDAL REEP                    22FEB15 10:27:118
31JAN15 SCHEDULE VIEWED BY PILOT

25FEB15          BY: DANIEL MAYS                    21FEB15 15:55:549
▓▓▓▓▓▓ ▓▓▓▓▓ ▓▓▓▓ ▓▓▓  ▓▓▓▓▓▓▓ ▓▓▓▓ ▓▓▓ ▓▓▓▓

CONFIDENTIAL

DELTA000012641

15.2

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393



**From:** Frederick, Chris
**Sent:** Sunday, March 22, 2015 9:32 AM
**To:** Behnfeldt, Barry W
**Subject:** Re: RANDAL REEP

Agreed. Let's think about this a little. How can we "encourage" more productivity? I've wracked my brain trying to think of ways, but as long as the PWA allows wanton schedule manipulation through PCS, MLOA, sick leave abuse, etc . . we will have part time employees getting full time pay. Frankly, it pisses me off.

I understand the thought process behind the PAS, but I don't give it much chance of having an impact. The guys that manipulate won't even look at it. Maybe . . just maybe .. enough guys will look at it that some sense of group accountability will grow. But I don't think that has any effect on the 10%.

Sent from Surface

**From:** Behnfeldt, Barry W
**Sent:** Saturday, March 21, 2015 10:29 PM
**To:** Chris Frederick

As of late, this is one of these guys who's working less than half time with Delta as a part time employee and getting all the benefits. Wish there was something in the contract to prevent this type of non productivity.

Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393



**From:** Frederick, Chris
**Sent:** Saturday, March 21, 2015 11:10 AM
**To:** Behnfeldt, Barry W
**Subject:** Re: RANDAL REEP

Not until now. We will take a good look. Thx.
Cf

Sent from my iPhone
On Mar 21, 2015, at 10:01 AM, Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com> wrote:

   Has this guy hit your radar in any way previous?


   http://www.avvo.com/attorneys/32202- fl-randal-reep-4043515/aboutme.html

CONFIDENTIAL

https://www.youtube.com/watch?v=h0FBWc13mcg

https://www.youtube.com/watch?v=tSaN4JWwyh0

http://www.news4jax.com/news/Atty- Randy-Reep-talks-Stand-Your-Ground-Law/9693944

vr,

Barry

**Barry Behnfeldt** | Special Assignment Supervisor | **Flying Operations** | **O: 404.715.1534** | **M: 404.725.8393**
<image001.jpg>

-----Original Message-----
From: noreply@delta.com [mailto:noreply@delta.com ]
Sent: Tuesday, March 17, 2015 7:53 PM
To: Mangie, Jim; Behnfeldt, Barry W
Subject: [FOP10193] Military Leave Log - Autogenerated email

primary_period: Non-Holiday Period

actual_dates_needed: 03 april - 06 april

pilot_name: randalreep

employee_number: 273605

city: Jacksonvill

state: FL

email_address: rsreep@aol.com

phone_number: 9046314346

fleet: 7ER

position: B-First Officer

CONFIDENTIAL

base: ATL

squadron_unit_name: 159 Fight Squadron

squadron_unit_base: Jacksonville IAP

branch_of_service: ANG

unit_city: Jacksonville

unit_state: FL

unit_phone: 9047417159

rank: O-5

billet: FLT/CC

co_do_xo_ops_wingco_higher: Yes

unit_commander_rank: O-5

unit_commander_name: Paul Reedy

unit_commander_status: Active

unit_commander_phone: 9047417140

wing_name_location: 125 Fighter Wing

wing_phone: 9047317140

wing_commander_rank: O-6

wing_commander_name: Brian Simpler

wing_commander_status: Active

wing_commander_phone: 9047417125

duty_performing: NORAD Alert - FS personnel are deploying overseas and I will back filling the ACA NORAD Alert. I will be on Alert this weekend at Homestead ARS Florida.

duty_location_performed: Homestead ARS Florida

duty_performed_another_time: No

other_information: I have attempted to personal drop this and attempted to drop it via icrew swap board as well.

B1: Submit

```
 1  marked as Exhibit 17, that ends in Bates No. 60085.

 2      A.   Yes, ma'am.

 3      Q.   When you look at that, do you see the e-mail to you

 4  and Mr. Behnfeldt from Jim Mangie, Tuesday, April 21st at

 5  3:03 p.m.?

 6      A.   (Witness examining document) Yes, ma'am.

 7      Q.   Okay.  It says first officer Reep has a long military

 8  leave of absent history.  Please look at his recent schedules,

 9  might be time to take action, again.  Please let me know your

10  thoughts.

11              Do you see that?

12      A.   Yes, ma'am.

13      Q.   Okay.  After that point, did you take a look at

14  Mr. Reep's schedules?

15      A.   I didn't personally.  I believe that I had Kevin

16  Hansen take a look at that schedule --

17      Q.   Understood.

18      A.   -- as I recall.

19      Q.   Okay.  So you assigned this task to Kevin Hansen and

20  you refer to Reep, as creep; is that correct?

21      A.   That's embarrassing.  But yes, ma'am.

22      Q.   So you would agree that's not professional behavior.

23      A.   Well, I can tell you it wasn't intentional, so it

24  could be a typo.  It could be a spell check.  I don't -- I

25  wouldn't do that.  You didn't see that anywhere in any other
```

| Date: | Tuesday, April 21 2015 03:12 PM |
|---|---|
| Subject: | RE: MLOA-F/O Reep 273605 |
| From: | Hansen, Donald K |
| To: | Frederick, Chris <Chris.Frederick@delta.com >; West, James C <James.C.West@delta.com >; Goedeke, Christophe W <christophe.goedeke@delta.com >; |
| CC: | Holmes, Barry P <Barry.P.Holmes@delta.com >; |
| Attachments: | image001.jpg |

Wilco

**From:** Frederick, Chris
**Sent:** Tuesday, April 21, 2015 3:11 PM
**To:** Hansen, Donald K; West, James C; Goedeke, Christophe W
**Cc:** Holmes, Barry P
**Subject:** FW: MLOA-F/O Reep 273605

Take another look at Creep. Let me know what you find.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*

**From:** Mangie, Jim
**Sent:** Tuesday, April 21, 2015 3:03 PM
**To:** Behnfeldt, Barry W; Frederick, Chris
**Subject:** MLOA-F/O Reep 273605

F/O Reep has a long MLOA history. Please look at his recent schedules. Might be time to take action again. Please let me know your thoughts. Thx

Captain Jim Mangie
Flight Operations
Delta Air Lines
404 715 1883-Office
404 918 5481-Cell
**▲ DELTA ✈**
AIR LINES



PLAINTIFF'S
EXHIBIT
17
8-26-21

CONFIDENTIAL

DELTA000060085

17.1

1   e-mails.  That's not something I would do, so.

2       Q.   You'd agree that the "C" on the keyboard is not near

3   the "R" on the keyboard, correct?

4       A.   I'll have to look and see.  They're within an inch of

5   each other on our keyboard.  We don't have to argue about it.

6   I'll admit that there is a C in front of his name, so.

7       Q.   Right.  Such that it spells, creep?

8       A.   And it's embarrassing to me that it's there, but it

9   wasn't intentional.

10      Q.   Do you think that your feelings about Mr. Reep

11  influenced the behavior of you and your subordinates in terms

12  of your investigations and dealings with Mr. Reep?

13      A.   No, ma'am.

14              (Exhibit 18 marked for identification.)

15      Q.   BY MS. MATTER:  If you can take a look at what's been

16  as Exhibit 18, please?  It's a two page ending in Delta Bates

17  Nos. 76790 to 76091.

18      A.   (Witness examining document.)  Okay.

19      Q.   Thank you.  On or about October 6th, 2015, you

20  actually went to visit with Mr. Reep's military unit onsite in

21  Jacksonville Florida; is that correct?

22      A.   Yes, ma'am.

23      Q.   And the purpose of your visit was to discuss Mr.

24  Reep's military duties and his military leave of absence usage;

25  is that correct?

1      A.   That was partially the reason.   Yes, ma'am.

2      Q.   What was the other reason or reasons?

3      A.   The unit had several other pilots that were Delta

4  pilots, and I wanted to be sure that the command structure

5  there realized that we weren't biased against any of their

6  pilots regardless, of what was transpiring with regard to Mr.

7  Reep, the other pilots in the units weren't going to be

8  effected.

9      Q.   Could you explain that to me?

10          What was that conversation?

11     A.   I just remember having the conversation.   I don't

12  remember a lot of the -- the details of that.   I do remember

13  that as was being one of the reasons that I went.   I -- I

14  believe that I saw that this had a lot of tentacles to it.   It

15  was much deeper than we initially expected it was going to be.

16  Mr. Reep was a Lieutenant Colonel, very high ranging in his

17  unit, likely someone that had a lot of responsibility, I didn't

18  know what those responsibilities were at the time, but I knew

19  that he was a highly responsible as a Lieutenant Colonel would

20  be, and I didn't want the unit to get the impression that Delta

21  was out to get the unit, or any of the pilots in the unit.

22     Q.   Just Mr. Reep, right?

23     A.   No, ma'am.   Were still in the middle of our

24  investigation.

25     Q.   In your e-mail dated Tuesday, October 6th, 2015, at

```
 1   7:51 p.m., it's about three quarters of the way down the page
 2   on 76790?
 3                 Can you find that e-mail or locate that?
 4        A.   Yes, ma'am.
 5        Q.   And you see that you're writing an e-mail to Jim
 6   Mangie, correct?
 7        A.   Yes, ma'am.
 8        Q.   And it's about this meeting in Jacksonville in
 9   October; is that correct?
10        A.   Yes, ma'am.
11        Q.   Okay.  Now, you talk about their being a nice group
12   of guys committed to their mission and not overly concerned
13   that we're crosswise with Reep, and then you also write, not
14   overly concerned that he had 200 plus days of duty last year.
15        A.   I'm sorry.  Let me find that.
16        Q.   Sure.
17        A.   I want to be sure I read along with you and
18   understand what you're saying.
19                 MR. MUNGER:  She's down at this one.
20                 THE WITNESS:  Down below.  I'm sorry.
21        Q.   BY MS. MATTER:  No worries.
22        A.   Okay.  So that's the first one, it's backward.  Okay.
23   I'm catching up.  I'm sorry.
24        Q.   Okay.  Have you found where I am on the page?
25        A.   Yes, ma'am.
```

1     Q.   Okay.  And really what I'd like to direct your

2  attention to is the sentence that say's not overly concerned

3  that he had 200-plus days of duty last year.

4            Are you with me on that?

5     A.   Yes, ma'am.

6     Q.   Meaning they, the unit, was not overly concerned that

7  Mr. Reep had 200-plus days of duty last year; is that correct?

8     A.   Yes, ma'am.

9     Q.   And would it be fair to say that when you're raising

10  that issue to his unit, you're -- and putting it in this e-mail

11  what you're essentially saying, is that their unit wasn't

12  concerned had he'd spent that how much time away from Delta; is

13  that correct?

14     A.   I wouldn't put it exactly that way, but that's the

15  gist of it.  200 days is a -- is a lot of military duty for a

16  pilot that is employed at an airline, or it seemed that way to

17  me, so I want to make sure that they understood that we were

18  concerned about that.

19     Q.   Why were you concerned that?

20     A.   Because he was very unproductive.

21     Q.   Would you call that excessive military leave of

22  absence?

23     A.   200 days out of the year?  Yes, ma'am.

24     Q.   So that's going to cause someone like Mr. Reep to be

25  on your radar?

1       A.   He wasn't on my radar until this started.  So I

2   didn't have him on my radar.

3       Q.   Okay.

4       A.   Until Kevin did the digging, and found out what we

5   found out.  So I wouldn't say I knew about the 200 days until

6   after the fact.  I didn't know it was going on while it was

7   going on.

8       Q.   Okay.  Understood.  But you knew he was a Lieutenant

9   Colonel, correct?

10      A.   After I visited the unit.  I may have known before

11  that, but Kevin may have reminded me that he was a Lieutenant

12  Colonel before that.  I don't recall when I became aware of

13  that.

14      Q.   But that would be important when you're considering

15  the amount of military duty that he's performing, right?

16      A.   Not necessarily.  No, ma'am.

17      Q.   Okay.  Well, remember earlier in our conversation

18  when we were talking about a pilot that was a Brigadier

19  General?

20      A.   Yes, ma'am.

21      Q.   And you were looking at his military leave and -- and

22  correct me if I'm wrong, because I'm paraphrasing.  But you

23  were surprised by the lower number of days because you would

24  have anticipated a greater number of military leave days for a

25  Brigadier General; is that fair?

1      A.    Yes, ma'am.

2      Q.    So had you taken a look at Mr. Reep's rank, that

3  might have clued you in as to what you would have thought would

4  have been a normal amount of military leave; is that fair?

5      A.    There's a lot of difference between a Brigadier

6  General and a Lieutenant Colonel.

7      Q.    Okay.

8      A.    So I wouldn't be quite doomed.  I would say these

9  really are two separate issues.  I would expect more than three

10  or four days a month from a Brigadier General because Generals

11  are very, very, few, and, very, very, busy and not necessarily

12  true about a Lieutenant Colonel in the air guard or the

13  reserve.  It's a little bit rank heavy, so there may be more

14  lieutenant colonel's in a reserve or a guard unit than there

15  might be in active duty unit.

16      Q.    Understood.  And -- and just for clarification for me

17  personally, I wasn't trying equate a Brigadier General to a

18  Lieutenant Colonel.  I understand they're -- they're different

19  ranks.

20      A.    Yes, ma'am.

21      Q.    When you visited Jacksonville with Mr. Reep's unit,

22  did you learn what their mission typically is.  Did you have a

23  greater understanding of the functions of that unit?

