IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JEREMY SORENSON, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | 1:17-CV-00541-ELR |
| | * | |
| DELTA AIR LINES, INC., | * | |
| a Delaware Corporation, | * | |
| | * | |
| Defendant. | * | |
| | * | |

_____

**O R D E R**

_____

There are several matters pending before the Court.  The Court sets forth its

reasoning and conclusions below.

## I.    Background[1]

This suit stems from employment disputes between five (5) military-affiliated

pilots and their former employer, Delta Air Lines, Inc.   See generally Compl.

[Doc. 1].  Plaintiffs Jeremy Sorenson, Randal Reep, Randal Smith, James Doyle,

---

[1] The facts discussed herein are undisputed unless noted otherwise.  The Court excludes proposed facts that are immaterial, includes facts drawn from its own review of the record, and considers all proposed facts in light of the standard for summary judgment.   See LR 56.1(B)(2)(a)(2)(iii), NDGa.; see also FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004) (explaining that a district court is not obligated to "scour the record" to determine whether triable issues exist).

and Adam McLean initiated this suit on behalf of themselves and a putative class of all others similarly situated against Defendant, alleging claims pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301, *et seq*. ("USERRA").[2]  See generally id.

Plaintiff Sorenson has been employed as a pilot for Defendant since he was hired on February 14, 2017; he was also a member of the Indiana National Guard and United States Air Force Reserves at the time Defendant hired him until he retired from the armed services in April 2020.  See Deposition of Jeremy Sorenson ("Sorenson Dep.") at 28:11–30:15 [Doc. 175].  Plaintiff Reep worked for Defendant as a pilot from April 16, 1998, through October 11, 2016; he was also a member of the Florida Air National Guard during that time.  See Deposition of Randal Reep ("Reep Dep.") at 17:7–19:21 [Doc. 172]; Declaration of Jason Zawislak ("Zawislak Decl.") ¶ 12 [Doc. 178-3].  Defendant hired Plaintiff Smith as a pilot on September 3, 2007; he was a member of the United States Navy at that time and until he retired from military service on January 31, 2017.  See Deposition of Randal Smith ("Smith Dep.") at 83:10–12, 42:15–43:2 [Doc. 174].  As explained further below, Plaintiff Smith no longer works for Defendant.  Plaintiff McLean has been a member of the United States Air Force Reserves since 2009 (prior to which he was a member of the

---

[2] For factual and procedural history beyond that included herein, the Court refers to its Orders dated February 16, 2018, and April 29, 2022.  [See Docs. 24, 191].

Iowa Air National Guard), and he worked for Defendant as a pilot when it merged with another airline that employed him during 2008 until he resigned on February 22, 2017.  See Deposition of Adam McLean ("McLean Dep.") at 91:16–92:4, 115:21–24, 274:24–275:5 [Doc. 171].  Defendant employed Plaintiff Doyle as a pilot from April 16, 2007, until he resigned on September 8, 2016; he is also a member of the Air Force Reserves and was during the time he was employed by Defendant.  See Deposition of James Doyle ("Doyle Dep.") at 30:8–12, 49:22–50:2, 61:19–24 [Doc. 170].

### A.   Plaintiffs' Employment Relationship with Defendant

Defendant's pilots—such as Plaintiffs—work pursuant to the terms of the Pilot Working Agreement (the "PWA"), a collective bargaining agreement between Defendant and the relevant pilots' union.  See Defendant's "Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment" ("Def.'s SOMF") ¶ 4 [Doc. 178-1]; Zawislak Decl. ¶ 3.  Defendant's pilots are paid based on the number of flight hours they log each month—rather than a fixed salary—and each pilot has an hourly rate that varies based on seniority, the type of aircraft the pilot flies, and the routes the pilot flies (for example, Defendant's pilots receive bonus pay for certain flight routes that are more difficult to staff).  See Def.'s SOMF ¶¶ 5–11; Zawislak Decl. ¶ 5.  A pilot's monthly number of flight hours per month necessarily varies because, pursuant to the PWA, Defendant's pilots are able to use

a Preferential Bidding System ("PBS") to shape their own schedules for the upcoming month. See Def.'s SOMF ¶ 13; Zawislak Decl. ¶ 6.

As a result of this PBS, Defendant's pilots "have significant discretion and ability to choose the number, type, and dates of [their] hours for the upcoming month[,]" although ultimately, Defendant must approve a pilot's selections (or "bids"). See Zawislak Decl. ¶ 6; see also Plaintiffs Smith, Doyle, and McLean's "Response to Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment and Statement of Additional Material Facts in Support of Opposition" ("Pls. Smith, Doyle, and McLean's Resp. to Def.'s SOMF") ¶ 16 [Doc. 206-1].[3]   And even after a pilot's initial work schedule has been established for the upcoming month through the PBS, that schedule frequently changes as pilots swap, drop, and pick up flights according to "personal preferences[,]" or if out-of-the-ordinary events require staff and schedule changes.

---

[3] Plaintiffs Smith, Doyle, and McLean object to nearly all of Defendant's proffered material facts. See generally Pls. Smith, Doyle, and McLean's Resp. to Def.'s SOMF. Almost all of their objections are argumentative (as are almost all of their responses, even as to those facts they do not dispute), unsupported by the record, immaterial, long-winded, or some combination of these. E.g., id. ¶ 22 (disputing Defendant's proffered fact that Plaintiff Reep "was a practicing attorney while also flying for Delta" by responding that "Reep was a practicing attorney while he was also employed by Delta, but there is no evidence to suggest he practiced law while *flying* for Delta" (emphasis in original)). Such objections violate Local Rule 56.1(B)(2)(a), which requires a response to the movant's statement of material facts "contain . . . concise, *nonargumentative* responses[.]" See LR 56.1(B)(2)(a)(1), NDGa. (emphasis added). The same Local Rule provides that the Court "will deem each of the movant's facts as admitted" where a respondent fails to "directly refute[] the movant's fact with concise responses supported by specific citations to evidence[.]" See id. 56.1(B)(2)(a)(2). Thus, where the Court includes a proposed fact with no comment on a corresponding objection, the corresponding objection has been considered and overruled, or the proposed fact has been deemed admitted. See id.

<u>See</u> Zawislak Decl. ¶ 8; Def.'s SOMF ¶¶ 15, 17.   Regardless of seniority or role, Defendant's pilots typically are not assigned to fly (or be "on call" to fly, which is called a "reserve day") more than eighteen (18) days per month and are often scheduled to work even fewer days per month.   <u>See</u> Zawislak Decl. ¶ 9; Def.'s SOMF ¶¶ 19–20.   Due to the flexible nature of Defendant's work schedule system, Defendant's "pilots are effectively part-time employees who have substantial," but not total, "discretion in setting their schedules and work hours" and frequently "have other careers."  <u>See</u> Zawislak Decl. ¶ 9; Def.'s SOMF ¶ 21.

At various times during their employment with Defendant, all Plaintiffs took leaves of absence to perform military duties, which, in this case, are referred to as Military Leave(s) of Absence ("MLOA").   <u>See</u> Def.'s SOMF ¶¶ 24–28.   When military-affiliated pilots receive notice of upcoming military duties, they provide notice to Defendant, which notes the MLOA and does not schedule the pilots to work that same day for which MLOA is scheduled (pursuant to Defendant's "concurrent duty" policy).  <u>See</u> Def.'s SOMF ¶¶ 46–47, 65.  Defendant does not permit its pilots to work for Defendant or be on call for Defendant during designated MLOA days.[4] <u>See</u> <u>id.</u>; <u>see also</u> Zawislak Decl. ¶ 10.   According to Defendant, it does not discriminate against military-affiliated pilots who take MLOA and appropriately

---

[4] It is Defendant's position that it "cannot require [a] pilot to perform any duties" for Defendant on "legally mandated MLOA days[.]"  <u>See</u> Zawislak Decl. ¶ 10; Def.'s SOMF ¶¶ 63, 65.

determines all employment-related benefits for such employees so that they are in no way penalized for fulfilling their military obligations.  See, e.g., Def.'s SOMF ¶¶ 48, 60.  Conversely, Plaintiffs claim that Defendant discriminated against them and deprived them of employment benefits because they took MLOA.  See, e.g., Pls. Smith, Doyle, and McLean's Resp. to Def.'s SOMF ¶¶ 48, 60.

**B.** **Overview of USERRA and Relevant Provisions**

In 1994, Congress enacted USERRA:

(1)   to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service;

(2)   to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and

(3)   to prohibit discrimination against persons because of their service in the uniformed services.

38 U.S.C. § 4301(a).  To achieves these ends, USERRA makes it unlawful for any employer to deny "any benefit of employment" to any "person who . . . has an obligation to perform service in a uniformed service."   38 U.S.C. § 4311(a). Specifically, in pertinent part, USERRA states:

A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership,

application for membership, performance of service, application for service, or obligation.

Id.   In addition to prohibiting discrimination against employees who perform military service, USERRA and its implementing regulations provide guidelines as to how employers must calculate employment benefits for the time such employees are on MLOA.   See 38 U.S.C. § 4316(b)(1).

      1.   Seniority-based benefits

In general, an employee "who is absent from a position of employment by reason of service in the uniformed services shall be[] deemed to be on furlough or leave of absence while performing such service."   38 U.S.C. § 4316(b)(1)(A). During any MLOA, USERRA requires that an employee still accrue any seniority-based benefits as if he or she was "continuously employed" with the civilian employer and did not have any "break in employment" by virtue of taking MLOA. See 38 U.S.C. § 4316(a) ("A person who is reemployed under this chapter is entitled to the *seniority and other rights and benefits determined by seniority* that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed." (emphasis added)).   Put differently, "the period of absence from employment due to or necessitated by [MLOA] is not considered a break in employment" for purposes of determining an

employee's "seniority and seniority-based rights and benefits."  See 20 C.F.R. § 1002.210.

    2.   Non-seniority-based benefits

For those employment benefits that are not seniority-based, USERRA provides that employees who take MLOA are "entitled to such . . . rights and benefits . . . as are generally provided by the employer of the person to employees having similar seniority, status, and pay[, and] who are on furlough or leave of absence[.]"[5] See 38 U.S.C. § 4316(b)(1)(B); see also 20 C.F.R. § 1002.150(a) ("The non-seniority rights and benefits to which an employee is entitled during a period of service are those that the employer provides to similarly situated employees[,]" including "those rights and benefits . . . that are provided to similarly situated employees on furlough or leave of absence.").  "If the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee" on MLOA "must be given the most favorable treatment accorded to any comparable form of leave[.]"  20 C.F.R. § 1002.150(b).

## II.   **Procedural History**

On February 13, 2017, Plaintiffs filed their original Complaint.  See Compl. They subsequently amended the Complaint twice.  See Am. Compl. [Doc. 12]; see

---

[5] "As a general matter, accrual of vacation leave is considered to be a non-seniority benefit that must be provided by an employer to an employee on [MLOA] only if the employer provides that benefit to similarly situated employees on comparable leaves of absence."  20 C.F.R. § 1002.150(c).

<u>also</u> 2d Am. Compl. [Doc. 84].  In their operative pleading, Plaintiffs bring four (4) causes of action pursuant to USERRA, which they label: (1) pension contributions, (2) vacation time accrual, (3) profit sharing, and (4) discrimination.[6]  <u>See generally</u> 2d Am. Compl.  Plaintiffs purport to bring their claims on behalf of themselves and a potential class of "pilots who are or were employed by [Defendant], and were or are members of the United States Armed Services or National Guard, who took [MLOA] from April 16, 1998[,] to the present."  <u>Id.</u> ¶ 98.