24      A.    Yes, ma'am.  They gave me a very good briefing about

25  what their mission was and where they were deployed and that

1  sort of thing.

2      Q.   Great.  So you had a greater understanding that they

3  had a lot of home defense alerts, deployments and local

4  training?

5      A.   Yes, ma'am.

6      Q.   You state the command structure in Jacksonville made

7  it very clear to you that they believe they cannot operate and

8  get their mission done without flexibility for their part

9  timers.

10             Did you have that understanding?

11     A.   Yes, ma'am.  It says it right here.

12     Q.   And the unit at that time, at the time of your visit,

13  was five to six pilots short, and were struggling to fill their

14  billets; is that correct?

15     A.   That's what they told me.  Yes, ma'am.

16     Q.   And you didn't have any reason to dispute that,

17  right?

18     A.   No, ma'am.

19     Q.   And that unit commanders believed that a pilot doing

20  admin duties in squadron was okay, and even necessary for them

21  to be able to keep up; is that correct?

22     A.   That was what they told me their belief was, yes,

23  ma'am.

24     Q.   Okay.  And the unit was worried that Delta forcing a

25  pilot to choose between Delta and the military, but they were

1  concerned about that because the military would lose; is that
2  correct?
3      A.   Because they know there is no choice.  That appears
4  to be what I'm saying.  Yes, ma'am.
5      Q.   And the unit made it very clear to you that Mr. Reep
6  had a lot of administrative duties, and if he was willing to
7  take on -- take work on the road or come to -- into the unit
8  after a Delta trip, the unit was happy the pay him for any time
9  he could spare; isn't that correct?
10      A.   Yes, ma'am.
11      Q.   But that violated Delta's concurrent duty policy,
12  right?
13      A.   Yes, ma'am.
14      Q.   Do you have an understanding that if Mr. Reep had any
15  sort of obligation for Delta while he was doing some
16  administrative duties or otherwise for his squadron, that they
17  would free him up.
18              Is that what they represented to you that they
19  would free him up so he could do his Delta's schedule and be
20  able to basically balance both responsibilities?
21      A.   Could you request the question, again?  I'm not sure
22  what you're asking me.
23      Q.   Sure.  I should phrase it a little bit better anyway.
24  Scratch that.  We'll come back to that that just a moment.
25      A.   Okay.

```
 1                    (Exhibit 19 marked for identification.)

 2        Q.   BY MS. MATTER:  I've given you what's been marked as

 3   Exhibit 19.   It's been produced by Delta with a Bates stamp

 4   ending in 16661 to 16663.

 5        A.   Yes, ma'am.

 6        Q.   Take a moment to review it.  I know it's a three-page

 7   document with a lot of dense materials.  Take as long as you

 8   need.

 9        A.   (Witness examining document.)  Okay.

10        Q.   Do you recognize this e-mail and the attachment as

11   your memo summarizing your visit to Mr. -- with Mr. Reep's unit

12   in Florida on October 6th, 2015?

13        A.   Yes, ma'am.

14        Q.   And the -- the e-mail was sent to Mr. Mangie and

15   Mr. Behnfeldt; is that correct?

16        A.   Yes, ma'am.

17        Q.   Well, and the e-mail also says that it was also sent

18   to O.C. Miller, Jim Graham and Chris Puckett; that correct?

19        A.   Yes, ma'am.

20        Q.   The first sentence of your e-mail says, we are

21   heavily exposed to MLOA and our exposure is growing with each

22   new hire class.  When you say, "we are heavily exposed to

23   MLOA," are you stating that -- that there's a lot of military

24   leaves of absent being taken by pilot's at Delta at that time?

25        A.   Yes, ma'am.  I'm saying that, and I think I'm saying
```

 1  more as well, because each of our new hire classes, we were

 2  hiring a lot of pilots at that point, and each of our new hire

 3  classes also had a lot of military pilots, many of whom had

 4  continuing commitments, reserve and guard commitments.

 5      Q.   Understood.

 6      A.   So not just who we had now, but also who were

 7  bringing aboard.

 8      Q.   That's fair.  Thank you, sir.  You mentioned there's

 9  already non-reporting going on and schedule manipulation.  By

10  the non-reporting going on, are you referring to -- are you

11  referring to pilots that are performing military duties but not

12  posting that on their schedule regardless of whether it's on a

13  Delta day or a day off?

14      A.   Yes, ma'am.

15      Q.   And then you mentioned schedule manipulation

16  occurring.  Now when you referenced schedule manipulation in

17  the context of this e-mail, would it be fair to say that you

18  are referring to schedule manipulation through a pilot's use of

19  MLOA?

20      A.   Yes, ma'am.

21      Q.   Then you state, we will need to decided whether

22  tightening down on our enforcement is necessary.

23           Do you see that?

24      A.   Yes, ma'am.

25      Q.   In terms of enforcement, are you referring to the

1  posting of military duty, the concurrent or double-dipping

2  policy.  Actually, I'll leave it at that, those two items?

3      A.   I'm sorry.  Can you re-ask the question?  I'm not

4  sure what asking me.

5      Q.   Sure.  So with the phase, we need to decide whether

6  tightening down on our enforcement is necessary.  When you use

7  the word "enforcement" --

8      A.   Yes, ma'am.

9      Q.   -- are you referring to the policy that pilots should

10 post military duty on their Delta schedule whether it's on a

11 day off or a day for Delta, and that the policy relating to --

12 to concurrent duty or double-dipping?

13     A.   Yes, ma'am.  I believe that's what I'm referring to.

14     Q.   Okay.  You state in the second sentence of the second

15 paragraph, the Commander JAX tried to make the point to me that

16 our double-dipping policy can have an effect of making a guy

17 choose went his Mil commitment and his Delta commitment.

18          Do you see that?

19     A.   Yes, ma'am.

20     Q.   And you go on to state, "I believe he is right to

21 some degree, but essentially if we decide to tighten down our

22 enforcement."

23          Do you see that?

24     A.   Yes, ma'am.

25     Q.   Does that mean that if you start to shine a spotlight

1   and investigate pilots, for either not posting their military

2   leave or doing what you believe is concurrent duty, then that

3   pilot will be forced into a position more -- forced into a

4   position where they have to choose between Delta and their

5   military unit?

6        A.   Yes, ma'am.

7        Q.   And the more that you tighten down those policies,

8   the more pressure you're putting on that pilot to perform less

9   military duty or retire from the military all together?

10       A.   I think the effect would be more that the pilots

11  would have to make a qualitative choice about whether to do

12  military duty or Delta duty.  That is what I was intending to

13  say.  Many of them were very engaged with their units and would

14  prefer to fly with their military unit.  My objection was to

15  doing that flying, not reporting it to us, and being paid twice

16  for the same days.

17       Q.   Let's parse that out because there's two things going

18  on here.  I understand what you're saying with respect to the

19  concurrent duty policy, but setting that aside for a moment.  I

20  asked, in part, I asked if you were referring to the

21  non-reporting aspect.

22            So focusing on that for a moment, when you use

23  the phrase "non-reporting," are you referring to Delta's policy

24  that pilots post all military days with military duty on their

25  Delta schedule?

1          A.    Yes, ma'am.

2          Q.    Okay.    Pilots must report all military duty,

3    regardless of what it's on their day off or on a day for Delta?

4          A.    Yes, ma'am.

5          Q.    And if we use Randy Reep as an example, posting

6    200-plus days of military leave puts him on the radar because

7    that's a lot of military leave, correct?

8          A.    That is a lot of military leave.    Yes, ma'am.

9          Q.    And it's "concerning," I think, was your word,

10   correct?

11         A.    Yes, ma'am.

12         Q.    So if we tighten down the policies, Delta's policies,

13   on posting military leave, then don't you think that has an

14   effect of having pilots do less military leave, if they don't

15   want to get fired from Delta?

16         A.    I don't think that we would have had the option to

17   fire those pilots.    I think it might have effected their income

18   because they would be choosing to do military duty rather than

19   Delta duty, and not getting as much of a paycheck from Delta if

20   they made that choose.

21         Q.    But in your mind, aren't you saying that a schedule

22   manipulation if a pilot does military leave, say, to the tune

23   of 200-plus hours, and therefore has low productivity for

24   Delta.

25         A.    Is there a question there?    I'm sorry.    Can you

```
 1  repeat that?
 2      Q.    Sure.   If I'm understanding correctly, you went to
 3  Florida following receipt of information that Mr. Reep had
 4  performed over 200 hours of military duty in a given year,
 5  correct?
 6      A.    Yes, ma'am.
 7      Q.    And you went down there to talk with his unit about
 8  his military leave usage, at least in part, correct?
 9      A.    Yes, ma'am.
10      Q.    And you didn't ever question that he actually
11  performed that military duty for those 200-plus hours, is that
12  correct?
13      A.    No, ma'am.
14      Q.    Okay.
15      A.    I think we believed that he had been on duty for
16  200 days.
17      Q.    Okay.   So his military leave caused -- caused you, a
18  chief pilot, to fly all the way to his unit to discuss your
19  concerns with his military leave usage, and -- and they told
20  you how short staffed they were.   Don't you think that by
21  shining a spotlight on the number of military days and them
22  talking about concurrent duty would have the effect of less
23  military leave being taken?
24      A.    For some pilots, that might have been the effect.
25      Q.    Okay.   And the rub here is that the work at the
```

1  military unit doesn't decrease, it stills needs to be done.  So

2  what that results in, is pilots not posting their military

3  leave so as to not have someone like you, sir, come to their

4  unit and ask -- ask questions about -- and raise concerns about

5  their military leave.  So it doesn't mean that work doesn't get

6  done, it's that it ultimately ends up violating this

7  double-dipping policy, right?

8      A.   I don't see the cause and effect that you're

9  referring to.  I'm sorry.

10     Q.   Okay.

11     A.   I don't understand what you're trying to get to

12  there.

13     Q.   I'll come back to that.

14     A.   Okay.

15     Q.   If a pilot is on reserve with Delta, but while on

16 with reserve with Delta, goes over to his or her military unit

17 to preform administrative duties, and is available to Delta if

18 called, why do you claim that Delta is subsidizing the guard

19 and reserve?

20     A.   That statement was a reflection of the fact that, for

21 instance, a pilot on reserve for Delta was standing by to fly

22 for Delta, waiting for a phone call or a trip assignment.  If

23 he was also working in his military unit, in many cases, not

24 all cases, but in many cases, if Delta called, he would not be

25 available to fly for Delta.  So if that were the case, then

```
 1  Delta would be de facto subsidizing that guard or reserve unit.

 2       Q.   Are you aware if Delta ever called Randy Reep while

 3  he was on reserve and he wasn't available?

 4       A.   No, ma'am.  I'm not aware.

 5       Q.   Not aware of any instance of that happening?

 6       A.   No, ma'am.

 7            MR. MUNGER:  Can we go off the record for just a

 8  second?

 9            MS. MATTER:  Sure.

10            (Off the record.)

11       Q.   BY MS. MATTER:  In your letter that's been marked as

12  Exhibit 19, you acknowledge that Mr. Reep's unit is under

13  manned; is that correct?

14       A.   That was what I was told.  Yes, ma'am.

15       Q.   And you acknowledge the -- or you summarize the

16  statements made by members of the unit that the double-dipping

17  policy creates -- puts pilots in a predicament that results in

18  them having to choose between Delta and the military; is that

19  correct?

20       A.   Yes, ma'am.

21       Q.   Such as if a pilot chooses Delta, it affects the

22  unit's the ability to complete their mission and, if a pilot

23  chooses the military it affects Delta's schedule, correct?

24       A.   Yes, ma'am.

25       Q.   Mr. Frederick, you never had to make the choice that
```

1  you were -- that you were telling these pilots they had to make

2  because you we were never a military reservist and a pilot for

3  Delta at the same time; is that correct?

4     A.   That's correct.

5     Q.   In your -- in your memo we've been discussing, you

6  mentioned that not reporting military duty is a violation of

7  USERRA and company policy.

8          Do you see that on the second page of the

9  document in the first paragraph?

10    A.   Sixth page of the document.  So the first page of the

11 memo?

12    Q.   Well, I apologize.  It would be the third page of the

13 exhibit?

14    A.   Which paragraph are we talking about though?

15    Q.   First full paragraph or first paragraph in the middle

16 of it, you'll see the sentence:  I made it clear to the 125th

17 that not reporting long periods of consecutive military duty is

18 a violation of USERRA and company policy?

19    A.   Yes, ma'am.  I see that.

20    Q.   All right.  What provision of USERRA were you

21 referring to there?

22    A.   I don't have USERRA in front of me, and I don't -- I

23 don't have that information.

24    Q.   Had you reviewed USERRA prior to writing this letter?

25    A.   I had reviewed parts of USERRA.  And had been over

1 them with a couple of guys in the office, so that we had a

2 working knowledge of that area of USERRA.

3      Q.   So it's your understanding or it was your

4 understanding at the time you wrote this letter, that USERRA

5 required service members to report long periods of consecutive

6 military duty to their employer?

7      A.   Yes, ma'am.

8      Q.   You report that the unit was not at all concerned

9 about Mr. Reep's military duties or the frequently of his

10 military duty; is that correct?

11      A.   Yes, ma'am.

12      Q.   But the unit was extremely concerned about Delta's

13 concurrent duty policy, and, again, the prohibitions like that

14 made the guard pilot choose between his guard duties and his

15 Delta duty; is that correct?

16      A.   That was my impression.  Yes, ma'am.

17      Q.   The unit even told you that the guard had no concerns

18 about their members double-dipping; is that correct?

19      A.   Did I say that in the -- in the document?  Because I

20 don't remember specifically them telling me that, but if I said

21 it in the document, that's probably what they told me.

22                MR. MUNGER:  Why don't you look at the document?

23                THE WITNESS:  I'm looking.  I'm trying to see if

24 it says that.