On December 9, 2021, Plaintiffs Smith, McLean, and Doyle submitted a "Motion for Appointment of Interim Class Counsel" seeking to have their lead attorneys, Mr. Gene Stonebarger and Mr. Charles Billy (together, "Proposed Co-Lead Class Counsel"), appointed by the Court as interim co-lead class counsel.  [<u>See</u> Doc. 139].  Plaintiffs Sorenson and Reep and their lead attorney, Ms. Crystal Matter, did not join in that motion.  [<u>See id.</u>]  Rather, Plaintiffs Sorenson and Reep (through Ms. Matter) submitted an "*Ex Parte* Notice and Motion for Permission to File Motion for Injunctive Relief against Mr. Gene J. Stonebarger and Mr. Charles M. Billy *In Camera* or Under Seal, Also to be Heard *Ex Parte*[,]" by which they sought to be heard regarding purported misconduct by Messrs. Stonebarger and Billy.  [<u>See</u> Doc. 137; 191 at 2–3].  Magistrate Judge Alan J. Baverman of this district granted

---

[6] Plaintiffs allege three (3) theories in support of their USERRA discrimination claim, which they label as "counts": (a) "general harassment," (b) "concurrent duty," and (c) "five-year limit."  <u>See</u> 2d Am. Compl. ¶¶ 143–88.

that motion in part and scheduled an *ex parte* hearing with only Plaintiffs' counsel for December 13, 2021.  [Doc. 140].

On December 13, 2021, Plaintiffs and their various attorneys appeared before Magistrate Judge Baverman for the *ex parte* hearing.  [Doc. 141].  During that *ex parte* hearing and in a minute order memorializing the proceedings, Magistrate Judge Baverman "reminded Plaintiffs that they must be represented in this court by a member of the Bar of the Court and not just counsel admitted *pro hac vice*."  [Id.]

The next day, on December 14, 2021, local counsel for all Plaintiffs, Mr. Joseph Coomes, filed a motion to withdraw from this case because "certain conflicts have arisen among . . . Plaintiffs and their counsel (the nature of which were disclosed to the Court in the context of the *ex parte* hearing conducted December 13, 2021)."  [See Doc. 142 at 2].  In his motion to withdraw, Mr. Coomes noted that Plaintiffs Smith, Doyle, and McLean (along with their lead counsel, Messrs. Stonebarger and Billy) had already obtained substitute local counsel: Mr. Stephen Anderson, who entered his notice of appearance on December 9, 2021.  [See Docs. 138 at 1; 142 at 2].  Further, Mr. Coomes explained in his motion that he had advised Plaintiffs Reep and Sorenson that "they are required to be represented by local counsel admitted as a regular member of this Court" and that their lead counsel, Ms. Matter, is not such an attorney as she only appears before this Court on a *pro hac*

*vice* basis.  [See Doc. 142 at 3].  Plaintiffs Reep and Sorenson objected to Mr. Coomes' withdrawal.  [See id. at 2–3].

At the request of Plaintiffs Reep and Sorenson, the undersigned scheduled an *ex parte* hearing for January 27, 2022, to discuss (among other things) Mr. Coomes' motion and the issue of local counsel as it pertained to Plaintiffs Reep and Sorenson.  [See Doc. 147].  At the January 27, 2022 hearing, the Court discussed the local counsel requirement with all Plaintiffs and their attorneys, and, later that day, issued an Order granting Mr. Coomes' motion to withdraw.  [See Docs. 149, 150].  Thus, Ms. Matter and her clients were put on specific notice of the local counsel requirement contained in the Local Rules of this district at least three (3) times: once by Mr. Coomes prior to his withdrawal, once in a hearing before Magistrate Judge Baverman, and once in hearing before the undersigned.  [See Docs. 141, 150].  Subsequently, Mr. Alexander Cyclone Covey entered an appearance as local counsel for Plaintiffs Reep and Sorenson on February 7, 2022.  [See Doc. 152].

Thereafter, on February 10, 2022, Plaintiffs Sorenson and Reep filed a response in opposition to Plaintiffs Smith, Doyle, and McLean's motion to appoint interim class counsel and claimed that Messrs. Stonebarger and Billy had engaged in "gross attorney misconduct" by supposedly interfering with Ms. Matter's ability to represent them.  [See generally Doc. 153].  In their response brief, Plaintiffs Sorenson and Reep request that Ms. Matter be appointed interim class counsel or co-

lead interim class counsel alongside Messrs. Stonebarger and Billy.   [See id.] Although Defendant had not previously challenged the motion to appoint Messrs. Stonebarger and Billy as co-lead interim class counsel, it requested leave to file a response after Plaintiffs Reep and Sorenson brought forth their allegations of attorney misconduct.  [See Doc. 160].  In an Order dated April 29, 2022, the Court accepted Defendant's response in opposition to the interim class counsel motion attached to Defendant's motion for leave to file the same.  [See Docs. 160-1; 191 at 11–14].

On March 14, 2022, Defendant filed its instant "Motion for Summary Judgment" seeking judgment as a matter of law on all five (5) Plaintiffs' individual claims.  [Doc. 178].  On May 12 and 13, 2022, Messrs. Stonebarger and Billy timely submitted individual response briefs in opposition on behalf of all five (5) Plaintiffs, even Plaintiffs Reep and Sorenson, claiming they did so out of an "abundance of caution."[7]  [See Docs. 191 at 23; 206; 207; 208; 209 at 1; 210 at 1].  Also on May 13, 2022, Ms. Matter filed individual response briefs in opposition to Defendant's

---

[7] The Court notes that Messrs. Stonebarger and Billy signed the response briefs filed on behalf of Plaintiffs Reep and Sorenson as "Attorneys for Plaintiffs Randal Reep, Randal Smith, Adam Mc[L]ean, James Doyle, and the Putative Class[.]"  [See Docs. 209 at 26; 210 at 26].  However, in the response briefs Messrs. Stonebarger and Billy submitted and signed on behalf of Plaintiffs Smith, McLean, and Doyle, Plaintiffs Sorenson and Reep's names are noticeably absent from the text beneath the attorney signature blocks.  [See Docs. 206 at 25–26; 207 at 26; 208 at 25–26] (all indicating beneath Messrs. Stonebarger and Billy's signatures that they are "Attorneys for Plaintiffs Randal Smith, Adam Mc[L]ean, James Doyle, and the Putative Class[,]" but not Plaintiffs Sorenson and Reep).  Otherwise, at no point have Messrs. Stonebarger or Billy indicated that they represent Plaintiff Sorenson individually.  [See, e.g., Doc. 210 at 26].

summary judgment motion on behalf of Plaintiffs Reep and Sorenson.  [See Docs. 211, 212].

Next, on May 19, 2022, through Ms. Matter, Plaintiffs Reep and Sorenson each submitted a "Notice of Filing of Errata to [Their] Response[s] in Opposition to Motion for Summary Judgment[,]" by which they purport to "promptly" correct multiple "clerical errors" in their summary judgment response briefs.  [See Docs. 214, 215].   And on July 7, 2022, Plaintiffs Smith, Doyle, and McLean filed a "Motion to File a Sur-Reply to Defendant's Reply Brief in Support of its Motion for Summary Judgment." [Doc. 223].  Defendant opposes Plaintiffs Smith, Doyle, and McLean's motion to file a surreply.  [See Doc. 224].  Having been fully briefed, Defendant's motion for summary judgment and Plaintiffs Smith, Doyle, and McLean's motion to appoint interim class counsel and motion to file a surreply are ripe for the Court's review.  [Docs. 139, 178, 223].

## III.   Defendant's Summary Judgment Motion

The Court now turns to Defendant's motion for summary judgment, which Plaintiffs Smith, Doyle, and McLean oppose (collectively, "Opposing Plaintiffs"). [See Docs. 178-2, 206, 207, 208, 220].  For the reasons set forth below, Defendant's

motion is deemed unopposed by Plaintiffs Sorenson and Reep.[8]  The Court begins with the relevant legal standard.

## A.    Legal Standard

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome pursuant to the governing law.  See id.

At summary judgment, the moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  Brooks v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1162 (11th Cir. 2006).  The Court must view all evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The moving party need not positively disprove the opponent's case; rather, the moving party must show the

---

[8] Although the Court considers Defendant's motion for summary judgment unopposed by Plaintiffs Sorenson and Reep, the Court still examine the merits of that motion as applied to Plaintiffs Sorenson and Reep's claims.  See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Mia., 363 F.3d 1099, 1101 (11th Cir. 2004).

lack of evidentiary support for the non-moving party's position.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

If the moving party meets this initial burden, it shifts to the non-moving party to present competent evidence beyond the pleadings to show that there is a genuine issue for trial.  See id. at 324–26.  The responding party must set forth "specific facts showing that there is a genuine issue for trial."  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 n.3 (11th Cir. 1993) (citing FED. R. CIV. P. 56(e)).  "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Id.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.  "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment.  Id. at 252.  There must be evidence on which the jury could reasonably find for the non-moving party.  See id.

## B.    Plaintiffs Sorenson and Reep's Summary Judgment Response Briefs

To clarify the scope of the summary judgment analysis herein, the Court begins by addressing the two (2) sets of summary judgment response briefs filed on behalf of Plaintiffs Sorenson and Reep, one set by Messrs. Stonebarger and Billy and a second, later set by Ms. Matter.  [See Docs. 209, 210, 211, 212].  For the reasons set forth below, the Court finds both sets of response briefs—as well as the

accompanying responses to Defendant's statement of material facts and statements of additional material facts [Docs. 209-1, 210-1, 211-1, 212-1]—to be improper and declines to consider the arguments advanced within them.

First, it was improper for Messrs. Stonebarger and Billy to file briefs on behalf of clients they do not represent.  It is undisputed that Mr. Stonebarger represents neither Plaintiff Reep nor Plaintiff Sorenson, as they both terminated him.  See Declaration of Jeremy Sorenson ("Sorenson Decl.") ¶ 16 [Doc. 153-2]; see also Declaration of Randal Reep ("Reep Decl.") ¶ 10 [Doc. 153-3].  It is further undisputed that Plaintiff Sorenson terminated Mr. Billy.  See Sorenson Decl. ¶ 15 ("Mr. Billy is no longer my attorney.").  Although it is less clear whether Plaintiff Reep terminated Mr. Billy, Plaintiff Reep offers several sworn statements that Mr. Billy "constructively abandoned" him as a client in late 2021 "because [Plaintiff Reep] terminated Mr. Stonebarger."  See Reep Decl. ¶¶ 12, 15, 17.  Plaintiff Reep further states that Ms. Matter is "our attorney" (referring to himself and Plaintiff Sorenson) and he casts various aspersions on Mr. Billy's course of conduct during this litigation.  See id. ¶ 11.