25                (Witness reading document.)

 1              Could you repeat the question again?  I'll see
 2  if I can find an answer here in the document.
 3      Q.   BY MS. MATTER:  The unit even told you that the guard
 4  has no concerns about the guard's double-dipping; is that
 5  correct?
 6      A.   Yes, ma'am.
 7      Q.   The unit even said that if Reep was at the unit, as
 8  long as he was not performing alert duties, he would be able to
 9  respond and fly for Delta; is that correct?
10              MR. MUNGER:  Are you asking him about the
11  document or just general?
12              MS. MATTER:  Yes.
13              THE WITNESS:  Which yes is that?  Is that a
14  question about the document or is that a question about what
15  they told me in the unit?
16      Q.   BY MS. MATTER:  Did they tell that you in the unit?
17      A.   I -- again, that was a long time ago.  If I put it in
18  the document, this was fresh in my memory whenever I wrote it,
19  so if it's in the document, my guess is that's exactly what
20  they told me.  I see a sentence here that may answer your
21  question for you -- for me.
22      Q.   And what sentence is that, sir?
23      A.   He had been in the squadron doing administrative
24  duties, had he been in the squadron doing administrative duties
25  and called out on Delta reserve, he would likely have been able

1  to respond and fly for Delta.  So if I wrote that, that's what

2  they told me.

3      Q.   All right.  Thank you, sir.  I'm done with that

4  document for now.

5      A.   Okay.

6      Q.   In the last paragraph of the document we've been

7  looking at, it reads:  They were clearly supporting Lieutenant

8  Colonel Reep and the op's group commander made the comment,

9  quote, I don't know how we would have gotten the mission done

10 without him, end quote.  Given how many days Reep has drilled

11 the past years, over 200, I'm not surprised at that statement.

12 If we are completing for Reep's time Fang versus Delta, they

13 are obviously winning.

14             Did you draft that statement, sir?

15     A.   Yes, ma'am.

16     Q.   And it was based on your conversation with Reep's

17 unit --

18     A.   Yes, ma'am.

19     Q.   -- on or only October 6th, 2015?

20     A.   Yes, ma'am.

21     Q.   Who in Reep's unit made this comment.

22             Do you remember?

23     A.   The ops group commander.

24     Q.   Do you recall what the -- what the military unit told

25 you they were doing during the period of time that they needed

1  Mr. Reep's time, what was their mission at that point in time?

2     A.   We had a discussion about their various missions and

3  I remember in general terms but I don't remember specifics.

4     Q.   Okay.

5                (Exhibit 20 marked for identification.)

6     Q.   BY MS. MATTER:  I've just handed you what's been

7  marked as Exhibit 20.  It's bearing Delta Bates stamp 8116 to

8  8117 -- apologies.  8116 through 8122.

9                If you'll take a look at that document, and let

10  me mow when you finish your review.

11     A.   Last page 122?

12     Q.   Yes, sir.

13     A.   Okay. (Witness examining document.)

14                MR. MUNGER:  Is the last one 112?

15                THE WITNESS:  122.

16                MR. MUNGER:  I think I just heard 12.

17                MS. MATTER:  121.  You're missing 122.

18                MR. MUNGER:  Thank you.

19                MS. MATTER:  No problem.

20                THE WITNESS:   (Witness examining document.)

21  Okay.

22     Q.   BY MS. MATTER:  Reserve pilots have 11 to 12 days off

23  each month; is that correct?

24     A.   In a general sense, yes, ma'am.  It varies greatly

25  but that's an average.

1      Q.    On those days off, is the pilot required to be

2 available?

3      A.    No, ma'am.

4      Q.    Do they need the answer their phone if Delta calls?

5      A.    Could we back up for just a second because there's

6 two different kinds of pilots.  There's regular pilots and

7 there's reserve pilots, so I need to be sure I know what you're

8 asking me here.

9            So if we could go back to the first question

10 here.  Are you asking me does a reserve pilot have 11 or

11 12 days off, the answer is most months, yes, ma'am.

12     Q.    Thank you.  On those days off, is the reserve pilot

13 required to be available to Delta?

14     A.    On an X day?

15     Q.    If that's what it's called.

16     A.    Yes, ma'am.  No, ma'am.  They are not required to be

17 available.

18     Q.    Okay.  So those days off, is the reserve pilot

19 required to answer their phone if Delta calls?

20     A.    No, ma'am.  You're -- you're asking me questions

21 about scheduling, and I'm not an expert on those.  So I may say

22 I don't know occasionally because I -- the rules on this stuff

23 change frequently, and I don't want to say, yes, and the answer

24 really is, no.

25     Q.    Understood.  So the pilot -- the reserve pilot could

```
 1   be in the remote wilderness on a hunting trip on his day off;
 2   is that correct?
 3        A.   Theoretically.  Yes, ma'am.
 4        Q.   And the reserve pilot could fly his or her own
 5   personal airplane and be away from their domicile; is that
 6   correct?
 7        A.   On an X day?
 8        Q.   Yes.
 9        A.   Yes, ma'am.
10        Q.   So why does it matter if a pilot goes to their
11   squadron to work on their days off?
12        A.   I can't answer your question.
13        Q.   Could you tell me why you couldn't answer it?
14        A.   Well, pilots do go to their squadron and work on --
15   on their off days.  Most of them report it as military duty,
16   some don't.  There's a policy that says they're to report all
17   military duty days.  It doesn't say only on reserve days or
18   only on call days.  It says they have to report all military
19   duty days.
20        Q.   So is the answer because it's policy?
21        A.   Yes, ma'am.  I guess so.
22             (Exhibit 21 marked for identification.)
23             THE WITNESS:  Can I clarify an answer?
24        Q.   BY MS. MATTER:  Sure.
25        A.   Because I've given it a little bit more thought, and
```

```
 1  I'm not sure that what I answered was absolutely correct.  The
 2  question, was does a pilot have to answer his phone on an X day
 3  and the answer is, no.  That doesn't mean he is unaccountable
 4  to the company for that X day.  If the company does get in
 5  touch with him, they can assign him a trip on an X day; they
 6  can assign him a trip that -- that transcends his reserve days
 7  and goes into his X days, so he's not completely off the hook
 8  on an X day.  He doesn't have to answer the phone or check his
 9  schedule in the computer, but he's not necessarily off the
10  hook.
11      Q.   Okay.  Thank you.
12      A.   Yes, ma'am.
13      Q.   If you'll take a look at what's been marked as
14  Exhibit 21, please.
15      A.   (Witness examining document.)  Okay.
16      Q.   Did you draft this e-mail?
17      A.   Yes, ma'am.
18      Q.   And you sent it to Christopher Goedeke?
19      A.   Yes, ma'am.
20      Q.   What was -- what was Mr. Goedeke's position at that
21  time?
22      A.   Assistant chief pilot.
23      Q.   Did he report to you?
24      A.   Yes, ma'am.
25      Q.   It appears that in December of 2015, you began
```

1  drafting a letter to deliver to Reep regarding Delta's

2  investigation into his military duties; is that correct?

3      A.   I don't have the documents, and so I don't know.   The

4  subject is NOI comments, Notice of Intent comments.

5      Q.   Yes.

6      A.   I think what you see here is Chris Goedeke's feedback

7  to me on a draft notice of intent that I had started putting

8  together.

9      Q.   Understood.   Thank you.

10     A.   Yes, ma'am.

11     Q.   You mentioned and wrote in earlier e-mails that

12 Reep's productivity with Delta is what brought him to your

13 attention; is that correct?

14     A.   One of the things that brought him to our attention.

15 Yes, ma'am.

16     Q.   Yet in this e-mail to inform Goedeke, you mentioned,

17 we probably don't want to discuss his lack of productivity,

18 because he's used the available processes to drop his trips

19 legally.

20          Do you see that?

21     A.   Yes, ma'am.

22     Q.   You also say, there are a lot of pilots who drop

23 their Delta work so can play golf or run a side business, and

24 we don't want comparisons to them in the grievance.   That might

25 play right into his hand, challenging our double-dip policy.

1                     Do you see that?

2        A.   Yes, ma'am.

3                     (Exhibit 22 marked for identification.)

4        Q.   BY MS. MATTER:  Okay.  I've handed you what's been

5   marked as Exhibit 22, it contains Delta Bates No. ending in

6   55673 to 55677.

7                     Please take a moment to look at this document,

8   and let me know when you've completed your review.

9        A.   (Witness examining document.)  Okay.

10                    (Exhibit 23 marked for identification.)

11       Q.   BY MS. MATTERS:  You signed and sent this letter to

12   Mr. Reep dated 12/11/2015; is that correct?

13       A.   Yes, ma'am.

14       Q.   The notes starting at Delta 55675 are your thoughts

15   on next steps; is that correct?

16       A.   55675.  Yes, ma'am.

17       Q.   What percentage of time does the average pilot call

18   in sick?

19       A.   I have no idea.

20                    (Exhibit 23 marked for identification.)

21       Q.   BY MS. MATTER:  I've just handed you a document

22   that's been marked as Exhibit 23, produced by Delta with Bates

23   stamp 26125 to 26127.

24                    If you'll take a moment, and take a look at this

25   documents, please?

1       A.    (Witness examining document.)  Okay.  Just let me

2    make sure I have everything, Exhibit 23 also has the very same

3    thought.

4       Q.    Yes, sir.

5       A.    Okay.  I thought I was seeing double here.  Okay.

6       Q.    Have you had an opportunity to review the document?

7       A.    Yes, ma'am.

8       Q.    On the page -- the second page of the document and

9    it's the third bullet in --

10      A.    Second page or third page?

11      Q.    Second page of Exhibit 23.

12      A.    I'm sorry.  We're on 23.

13      Q.    Yes.  Third bullet in.

14      A.    Third bullet in?  Okay.

15      Q.    It reads:  Though his sick leave usage is relatively

16   low, there are several days over those three years, where he

17   showed sick on his DBMS scheduled, but had unreported military

18   duty on the same day.

19                 Do you see that?

20      A.    Yes, ma'am.

21      Q.    If you don't know what normal sick leave usage is,

22   how do you know if Reep's is high or low?

23      A.    I probably knew at the time.  This was six years ago.

24   I can't tell you today what it is.  I wouldn't have said that

25   in the document though if I haven't checked it against the

1  numbers, so I knew at the time.

2      Q.   What -- what would you have referred to in order to

3  determine the numbers?

4      A.   Good question.  I probably would have gotten in touch

5  with Jason Zawislak, who kept tabs on those kinds of numbers,

6  in great detail, and I may have called Jason, to say, hey,

7  what's the average or what's the average in Atlanta or who

8  knows how I asked it but, I probably got that information -- or

9  may be Chris Goedeke got it for me.  I don't know.  I don't

10 know the answer.

11     Q.   Okay.  Do you know why Delta has the concurrent duty

12 policy?

13     A.   I didn't develop the policy.  I wasn't around when it

14 was implemented.  I only was responsible for exercising it.  I

15 could speculate, but, no, I don't know why we have that policy.

16     Q.   Okay.  On Exhibit 22, at page 55676, I'll direct your

17 attention on the bottom of the page.  The first sentence in the

18 last paragraph reads:  My recommendation is that we terminate

19 Reep.

20             Was it your recommendation that Delta terminate

21 Mr. Reep due to his violations of the concurrent duty policy?

22     A.   There were a lot of reasons that were all part of the

23 investigation.  I think they're spelled out in this document in

24 a couple of places.  I can look through them and read them to

25 you, if you'd like, but there are a number of areas where he

1  violated Delta policy, even though he understood it completely.

2  And I would say that was probably the overriding reason why I

3  felt we would terminate him.

4        Q.    What was the overriding reason?

5        A.    Okay.  I'm read them to you.  He has 361 days of

6  military duty over the last three years that was unreported and

7  unaccounted for on his schedule, violation of Delta policy.  He

8  admitted that he has a habit of not reporting MLOA extent

9  beyond the past three years.  We didn't even look prior to

10  that, so there must have been more, he admitted that there --

11  that there was.

12              Next bullet.  Although the sick leave usage is

13  relatively low, there are several days over those three years

14  where he showed sick on his DBMS schedule but had unreported

15  military duty on the same day, so he took money from his sick

16  bank, for the sick day, but he also had military duty on that

17  day, so that's a -- that's a double-dip.  He has a long

18  standing habit of posting late notice MLO that causes him to

19  drop many trips on his DBMS line.  A lot of pilots did that, so

20  that's not something that someone should be terminated for, so

21  I wouldn't include that.

22              The next bullet down, during the year he had two

23  extend periods greater than 30 days consecutive military duty

24  that were unreported.  He had not gone off payroll, and so he

25  accrued unearned vacation days, collected 401(k) matching funds

1  he was not due, and accrued unearned profit sharing during

2  those unreported long-term military leave events. He has a

3  total of five unreported periods military duty greater than

4  30 days in the past three years. In my opinion, Mr. Reep was

5  fully aware that he was supposed to let us know about long

6  term, military leave and choose not to do that.

7      Q.   Did you make the final decision to terminate

8  Mr. Reep?

9      A.   No, ma'am.

10     Q.   Who did?

11     A.   I'm confident that that decision was made by Jim

12 Graham.

13     Q.   What --

14     A.   I didn't -- I wasn't in the room when Jim made that

15 decision, but I suspect that it was Jim's decision to make.

16 There were probably a lot of people involved besides Jim.

17     Q.   When you say, "I'm confident it was Jim Graham," what

18 makes you confident that it was Jim Graham?

19     A.   He signed the letter.

20     Q.   Do you know who drafted the termination letter to

21 Mr. Reep?

22     A.   No, ma'am.

23     Q.   Did you share the memo that you drafted regarding the

24 October 6th, 2015, visit to Mr. Reep's unit to Mr. Graham to

25 identify to him -- strike that.