No attorney who has appeared in this case has presented documents showing the status of their legal representation of Plaintiff Reep, such as a letter of engagement, termination, or withdrawal.  However, in view of Plaintiff Reep's sworn statements to this Court, Mr. Billy's statement that he filed a summary

judgment response brief on behalf of Plaintiff Reep only out of "an abundance of caution and in consideration of existing circumstances[,]" and various other materials presented to the undersigned, the Court finds that Ms. Matter is Plaintiff Reep's attorney and that he terminated Mr. Stonebarger.  [See, e.g., Docs. 137 at 2 (Ms. Matter stating that she represents Plaintiffs Sorenson and Reep); 191 at 7 ("Plaintiff Reep is represented by Attorneys Matter and Covey"); Doc. 209 at 1, 26]; Reep Decl. ¶ 10; see also Est. of Nixon v. Barber, 796 S.E.2d 489, 493 (Ga. Ct. App. 2017) (noting that whether an attorney-client relationship exists in Georgia is determined by looking to the putative client's "reasonable beliefs" about whether an attorney represents him or her).  The Court accordingly declines to consider the summary judgment filings Messrs. Stonebarger and Billy filed on behalf of Plaintiffs Reep and Sorenson.

Second, the filing of duplicate summary judgment response briefs on behalf of Plaintiffs Reep and Sorenson—one set by Messrs. Stonebarger and Billy, one set by Ms. Matter—directly violates the Local Rules of this district and the undersigned's April 29, 2022 Order.  [See Doc. 191]; see also LR 56.1, NDGa. Local Rule 56.1 provides that "[i]n accordance with [Local Rule 7.1(C)], the parties shall not be permitted to file supplemental briefs and materials, with the exception of a reply by the movant, except upon order of the court."  See LR 56.1, NDGa.  The Local Rules also limit response briefs to twenty-five (25) pages.  See id. 7.1(D).  The

Court did *not* give Plaintiffs Reep and Sorenson leave to file supplemental briefs or materials.  And by filing two (2) sets of response briefs, Plaintiffs Reep and Sorenson far exceed this page limit.  [See Docs. 209, 210, 211, 212].

Additionally, in its April 29, 2022 Order, the Court *expressly* directed "each individual Plaintiff, through his chosen, individual attorneys, to file a response [to Defendant's summary judgment motion] regarding only their own individual claims[.]"  [See Doc. 191 at 10–11, 23] (reiterating the directives for "the attorneys representing . . . Plaintiffs to respond to Defendant's motion for summary judgment on behalf of their individual clients[,]" for "Plaintiffs to file individual responses [to Defendant's summary judgment motion] *through their respective counsel*[,]" and that all Plaintiffs "file their briefs in accordance with the instructions stated herein and in accordance with the Local Rules of this district" (emphasis added)).  Thus, as Defendant correctly notes, the Court's April 29, 2022 Order clearly permitted "a total of 5 [summary judgment response] briefs"—one for each Plaintiff—and no more.  [See Doc. 220 at 16].  Messrs. Stonebarger and Billy clearly flouted this Court's directives when they filed response briefs on behalf of Plaintiffs Sorenson and Reep.  "Such disregard for the procedural rules of this Court will not be tolerated." Hill v. Delta Air Lines, Inc., Civil Action No. 1:18-CV-05589-JPB-WEJ, 2020 WL 12182139, at *2 (N.D. Ga. June 5, 2020) (quoting Gainor v. Douglas Cnty., 59 F. Supp. 2d 1259, 1297 (N.D. Ga. 1998)).  Messrs. Stonebarger and Billy's

disregard for this district's Local Rules and the Court's April 29, 2022 Order provides independent bases for the undersigned to disregard the response briefs they filed on behalf of Plaintiffs Reep and Sorenson even absent any question about who represents them.  See LR 7.1(E), NDGa.

Third, even if the *only* summary judgment response briefs on behalf of Plaintiffs Sorenson and Reep were those filed by Ms. Matter, that set of briefs would still be improper because neither contains the signature of local counsel.  [See Docs. 211, 212].  The Court discussed the local counsel requirement—and how it applied to Ms. Matter and her clients specifically—during the January 27, 2022 *ex parte* hearing.  [See Doc. 150]; see also LR 83.1(B)(4), NDGa. ("Local counsel must authorize and sign all pleadings and other papers filed in the case by the attorney appearing *pro hac vice*.").  Ms. Matter obtained local counsel (Mr. Covey) on February 7, 2022.  [See Doc. 152].  Yet, Mr. Covey's signature is not present on any of the summary judgment response filings Ms. Matter made on May 13, 2022.  [See Docs. 211 at 26–28; 212 at 26–28].  Apparently realizing this error (and several others, such as omitted exhibits, declarations labeled with the wrong declarant's name, and errors in multiple proffered statements of material fact), nearly a week later, Ms. Matter submitted "Notice[s] of Filing of Errata" which purported to "correct" the "incomplete" signature pages to add the signature of local counsel. [See Docs. 214, 215].  Ms. Matter's filing are untimely attempts to amend the

summary judgment response briefs she filed on behalf of her clients without the leave of Court. Thus, Ms. Matter's "Notice[s] of Filing of Errata" do not correct the crucial error she made in omitting the signature of local counsel from the filings at hand. [See Docs. 214, 215].

The Local Rules permit this Court, in its discretion, to "decline to consider any . . . brief that fails to conform to the requirements of" the Local Rules and to sanction any party who fails to comply with the orders of the Court. See LR 7.1(E), NDGa.; see also id. 16.5 ("failure to comply with the court's pretrial instructions may result in the imposition of sanctions, including dismissal of the case"). And district courts have discretion in interpreting, enforcing, and applying their Local Rules. See Ramion v. Brad Cole Constr. Co., 805 F. App'x 948, 950 (11th Cir. 2020); see also Mann v. Taser Intern., Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (explaining that this district's Local Rule 56.1 "is designed to help the court identify and organize the issues in the case").

Therefore, the Court declines to consider the summary judgment briefs submitted by Messrs. Stonebarger and Billy on behalf of Plaintiffs Sorenson and Reep because (1) they were not authorized to make those filings and (2) the filing of the duplicate set of briefs violated both the Local Rules of this district and the express directives of this Court. [See Docs. 209, 210]. Additionally, the Court finds it proper to disregard the summary judgment briefs and other associated filings Ms. Matter

submitted on behalf of Plaintiffs Sorenson and Reep because (1) they do not contain the signatures of local counsel in violation of both the Local Rules of this district and the express directives of this Court and (2) Ms. Matter's "Notice[s] of Errata" amount to no more than untimely, misguided attempts to amend the pleadings she filed.  [See Docs. 211, 212, 214, 215].  However, despite the veritable litany of failures by Plaintiffs' counsel that necessitate these decisions, the Court is also mindful of its obligation to examine the merits of the underlying summary judgment motion and only enter summary judgment "when appropriate" (instead of automatically) even though the motion is deemed unopposed by Plaintiffs Sorenson and Reep.  See One Piece of Real Prop. Located at 5800 SW 74th Ave., 363 F.3d at 1101.  Accordingly, the Court turns to the merits of Defendant's motion.

## C.    Discussion

In the matter at hand, Defendant argues it is entitled to summary judgment on all of Plaintiffs' claims.[9]  [See generally Docs. 178-2, 220].  The Court examines Defendant's motion with regard to each claim in turn, beginning with those claims stemming from seniority-based employment benefits.

---

[9] Because the Opposing Plaintiffs' briefs are identical, for the most part, the Court primarily cites to the brief at Docket Entry 206 in the analysis below.  When addressing any Plaintiff-specific portion of an Opposing Plaintiff's response brief, the Court provides the citation to that Opposing Plaintiff's brief.

1.  Seniority-based benefits

Defendant contends it is entitled to summary judgment on both claims regarding Plaintiffs' seniority-based employment benefits: specifically, Plaintiffs' claims related to the funding of their pension plans during their periods of MLOA and their profit-sharing payments. [See Doc. 178-2 at 5–10]. As the Court discusses further below, the Parties dispute the lawfulness of Defendant's methodology for calculating pension contributions and profit-sharing cash awards for pilots who take MLOA. [See Doc. 206 at 6–12]. The Court addresses each benefit in turn.

a.  *Pension contributions*

In their first cause of action, Plaintiffs allege that Defendant violated various provisions of USERRA by underfunding the pension plans of pilots who take MLOA. See, e.g., Am. Compl. ¶¶ 120–22. Defendant argues it is entitled to summary judgment on this claim because its methodologies for calculating Plaintiffs' pension contributions for periods of MLOA are in accordance with USERRA. [See Doc. 178-2 at 3–10]. Defendant further contends that it has actually provided Plaintiffs with greater pension contributions than required by law. [See id.]

As discussed above, when a military-affiliated pilot who works for Defendant takes MLOA, the military (but not Defendant) pays that pilot during the MLOA period. See 38 U.S.C. § 4331(a); see also 20 C.F.R. § 1002.210. However, that military-affiliated pilot is still entitled to accrue any seniority-based benefits

provided by the employer or required by USERRA *as if* he or she had never been absent or had a "break in employment" due to the MLOA.  See 38 U.S.C. § 4316(a); see also 20 C.F.R. § 1002.210.   Contributions to pension plans are one such seniority-based benefit.   See 38 U.S.C. § 4318(a)(2)(A) (USERRA provision specific to pension plans).

The Parties' dispute here centers on the proper method for calculating the earnings Plaintiffs would have received from Defendant "but for [their] MLOA." [See Docs. 178-2 at 3; 206 at 6].  This initial earnings calculation, in turn, allows Defendant to calculate the appropriate pension contributions for a given employee who has taken MLOA so that the employee receives the same pension contributions as those employees who did not take MLOA during the same time period.  [See Docs. 178-2 at 2–3; 206 at 6]; see also 38 U.S.C. § 4318.

Pursuant to § 4318 of USERRA, the amount of funds an employer must contribute to an employee pension plan during the employee's "period of [military] service . . . shall be computed" either:

> (A) at the rate the employee would have received but for the period of service . . . , or
>
> (B) in the case that the determination of such rate is *not* reasonably certain, on the basis of the employee's average rate of compensation during the 12-month period immediately preceding such period (or, if shorter, the period of employment immediately preceding such period).

23

38 U.S.C. § 4318(b)(3) (emphasis added).[10]  The Parties refer to the formula in 28 U.S.C. § 4318(b)(3)(B) for earnings that are not reasonably certain as the "twelve (12)-month lookback" calculation.  [See Docs. 178-2 at 3; 206 at 8].  The Parties disagree on (1) whether Plaintiffs' compensation was "reasonably certain," and, if not, (2) whether the methodology Defendant previously used or currently uses to calculate their pension contributions comports with USERRA.[11]

i.      Reasonably certain

Thus, the first inquiry the Court must resolve is whether Plaintiffs' regular compensation was "reasonably certain."  See id.  Defendant contends it was not. [See Doc. 178-2 at 3–7].  Opposing Plaintiffs appear to suggest it was.  [See Doc. 206 at 6–8].

Defendant's pilots are paid by the flight hour, and each pilot has an hourly rate that varies based on seniority, type of aircraft, and flight route.  See Zawislak Decl. ¶¶ 3, 5.  Additionally, due to the PBS system that allows Defendant's pilots to "bid" for  the schedules they want and pilots' ability to change their own schedules later, variations in monthly compensation are to be expected.  See id. ¶¶ 6, 8; Def.'s SOMF ¶¶ 13, 15, 17.  In arguing that Plaintiffs' monthly compensation is not

---

[10] It is undisputed that Defendant "contributes a fixed percentage of a pilot's pensionable earnings into the pilot's individual 401k account."  See Zawislak Decl. ¶ 18.