1              Did you share your memo following your

2    October 6th, 2015, meeting with Mr. Reep's unit, so that he

3    could consider it in any mitigating factors before terminating

4    Mr. Reep?

5        A.    Did I share that with Jim Graham.

6        Q.    Correct.

7        A.    I don't know who all I sent it to.  I'm confident

8    that I sent it to O.C. Miller, he was my boss.  But other than

9    O. C. and probably labor relations, Chris Puckett, I don't

10   recall who got the memo.

11       Q.    Did you have a conversation with Jim Graham about

12   your visit to Mr. Reep's unit?

13       A.    I don't recall.

14       Q.    Can you recall a time when you recommended the

15   termination of someone at Delta and that recommendation was not

16   followed?

17       A.    Yes, ma'am.

18       Q.    On how many occasions?

19       A.    Probably a couple of times, but I was in the chief

20   pilot's office for over four years, and we terminated 12 to 15

21   people during that time period.  There were others that we

22   choose not to terminate.  I'm confident that there were

23   recommendations by me that were not followed up on, both ways.

24   But I can't tell you how many there were.

25              (Exhibit 24 marked for identification.)

```
 1                    MS. MATTER:  Could you mark this as well,
 2    please?
 3                    (Exhibit 25 marked for identification.)
 4        Q.   BY MS. MATTER:  I've handed you what's been marked as
 5    Exhibit 24, it bears Delta Bates stamps 5524 through 5526.  And
 6    Exhibit 25 which has a Bates stamp of 35316.
 7                    If you'll take a movement to review those two
 8    documents.
 9                    MR. MUNGER:  I didn't know if these were page 2
10    of that.
11                    MS. MATTER:  Yes.  Thank you.
12                    MR. MUNGER:  Sure.
13        Q.   BY MS. MATTER:  And 6217.
14        A.   (Witness examining document.)  Okay.
15        Q.   You did end up finding that Mr. Reep took periods of
16    military leave from Delta; is that correct?
17        A.   I'm sorry.  Could you ask that questions again?
18        Q.   I said, you did end up finding that Mr. Reep took
19    periods of military leave from Delta; is that correct?
20        A.   Yes, ma'am.
21        Q.   Throughout the investigation, the Reep investigation,
22    Mr. Reep always asserted that if he was on a reserve day with
23    Delta; he was always able to make a Delta assignment if a
24    flight was assigned; is that correct?
25        A.   Yes, ma'am.
```

1    Q.    Including on days when he was performing military

2  duty, but did not take actual military leave; is that correct?

3    A.    Military-- can you repeat that question?

4    Q.    Sure.  And I'll phrase it a little slightly

5  different.

6    A.    Okay.

7    Q.    Throughout the Reep investigation, Mr. Reep always

8  asserted that if he was on a reserve day with Delta, he was

9  always able to make a Delta assignment if a flight was assigned

10 including on days he was performing military duty but did not

11 take actual military leave; is that correct?

12   A.    Yes, ma'am.

13   Q.    In your investigation, you never found an in instance

14 of when Mr. Reep didn't show up for a Delta assignment; is that

15 correct?

16   A.    Not that I recall.  I don't see that documented

17 anywhere and it would have been.

18   Q.    Okay.

19   A.    So I think the answer is, no.

20   Q.    And you never found an instance when he was late for

21 an assignment; is that correct?

22   A.    I don't know.

23   Q.    Well, that would have been in your report, correct?

24   A.    Not necessarily.  Late for assignment is a pretty

25 common occurrence, pilots sign in late for a trip on occasion.

**Date:** Tuesday, October 6 2015 11:20 AM
**Subject:** RE: Reep
**From:** Frederick, Chris
**To:** Mangie, Jim <Jim.Mangie@delta.com>;

No deals today. Tomorrow. I don't know if OC and Jim want to talk about Reep in deals. I think it has risen above.

There are some sticky issues associated with how we handle this one, Jim. The command structure in Jax made it very clear to me they believe they cannot operate and get their mission done without flexibility for their part timers. They are about 5 or 6 pilots short there and struggling to fill their billets. They are committed and strung out. They believe a pilot doing administrative duties in the squadron and also on Delta reserve is OK, and even necessary for them to be able to keep manning. They worry about us forcing a pilot to choose between Delta and the military . . because they know there is no choice.

Reep is a Flight Commander and has a lot of administrative duties. He does a lot of paperwork. If he is willing to take paperwork with him on a layover, or if he is willing to get home from a trip or a simulator and go into the squadron, they are happy to pay him for the work. That is directly opposed to our policy.

It is clear that he knew our policies and chose to violate them. Simpler is going to his JAG to see if they can provide more information to me about the days in question . . was he in the squadron doing paperwork or was he in Homestead sitting alert? He double-dipped hundreds of days and may have violated our sick policy . . I asked for what kind of duty Reep was doing on those days, as well. We will need to decide whether to take actions against him for those violations.

We will need to discuss this. I'm putting a report together.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Mangie, Jim
**Sent:** Tuesday, October 06, 2015 11:11 AM
**To:** Frederick, Chris
**Subject:** RE: Reep

Sounds good. Is this a topic of discussion at Deals today? Thanks

**From:** Frederick, Chris
**Sent:** Tuesday, October 06, 2015 7:51 AM
**To:** Mangie, Jim
**Subject:** RE: Reep

I'm putting a brief report together. Simpler is going to his JAG to see if they can release information on what duties Reep had on specific days to help me fill in whether he was flying or working a desk, etc. . Nice group of guys, committed to their mission, not overly concerned that we are cross-wise with Reep. Not overly concerned that he had 200+ days of duty last year. More to follow.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Mangie, Jim
**Sent:** Monday, October 05, 2015 10:14 PM
**To:** Frederick, Chris
**Subject:** Reep



PLAINTIFF'S EXHIBIT
18
8-26-21
PENGAD 800-631-6989

CONFIDENTIAL

DELTA000076790

18.1

How did your discussion go today? Thx

DELTA000076791

18.2

| Date: | Tuesday, October 6 2015 12:46 PM |
|---|---|
| Subject: | Discussion with 125th FW, Florida Air National Guard.doc |
| From: | Frederick, Chris |
| To: | Mangie, Jim <Jim.Mangie@delta.com>; Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >; |
| Attachments: | Discussion with 125th FW, Florida Air National Guard.doc |

Already sent to OC, JG, Puckett. A couple of observations and comments.

We are heavily exposed to MLOA, and our exposure is growing with each new-hire class. Anecdotally, we know there is already non-reporting going on and schedule manipulation occurring. We will need to decide whether tightening down on our enforcement is necessary.

Reserve and Guard units depend heavily upon their part-timers. The command in JAX tried to make the point to me that our double-dipping policy can have the effect of making a guy choose between his Mil commitment and his Delta commitment. I believe he is right to some degree, but especially if we decide to tighten down on our enforcement. Delta cannot afford to subsidize the Guard and Reserve. That said, if a reserve pilot is doing administrative duties in the squadron, is he not available to Delta? Could be we don't want to start down that slippery slope.

Reep has violated our policies in substantial ways. I don't know yet whether he would have been available to us on all those reserve days when he was doing mil duties or not. I've asked for info from the unit, but they may or may not provide it. I am confident he knew the rules and knowingly violated them. I'm also confident that we cannot allow widespread behavior similar to Reep's. Imagine if just half our mil guys decided to do what Reep has done. I think we may have to take actions to protect ourselves. We can see what non-enforcement has done in the sick-leave area.

CF



PLAINTIFF'S
EXHIBIT
19
8-26-21
PENGAD 800-631-6989

CONFIDENTIAL



**Captain Chris Frederick**
Director and Chief Pilot
ATL

**Delta Air Lines, Inc.**
Dept. 062
P.O. Box 20706
Atlanta, Georgia 30320

# MEMO

To:      Flight Ops MLOA oversight group
Date:    6 October, 2015
Re:      DEALS Issue, Randy Reep

### Report on discussions with command in 125th Fighter Wing, Florida Air National Guard

On Monday, 5 October, I went down to Jacksonville to meet with Colonel Brian Simpler, Wing Commander of the 125th and discuss our problem with Randy Reep. Also in attendance in the meeting were his Ops Group Commander and another LCol pilot whose exact position in the unit was unclear to me, but who had an interest in the Reep situation. This is a report on our discussion and my assessment of their take on our Reep problem. We met for about 2 hours, and Colonel Simpler also gave me a brief on the unit's structure and various commitments and missions. It is my overarching opinion that the FANG is focused on getting their mission accomplished successfully and not overly concerned with what has transpired between us and LCol Reep except in how the outcome may affect other Delta pilots in their unit and the Reserve/Guard structure in general.

I explained the situation, how and why the initial investigation began, what the company expects from Reserve and Guard pilots with respect to reporting their activities, and why the magnitude of LCol Reep's violations concerned us. I made it clear LCol Reep has been on the radar for a long period of time. I offered to provide detail, numbers, dates, etc . . They listened and asked a few questions, but they did not take any notes and did not ask for detail. I asked Col Simpler to provide clarification on what kind of duties LCol Reep was engaged in on specific days. He is going to his JAG to see what he can provide. Once I hear from him, and assuming his JAG feels the information is releasable, I will ask for information on days when Reep was on reserve but says he would have been available if we called, and I will take a look at days Reep called in sick.

Here is the situation as I see it:

- The unit is undermanned by about 5 or 6 pilots. With a cadre of only 30 or so, they are stretched thin to meet all the commitments they have. Half the unit's aircraft have been deployed to Europe (3 different places) since April. That means the other half of the aircraft and pilots have been pulling the Homestead alert duty for that time. That is a 7-day-a-week mission, and pilots rotate in for 3 day weekends or 4 days during the week. The weekend guys get credited with an extra day as a comp. With the unit 5 or 6 pilots short, it does not surprise me full time orders were cut for Reep . . he was needed to man the Homestead operation with half

the unit deployed. That does not excuse the fact that he did not tell us about this until after the orders were in place. But since he has a history of long stretches of consecutive duty that he has not reported (5 stretches of >30 days consecutive in the past 3 years) I suspect he was going to handle this one the same way and not report it to us. I made it clear to the 125th that not reporting long periods of consecutive military duty is a violation of USERRA and company policy.

- The unit depends heavily upon their troops to work on off days and part time to get their mission accomplished. LCol Reep is a flight commander and they say has a heavy administrative load. For that reason, they were not concerned that he'd claimed numerous mil work days while on duty at Delta in the simulator or out flying a rotation. They didn't ask for dates, times, or any other specifics. They simply weren't concerned.

- They were concerned that we have a policy against "double dipping". Col Simpler made it clear they rely upon these part-timers to get the mission accomplished and that prohibitions like that make a Guard pilot choose between his Guard duties and his Delta duties. There could be significant financial ramifications for a pilot who is unwilling to work part time. He, like Reep, reminded me many of the Guard troops have outside jobs and as long as they are getting those jobs done, the Guard has no concerns about double dipping.

- I asked about Reep's comment that while he was on Delta reserve and also working mil days, had Delta called, he'd have been available. The Guard agrees Reep could not simply walk away from alert duty in Homestead, and if he was committed to a flying schedule for the Guard even there in JAX, he would not be available to Delta. However, they also made the point again that Reep has a heavy administrative load. Had he been in the Squadron doing administrative duties and called out on Delta reserve, he would likely have been able to respond and fly for Delta. I asked for corroboration of what kind of duties Reep was doing on specific days, and Col Simpler said he'd see what the JAG had to say about release of such information. I mentioned that much of it was likely available via FOIA, but that we'd prefer the more expeditious method of informal cooperation. More to follow on this.

- They were clearly supporting LCol Reep, and the Ops Group Commander made the comment . . "I don't know how we would have gotten the mission done without him." Given how many days Reep has drilled in the past year (over 200), I'm not surprised at the statement. If we are competing for Reep's time . . FANG versus Delta . . they are obviously winning.