[11] From 2005–2011, Defendant used a twelve (12)-month lookback calculation to determine the pension contributions at issue.  See id. ¶ 19.  From 2012 forward, Defendant has used the Average Line Value calculation described below.  See id. ¶ 20.  Opposing Plaintiffs do not challenge Defendant's method of calculating such seniority-based benefits prior to 2005.  [See Doc. 206].

"reasonably certain," Defendant presents evidence of the range of hours Plaintiffs worked during months when they took no MLOA.  [See Docs. 178-2 at 5–7; 220 at 3].  Thus, any months when a Plaintiff took any MLOA are excluded from the below:

- The average monthly total pay hours for Plaintiffs was sixty-five and a half (65.5).  [See Doc. 204-2 at 13].

- Between August 2014 and October 2020, Plaintiff Sorenson's monthly pay hours ranged from forty-two (42) to 137.  See Zawislak Decl. ¶ 14.

- Between November 2008 and October 11, 2016, Plaintiff Reep's monthly pay hours ranged from zero (as was the case during five (5) months where he also took no MLOA or personal leave) to ninety-five (95).  See id. ¶ 12; [see also Doc. 178-3 at 160–62].

- Between September 2007 and October 2020—during which he only worked a short time for Defendant, as he was on MLOA almost the entire time— Plaintiff Smith only surpassed twenty (20) pay hours per month a total of eight (8) times and never exceeded sixty-eight (68) pay hours in a single month.  See Zawislak Decl. ¶ 17; [see also Doc. 178-3 at 165–68].

- Between April 2007 and September 1, 2016, Plaintiff Doyle's monthly pay hours ranged from zero to 104.  See Zawislak Decl. ¶ 15.

- From January 2010 through February 22, 2017, Plaintiff McLean's

  monthly pay hours ranged from fifty-seven (57) to ninety-nine (99).

  See id. ¶ 16.

Additionally, Defendant's expert witness (Robert B. Speakman, Jr., Ph.D.) opines

that the standard deviation of Plaintiffs' pay hours in months where they took no

MLOA or other personal leave is 27.4 hours.  [See Doc. 204-2 at 10–12].  As a

comparison, according to materials from the U.S. Department of Labor ("DOL")

(cited and replicated in Dr. Speakman's expert report), a standard deviation of 11.8

hours per month is sufficient to render an employee's monthly pay "not reasonably

certain."[12]  [See Doc. 204-2 at 10–12].

In their response brief, Opposing Plaintiffs contend that the volatility in

Plaintiffs' monthly pay hours described above is attributable to Defendant including

months where they were on MLOA.  [See Doc. 206 at 10–11].  However, in reaching

the above calculations, Defendant's expert specifically excluded from his analysis

"months in which a pilot had *any* military leave days or personal leave days at *any*

time during the month[.]"  [See Doc. 204-2 at 10] (emphasis added) (copy of Dr.

Speakman's expert report).   And in Excel spreadsheets Defendant provided to

---

[12] "A standard deviation . . . is a measure of how dispersed the data is in relation to the mean.  Low standard deviation means data are clustered around the mean, and high standard deviation indicates data are more spread out."  See Standard Deviation, Nat'l Libr. Of Med., https://www.nlm.nih.gov/nichsr/stats_tutorial/section2/mod8_sd.html (last visited Mar. 27, 2023).  Thus, here, a lower standard deviation would indicate that a Plaintiff's monthly pay hours remained fairly consistent from month to month.

Plaintiffs during discovery (the authenticity of which has been stipulated to by the Parties) listing the total pay hours for each of Plaintiffs by bid month, "MLOA days" and personal leave days are clearly separated out.  [See Doc. 178-3 at 156–168]. Therefore, the Court finds that Defendant has demonstrated the absence of material fact on this issue and shown that Plaintiffs' monthly pay is not "reasonably certain" pursuant to USERRA.[13]  See 38 U.S.C. § 4318(b)(3).

## ii.      Lawfulness of calculations

Having determined that Plaintiffs' earnings were not "reasonably certain," the Court turns to assess whether the two (2) methods Defendant has used to calculate pension contributions during the relevant time period comply with the requirements of USERRA.  First, from 2005 through 2011, Defendant used a twelve (12)-month lookback calculation to determine the pension contributions at issue.  [See Doc. 178-2 at 7].  Second, since 2012, Defendant has used the Average Line Value ("ALV")

---

[13] Perplexingly, much of Opposing Plaintiffs' argument on this issue relies on citations to the sworn statement of Mr. Billy, Opposing Plaintiffs' counsel.  [See, e.g., Doc. 206 at 8–11; 207 at 8–10, 10 n.3; 208 at 8–11] (all citing to various paragraphs of the Declaration of Charles M. Billy ("Billy Decl.") [Doc. 206-2]).  However, Mr. Billy lacks personal knowledge of the evidence Opposing Plaintiffs attempt to advance through his declaration.  E.g., Billy Decl. ¶¶ 47, 53 (merely two (2) of the numerous examples of paragraphs concerning Plaintiffs' experiences, which could not possibly be based on Mr. Billy's own personal knowledge and contain assertions with no citations to supporting evidence).  The Court declines to consider this "evidence" for this reason. See FED. R. CIV. P. 56(e); see also Tishcon Corp. v. Soundview Commc'ns, Inc., Civil Action No. 1:04-CV524-JEC, 2005 WL 6038743, at *5 (N.D. Ga. Feb. 15, 2005) (explaining that "[t]o have personal knowledge means more than to have been told that something is what it purports to be or to have collected the information from one's client" and that it is "an unnatural, if not virtually impossible, task for counsel, in his own case" to present objective testimony that can be considered on a motion for summary judgment).

calculation described below.  [See id. at 8–9].  And, as noted, USERRA requires that if an employee's compensation is not "reasonably certain," the amount of funds an employer must contribute to an employee pension plan during the employee's "period of [military] service . . . shall be computed" based on "the employee's average rate of compensation during the 12-month period immediately preceding such period (or, if shorter, the period of employment immediately preceding such period)."  See 38 U.S.C. § 4318(b)(3)(B).

Opposing Plaintiffs do not rebut Defendant's argument that both methods are lawful.  [See Docs. 206 at 6–11; 207 at 6–11; 208 at 6–11].  Instead of asserting that either method of calculation used by Defendant violates USERRA, Opposing Plaintiffs contend that their alternative proffered method of calculating these benefits is "the most accurate [and] most fair[.]"  [E.g., Doc. 206 at 9–11] (discussing Opposing Plaintiffs' proposed methodology of "Average Pay Hours" or "APH" to calculate monthly compensation).  Standing alone, Opposing Plaintiffs' failure to respond to Defendant's lawfulness argument is sufficient for the Court to grant summary judgment in Defendant's favor on this claim.  See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned); Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587,

599 (11th Cir. 1995) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

Nevertheless, the Court evaluates this issue on the merits and finds that both methods Defendant has used to calculate pension contributions during the relevant time periods comply with the requirements of USERRA.  The "12-month lookback" method that Defendant used to establish a pilot's compensation (a fixed percentage of which goes to that pilot's pension) between 2005 and 2011 looked to the pilot's average rate of compensation during the preceding twelve (12) months.  See Zawislak Decl. ¶ 19.  This method tracks the plain statutory language of 38 U.S.C.§ 4318(b)(3)(B), and thus, the Court finds it complied with USERRA.

As for the ALV method Defendant has used since 2012, that method calculates the "deemed earnings for long-term MLOAs by multiplying a pilot's hourly rate in effect during the MLOA by the ALV for each month of the MLOA." [See Doc. 178-2 at 8] (citing Zawislak Decl. ¶ 20).  Importantly, Defendant's ALV formula assumes that a pilot works *at least* seventy-one (71) hours per month.  [See id.] (citing Zawislak Decl. ¶ 20).  Plaintiffs rarely reached—much less surpassed—this number of monthly pay hours during any non-MLOA month.  [See, e.g., Doc. 204-2 at 10–13].  And Defendant presents evidence that its "change to the ALV calculation resulted in much *higher* [pension] contributions for MLOA periods" than the "12-month lookback calculation" because "the ALV calculation typically

includes higher hourly rates and higher pay hours than the 12-month lookback calculation." Zawislak Decl. ¶ 21. Specifically, Defendant presents evidence that the ALV method has resulted in Defendant contributing over $11 million more to military-affiliated pilots' pension plans than it would have under the twelve (12)-month lookback calculation. See id. "USERRA establishes a floor, not a ceiling, for the employment and reemployment rights and benefits of those it protects. . . . [A]n employer may provide greater rights and benefits than USERRA requires[.]" 20 C.F.R. § 1002.7(a). Thus, the Court finds the ALV method to be lawful pursuant to USERRA because it provided Plaintiffs with more pension contributions than they would have received pursuant to the plainly legal twelve (12)-month lookback method. Therefore, the Court grants summary judgment in Defendant's favor on Plaintiffs' first cause of action related to pension contributions.[14]

---

[14] As Defendant notes in its instant motion, the Second Amended Complaint does not refer to "deemed earnings calculations for short-term (30 days or less) MLOAs" and Defendant "is uncertain whether Plaintiffs are claiming that [it] violated USERRA with regard to such MLOAs." [Doc. 178-2 at 10 n.8]. However, Defendant states that "when a Delta pilot takes even *one day*" of MLOA during a given month, Defendant "provides them pension contributions as if they flew either ALV or a very similar number of 'reserve monthly guarantee hours[,]'" both of which credit pilots for a higher average of monthly hours than Plaintiffs worked during non-MLOA months. [See id. at 10] (emphasis in original). Opposing Plaintiffs abandon any claim they have related to pension contributions for short-term MLOA by failing to address that claim in their response briefs. [See Doc. 206 at 8] (mentioning such a claim only in passing when asserting that using ALV "undercalculates deemed earnings" "for both short-term and long-term MLOA"); Coal. for the Abolition of Marijuana Prohibition, 219 F.3d at 1326; Resol. Tr. Corp., 43 F.3d at 599. For the reasons explained above, even if Opposing Plaintiffs did not abandon their pension claims as it relates to short-term MLOA, the Court agrees with Defendant that any such claim would fail.

b.    *Profit-sharing claims*

In their third cause of action, Plaintiffs claim that Defendant undercalculates "profit-sharing [payments] for pilots on MLOA" in violation of USERRA by using the "flawed" and "artificially low" ALV method to calculate "the deemed earnings a pilot would have earned but for MLOA[.]"  [See Doc. 206 at 11].  Opposing Plaintiffs argue that "[p]rofit-sharing compensation is pensionable, so the undercalculation also leads to . . . pension underfunding" and is properly considered part of their annual compensation such that it must "be equal to the earnings the [pilot] would have received had the individual been" continuously and "actively employed by [Defendant]" and not on MLOA.[15]  [Id. at 11–12].