**From:** Frederick, Chris
**Sent:** Friday, October 16, 2015 11:10 AM
**To:** Behnfeldt, Barry W
**Cc:** Puckett, Chris
**Subject:** RE: Reep Accounting for next week



*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*

**From:** Behnfeldt, Barry W
**Sent:** Wednesday, October 14, 2015 2:17 PM
**To:** Frederick, Chris
**Cc:** Puckett, Chris
**Subject:** Re: Reep Accounting for next week



Vr,
Barry

**Barry Behnfeldt | Special Assignment Supervisor | Flying Operations | O: 404.715.1534 | M: 404.725.8393**

[x]

On Oct 14, 2015, at 12:46, Frederick, Chris <Chris.Frederick@delta.com> wrote:

> Putting packages together so we can sit down and do a thorough review of where we stand.
>
> A question has come up that probably needs a decision. We have accounted for all of Reep's "double dip" days . . those are defined as RES days when he also had an undeclared military drill day or days when he was working for Delta flying a trip or in the simulator and also had an undeclared military drill day. The idea is he'd be paid by Delta and by the military on the same day, prohibited by Delta policy.
>
> Here's the question. Reep bid RES for 17 of the 36 months we've looked at. In a given RES month, a pilot is actually on reserve for 18 or 19 days, and he has 11 or 12 X days. Mil guys are required to report mil duty on any day of the month, whether it is a day actually on reserve or an X day. For the purposes

2

PLAINTIFF'S
EXHIBIT
20
8-26-21
PENGAD 800-631-6989

DELTA000008116

20.1

ORIGINAL

FLORIDA AIR NATIONAL GUARD
FLORIDA AIR NATIONAL GUARD (ACC)
SAINT FRANCIS BARRACKS
P.O. BOX 1008
SAINT AUGUSTINE FL 32085-1000

Personnel Data - Privacy Act of 1974 (5 USC 552a)

ORDER NUMBER Z6M84S
FILING SEQUENCE NUMBER A-0000275                          27 Mar 2015
AROWS TRACKING NUMBER 5872760

1. TYPE OF DUTY / AUTHORITY: ACTIVE GUARD RESERVE OCCASIONAL DEPLOYMENT
   BACKFILL TOUR (TITLE 32) 32 USC 328 & 502(F) & ANGI 36-101

2. PURPOSE: FULL-TIME DUTY (AGR TOURS ONLY)

3. This is a pay only order. Travel authorization will be completed using
   Defense Travel System (DTS).

4. ADDRESSING:
   LT COL, REEP, RANDAL, S, ███████████, C21CFL3V, INCENTIVE PAY A
   1270 MAYFAIR ROAD, JACKSONVILLE, FL 32207-0000, UNITED STATES

5. ITINERARY: 01 Apr 2015 - 15 Jul 2015 (105 WK-DY, 106 CAL-DY)
   Transportation:
   FROM: 1270 MAYFAIR ROAD, JACKSONVILLE, FL 32207-0000, UNITED STATES
   TO: 159 FIGHTER SQ, 14300 FANG DRIVE, JACKSONVILLE, FL 32218-7933,
   UNITED STATES
   RETURN TO: 1270 MAYFAIR ROAD, JACKSONVILLE, FL 32207-0000, UNITED
   STATES

6. Members are required to keep in their possession, at all times, a copy
   of this order.

7. Upon approval and by order of federal command authority, ANG AGR Airmen
   will convert to Title 10 U.S.C. Section 12301(d)/12302/12304 status (as
   appropriate) when performing duty, OCONUS or CONUS, supporting Active
   Duty requirements for operations/missions/exercises. This AGR order
   will be amended to include any Title 10 duty for 30 or more consecutive
   days and reflect the Title 10 authority, Title 10 duty inclusive dates,
   named mission and GMAJCOM being supported. Less than 30 consecutive
   days of Title 10 duty will be captured on AF IMT 1299, Officer's
   Certificate of Statement of Service and certified by the commander.
   While performing duty under Title 10 orders, AGR Airmen are assigned to
   the 201st MSS, ANGRC, Joint Base Andrews, MD for ADCON purposes and
   subject to the Uniform Code of Military Justice (UCMJ). AGR Airmen will
   revert to their original Title 32 U.S.C. Section 502(f) status upon
   completion of this period. This policy applies to both CONUS and OCONUS
   duty supporting current or future operations. By order of the
   commander, ANG AGR Airmen will convert to Title 10 U.S.C. 10147 status
   when performing duty OCONUS for training purposes.

   MILITARY INFORMATION:

   UMD PAS CODE: C21CFL3V, UMD FUNCTIONAL ACCOUNT CODE: 31B100, UMD
   POSITION NUMBER: 1C0977005, UMD AUTHORIZED GRADE: LT COL, UMD DUTY
   TITLE: FIGHTER PILOT, CAFSC: 11F3F, PAFSC: S11F3F, DAFSC: 11F3F, TAFMS:
   13 Years 0 Months 18 Days

   ADDITIONAL INFORMATION:

   RESOURCE IDENTIFICATION CODE: 34, ANG ACTIVE DUTY STATUS CODE: U,
   GAINING COMMAND: ACC, UNIT OF ASSIGNMENT: 159 FIGHTER SQUADRON, POC:
   MSGT ARIANNA CLINE, DSN: 641-7820, COMM:904-741-7820

Scanned by CamScanner

DELTA000008117

20.2



A-0000275, FLORIDA AIR NATIONAL GUARD, 27 Mar 2015

8.  TAFMSD: 020314

9.  By Order of the Secretary of the Air Force, or delegated official, ANG aircrew members performing alert duty will automatically convert to Title 10 U.S.C. 12301(D) when accomplishing an operational federal mission. Members will revert to their original/previous status upon completion of such duty.

10. This Occasional AGR Tour is for an AGR Deployment Backfill with inclusive dates 27 Mar 2015 to 28 Jul 2015. HRO has reviewed the CED orders.

11. A certified pay order with all associated modifications must be submitted to Military Pay within 5 working days after the end of the tour for payment processing.

12. Member may be entitled to ACIP

13. Member may be entitled to BAH I

14. Officer is entitled to BAS type N

15. Department of Defense organizations requiring order validation, please contact the AROWS Help Desk at 1-240-612-7717 (DSN: 612-7717).

16. This is a pay only order. Travel authorization will be completed using Defense Travel System (DTS).

17. CERTIFICATION: WUC: 95 Perstempo: Q
    Fund Cite:
    P&A    5753850 565 4156 54305/06 380100

    CIC: n/a
    Estimates: Travel: $0.00 Per Diem: $0.00 Rental Car: $0.00
    Certifying Official: /s/ MSGT TONYA R MCEADY /s/

18. AUTHENTICATION:

    BY ORDER OF THE GOVERNOR / COMMANDING GENERAL


    /S/OFFICIAL/S/

    JAMES O. EIFERT, BRIG GEN, FLANG          DISTRIBUTION: F
    Commander

Scanned by CamScanner

DELTA000008118

20.3

STATEMENT OF DUTY

(   )   Member without dependents

(   )   Member with dependents

(   )   Married to Military Member
        Status of Spouse (if known)
        (   )  a.   Spouse on Active Duty or AGR status
        (   )  b.   Spouse not on Active Duty
        (   )  c.   Active duty/AGR spouse claims child/children for BAH
                    purposes

(   )   Member occupied contract/government quarters for this period of
        duty.

(   )   Member did not occupy contract/government quarters for this period
        of duty.

I certify,

1) I reported for duty at _____ hours on _____ and/or was
                            (time)              (date)

   released from duty at _____ hours on _____
                          (time)               (date)

2) I was the owner/operator of the Privately Owned Vehicle (POV)
   (Use DD Form 1351-2 for claims other than POV MILEAGE.)

   Start Date _____   End Date _____   POV Miles _____

_____
Printed Name of Member

_____
Signature of Member

_____
Printed Name of Attendance Certifying Official
(Duty Supervisor)

_____
Signature of Attendance Certifying Official
(Duty Supervisor)

Page   3 of   3

Scanned by CamScanner

DELTA000008119

20.4



```
NAME: REEP, R S                      0273605 LOCKER: -          05/19/15  15:52:48
LOT: 0260 ATL 7ER B 01APR14 / 01MAY14     SECND-CAT:                   /
MU:
  DTE OR DES OFF  STAT  ROT1 D R1 STAT  ROT2 D R2 RPT1 RPT2 E/L R CALL BLKN DTE
  01T    REG                                                                 01T
  02W    REG                                                                 02W
  03T    REG           .8946                 1610                            03T
  04F    REG           ----                                                  04F
  05S    REG           ----                                                  05S
  06S    REG           ----                                           1919   06S
  07M    REG                                                                 07M
  08T    REG                                                                 08T
  09W    REG           .8548 2               0630                            09W
  10T    REG           ----                                                  10T
  11F    REG           ----                                           1410   11F
  12S    REG                                                                 12S
  13S    REG                                                                 13S
  14M    REG                                                                 14M
  15T    REG                                                                 15T
  16W    REG                                                                 16W
PF1--PF2---PF3---PF4---PF5--PF6--PF7--PF8---PF9---PF10--PF11--PF12--PF13--PF14
NFY MOTS  QUIT  COPY  MOTV  REST LEAV SICK  PHON  WHI    YELS  A/P   TNG   VTSS
COMMAND: _____   ROT: _____   DATE: ___ APR              IN B/W  000.00
```

```
NAME: REEP, R S                      0273605 LOCKER: -          05/19/15  15:52:58
LOT: 0260 ATL 7ER B 01APR14 / 01MAY14     SECND-CAT:                   /
MU:
  DTE OR DES OFF  STAT  ROT1 D R1 STAT  ROT2 D R2 RPT1 RPT2 E/L R CALL BLKN DTE
  17T    REG                                                                 17T
  18F    REG                                                                 18F
  19S    REG                                                                 19S
  20S    REG                                                                 20S
  21M    REG                                                                 21M
  22T    REG                                                                 22T
  23W    REG                                                                 23W
  24T    REG                                                                 24T
  25F    REG           .8584                 0635                            25F
  26S    REG           ----                                                  26S
  27S    REG           ----                                           1524   27S
  28M    REG                                                                 28M
  29T    REG                                                                 29T
  30W    REG                                                                 30W
  01T    REG                                                                 01T
REMARKS:
PF1--PF2---PF3---PF4---PF5---PF6--PF7--PF8---PF9---PF10--PF11--PF12--PF13--PF14
NFY MOTS  QUIT  COPY  MOTV  REST LEAV SICK  PHON  WHI    YELS  A/P   TNG   VTSS
COMMAND: _____   ROT: _____   DATE: ___ APR              IN B/W  000.00
```

DELTA000008120

```
NAME: REEP, R S                    0273605 LOCKER: -           05/19/15  18:11:06
LOT: 0250 ATL 7ER B 02MAY14 / 01JUN14      SECND-CAT:                   /
MU:
 DTE OR DES OFF   STAT  ROT1 D R1 STAT  ROT2 D R2 RPT1 RPT2 E/L R CALL BLKN DTE
 02F    REG                                                                 02F
 03S    REG                                                                 03S
 04S    REG                                                                 04S
 05M    REG                                                                 05M
 06T    REG                                                                 06T
 07W    REG                                                                 07W
 08T    REG                                                                 08T
 09F    REG                                                                 09F
 10S    REG       P/D                                                       10S
 11S    REG                                                                 11S
 12M    REG                                                                 12M
 13T    REG                                                                 13T
 14W    REG                                                                 14W
 15T    REG       ////  .B537                                              15T
 16F    REG       ////  ----                                               16F
 17S    REG       MLOA  ----                                               17S
PF1--PF2---PF3---PF4---PF5---PF6---PF7---PF8---PF9---PF10--PF11--PF12--PF13--PF14
NFY  MOTS  QUIT  COPY  MOTV  REST LEAV SICK  PHON  WHI    YELS  A/P   TNG   VTSS
COMMAND: _____  ROT: _____  DATE: ___ MAY               IN B/W  000.00

NAME: REEP, R S                    0273605 LOCKER: -           05/19/15  18:11:15
LOT: 0250 ATL 7ER B 02MAY14 / 01JUN14      SECND-CAT:                   /
MU:
 DTE OR DES OFF   STAT  ROT1 D R1 STAT  ROT2 D R2 RPT1 RPT2 E/L R CALL BLKN DTE
 18S    REG                                                                 18S
 19M    REG                                                                 19M
 20T    REG                                                                 20T
 21W    REG                                                                 21W
 22T    REG                                                                 22T
 23F    REG                                                                 23F
 24S    REG                                                                 24S
 25S    REG                                                                 25S
 26M    REG                                                                 26M
 27T    REG                                                                 27T
 28W    REG                                                                 28W
 29T    REG                                                                 29T
 30F    REG       APD   B625                                               30F
 31S    REG       ////  ----                                               31S
 01S    REG       ////  ----                                               01S
REMARKS:
PF1--PF2---PF3---PF4---PF5---PF6---PF7--PF8--PF9---PF10--PF11--PF12--PF13--PF14
NFY  MOTS  QUIT  COPY  MOTV  REST LEAV SICK  PHON  WHI    YELS  A/P   TNG   VTSS
COMMAND: _____  ROT: _____  DATE: ___ MAY               IN B/W  000.00
```

DELTA000008121

of accounting for "double dipping", do we want to count X days as double paid? I believe the answer is yes . . a pilot gets a pro rata share of his pay for each day of the month in a reserve month, both for X days and for days on reserve. If a pilot has MLOX on his schedule over an X day, he does not get that pro rata share of the reserve pay for that day. However, I think there could be an argument made that he would not have been actually flying a trip for Delta on an X day, so those days should not be counted against him for the purposes of "double dip" accounting.

I'll have it analyzed both ways. Just be advised that the total number of "double dip" days goes down considerably if we do not count X days in a reserve month.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404·714·1595*

3

DELTA000008122

20.7

**Date:**    Friday, December 4 2015 01:04 PM

**Subject:**  NOI comments

**From:**    Frederick, Chris

**To:**      Goedeke, Christopher W <christopher.goedeke@delta.com>;

Ref your questions and comments:

1) No, we probably do not want to discuss his lack of productivity. Although that irritates us, he's used the available processes to drop his trips legally, and his lack of productivity has little to do with his mil duties .. although we all know he's dropped his Delta work so he can work more days in his unit, there are a lot of pilots who drop their Delta work so they can play golf or run their side business. We don't want comparisons to them in the grievance. That might play right into his hand in challenging our double-dip policy.

2) Potential irregularities before 2012 .. good question. Do we suggest he's probably been engaging in similar behavior in previous years? I think it would be safe to say he probably has, and also safe to say he wouldn't likely challenge our assertions since he would have to show proof he hadn't been doing it before to make his case. That would likely reveal that he HAS been doing it for many years. I'll run that one by LR for consideration.

3) I'm going to leave the lack of cooperation and resulting inference of guilt to the lawyers to wordsmith. That's why I left that note in the draft .. they will need to decide how to characterize that issue. Yes, I am certain we will bring that to light, but no, I'm not sure how you do so from a legal perspective. My stash of Perry Mason is bone dry on that one ..