In its instant motion, Defendant explains that its "pilots are covered by the company's Annual Profit-Sharing Plan (the 'Profit-Sharing Plan')" and that "[u]nder the Profit-Sharing Plan, a pilot may receive a cash award for each year when Delta makes profit-sharing payments." [Doc. 178-2 at 15] (citing Zawislak Decl. ¶ 22, Ex. G).  "The Profit-Sharing Plan determines cash awards by a set percentage of a pilot's [a]nnual [c]ompensation."  [Id.] (internal quotation marks omitted).  Defendant further proffers:

> In general, the Profit-Sharing Plan *does not* "impute earnings" that a
> pilot has not actually earned during leaves of absence.  (Zawislak Decl.
> Ex. G, Article 2.3.)  There is one exception to this rule, however.  The

_____

[15] Importantly, "Plaintiffs are not claiming Delta's profit-sharing plan is an ERISA plan under Section 4318."  [Doc. 206 at 11].

> Profit-Sharing Plan *does* impute earnings for MLOA periods when determining a pilot's [a]nnual [c]ompensation.  (Id. at Articles 2.3(b) and 2.6.)  This is another example of [Defendant's] pro-reservist employment policies.

[Doc. 178-2 at 15] (emphasis in original).  With this context in mind, Defendant argues that Plaintiffs' profit-sharing claim fails as a matter of law because (1) the pension benefits provision of USERRA (§ 4318) "does not apply to profit-sharing plans" and (2) Defendant does not "impute earnings" towards pilots' profit-sharing payments when pilots take any type of extended leave *other than* MLOA, such that Defendant essentially provides an extra benefit to military-affiliated pilots not available to civilian pilots.  [See id. at 15–16.]

It is well-established that "while USERRA requires employers to treat servicemembers equally with respect to other employees, it does not require preferential treatment."  See Case v. Judd, No. 8:19-CV-607-T-33TGW, 2019 WL 10966204, at *3 (M.D. Fla. Oct. 23, 2019) (collecting cases); see also Gross v. PPG Indus., Inc., 636 F.3d 884, 889 (7th Cir. 2011); Crews v. City of Mount Vernon, 567 F.3d 860, 866 (7th Cir. 2009); Rogers v. City of San Antonio, 392 F.3d 758, 669 (5th Cir. 2004).  "While the Eleventh Circuit has not directly addressed the issue presented here, other circuits have held that USERRA does not cover benefits that are available only to military-affiliated employees."  See Judd, 2019 WL 10966204, at *3 (citing Crews, 567 F.3d at 866).  Where an employer's policy conveys preferential treatment to military-affiliated employees that is "not available to non-

military employees, such policies are not 'benefits of employment' under USERRA" and, therefore, are not actionable pursuant to USERRA.[16]  See id.  The Court finds that this authority squarely forecloses Plaintiffs' profit-sharing claim.  Indeed, in the two (2) paragraphs of their responses addressing this claim, Opposing Plaintiffs do not refute Defendant's argument that it only "imputes earnings" toward profit-sharing payments for employees who take MLOA—but not any other type of extended leave—such that military-affiliated pilots who take MLOA (like Plaintiffs) receive a "benefit" not available to other employees on extended leave.  [See Docs. 178-2 at 15; 206 at 11–12].

The only argument Opposing Plaintiffs make in an attempt to save their profit-sharing claim is that Defendant should use their proposed APH to "calculate deemed earnings . . . reflecting what a pilot would earn but for MLOA."  [See Doc. 206 at 9–11].  For the reasons explained above, the Court is not persuaded by this argument.

---

[16] Further, the Court notes that Opposing Plaintiffs do not argue—nor does the Second Amended Complaint allege—that Defendant's profit-sharing payments are automatically applied to their pensions (as a type of deferred compensation) instead of paid directly to pilots (as a bonus or extra compensation).  [See Doc. 206 at 11–12]; see also 2d Am. Compl. ¶¶ 136–42.  Thus, although Opposing Plaintiffs characterize Defendant's profit-sharing payments as "pensionable" because they *may* elect to direct such payments to their pension plans, nothing in the record suggests that the profit-sharing payments constitute "a deferred compensation plan."  See Scanlan v. Am. Airlines Grp., Inc., 384 F. Supp. 3d 520, 531 (E.D. Pa. 2019); [see also Doc. 206 at 11].  And as at least one district court has observed, a plaintiff fails to state a claim for relief pursuant to USERRA's pension provision (§ 4318) where "employees participating in [a] [profit-sharing p]lan *may* place the lump sum payments in their retirement [or pension] plans" but the profit-sharing plan is, in essence, "an extra compensation or bonus plan where payments are awarded in addition to regular compensation" instead of "a deferred compensation plan."  See Scanlan, 384 F. Supp. 3d at 531 (emphasis added).  This independent reason supports summary judgment in favor of Defendant on Plaintiffs' profit-sharing claim.

See supra part III.C.1.a.   Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiffs' third cause of action related to profit sharing payments.[17]

### 2.   Non-seniority-based benefit—vacation accrual

In their second cause of action, Plaintiffs claim that Defendant violated the USERRA provision pertaining to non-seniority-based employment benefits because it did not allow them to accrue vacation time during their periods of long-term MLOA.   See 2d Am Compl. ¶¶ 126–35 (citing 38 U.S.C. § 4316(b)(1)(B)).   The Parties agree that long-term MLOA lasts thirty (30) or more days, or at least one "bid month" in the context of the monthly schedule bidding system Defendant's pilots use to create their schedules.   According to Plaintiffs, Defendant allows "pilots on other forms of leave . . . [to] accrue vacation time during their leaves of absences that are longer than a bid month or greater than 30 consecutive days[,]" but excludes pilots on long-term MLOA from this same benefit.   See id. ¶¶ 131, 133.   Other forms of leave (other than long-term MLOA) during which Plaintiffs allege that Defendant permits its pilots to accrue vacation time include if the pilots are on "Association

---

[17] In light of the above findings, the Court need not reach Defendant's alternative argument that "Plaintiffs' profit-sharing claims are not cognizable under USERRA Section 4316 (non-seniority benefits provision) or Section 4311 (antidiscrimination provision) because the only leave for which De[fendant] provides imputed earnings toward profit-sharing payments is MLOA."  [Docs. 178-2 at 15; 220 at 25].

Business leave," sick leave, jury duty, "Known Personal Leaves [of Absence,] and certain personal leaves of absence[.]"  See id. ¶ 131.

In its motion, Defendant argues that it is entitled to summary judgment on Plaintiffs' vacation accrual claim because long-term MLOA is not comparable to any of other the types of leave listed by Plaintiffs with respect to the duration of the leave, purpose of the leave, and a pilot's ability to schedule the leave.  [See Doc. 178-2 at 11–14].  As Defendant correctly notes, USERRA entitles employees on MLOA to the same non-seniority-based benefits afforded to "employees having similar seniority, status, and pay who are on furlough or leave[.]"  See 38 U.S.C. § 4316(b)(1)(B).  The corresponding federal regulation, promulgated by DOL, instructs that "[i]f the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to *any comparable form of leave* when he or she performs service in the uniformed services."  See 20 C.F.R. § 1002.150(b) (emphasis added); see also id. § 1002.150(c) ("As a general matter, accrual of vacation leave is considered to be a non-seniority benefit that must be provided by an employer to an employee on a [MLOA] only if the employer provides that benefit to similarly situated employees on comparable leaves of absence.").  To determine whether MLOA is "comparable" to another form of leave, the Court should consider (1) "the duration of the leave" (which "may be the most significant

35

factor to compare"), (2) "the purpose of the leave[,]" and (3) "the ability of the employee to choose when to take the leave[.]" Id. § 1002.150(b).

Defendant cites to two (2) recent federal cases that addressed this very issue and held that MLOA is not comparable to either jury duty or sick leave based on the above factors.[18]  [Doc. 178-2 at 12–14] (citing Moss v. United Airlines, Inc., 420 F. Supp. 3d 768 (N.D. Ill. 2019), aff'd, 20 F.4th 375 (7th Cir. 2021) and Hoefert v. Am. Airlines, Inc., 438 F. Supp. 3d 724 (N.D. Tex. 2020)).   Additionally, Defendant contends that neither "Association Business leave" nor sick leave are "leaves of absence" (or furloughs) pursuant to the PWA governing Plaintiffs' employment. [See id. at 13, 14 n.10].   Finally, as for Known Personal Leaves of Absence (abbreviated by the Parties as "KLOA"), Defendant maintains that it is not a "comparable" form of leave because (1) KLOA serves a materially different purpose than MLOA and (2) KLOA is voluntary.  [See id. at 14 n.10].  In support, Defendant offers the sworn statement of its general manager for flying operations, Mr. Jason Zawislak, who avers that "KLOA is offered by [Defendant] for a specific bid period[] for the purposes of allowing [Defendant] to reduce labor costs during overstaffed periods" and that "a pilot cannot otherwise request or obtain a KLOA

---

[18] Defendant cites a third case that was recently reversed and remanded—Clarkson v. Alaska Airlines, Inc., No. 2:19-CV-0005-TOR, 2021 WL 2080199 (E.D. Wash. May 24, 2021), rev'd and remanded, 59 F.4th 424 (9th Cir. 2023)—however, that action concerned short-term MLOA, whereas the instant dispute specifically concerns long-term MLOA. [See Doc. 178-2 at 11–14]; see also Clarkson, 2021 WL 2080199, at *1 (explaining that the plaintiff in that action took three (3) periods of MLOA, each lasting thirty (30) days or less).

from [Defendant]."  <u>See</u> Zawislak Decl. ¶ 26.  And during his deposition, Zawislak testified that KLOAs are absences whereby "a pilot can choose to put in their bid [for] a period of time that they don't want to work."  <u>See</u> Deposition of Jason Zawislak at 90:13–15 [Doc. 200].

Opposing Plaintiffs do not refute any of Defendant's arguments with respect to "Association Business leave[]," sick leave, or jury duty.  [<u>See, e.g.</u>, Doc. 206 at 12–14].  In the last two (2) sentences of their response briefs, Opposing Plaintiffs assert that KLOA is comparable to MLOA because pilots remain "active" employees of Defendant during both types of leave and "KLOA's [sic] are typically up to 90 days in length . . . and cannot be unilaterally revoked."  [<u>Id.</u> at 13].  However, Opposing Plaintiffs do not address how KLOA could be "comparable" to MLOA pursuant to any of the three (3) factors set forth by 20 C.F.R. § 1002.150(b), much less present any supporting evidence for the limited argument they make.  [<u>Id.</u> at 12–14].  Therefore, the Court rejects Opposing Plaintiffs' contention that KLOA is a comparable form of leave to MLOA for purposes of their vacation accrual claim.

Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiffs' second cause of action related to vacation time accrual.[19]

### 3.   Discrimination claims

Next, Defendant argues it is entitled to summary judgment on Plaintiffs' various discrimination claims pursuant to USERRA.  [See Doc. 178-2 at 16–35].  In the Second Amended Complaint, Plaintiffs style their fourth cause of action for discrimination as encompassing three (3) theories of liability: (a) "general harassment," (b) "concurrent duty," and (c) "five-year limit."[20]  See 2d Am. Compl. ¶¶ 143–88.

Section 4311 of USERRA provides a cause of action for discrimination.  See 38 U.S.C. § 4311.  Pursuant to § 4311, "a member of a uniformed service shall not be denied a 'promotion, or any benefit of employment by an employer on the basis of that membership [or] performance of service.'"  Annarumma v. City of High

_____

[19] Opposing Plaintiffs also assert in their response briefs—for the first time—that "Special Conflict Military Leave" ("SCML") is comparable to MLOA and should be used to assess the lawfulness of Defendant's vacation accrual policy.  [See id. at 12–13].  The well-established precedent of this Circuit holds that a party may not "raise a claim in [its] opposition to [a] summary judgment motion" for the first time and that "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint."  See Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004); see also Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1296–97 (11th Cir. 2006) (holding that a plaintiff may not amend its complaint through a summary judgment filing).  For this reason alone, Opposing Plaintiffs' SCML theory is insufficient as a matter of law to sustain their vacation accrual claim.