4) I don't know whether Michalakis will testify or not. I suspect LR will want him to. He will be reluctant, I'm sure. Imagine yourself .. being asked to testify against a squadronmate from the past. You know he's a horse's rear end, but he's a squadronmate .. tough to ask a guy to do that. I guess it's a "fighter pilot" thing, but the bonds are strong, even with the guys who don't deserve it. We will see.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*



CONFIDENTIAL

DELTA000062721

21.1

 **DELTA**

**Captain Chris Frederick**
Director and Chief Pilot -
Atlanta

**Delta Air Lines, Inc.**
P. O. Box 20706
Atlanta, GA 30320

December 11, 2015

First Officer Randal Reep
1270 Mayfair Road
Jacksonville, Florida 32207

Dear First Officer Reep,

As you are aware, the Company is engaged in an on-going investigation related to your use of military leave and sick leave. In full compliance with USERRA, Delta pilots are entitled to unpaid military leave, and Delta's long-standing military leave of absence policy provides "that a pilot performing military duty (on orders, UTA drill periods, proficiency training periods, flight training periods, or any other duty that is paid by the state or the U.S government) is ineligible to perform Delta duties in any capacity (except while on military terminal leave)." To date, the Company's investigation has determined that you were on military leave performing duties for the 125th Fighter Wing, Florida Air National Guard for 75 days during the period between April, 2012 and July, 2015, while at the same time remaining in an active status and representing to Delta that you were available for flight duty or had called in sick. This constitutes a violation of Delta policy, from which you received significant pay and benefits that you would not have received had you complied with the policy. You have claimed your military duty during this period was "administrative" in nature and that you were always readily available to meet your Delta obligations regardless of your simultaneous performance of military duties.

In an effort to fully assess your claim, the Company asked you to provide information demonstrating that all of your military duty during this period was "administrative," which you have not done. The Company has discussed the matter with your unit leadership and requested copies of your flight logs, orders, and a description of your duties for days you were simultaneously on military and Delta duty. Your unit has informed us that the requested information was compiled and on (or about) November 23 and was provided directly to you to turn over to the Company. You have since indicated that you do not intend to provide any of this information to Delta and have refused to do so stating that, in your view, this information is "not relevant." The information compiled by your unit as to the nature of your military duties, where you were when you were performing military duty, and your flight logs is reasonably necessary for the Company to evaluate your claim that you were always available to perform flight duty for Delta or properly categorized as sick.

I understand that you are currently on military duty through December 11th. Upon your return, you are directed to report to my office at 1000 on December 14. At that time, I will give you a final opportunity to turn over an un-redacted copy of the requested information that your unit has prepared and provided to you. I have confirmed that on November 16-30, 2012 you were on an



PLAINTIFF'S
EXHIBIT
22
9-26-21

authorized Known Leave of Absence and not military leave, so we do not need to see the requested information on those days but do need to see un-redacted information for the remaining 75 days. If you choose not to provide all of the information requested, the investigation will proceed. You should be advised that you may decline to provide evidence and information in response to reasonable requests. That will, however, provide grounds for drawing an adverse inference and the Company may conclude that the information prepared by your unit demonstrates that your availability claim is not accurate and that you were not actually sick on days you called in sick.

Sincerely,

Captain Chris Frederick
ATL Regional Director & Chief Pilot


cc:    Captain Hartley Phinney, Chairman – MEC Contract Administration Committee
       Captain Hermon Cook, Chairman – Council 44 LEC
       Captain Jim Graham, Vice President – Flying Operations & Chief Pilot
       Captain O.C. Miller, Managing Director – Flying Operations
       Personnel file

CONFIDENTIAL

Reep – Thoughts on next steps

A review of the past three years of F/O Reep's military duty versus DBMS schedule is complete, and we've interviewed him to get his reaction to what we found there. I'd like to briefly discuss where I think we are and what I recommend for next steps.

Our review found that Reep has routinely broken the rules regarding posting of MLOA on his schedule as well as several other FOM policies and USERRA rules.

- He has 361 days of military duty over the past 3 years that was unreported and unaccounted for on his schedule.
- He admitted that his habit of not reporting MLOA extends beyond the past 3 years, so it is safe to assume a similar level of unreported activity going back some number of years. He has been with his Florida Air National Guard unit since before he was hired by Delta in 1998. He has a long negative history of contact with management and his Chief Pilot over his habits regarding his use of MLOA.
- Though his sick leave usage is relatively low, there are several days over those 3 years where he showed sick on his DBMS schedule but had unreported military duty on the same day.
- He has a long-standing habit of posting late notice MLOA that causes him to drop many trips on his DBMS line. As a result, he is very unproductive as a line pilot. For instance, a review of the period of July '14 to June '15 shows he flew 12 rotations and 97 block hours. During that same one year period he had 4 weeks of vacation (91 hours of pay) and 340 hours credit (including a few days of sick leave) paid. He worked 85 days of unposted military leave as well as 132 days of posted mil leave, for a total of 217 days of military duty. Although the number of unreported days of military duty during that year seems to be down from previous years, it is our assessment (see below) that he had no intent to report the extended period of military duty he just finished, so without our intervention, the number of unreported days of military duty from the past year would likely have been just as high as in previous years.
- During the past year he had two extended periods (>30 days consecutive) of military duty that was unreported. He did not go off payroll and so he accrued unearned vacation days, collected 401K matching funds he was not due, and accrued unearned profit sharing during those two unreported long term military leave events. He has a total of 5 unreported periods of military duty of >30 days in the past 3 years.
- He did not complete the return to work process for any of these >30 day absences, and technically he had no re-employment rights for any of them since he did not follow the required process.
- At the end of the past one year period, he had a third long term (a total of 106 days consecutive) military duty commitment that likely would have also gone unreported had we not caught him doing it. It extended from April through mid-July. He had bid as a regular line holder for April and May before we noticed what was going on and began our investigation. Again, our assumption is that he would have continued his past behavior and either given us short notice MLOA to drop those April and May trips or used P/D and/or sick to get out of the flying PBS assigned.

CONFIDENTIAL

It is probably clear by now the nature and massive size of F/O Reep's violation of policy and procedure. During our interview he denied nothing, including the unreported long term military sequences and the sick leave abuse. He claimed to be ignorant of and otherwise unaware of the FOM requirements and of the processes spelled out in the Mil Leave Guide. He claimed he was just like any other Delta pilot with outside employment, with a routine of doing his other job on days off or whenever his Delta work allowed. He claimed he would have been available to Delta on any of the many Delta reserve days on which he also shows military duty. There were a number of days where he was actually flying a Delta trip or in the simulator training and also showed working for his FANG unit. He claimed they would not question whether he'd deserved a pay day from them on those occasions. He claimed the type of work he occasionally did for them allowed him to work from home or telecommute, or perhaps he went into the squadron after arriving home from his trip. On those occasions where his DBMS schedule shows him sick, perhaps he was sick and couldn't fly for Delta, but he was OK to do work in the squadron.

In short, he took full responsibility for all of the violations, but he showed no remorse for the results. He objected to the term "double-dipping" and claimed he was just another pilot with an outside job. He was incensed that we even suggested anything was wrong with his behavior.

So, what should our response be?

We have a great number of pilots with reserve and guard commitments, all of whom are subject to our policies and guidelines. Although there is the occasional violation of the rules or policy, most of these pilots attempt to follow protocol and guidelines. Delta has supported these pilots and their units in an exemplary fashion, support that has been recognized by the Department of Defense. We have our rules and guidelines for a good reason. If those rules and guidelines are not enforced, we will have a huge problem.

We are hiring pilots at a rapid rate, and many of them also have military commitments, so our exposure is getting larger. We have seen some problems with the new-hires, their priorities, and following the guidelines. We assume many of these pilots "learn" how to comply with USERRA and our policies from other Delta pilots in their squadrons or military pilots that they know from other units. We cannot afford to be loose with our enforcement. There is too much to lose, too great a potential for significant impact on the Delta operation. Imagine if every military/Delta pilot only flew 97 hours for us next year while working 217 days in his unit.

Mr. Reep, though he claims ignorance, has a very long history of conflict with Delta Flight Ops management over his military duty. He has access to all of the policy and guidelines we publish, and with his history, I don't find it credible that he'd be ignorant of anything. He is a lawyer (a third job he holds down), and it is very likely he is fully aware of USERRA and Delta policy.

My recommendation is that we terminate Reep. If he chooses to retire instead, we only allow that if he agrees to restitution for the past 3 years of abuse. Our conservative estimate of fraudulent payments he has received over that period is $95,000. That includes "double dipping" on unreported military duty days, undue vacation days paid, undue profit sharing paid, sick leave abuse, and other odds and ends.

CONFIDENTIAL

If he chooses to contest this, we may be able to invoke USERRA with regards to re-employment rights and terminate him on those grounds. Any of the unreported >30 day stretches of military duty could be considered a long term MLOA in which he did not apply for re-employment.

He is a civilian lawyer and comes across as "the smartest guy in the room" type of personality, so I would anticipate significant objection and perhaps legal action with any form of discipline we impose. We will want LR and Corporate Legal to review prior to any decision we make.

CONFIDENTIAL

| **Date:** | Monday, August 10 2015 02:35 PM |
| **Subject:** | FW: Reep |
| **From:** | Miller, OC |
| **To:** | Frederick, Chris <Chris.Frederick@delta.com>; Behnfeldt, Barry W <Barry.W.Behnfeldt@delta.com >; Bennett, Ryan M <Ryan.M.Bennett@delta.com>; Zawislak, Jason E <Jason.E.Zawislak@delta.com>; Mangie, Jim <Jim.Mangie@delta.com>; |
| **Attachments:** | Reep discussion and recommendation.docx |

Thanks Chris, very well done.

Ryan/Jason, can't remember who is setting up this meeting but please get it done and include some of this background information in the invitation.

Thanks.

**From:** Frederick, Chris
**Sent:** Monday, August 10, 2015 2:14 PM
**To:** Miller, OC; Behnfeldt, Barry W
**Subject:** Reep

OC,
In preparation for a meeting outside of DEALS, here is a synopsis and recommendation. This week has two days of leadership meetings and no DEALS, so I'm sure the earliest we might meet would be next week. I will make myself available. Can I assume you will schedule the meeting, or do you want me to take it for action? We will likely want Puckett and corporate legal, as well as Jim Graham.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*



PLAINTIFF'S
EXHIBIT
23
8-26-21

CONFIDENTIAL

DELTA000262124

23.1

Reep – Thoughts on next steps

A review of the past three years of F/O Reep's military duty versus DBMS schedule is complete, and we've interviewed him to get his reaction to what we found there. I'd like to briefly discuss where I think we are and what I recommend for next steps.

Our review found that Reep has routinely broken the rules regarding posting of MLOA on his schedule as well as several other FOM policies and USERRA rules.

- He has 361 days of military duty over the past 3 years that was unreported and unaccounted for on his schedule.
- He admitted that his habit of not reporting MLOA extends beyond the past 3 years, so it is safe to assume a similar level of unreported activity going back some number of years. He has been with his Florida Air National Guard unit since before he was hired by Delta in 1998. He has a long negative history of contact with management and his Chief Pilot over his habits regarding his use of MLOA.
- Though his sick leave usage is relatively low, there are several days over those 3 years where he showed sick on his DBMS schedule but had unreported military duty on the same day.
- He has a long-standing habit of posting late notice MLOA that causes him to drop many trips on his DBMS line. As a result, he is very unproductive as a line pilot. For instance, a review of the period of July '14 to June '15 shows he flew 12 rotations and 97 block hours. During that same one year period he had 4 weeks of vacation (91 hours of pay) and 340 hours credit (including a few days of sick leave) paid. He worked 85 days of unposted military leave as well as 132 days of posted mil leave, for a total of 217 days of military duty. Although the number of unreported days of military duty during that year seems to be down from previous years, it is our assessment (see below) that he had no intent to report the extended period of military duty he just finished, so without our intervention, the number of unreported days of military duty from the past year would likely have been just as high as in previous years.
- During the past year he had two extended periods (>30 days consecutive) of military duty that was unreported. He did not go off payroll and so he accrued unearned vacation days, collected 401K matching funds he was not due, and accrued unearned profit sharing during those two unreported long term military leave events. He has a total of 5 unreported periods of military duty of >30 days in the past 3 years.
- He did not complete the return to work process for any of these >30 day absences, and technically he had no re-employment rights for any of them since he did not follow the required process.
- At the end of the past one year period, he had a third long term (a total of 106 days consecutive) military duty commitment that likely would have also gone unreported had we not caught him doing it. It extended from April through mid-July. He had bid as a regular line holder for April and May before we noticed what was going on and began our investigation. Again, our assumption is that he would have continued his past behavior and either given us short notice MLOA to drop those April and May trips or used P/D and/or sick to get out of the flying PBS assigned.

CONFIDENTIAL

It is probably clear by now the nature and massive size of F/O Reep's violation of policy and procedure. During our interview he denied nothing, including the unreported long term military sequences and the sick leave abuse. He claimed to be ignorant of and otherwise unaware of the FOM requirements and of the processes spelled out in the Mil Leave Guide. He claimed he was just like any other Delta pilot with outside employment, with a routine of doing his other job on days off or whenever his Delta work allowed. He claimed he would have been available to Delta on any of the many Delta reserve days on which he also shows military duty. There were a number of days where he was actually flying a Delta trip or in the simulator training and also showed working for his FANG unit. He claimed they would not question whether he'd deserved a pay day from them on those occasions. He claimed the type of work he occasionally did for them allowed him to work from home or telecommute, or perhaps he went into the squadron after arriving home from his trip. On those occasions where his DBMS schedule shows him sick, perhaps he was sick and couldn't fly for Delta, but he was OK to do work in the squadron.

In short, he took full responsibility for all of the violations, but he showed no remorse for the results. He objected to the term "double-dipping" and claimed he was just another pilot with an outside job. He was incensed that we even suggested anything was wrong with his behavior.

So, what should our response be?

We have a great number of pilots with reserve and guard commitments, all of whom are subject to our policies and guidelines. Although there is the occasional violation of the rules or policy, most of these pilots attempt to follow protocol and guidelines. Delta has supported these pilots and their units in an exemplary fashion, support that has been recognized by the Department of Defense. We have our rules and guidelines for a good reason. If those rules and guidelines are not enforced, we will have a huge problem.