[20] At this procedural stage, Plaintiffs' "five-year limit" theory of discrimination concerns only Plaintiff Smith and Defendant's purportedly unlawful failure to reemploy after he took multiple consecutive MLOAs that lasted approximately eight (8) years in combined length.  See 2d Am. Compl. ¶¶ 179–88; [see also Docs. 178-2 at 23–25; 208 at 22–25; 220 at 45–47].

Springs, 846 F. App'x 776, 781–82 (11th Cir. 2021) (per curiam) (internal footnote omitted and alteration in original) (quoting 38 U.S.C. § 4311(a)).  "An employer violates this provision when an employee's membership or performance of service is a 'motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or service.'"  Id. at 782 (quoting 38 U.S.C. § 4311(c)(1)).

"Section 4311 clearly mandates proof of [the employer's] discriminatory motive."  Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005) (citing Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001)). As the Eleventh Circuit has explained, the Court's analysis of a USERRA discrimination claim (even at summary judgment) must begin with whether the employee establishes the prima facie elements of the claim.  See Annarumma, 846 F. App'x at 782.  Specifically, a court looks to see whether the employee has

> [d]emonstrate[d] by a preponderance of the evidence that his military membership or service was a motivating factor in the employer's decision to take an adverse employment action covered by § 4311. [Coffman, 411 F.3d at 1238].  A motivating factor does not have to be "the sole cause of the employment action."  Id.  Rather, "it is one of the factors that a truthful employer would list if asked for the reasons for its decision."  Id. (quotation omitted).

Annarumma, 846 F. App'x at 782.  An employee's "[m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision" to take an adverse employment action against the employee "on that

consideration." <u>See</u> <u>Coffman</u>, 411 F.3d at 1238 (internal citations omitted). "Circumstantial evidence plays a critical part in these cases, 'for discrimination is seldom open or notorious.'" <u>Id.</u> (quoting <u>Sheehan</u>, 240 F.3d at 1014). For this reason,

> [a] court can infer a discriminatory motivation from a variety of considerations, such as: (1) the temporal proximity between the employee's military activity and the adverse employment action; (2) inconsistencies between the proffered reason for the employer's decision and other actions of the employer; (3) an employer's expressed hostility toward members protected by the statute combined with its knowledge of the employee's military activity; and (4) disparate treatment of similarly situated employees.

<u>Annarumma</u>, 846 F. App'x at 782 (citing <u>Coffman</u>, 411 F.3d at 1238).

If an employee carries his burden to establish a prima facie USERRA discrimination claim,

> the burden shifts to the employer to prove, by a preponderance of the evidence, that legitimate reasons, standing alone, would have induced it to take the same adverse action. [<u>Coffman</u>, 411 F.3d] at 1238–39. Even if prohibited discrimination was a motivating factor, the employer does not violate the statute if "the employer can prove that the action would have been taken in the absence of [the employee's military status]." 38 U.S.C. § 4311(c)(1). The standard of proof the employer

must meet is "the so-called-'but for' test."[21]   [Id.] at 1238 (quoting [Sheehan, 240 F.3d at 1013]).

Annarumma, 846 F. App'x at 782.  With this framework in mind, the Court clarifies one preliminary issue—whether Plaintiffs bring a "hostile work environment claim"—and then addresses in turn the Parties' arguments regarding each Plaintiff's discrimination claim.

a.   *Hostile work environment*

Portions of Defendant's summary judgment briefs appear to assume that Plaintiffs bring a hostile work environment claim.  [See, e.g., Doc. 178-2 at 17 n.13; 220 at 36–40].  And the Court observes that the Second Amended Complaint contains general, conclusory allegations that Defendant fostered a hostile work environment against Plaintiffs and that this environment caused Plaintiff Doyle to resign.  See, e.g., 2d Am. Compl. ¶ 22 (general allegation that DOL "clarified its interpretation that a 'benefit of employment' included a freedom from workplace harassment and/or hostile work environment" in a 2010 report to Congress); id. ¶ 97

---

[21] In Coffman, the Eleventh Circuit "adopted the framework the Federal Circuit articulated in Sheehan, which clarified that the procedural framework and evidentiary burdens set out in [USERRA] . . . are different from those in discrimination cases under Title VII of the Civil Rights Act of 1964, which are analyzed pursuant to the burden-shifting framework described in McDonnell Douglas" and its progeny.  See Annarumma, 846 F. App'x at 782 n.8 (cleaned up). Unlike the McDonnell Douglas test, which only allocates the burden of production of evidence, the two (2)-step Coffman framework "shift[s] the burden of persuasion to the employer[.]"  See id. (internal quotation marks and citation omitted).  Thus, "[p]ursuant to Sheehan and Coffman, the employer" in a USERRA discrimination case "has [a] heavier burden to prove that it would have taken the adverse action even in the absence of the employee's military status" than an employer in a Title VII.  See id. (internal citations omitted); see also 38 U.S.C. § 4311(c)(1).

("Due to the hostile work environment Doyle was experiencing at [Defendant's workplace], he resigned his employment . . . on September 8, 2016); id. ¶ 157 ("[Defendant's] anti-military environment caused and allows discriminatory practices against Class members with military service obligations.").

The Eleventh Circuit has previously addressed a hostile work environment claim in the USERRA context.   For example, in Annarumma, the plaintiff specifically pled a hostile work environment claim pursuant to USERRA—in addition to a separate USERRA discrimination claim—and brought an appeal challenging the district court's grant of summary judgment in favor of the defendant as to both claims.  See 846 F. App'x at 781–85.  In its opinion, the Eleventh Circuit explained that the plaintiff "contend[ed] that the Title VII framework[] for hostile work environment . . . appl[ied] to his USERRA [hostile work environment] claim[]" and the defendant "ha[d] not disputed that contention."  See id. at 785. Thus, as the district court in that case had, the Eleventh Circuit "assume[d] without deciding" that a hostile work environment claim "[was] actionable under USERRA and [should be] analyzed under [the] Title VII test."  See id.

However, unlike the plaintiff in Annarumma, Plaintiffs here do not allege a separate claim or theory of liability based on the existence of a hostile work environment.  See 2d Am. Compl. ¶¶ 143–88.  Rather, they crafted their Second Amended Complaint to include three (3) theories of discrimination, none of which

42

are hostile work environment.  See id.  Thus, the undersigned declines to recast their pleading as advancing such a theory (or claim).  And because Plaintiffs have pled no USERRA claim based on a hostile work environment theory, the Court need not analyze whether such a claim survives Defendant's present motion for summary judgment.  See Gilmour, 382 F.3d at 1315 ("Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint."); Hurlbert, 439 F.3d at 1296–97 (holding that a plaintiff may not amend its complaint through a summary judgment filing).

Regardless, the Court still considers Opposing Plaintiffs' arguments regarding Defendant's purported hostility towards them in its analysis below, as any evidence of such is properly encompassed by the considerations from which a court may infer a discriminatory motivation for adverse action against an employee.  See Annarumma, 846 F. App'x at 782 (listing the third such consideration as "an employer's expressed hostility toward members protected by the statute combined with its knowledge of the employee's military activity" (citing Coffman, 411 F.3d at 1238)).

b.    Plaintiff Sorenson

Unlike the other Plaintiffs, Sorenson still works for Defendant.  [See Doc. 220 at 18 n.3].  Defendant argues Plaintiff Sorenson lacks standing to bring a

discrimination claim because he has not alleged any cognizable injury flowing from Defendant's conduct.  [See Docs. 178-2 at 20; 220 at 18].

Standing is a "threshold jurisdictional question of whether a court may consider the merits of a dispute."  See Elend v. Basham, 471 F.3d 1199, 1204 (2006); see also Cuban Am. Bar Ass'n, Inc. v. Christopher, 43 F.3d 1412, 1422 (11th Cir. 1995) (explaining that a court has an "obligation . . . to examine its own jurisdiction . . . at each stage of the proceedings").  The well-trod constitutional standing requirements are (1) a "concrete and particularized injury[,]" (2) caused by the defendant's "complained-of actions," (3) that is "redress[a]ble by a favorable court decision."  Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1159 (11th Cir. 2008).  Here, Plaintiff Sorenson does not allege how he was harmed by Defendant's supposed discrimination against him in violation of USERRA, going so far as to testify that he has no claim for any "economic" damages flowing from Defendant's alleged discrimination.  See Sorenson Dep. at 157:17–22.  This record evidence stands unrebutted.[22]  Therefore, the Court finds Plaintiff Sorenson lacks standing to

---

[22] Plaintiff Sorenson's own response briefs are not properly before this Court for the reasons discussed above.  See supra, part III.B.

bring a USERRA discrimination claim.[23]  See Fla. State Conf. of NAACP, 522 F.3d at 1159.  Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiff Sorenson's fourth cause of action for discrimination.

### c.    Plaintiff Reep

Next, the Court examines the merits of Plaintiff Reep's discrimination claim. See Annarumma, 846 F. App'x at 782.  As set forth above, the Court must first determine whether Plaintiff Reep establishes the prima facie elements of a USERRA discrimination claim.  See id. (setting forth the prima facie elements as showing "by a preponderance of the evidence that his military membership or service was a motivating factor in the employer's decision to take an adverse employment action covered by § 4311" (citing Coffman, 411 F.3d at 1238)).  However, Plaintiff Reep does not present any record evidence to the Court to establish the prima facie elements of his claim.[24]  The Court has examined the merits of the underlying summary judgment motion and finds that Defendant's unrebutted evidence establishes Plaintiff Reep was subject to termination for abusing Defendant's

---

[23] Unlike Plaintiff Sorenson, the Court finds that the other four (4) Plaintiffs have standing to bring a claim for USERRA discrimination because they all allege they were either ousted by or resigned under pressure from Defendant.  [See Docs. 172-8; 206 at 25; 207 at 25; 208 at 23–24].  Though Defendant is correct that injunctive relief is not available to Plaintiffs Reep, Smith, Doyle, and McLean because they are not current employees, that does not affect their standing to seek damages pursuant to USERRA for any actionable discrimination they suffered.  See Dees, 368 F. App'x at 52–53

[24] Plaintiff Reep's own response briefs are not properly before this Court for the reasons discussed above.  See supra, part III.B.

policies regarding sick leave and concurrent duty, not by virtue of his military affiliation.  [See Doc. 172-8 at 1]; see also Tomasini, 315 F. Supp. 2d at 1260 n.11 (explaining that a district court is not obligated to "scour the record" to determine whether triable issues exist).  Accordingly, the Court grants summary judgment in favor of Defendant on Plaintiff Reep's discrimination claim.