We are hiring pilots at a rapid rate, and many of them also have military commitments, so our exposure is getting larger. We have seen some problems with the new-hires, their priorities, and following the guidelines. We assume many of these pilots "learn" how to comply with USERRA and our policies from other Delta pilots in their squadrons or military pilots that they know from other units. We cannot afford to be loose with our enforcement. There is too much to lose, too great a potential for significant impact on the Delta operation. Imagine if every military/Delta pilot only flew 97 hours for us next year while working 217 days in his unit.

Mr. Reep, though he claims ignorance, has a very long history of conflict with Delta Flight Ops management over his military duty. He has access to all of the policy and guidelines we publish, and with his history, I don't find it credible that he'd be ignorant of anything. He is a lawyer (a third job he holds down), and it is very likely he is fully aware of USERRA and Delta policy.

My recommendation is that we terminate Reep. If he chooses to retire instead, we only allow that if he agrees to restitution for the past 3 years of abuse. Our conservative estimate of fraudulent payments he has received over that period is $95,000. That includes "double dipping" on unreported military duty days, undue vacation days paid, undue profit sharing paid, sick leave abuse, and other odds and ends.

CONFIDENTIAL

If he chooses to contest this, we may be able to invoke USERRA with regards to re-employment rights and terminate him on those grounds. Any of the unreported >30 day stretches of military duty could be considered a long term MLOA in which he did not apply for re-employment.

He is a civilian lawyer and comes across as "the smartest guy in the room" type of personality, so I would anticipate significant objection and perhaps legal action with any form of discipline we impose. We will want LR and Corporate Legal to review prior to any decision we make.

CONFIDENTIAL

Message

| | |
|---|---|
| **From:** | Frederick, Chris [/O=DELTA/OU=NORTH AMERICA/CN=RECIPIENTS/CN=887531] |
| **Sent:** | 5/24/2016 11:24:09 AM |
| **To:** | Graham, Jim [/O=DELTA/OU=North America/cn=Recipients/cn=980244]; Miller, OC [/O=DELTA/OU=North America/cn=Recipients/cn=493882] |
| **CC:** | Puckett, Chris [/O=DELTA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=951756] |
| **Subject:** | RE: Reep review |



*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-741-1595*

**From:** Frederick, Chris
**Sent:** Friday, May 20, 2016 2:34 PM
**To:** Graham, Jim; Miller, OC
**Subject:** Fw: Reep review

OC and Jim,
No need to read through all of this long email trail, I will synopsize. Puckett asked me to review the documents Reep provided at the Initial Hearing and to review the notes from that meeting. I was to comment upon anything there that we didn't know about before that perhaps mitigates the punishment or otherwise might impact your decision.

The flying records and the memo provided by his unit confirm dates he was working in the squadron or flying F-15 aircraft during the 3 year period of investigation. Of particular interest to us are the days he was on reserve for Delta. I cannot discern from the documents whether the sorties were out of Homestead and under the alert commitment, whether they were out of Jacksonville, or whether they were from some deployed location. He has made an argument that he could have met his Delta reserve commitment had he been assigned a DAL trip, even if he was on the flying schedule. Since we don't know where he was flying from or to, it is impossible to definitively comment on whether his argument is vaild or not. If he was on alert or deployed somewhere, I find it far fetched to think he could have gotten to ATL to fly for Delta, even with a 12 hour leash.

One of the documents seems to prove he did not fly an F-15 sortie while out sick from Delta. I take that document at face value. He probably did not fly an F-15 sortie while sick from Delta. However, he did do military duty, unreported, on days he was sick from Delta. Those days were improperly paid out of his sick bank. Had he reported the mil duty, he would not have received sick bank pay.

There were a number of days these new documents show he was engaged in military duty that were not reported in the original orders and activity sheet he gave us at the beginning of the investigation. Summing it up, there were 4 additional "concurrent duty" days, 17 total days of military activity


PLAINTIFF'S
EXHIBIT
24
8-26-21

not previously known to us (not reported to us as MLOA), and one other important situation you should be aware of.

On September 8, 2012, the records show he flew an F-15 sortie and a Delta trip on the same day. DBMS records show the trip was assigned off reserve, and it had a sign in time of 7:23 the morning. It flew one leg to San Diego, layover of 20 hours, then three legs the next day. I don't believe it is possible he flew an F-15 sortie on the first day of that trip. So, what does it mean? Either the records his unit provided are inaccurate or our DBMS records are inaccurate. Since the "official records" he gave us at the beginning of the investigation were later contradicted by the memo his unit provided and he brought to the Initial Hearing, I believe the unit's records to be the ones in error. Col Bell signed the memo, and it includes a statement that says " . . the undersigned fully attests to the validity of all information herein". That is troubling.

So, big picture, the records of his military duty, much of which was unreported to us over the 3 year period, show a repeated pattern of non-compliance with our FOM policy and also non-compliance with USERRA guidelines regarding long term (greater than 30 consecutive days) military duty. Nothing in what he provided changes any of that, and it actually adds to the totals we previously noted in the NOI.

As for the emails from Winford and the comments about Mangie and Tate, his argument seems to be that he was led to believe he should not report MLOA duties to us . . he was using too much of it and we'd rather not know. I talked to Winford during the investigation, and he said in no uncertain terms that was never his message to Reep. His message was that Reep seemed to be prioritizing his military career over his Delta career and that he was very unproductive. Reep uses colorful language and a lawyer's "cross examination" prospective to parse what Winford said to him. It comes across as an excuse to me, not a vaild counter argument. He admits he routinely violated the FOM and USERRA. It is very possible our enforcement of our policy has been lax in the past, but his claimed ignorance of the policies are no excuse, in my mind. Puckett has suggested you might want to speak to Winford and Tate face to face prior to your decision. If you want to do so, I can help with scheduling that meeting.

I spoke to Winford, Popeye, and Mangie about their experiences in dealing with Reep while they were the CP in ATL. He has been a problem for everyone all along. Until the in-depth investigation was completed, the level of non-compliance was not fully understood. I think we know now what we are dealing with.

Standing by for orders or to discuss if you feel the need. I don't see any reason to mitigate the termination.

CF

Sent from Surface

**From:** Chris Frederick
**Sent:** Tuesday, May 17, 2016 3:04 PM
**To:** Chris Puckett

Chris,

DELTA000005525



*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*

**From:** Frederick, Chris
**Sent:** Tuesday, May 17, 2016 2:36 PM
**To:** Goedeke, Christopher W
**Subject:** RE: Reep review

Synopsis below.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*

**From:** Goedeke, Christopher W
**Sent:** Tuesday, May 17, 2016 2:22 PM
**To:** Frederick, Chris
**Subject:** FW: Reep review

Comments in RED below

Chris Goedeke
Assistant Chief Pilot
Atlanta Chief Pilot's Office
O - 404-714-9473
C - 404-780-2879

**From:** Frederick, Chris
**Sent:** Tuesday, May 17, 2016 1:14 PM
**To:** Goedeke, Christopher W
**Subject:** Reep review

DELTA000005526

Reep Timeline

April '15

ACP Kevin Hansen came to me with a concern. LCol Reep had just dropped a second trip in Apr short notice for MLOA. Kevin said he was aware of Reep from previous interactions and was concerned about. We had been experiencing a lot of friction with MLOA, and our solution had become to ask pilots for orders if a questionable MLOA showed up on their schedule and they'd been of concern before. I told Kevin to ask LCol Reep for orders.

Kevin contacted LCol Reep to ask for orders covering those two MLOA events.

April 28, 2015, LCol Reep's orders arrived in the CPO. We were surprised because they were "long term" orders (Florida Air National Guard orders, number Z6M84S) that showed he'd been issued orders on 27 March that were effective 01 April and would continue to be on orders through 15 July. We checked his schedule, and he had already dropped a trip 02-05 April through Crew Scheduling, then a 6 day trip 13-19 through the Chief Pilot Support Center. He'd dropped a third trip (25-28) through the pilot swap board.

May/June '15.

Reep had already bid his schedule for May and had not posted long term MLOA per USERRA guidelines. He dropped a trip using short notice MLOA on 02-06 May, then he used his Authorized Personal Drop to drop a trip 09-10 May, then he used MLOA to drop a trip 14-17 May and a second 31 May through 03 June.

Reep's schedule was back-dated to note the long term military orders he was under, and he was contacted with that information. Goedeke forwarded his orders to Lynn Ivey on April 29, 2016. We did not expect to see him back until after his orders expired on July 15. We were concerned that he had been on long term orders without notifying us, so we made the decision to ask for the past year's military duty so we could compare that with his Delta schedule. We made that request on May 8, 2015.

We got the one year lookback of orders on May 17, 2015. There were numerous periods of military duty we'd not been informed of, contrary to company policy. We asked for clarification of several MLOA periods during Oct 2014 on May 21, 2015. He did not provide that data. There was a sequence of consecutive days in November of 2014 that appeared to be another long term military duty we'd not been informed of. Based upon the concerns regarding the year April 2014 to March 2015, we then expanded our request for orders to cover the two previous years, April 2012 to Mar, 2014 and asked for that data on May 27, 2015.



PLAINTIFF'S
EXHIBIT
26
8-26-21
PENGAD 800-631-6989

DELTA000055683

On June 10, Reep indicated he was having trouble getting some of the materials we had asked for. We got those from him on 15 June 2015 in the form of what we will call "Drill sheets".

July '15.

Reep's orders expired on July 15. He contacted us indicating he intended to return to work on or about August 1.

Email sent from CF to CrewScheduling that Reep is suspended (SUSP) July 20, 2015

August '15.

Reep suspended pending the outcome of the investigation. Removed from service after his military orders expired, and he was not scheduled for requalification training. Suspended with pay.

Interviewed LCol Reep on August 5. He did not deny significant military duty that he did not report to Delta, and he did not deny there were several periods of duty greater than 30 days in duration that he did not report to Delta.

Sep '15.

Sep 11, Reep discussion in Maroney conf room with JG, OC, CP. Prepared a comprehensive spreadsheet covering the 3 year period in question to document, month by month and day by day, military duty performed by LCol Reep as compared to the Delta schedule in our records. This was a time consuming process, but in the end, it showed 350+ days of unreported duty, 5 periods of unreported military duty in excess of 30 consecutive days duration, several periods of sick leave conflicting with military duty, and several instances of Delta duty where he also claimed military duty on the same day.

Oct, 15.

Prepared to discuss this investigation with his command structure in Jacksonville. Oct 5, fly JAX to discuss with Col Simpler and his team. I asked if they would be willing to provide confirmation of Reep's activities, military duty, deployment dates, etc . . They said they would discuss in the unit.

Internal discussion on Oct 22.

Letter from CF to Col Simpler dated Oct 28 asking for information on specific dates. They agree to provide a memo and give it to Reep, then he can decide whether to give it to us. Privacy concerns.

Nov '15.

Contact with LCol Reep reminding him to post mil duty days. He was on suspension with pay, but that did not mean he did not have to report mil duty.

LCol Reep's unit provided him a memorandum dated 17 November with the subject line "Info requested by civilian employer (Delta Airlines), letter dated 29 Oct 2015".


Dec '15.

On Dec, 1 2016 asked Reep to fill out Mil Leave Log for Dec 2-11, 2015 MLOA

Dec 3, 2015 changed pay code from NQAT to CADM.

Letter to Reep from CF dated December 11. The letter attempts to clarify exactly what the company wants in the way of information at the upcoming meeting.

Dec 15, interview. Reep was told ahead of time what we needed to confirm. He was not willing to provide it, and he said he did not know what information we needed. He said the memo from his unit (see above) did not include the information we were seeking, but he would not provide a copy of it.

May '16.

Issued Notice of Intent to Terminate on May 3.

May 11, received memo from Lt. Col George Downs, 125th Ops Group Commander, regarding LCol Reep's schedule. The memo included military flight logs for the period of 31 Jan, 2013 to 29 Oct, 2013. The memo says that although Reep was present for military duties on March 20 and 21, March 26, and July 13-14, 2013, he did not perform flying duties on those dates. Those were dates upon which Reep's Delta schedule showed he was SICK.

Initial Hearing with JG on May 13.


June '16.

June 9, a letter to Reep from JG regarding the initial hearing. JG asks that Reep provide specific information as previously requested regarding his military activities on specific dates (see letter to Col Simpler from CF dated Oct 28, 2015) and gives him until June 17 to provide the information requested.

Company becomes interested in LCol Reep's activities as a lawyer and how those activities might conflict with sick leave during the 3 year period of investigation. Investigation into his court dates, cases on dockets, transcripts from hearings, etc . . begins.

July '16.

Initial NOI retracted.

Interview with Reep on July 29 regarding law practice, court dates, conflicts with Delta sick. Reep consistently says he did not call in sick to meet a court date. He admits he was sick and in court on the same days, but he says he "could not exercise his Class 1 medical" on those dates.

August '16.

August 15, new NOI Terminate is delivered to Reep by CF.

CONFIDENTIAL


**To:**       First Officer Randal Reep, # 273605

**From:**    Captain Jim Graham, Vice President Flying Operations and Chief Pilot

**Subject:**  NOTICE OF INTENT TO TERMINATE

This letter is being presented to you in accordance with ***Section 18 C.*** of the Pilot Working Agreement ("PWA") between Delta Air Lines, Inc. ("Delta" or "the Company") and the Air Line Pilots in the service of Delta, as represented by the Air Line Pilots Association, International ("ALPA").

A thorough investigation conducted by Flight Operations has revealed that during a period of over three years you routinely and repeatedly violated Company policies that govern the use of military leave. Additionally, during the same time period you violated the Company's sick leave policy. Your repeated violations of Company policies between April 2012 and July 2015 enabled you to receive at least $66,369.86 in pay and benefits that you were not entitled to receive.