### d.    Plaintiff Doyle

Plaintiff Doyle contends Defendant falsely accused him of misconduct and pressured him to resign because of his military status.[25]  [See Doc. 207 at 23–25]. Upon review, the Court finds Plaintiff Doyle has offered evidence establishing the prima facie elements of his USERRA discrimination claim by a preponderance of the evidence.  Specifically, Plaintiff Doyle asserts that an April 28, 2015 email exchange between one of Defendant's supervisors, Mr. Barry Behnfeldt (who oversaw the MLOA process for at least some of Defendant's employees, including Plaintiff Doyle), and Defendant's regional director, Captain Phil Davis, shows that

---

[25] Opposing Plaintiffs all argue that Defendant discriminated against them through its supposed practice of "dissuading" military-affiliated pilots from taking MLOA on or around holidays (which are often the busiest travel days of the year).  [See, e.g., Doc. 206 at 16–19].  Specifically, Opposing Plaintiffs contend that Defendant would sometimes ask a pilot or the pilot's military commander if MLOA originally scheduled around holidays could be rescheduled.  [See, e.g., id.]  The Court finds that this theory of discrimination fails on the merits because it is undisputed that Defendant never denied any Plaintiff's requested MLOA because of a holiday and because contacting individuals in a reservist employee's military chain of command is lawful pursuant to USERRA. [See Doc. 220 at 34]; see also 20 C.F.R. § 1002.104; McLean Dep. at 164:1–3.  Independently, none of Opposing Plaintiffs connect this supposed practice to any adverse action taken against them, or anyone else.  [See Doc. 206 at 16–19].  For both of these independent reasons, this theory does not support a USERRA discrimination claim.  See Coffman, 411 F.3d at 1238.

Defendant discriminated against him because of his military status.  [See generally Doc. 197-16].  In that email exchange, Mr. Behnfeldt alerts Captain Davis that he "stumbled across" Plaintiff Doyle's pattern of taking a single MLOA day in a block of on-call days (or "reserve days") and that Plaintiff Doyle was "not being too kind to his primary employer."  [See id.]  Captain Davis responds: "Interesting that you raised this guy's schedule today.  He hit my radar last week[;] . . . . [W]e [will] be visiting . . . him the next time he does the single MLOA day in the middle of a reserve days block.  He has done it very blatantly over the last year."  [See id.]  The Court agrees with Plaintiff Doyle that this evidence is sufficient to establish a prima facie case of USERRA discrimination because a reasonable jury could use it to infer that Defendant pressured Plaintiff Doyle to resign from Defendant's employ because of Plaintiff Doyle's military status.

Therefore, the burden shifts to Defendant "to prove, by a preponderance of the evidence, that legitimate reasons, standing alone, would have induced it to take the same adverse action" against Plaintiff Doyle.  Annarumma, 846 F. App'x at 782 (citing Coffman, 411 F.3d at 1238–39).  Defendant proffers that Plaintiff Doyle's repeated abuse of its sick leave and MLOA systems gave rise to such standalone, legitimate reasons for its actions.  In his deposition, Plaintiff Doyle concedes that (1) he flew military planes or performed other military duties while on call or regularly scheduled to work for Defendant, (2) that he performed military duties while on paid

sick leave with Defendant, and (3) that he would sometimes have military orders but not inform Defendant of his need for MLOA until the day before—or even the day of—the military duty.[26]   See Doyle Dep. at 214:21–215:6, 231:19–25, 337:15–339:8, 340:16–341:5.   Defendant's counsel asked Plaintiff Doyle about his last-minute MLOA requests during his deposition, during which Plaintiff Doyle stated:

> A: I can take military leave when I need to take military leave.
>
> . . . .
>
> The company should not tell me that I have to [report planned MLOA] the month prior or even the day that I know of it because perhaps I forgot to do it.
>
> Q: So it's your view the company should not be allowed to tell you to give notice [of planned MLOA] around when you find out.  You should be able to –
>
> A: No.
>
> Q: – sit on it for as long as you want –
>
> A:  Yeah.
>
> Q: – and then post it at that last minute?
>
> A: I believe that when I remember I should tell the company.  That might be the day prior.  That might be a month prior, a week prior.  But it [] should not matter according to the law.

---

[26] In his deposition, Plaintiff Doyle also testified about a fellow servicemember who, according to Plaintiff Doyle, also misused MLOA, but was not penalized by Defendant.  See Doyle Dep. at 252:5–254:6.  The Court notes that this testimony appears to undercut any presumption that Defendant's actions were motivated by Plaintiff Doyle's military status rather than his individual, improper conduct.

> Q: Okay.  So you would agree that it's possible that at times you had [military] orders, did not submit a leave request, and did so at the last moment?
>
> A: It is possible, yes.

See id. at 238:1–239:15.  Additionally, Defendant presents unrebutted evidence of its conversations with Plaintiff Doyle regarding its concerns about his "sudden increase" in sick leave starting in 2012, his use of sick leave in combination with paid vacation days or unpaid days off to increase his time off, his "lack of productivity for the company" based on his low flight hours, and his "effect on fellow employees."  [See Doc. 170-12 at 1].

Upon consideration, the Court finds that Defendant carries its burden to demonstrate, by a preponderance of the evidence, that it possessed standalone, legitimate reasons for the so-called "pressure" it placed on Plaintiff Doyle that ultimately led to his resignation.  See Annarumma, 846 F. App'x at 782 (citing Coffman, 411 F.3d at 1238–39).  Regardless of his military status, Plaintiff Doyle's admitted violations of Defendant's policies, disregard for Defendant's ability to schedule his leave (which no doubt impacted other employees), lack of productivity, and abuse or misuse of Defendant's leave systems all supported Defendant's investigation and that its actions were not motivated by animus against servicemembers.  See id. (citing Coffman, 411 F.3d at 1238–39).  Because there is no genuine dispute of material fact as to whether Defendant would be justified in

pressuring Plaintiff Doyle to resign even absent his military status, the Court grants summary judgment in favor of Defendant on Plaintiff Doyle's discrimination claim.

> e.    *Plaintiff McLean*

Plaintiff McLean maintains that Defendant took the adverse employment actions of wrongfully accusing him of misconduct and issuing a "Notice of Intent to Terminate" to him because of his military status.  [See Doc. 206 at 23–25].  Similar to Plaintiff Doyle, Plaintiff McLean contends that he ultimately resigned under pressure by Defendant to do so (or else face termination).  [See id. at 25].

In support of his prima facie claim, Plaintiff McLean cites to the deposition testimony of Captain William Underwood, one of Defendant's chief pilots and regional directors.  [See Doc. 206 at 23].  During his deposition, Captain Underwood testified that Plaintiff McLean "basically performed no flying for [Defendant], who's his primary employer, for essentially month after month after month[.]"  See Deposition of William Underwood ("Underwood Dep.") at 226:14–20 [Doc. 202].  This testimony supports that Defendant was, at minimum, concerned about Plaintiff Doyle's availability to Defendant due to his military status.

Therefore, the burden shifts to Defendant "to prove, by a preponderance of the evidence, that legitimate reasons, standing alone, would have induced it to take the same adverse action."  Annarumma, 846 F. App'x at 782 (citing Coffman, 411 F.3d at 1238–39).  To that end, Defendant presents Plaintiff McLean's own

deposition testimony wherein he concedes that he violated Defendant's concurrent duty policy by performing military duties on days he was also working for Defendant, despite being warned not to do so by his supervisor, Captain Underwood. See McLean Dep. at 175:12–176:13, 191:24–194:5, 217:9–25, 219:2–6, 231:9–24, 237:22–239:14.    Notably, Plaintiff McLean himself characterizes Captain Underwood (who is also a former military pilot) as "an honorable man" and "very pro[-military]."   See id. at 196:3–11, 198:20–21.   According to Defendant's unrebutted evidence, Plaintiff McLean violated the concurrent duty policy on no fewer than sixty-nine (69) days during the period between January 1, 2013, and March 31, 2016.  [See Doc. 171-13 at 1–2] (copy of Notice of Intent to Terminate Letter issued to Plaintiff McLean).   Additionally, Defendant points to Plaintiff McLean's concessions that he performed military duty, including flying Air Force jets, while on paid sick leave with Defendant.   See McLean Dep. at 180:22–25, 222:1–22, 257:9–24.   Defendant's unrebutted evidence purports to show that Plaintiff McLean performed military duty while on paid sick leave a minimum of thirty-one (31) days and that his "misuse" of "sick leave provide[d] an independent basis for termination" aside from his abuse of MLOA.   [See Doc. 171-13 at 2]. Finally, Defendant highlights Plaintiff McLean's admissions that there were "periods" when he "had [MLOA] on his schedule" provided to Defendant when no such military duty was actually scheduled.   See McLean Dep. at 215:21–216:16,

225:8–23.   Defendant's unrebutted evidence maintains that Plaintiff McLean reported he was "on military orders on 25 separate days . . . when in fact [he] was not on military orders." [See Doc. 171-13 at 1].  Thus, according to Defendant, it intended to terminate Plaintiff McLean not because of his military status, but because of his repeated abuses or misuses of Defendant's various leave systems (conduct which Plaintiff McLean largely admits or fails to rebut) and his disregard for direct instructions from supervisors about Defendant's policies.  [See generally id.]

Upon consideration, the Court finds that Defendant carries its burden to prove "by a preponderance of the evidence, that legitimate reasons, standing alone, would have induced it to take the same adverse action" against Plaintiff McLean.  See Annarumma, 846 F. App'x at 782 (citing Coffman, 411 F.3d at 1238–39).  Plaintiff McLean's admitted history of abusing or misusing Defendant's leave systems for his own benefit presents a standalone, legitimate reason for Defendant's actions regardless of Plaintiff McLean's military status that comports with Defendant's communications to Plaintiff McLean prior to his resignation.  [E.g., Doc. 171-13].  Therefore, no genuine dispute of material fact remains with regard to Plaintiff McLean's discrimination claim, and the Court grants summary judgment in favor of Defendant as to the same.

### f.   Plaintiff Smith

USERRA states, in relevant part:

> any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter if . . . the cumulative length of the [MLOA] . . . does not exceed five years[.]

See 38 U.S.C. § 4312(a)(2) (the "Five (5)-Year Limit").  By its terms, then, USERRA establishes a temporal limitation on a servicemember's right to demand statutory benefits from his non-military employer  Nevertheless, an individual may serve MLOA that exceeds five (5) years in length and still be eligible for reemployment rights and other employment benefits if one of the several exemptions set forth in § 4312(c) applies.  See generally 38 U.S.C. § 4312(c).

Defendant hired Plaintiff Smith as a pilot in 2007.  See Smith Dep. at 83:10–12; [Doc. 174].  From August 2008 until October 2016, Plaintiff Smith was on continuous MLOA.  See Smith Dep. at 221:24–222:5.  On October 5, 2016, he requested that Defendant reemploy him and represented that his MLOA was exempt from the Five (5)-Year Limit.  See id. at 204:5–8.  Defendant ostensibly engaged in a reemployment process with Plaintiff Smith and allowed him to become "an active pilot with [Defendant] as of November 16[,]" 2016.  See id. at 42:15–43:2.  However, according to Plaintiff Smith, in early December 2016, Defendant

determined that Plaintiff Smith's military documents were insufficient to support his reemployment as exempt from the Five (5)-Year Limit.  See id.