***Section 13 D. 1.*** of the PWA states that military leave is to be provided "in accordance with applicable law," in reference to the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Delta trusts and expects that pilots in the armed services will follow the few Company policies and procedures, in accordance with the applicable USERRA provisions, that govern the use of military leave at the Company. Amongst these policies and procedures are requirements that pilots provide advance notice of military leave, where possible, and that all military duty must be reported. Additionally, Delta policy states that "a pilot performing military duty (on orders, UTA drill periods, proficiency training periods, flight training periods, or any other duty that is paid by the state or the U. S. Government) is ineligible to perform Delta duties in any capacity (except while on military terminal leave)." This policy, often referred to and understood as the "double dipping" policy, does not permit pilots to simultaneously be on military orders but refrain from taking military leave at Delta. Consequences of "double dipping" include, but are not limited to: (1) placing Delta's operation at risk due to a pilot's uncertain availability created by simultaneous military obligations, and (2) the obtainment of pay, benefits and other privileges when inappropriately remaining on an active status at Delta. Indeed, your actions on several occasions reporting military leave establish that you were well aware of the requirement to report military leave to Delta.

Although you were required to report military leave to Delta and were aware of this requirement, the Company's investigation has determined that during the 40-month period from April 1, 2012 through July 31, 2015, you served at least 357 days of military duty for

- 1 -

PLAINTIFF'S
EXHIBIT
27
8-24-21

PENGAD 800-631-6989

DELTA000353618

27.1

your squadron, based in Florida but deployable to other locations, that was not reported to Delta. Instead, you misrepresented yourself as being on active status at Delta and were based in Atlanta in the 7 ER category. The Company's investigation has revealed, in particular, the following:

- On 71 of these 357 days of unreported military duty, you were on on-call reserve days at Delta for which you were paid and expected to be able to report for duty with as little as 12 hours – or even as few as two hours – notice from Crew Scheduling;
- On 14 of these 357 days of military duty, you actually performed flying or training for Delta, or were removed from a trip to accommodate the training of another pilot; you were paid for all this duty or assigned duty but should have been on military leave;
- You were on "long-term" military orders in excess of 30 days on five (5) different occasions throughout this period but failed each time to provide the advance notice required by both Company policy and USERRA. *See* 38 U.S.C. § 4312(a)(1); 20 C.F.R. § 1002.85(d) (USERRA requires service members to give "notice as far in advance as is reasonable under the circumstances" and at least 30 days is recommended);
- Your misuse of military leave allowed you to obtain 18 vacation days you were not entitled to receive and prevented the Company from accurately accounting for the amount of cumulative leave you have used and that USERRA allows;
- On at least one instance you admit you knew in advance of such long-term military orders (between April 1, 2015 and July 15, 2015), but you continued to bid your regular monthly schedule at Delta and on three (3) occasions during that extended military duty period waited to report your military leave until very close to any assigned reserve on-call days or trips that you would not be able to perform at Delta due to your military obligations;
- You engaged in sick leave abuse. On at least five (5) occasions during this period, you called in sick and received pay for assigned duty at Delta while you were also on military orders; a pilot who should be on military leave is, of course, not simultaneously entitled to the benefit of sick leave at Delta.

Throughout the Company's investigation, you were asked to provide documentation of your military orders and activities and to respond to other relevant and reasonable inquiries. In a letter dated December 11, 2015, you were given a specific request for documents in advance of a meeting with your Regional Director and Chief Pilot (copy enclosed as Attachment A). This letter also informed you that failure or refusal to respond to the Company's investigative requests could result in the drawing of negative inferences by the Company relating to the inquiries and your responses, or lack thereof, to the Company's investigation. Despite your claims that you desired to cooperate fully, at a meeting on December 16, 2015 you pled ignorance as to why your conduct was subject to investigation and claimed you did not know you were expected to bring documents to the meeting. To this date, you have refused to provide any substantive responses to the Company's investigative requests detailed in Attachment A and have admitted no fault or wrongdoing. Due to your failure to provide responses, the Company has drawn negative inferences that serve as aggravating factors and support the conclusions reached independently in the Company's investigation.

-2.-

CONFIDENTIAL

DELTA000353619

27.2

The inferences drawn are that on days you called in sick at Delta while you were also on military duty, you were either flying, on alert to fly or on other military duty inconsistent with someone who is sick or someone who is resting and recovering from an illness; and that on days you were on reserve duty at Delta and also on military duty, you were not always readily available to meet your Delta commitments if called to do so.

Even without consideration of the negative inferences noted above, your conduct merits termination. Delta demands that its pilots exercise the highest standards of professionalism, integrity, conduct, judgment, character and trust, and you have failed to meet those standards. Your repeated abuse of Delta's military leave policies and your repeated violation of Delta's sick leave policies constitute separate and independent bases for your termination. Delta considered several factors that could potentially mitigate your conduct, but the facts and circumstances revealed in the investigation weighed heavily against excusing or accepting your behavior. Accordingly, Delta intends to terminate your employment.

You are hereby advised that you are entitled to contact your ALPA representative.

Captain Jim Graham

I hereby acknowledge receipt of this letter.

Randal Reep

Date: 3 May 2016

cc: Captain Hartley Phinney, MEC Contract Administration Committee Chairman
Captain O.C. Miller, Managing Director – Flying Operations
Chris Frederick, ATL Director & Chief Pilot
Personnel file

Enclosure (1)

- 3 -

CONFIDENTIAL

DELTA000353620

27.3

Message

| | |
|---|---|
| **From:** | Frederick, Chris [/O=DELTA/OU=NORTH AMERICA/CN=RECIPIENTS/CN=887531] |
| **Sent:** | 5/24/2016 11:37:44 AM |
| **To:** | Graham, Jim [/O=DELTA/OU=North America/cn=Recipients/cn=980244] |
| **CC:** | Miller, OC [/O=DELTA/OU=North America/cn=Recipients/cn=493882]; Puckett, Chris [/O=DELTA/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=951756] |
| **Subject:** | RE: Reep review |



*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Graham, Jim
**Sent:** Tuesday, May 24, 2016 11:36 AM
**To:** Frederick, Chris
**Cc:** Miller, OC; Puckett, Chris
**Subject:** Re: Reep review



JG

On May 24, 2016, at 11:24 AM, Frederick, Chris <Chris.Frederick@delta.com> wrote:



*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

**From:** Frederick, Chris
**Sent:** Friday, May 20, 2016 2:34 PM
**To:** Graham, Jim; Miller, OC
**Subject:** Fw: Reep review



PLAINTIFF'S
EXHIBIT
28
8-26-21

OC and Jim,
No need to read through all of this long email trail, I will synopsize. Puckett asked me to review the documents Reep provided at the Initial Hearing and to review the notes from that meeting. I was to comment upon anything there that we didn't know about before that perhaps mitigates the punishment or otherwise might impact your decision.

DELTA000006157

28.1

The flying records and the memo provided by his unit confirm dates he was working in the squadron or flying F-15 aircraft during the 3 year period of investigation. Of particular interest to us are the days he was on reserve for Delta and also flying military sorties. I cannot discern from the documents whether the sorties were out of Homestead and under the alert commitment, whether they were out of Jacksonville, or whether they were from some deployed location. He has made an argument that he could have met his Delta reserve commitment had he been assigned a DAL trip, even if he was on the flying schedule. Since we don't know where he was flying from or to, it is impossible to definitively comment on whether his argument is vaild or not. If he was on alert or deployed somewhere, I find it far fetched to think he could have gotten to ATL to fly for Delta, even with a 12 hour leash.

One of the documents seems to prove he did not fly an F-15 sortie while out sick from Delta. I take that document at face value. He probably did not fly an F-15 sortie while sick from Delta. However, he did do military duty, unreported, on days he was sick from Delta. Those days were improperly paid out of his sick bank. Had he reported the mil duty, he would not have received sick bank pay.

There were a number of days these new documents show he was engaged in military duty that were not reported in the original orders and activity sheet he gave us at the beginning of the investigation. Summing it up, there were 4 additional "concurrent duty" days, 17 total days of military activity not previously known to us (not reported to us as MLOA), and one other important situation you should be aware of.

On September 8, 2012, the records show he flew an F-15 sortie and a Delta trip on the same day. DBMS records show the trip was assigned off reserve, and it had a sign in time of 7:23 the morning. It flew one leg to San Diego, layover of 20 hours, then three legs the next day. I don't believe it is possible he flew an F-15 sortie on the first day of that trip. So, what does it mean? Either the records his unit provided are inaccurate or our DBMS records are inaccurate. Since the "official records" he gave us at the beginning of the investigation were later contradicted by the memo his unit provided and he brought to the Initial Hearing, I believe the unit's records to be the ones in error. Col Bell signed the memo, and it includes a statement that says " . . .the undersigned fully attests to the validity of all information herein". That is troubling.

So, big picture, the records of his military duty, much of which was unreported to us over the 3 year period, show a repeated pattern of non-compliance with our FOM policy and also non-compliance with USERRA guidelines regarding long term (greater than 30 consecutive days) military duty. Nothing in what he provided changes any of that, and it actually adds to the totals we previously noted in the NOI.

As for the emails from Winford and the comments about Mangie and Tate, his argument seems to be that he was led to believe he should not report MLOA duties to us . . he was using too much of it and we'd rather not know. I talked to Winford during the investigation, and he said in no uncertain terms that was never his message to Reep. His message was that Reep seemed to be prioritizing his military career over his Delta career and that he was very unproductive. Reep uses colorful language and a lawyer's
"cross examination" prospective to parse what Winford said to him. It comes across as an excuse to me, not a vaild counter argument. He admits he routinely violated the FOM and

USERRA. It is very possible our enforcement of our policy has been lax in the past, but his claimed ignorance of the policies are no excuse, in my mind. Puckett has suggested you might want to speak to Winford and Tate face to face prior to your decision. If you want to do so, I can help with scheduling that meeting.

I spoke to Winford, Popeye, and Mangie about their experiences in dealing with Reep while they were the CP in ATL. He has been a problem for everyone all along. Until the in-depth investigation was completed, the level of non-compliance was not fully understood. I think we know now what we are dealing with.

Standing by for orders or to discuss if you feel the need. I don't see any reason to mitigate the termination.

CF

Sent from Surface

---

**From:** Chris Frederick
**Sent:** Tuesday, May 17, 2016 3:04 PM
**To:** Chris Puckett

Chris,



DELTA000006159

28.3

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*

**From:** Frederick, Chris
**Sent:** Tuesday, May 17, 2016 2:36 PM
**To:** Goedeke, Christopher W
**Subject:** RE: Reep review

Synopsis below.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-714-1595*

**From:** Goedeke, Christopher W
**Sent:** Tuesday, May 17, 2016 2:22 PM
**To:** Frederick, Chris
**Subject:** FW: Reep review

Comments in RED below

Chris Goedeke
Assistant Chief Pilot
Atlanta Chief Pilot's Office
O - 404-714-9473
C - 404-780-2879

**From:** Frederick, Chris
**Sent:** Tuesday, May 17, 2016 1:14 PM
**To:** Goedeke, Christopher W
**Subject:** Reep review

Take a look yourself, but here's the irregularities I found.

Undocumented flying (nothing he sent us) for military on April 20, 22, 23, and 26, 2012. Concur He was a regular line holder, so there would not be any double dipping charged, but why don't the documents he sent us include these flights? Not sure

Undocumented flying for military on September 14, 2012 while on DAL RES. So one more double dip charged. Concur

On Sep 8, 2012, he flew rotation 2345 for Delta (a 2 day trip on 8 and 9), but he also shows flying a military sortie on the 8th. So, did he fly a military sortie, then come to ATL and fly a Delta rotation? Concur

Undocumented flying for military on November 14, 2013 while on RES (double dip add), and also on Dec 27, 2013 while on an X day. Concur

Undocumented flying for military on Oct 3 and 4, 2014 while on DAL RES. (2 double dips adds) Concur

Undocumented flying for military on Jan 27, 2015 while on REG, so no double dip. But, why don't the documents he gave us show that flying? Concur

Others:
Apr 24 2013 DAL RES/FANG FLY (no orders) Agree, so double dip add.
May 18 2013 REG/FANG FLY (no orders) Agree
May 22 2013 REG/FANG FLY (no orders) Agree
July 24 2013 REG/FANG FLY (no orders) Agree
Apr 24 2014 REG/FANG FLY (no orders) Agree
Oct 14 2014 RES P/D/FANG FLY (no orders) Agree

So, totaling it all up and synopsizing the review:
4 added double dip days
Numerous (17) mil duty days on the review provided by his unit that did not show up in the documentation/orders he gave us before.
One odd situation . . he appears to have flown a military sortie on September 8, 2012, then started a 2 day trip for Delta on the same day, flying for Delta on the 8th and 9th.

*Captain Chris Frederick*
*Director and Chief Pilot - ATL*
*404-7141595*

DELTA000006161

```
 1                    CERTIFICATE OF REPORTER

 2

 3         STATE OF GEORGIA)

 4                         )

 5         COUNTY OF DEKALB)

 6

 7              I, TAMIKA M. BURNETTE, hereby certify that the

 8    foregoing proceedings were taken before me at the time and

 9    place therein designated; that a review of the transcript was

10    not requested, and that the foregoing pages numbered 1 through

11    185 are a true and correct record of the aforesaid proceedings.

12                   I further certify that I am not a relative,

13    employee, attorney or counsel of any of the parties, nor am I a

14    relative or employee of any of the parties' attorneys or

15    counsel connected with the action, nor am I financially

16    interested in the action.

17

18              DATED this 9th day of September, 2021.

19

20

21    _____

22              TAMIKA M. BURNETTE

23    CERTIFIED COURT REPORTER, RPR, CSR-2870

24

25
```