On December 8, 2016, Plaintiff Smith was attending a simulator training event at Defendant's headquarters when, according to his own testimony, an unspecified individual "made a phone call and came down and interrupted [him] in the middle of [his] [simulator] . . . to tell [him] that [he] would have a meeting with" a supervising captain.  See id. at 42:4–7.  Upon Plaintiff Smith's "completion of [his] simulator, they sent" a member of senior management "to collect [Plaintiff Smith] from the simulator event and take [him] to that meeting."  See id. at 189:16:–21, 220:4–5.  During the meeting, Plaintiff Smith was told that he exceeded the Five (5)-Year Limit, that the military documentation he provided to exempt him from the Five (5)-Year Limit was insufficient, and that he was being placed on unpaid leave and sent home immediately.  See id. at 208:5–11, 212:8–213:8.  A meeting outline associated with the December 8, 2016 meeting shows under the heading "opening statement": "[w]e are here today primarily to discuss and clarify some questions or *concerns we have with your MLOA, [s]ick [l]eave[,] and attendance* with [Defendant]."  [See Doc. 171-14] (emphasis added).  Plaintiff Smith argues that Defendant took the adverse employment actions of (1) not reemploying or retaining him after being on MLOA for approximately eight (8) years even though his MLOA was "exempt" from the Five (5)-Year Limit and (2) subjecting to him embarrassment

at the aforementioned December 8, 2016 meeting, which he describes as "a public execution designed to intimidate other military pilots." [See Doc. 208 at 22–24]. The Parties do not dispute that in order to be exempt from the Five (5)-Year Limit, Plaintiff Smith's "relevant military orders" *should* state the "exempt status" of the service. [See Doc. 178-2 at 24]; see also Smith Dep. at 237:2–15. Plaintiff Smith admits that his orders did not so provide, but he contends that another form of documentation he submitted—his "DD-214" document—should have been accepted as "equally . . . valid . . . proof of [exempt status] service." See Smith Dep. at 237:12–22. Defendant disputes that a DD-214 document is sufficient to establish that an individual's service is "exempt" from the Five (5)-Year Limit and further contends that Plaintiff Smith "coerced Navy personnel through fraud and deceit to include inaccurate language" in his DD-214 document to show an exempt status as part of a "deceptive plot." [See Doc. 220 at 47 & n.30].

Upon review and consideration, the Court finds that Plaintiff Smith fails to sufficiently demonstrate the prima facie elements of his discrimination claim with respect to the December 8, 2016 meeting. Although that meeting interrupted a simulator training activity, being called to a meeting is not "an adverse employment action covered by § 4311" as required to support a USERRA discrimination claim. See Coffman, 411 F.3d at 1238; see also 38 U.S.C. § 4311(a). Furthermore, the Court does not discern any basis for characterizing this event as a "public execution,"

as Plaintiff Smith has chosen to call it.  [See Doc. 208 at 23].  However, the Court finds that Plaintiff Smith sufficiently demonstrates the prima facie elements of his discrimination claim with respect to his termination.  The record evidence before the Court demonstrates that Plaintiff Smith was either terminated or not fully reemployed by Defendant based, at least in part, on Defendant's concerns about his military service.  [See, e.g., Doc. 171-14].

Thus, the burden shifts to Defendant "to prove, by a preponderance of the evidence, that legitimate reasons, standing alone, would have induced it" to terminate Plaintiff Smith.  See Annarumma, 846 F. App'x at 782 (citing Coffman, 411 F.3d at 1238–39).  Although Defendant argues that its decision was legitimate pursuant to the Five (5)-Year Limit, the Court finds that genuine disputes of material fact remain regarding that question, particularly around whether the military documentation Plaintiff Smith provided to Defendant was sufficient to entitle him to an exemption from the Five (5)-Year Limit and whether Plaintiff Smith engaged in "fraud and deceit" to obtain that documentation.  [See Doc. 220 at 47]; see also Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict.").  Accordingly, the Court grants in part and denies in part

Defendant's motion for summary judgment as to Plaintiff Smith's discrimination claim.[27]

## IV.   Motion to Appoint Interim Class Counsel

The Court next turns to Plaintiffs McLean, Doyle, and Smith's "Motion for Appointment of Interim Class Counsel." [Doc. 139]. As noted, through that motion, Plaintiffs McLean, Doyle, and Smith seek the appointment of Messrs. Stonebarger and Billy as interim co-lead class counsel pursuant to Federal Rule of Civil Procedure 23(g).[28]   [See id. at 1].   Both Defendant and Plaintiffs Reep and Sorenson—through their attorney, Ms. Matter—oppose this motion.[29]   [See Docs. 153, 160-1, 192].  However, Plaintiffs Reep and Sorenson did not file a competing motion seeking to have Ms. Matter appointed as interim lead (or co-lead) class counsel.  Instead, Plaintiffs Reep and Sorenson argue that if the Court chooses to appoint interim class counsel at present—and they contend it should not—then they "join the motion to appoint interim class counsel and ask that [Ms.] Matter be appointed lead or co-lead" counsel.  [See Doc. 153 at 13].  Nonetheless, an argument

---

[27] In light of the Court's above rulings, the Court denies as moot Plaintiffs Smith, Doyle, and McLean's "Motion for Leave to File a Sur-Reply to Defendant's Reply Brief in Support of its Motion for Summary Judgment."  [Doc. 223].

[28] Plaintiffs Doyle, McLean, and Smith's interim class counsel motion fails to conform to the formatting requirements of this district's Local Rules.  Compare LR5.1(A)(2), (C)(2), [with Doc. 139].  The Court cautions Plaintiffs Doyle, McLean, and Smith that it will not consider any future filings that fail to conform with this district's Local Rules.  See LR 7.1(F), NDGa. ("The court, in its discretion, may decline to consider any motion or brief that fails to conform to the requirements of these rules.").

[29] Unlike the summary judgment response briefs Ms. Matter filed, the response she filed in opposition to the instant motion contains the signature of her local counsel.  [See Doc. 153 at 25].

contained in a response brief is not the same as a motion properly before the Court, and the Court will not construe it as such.  See LR 7.1(A)(1), NDGa.  Additionally, none of the claims brought by Ms. Matter's clients survive summary judgment, and thus, it is unnecessary to consider her as potential lead counsel for the putative class.

### A.      Legal Standard

Federal Rule of Civil Procedure 23(g)(3) permits the Court to "designate interim counsel to act on behalf of putative class members before determining whether to certify the action as a class action."  FED. R. CIV. P. 23(g)(3).  "When appointing interim class counsel, courts generally look to the same factors used in determining the adequacy of class counsel under Rule 23(g)(1)(A)."  In re Mun. Derivatives Antitrust Litig., 252 F.R.D. 184, 186 (S.D.N.Y. 2008).  Those factors are:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class[.]

FED. R. CIV. P. 23(g)(1)(A).  Further, the Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  See id. 23(g)(1)(B).

The Court's task is "to ensure that counsel appointed to leading roles are qualified and responsible, that they will fairly and adequately represent all of the

parties on their side, and that their charges will be reasonable." See Manual for Complex Litigation (Fourth) § 10.22 (2004); see also id. § 21.11 (explaining that, when the various lawyers involved in a litigation stipulate to the selection of interim class counsel, the Court's role is to "determin[e] that the chosen counsel is adequate to [so] serve[,]" but "[a]bsent a stipulation, the [C]ourt may need to select interim class counsel from lawyers competing for the role and formally designate the lawyer selected").  Additionally, the Court notes that:

> [s]election of interim lead counsel facilitates "efficiency and economy without jeopardizing fairness to the parties."  [See id. § 10.22] (noting that interim counsel "assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel").  In matters such as this, appointing seasoned lead counsel is one of the district court's key organizational tools.  [Id.] at §§ 10.224, 21.272.  The "designation of interim class counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." Id. at § 21.11. Because lead counsel is charged with the ultimate responsibility of acting on behalf of the class throughout the entire litigation, th[e] Court must appoint lead counsel who are fully capable and qualified to fairly and adequately represent the interests of the class, including through trial if necessary.  Id. at §§ 21.271–72.

In re: Disposable Contact Lens Antitrust Litig., No. 3:15-MD-2626-J-20JRK, 2015 WL 10818781, at *1 (M.D. Fla. Oct. 7, 2015).

## B.    Discussion

The Court finds the leadership structure for Plaintiffs' interim class counsel proposed by Plaintiffs Doyle, McLean, and Smith to be the "most sensible."  See

<u>Bowers v. Sioux Honey Coop. Assn.</u>, No. 12-21034-CIV, 2012 WL 12865846, at *3 (S.D. Fla. Dec. 14, 2012).  First, Messrs. Stonebarger and Billy (together, "Proposed Co-Lead Counsel") have each done extensive work in identifying and investigating potential claims in the action over the course of the last five (5) years.  [<u>See</u> Doc. 139-1 at 6].   Second, Proposed Co-Lead Counsel have significant experience handling USERRA actions against defendants in the airline industry specifically as well as class action litigation more broadly; each has served "as lead, co-lead[,] or primary [c]lass counsel" in class actions over the last twelve (12) years.  [<u>See</u> <u>id.</u> at 7–8].  Third, based on their extensive combined experience, including other similar cases they litigated and in which they prevailed, the Court finds that Proposed Co-Lead Counsel possess knowledge of the applicable law and the federal litigation process.  [<u>See</u> <u>id.</u>]  Fourth, the Court finds that Proposed Co-Lead Counsel, through their respective firms, possess adequate resources to litigate this action and to seek a resolution of it that is in the best interests of the putative class.  [<u>See</u> <u>id.</u> at 8–9].  Proposed Co-Lead Counsel tout their own abilities to litigate efficiently, "streamline the litigation" and "us[e] case management strategies . . . to avoid duplication and inefficiency in the" process.  [<u>See</u> <u>id.</u> at 9].  Now is the time for them to demonstrate these abilities.  The Court accordingly grants Plaintiffs McLean, Doyle, and Smith's "Motion for Appointment of Interim Class Counsel."  [Doc. 139].

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant Delta Air Lines Inc.'s "Motion for Summary Judgment." [Doc. 178].  Specifically, the Court **DENIES** Defendant's motion with regard to Plaintiff Smith's discrimination claim to the extent it is based on Defendant's termination of his employment.  The Court **GRANTS** Defendant's motion in all other respect and **DIRECTS** the Clerk to enter judgment in favor of Defendant on all claims except Plaintiff Smith's discrimination claim (to the extent it is based on Defendant's termination of his employment).  The Court **DIRECTS** the Clerk to terminate Plaintiffs Sorenson, Reep, Doyle, and McLean as Party Plaintiffs to this matter.

The Court **DENIES AS MOOT** Plaintiffs Smith, Doyle, and McLean's "Motion for Leave to File a Sur-Reply to Defendant's Reply Brief in Support of its Motion for Summary Judgment."  [Doc. 223].  The Court **GRANTS** Plaintiffs McLean, Doyle, and Smith's "Motion for Appointment of Interim Class Counsel" and **APPOINTS** Gene J. Stonebarger of Stonebarger Law, APC and Charles M. Billy of the Law Offices of Charles M. Billy, P.C. as interim co-lead class counsel. [Doc. 139].

Pursuant to the most recent Amended Scheduling Order entered by the Court, "[a]ny class certification motion shall be filed within sixty (60) days of the Court's

ruling on dispositive motions, if no appeal is filed." [See Doc. 55 at 1].  Thus, the

Court **DIRECTS** Interim Co-Lead Counsel Stonebarger and Billy to file any class

certification motion within sixty (60) days from the date this order issues.

      **SO ORDERED**, this 31st day of March, 2023.


Eleanor L. Ross
United States District Judge
Northern District of Georgia